**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| | : | |
| In re: | : | Chapter 9 |
| | : | |
| CITY OF CHESTER, PENNSYLVANIA, | : | Case No. 22-13032 |
| | : | |
| Debtor. | : | |
| | : | |

**DECLARATION OF MICHAEL DOWEARY IN SUPPORT OF THE CITY OF
CHESTER, PENNSYLVANIA'S STATEMENT OF QUALIFICATIONS PURSUANT TO
SECTION 109(c) OF THE BANKRUPTCY CODE AND FIRST DAY PLEADINGS**

I, Michael Doweary, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.      I am the duly appointed receiver for the City of Chester, Pennsylvania ("Chester" or the "City"), the debtor in the above-captioned chapter 9 case. On June 1, 2020, I was nominated pursuant to the Pennsylvania Municipalities Financial Recovery Act, Act of 1987, P.L. 246, No. 47 ("Act 47") by Dennis M. Davin, then the Secretary (the "Secretary") of the Pennsylvania Department of Community and Economic Development ("DCED"), to serve as receiver for Chester, and appointed by the Commonwealth Court of Pennsylvania (the "Commonwealth Court") on June 22, 2020, in Case No. 336 MD 2020 (the "Receivership Case").

2.      As Receiver, I have authority to require and direct the City to take actions necessary to implement the Amended Recovery Plan (as defined below); to require the City to cause the sale, lease, or assignment of the City's assets; to approve, disapprove, modify, reject, terminate or renegotiate contracts (to the extent permissible under the Pennsylvania and United States Constitutions); to attend executive sessions of the City's Council; and to employ professionals. The City Council and City's mayor are prohibited from interfering with the powers granted to me, as Receiver, or the goals of the Amended Recovery Plan.

3.     Further, as Receiver, I possess the sole power under Pennsylvania law to file a municipal debt adjustment action under chapter 9 of the Bankruptcy Code and to act on the City's behalf in the proceeding.  On January 14, 2022, I requested authorization to commence a chapter 9 case on behalf of the City from the Secretary (the "Request"), and, by letter dated February 8, 2022, the then Secretary granted me the authority to commence a chapter 9 case on behalf of the City (the "Bankruptcy Authorization").  True and correct copies of the Request and Bankruptcy Authorization are attached hereto as Exhibits A & B.

4.     Pursuant to Section 711(e) of Act 47, I consulted with the Municipal Financial Recovery Advisory Committee ("MFRAC") on September 13, 2022, about the severe and immediate financial issues facing the City, the concessions necessary from unions, retirees, and other creditor constituencies to avoid having to file a bankruptcy case, and why, ultimately, I may need to exercise my power to file a municipal debt action under chapter 9 of the Bankruptcy Code. That meeting was recorded and can be found online at: https://www.youtube.com/channel/UCt2JjA1zsXVR9Zcg8HJUBiw/videos.   A copy of the powerpoint presentation made at the September 13 MFRAC meeting (the "MFRAC Presentation") is attached hereto as Exhibit C.

5.     After receiving the Bankruptcy Authorization, my professionals and I continued to try to avoid a bankruptcy filing.  However, the City's financial condition continued to deteriorate and the City's good faith negotiations failed to result in the concessions necessary to address the City's dire financial situation causing me, after considering the limited non-bankruptcy options available to the City, on November 10, 2022, to issue an Order Authorizing the Filing of Case Under Chapter 9 of the Bankruptcy Code and Related Actions directing and authorizing the commencement of this case pursuant to the Bankruptcy Authorization and Act 47 (the "Receiver's

Bankruptcy Resolution"). A true and correct copy of the Receiver's Bankruptcy Resolution is attached hereto as Exhibit D.

6. In my approximately 2½ years as Receiver, I have become familiar with the history, functions, assets, operations, and financial affairs of the City. This Declaration (along with other declarations contemporaneously filed by the City, including the *Declaration of Vijay Kapoor in Support of the City of Chester, Pennsylvania's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code and First Day Pleadings* (the "Kapoor Declaration")[1]) provide the factual foundation underlying (a) the Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (the "Statement of Qualifications") certifying that the City satisfies each of the criteria set forth in Section 109(c) of title 11 of the United States Code (the "Bankruptcy Code") for determining the City's eligibility to be a debtor under chapter 9 of the Bankruptcy Code, (b) the Memorandum of Law in Support of Statement of Qualifications (the "Memorandum of Law"), and (c) the First Day Pleadings (as hereinafter defined). Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my discussions with City personnel, discussions with my professional advisors, my review of relevant documents and sources, and my opinion based on my professional experience and knowledge of the City's history, functions, assets, operations, and financial affairs.[2]

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed in the Kapoor Declaration.

[2] The statements contained herein, in part, rely upon unaudited financial information that is subject to further review or potential adjustment, and reflect best efforts by me and my professionals to completely and accurately describe the City's financial history and status and the City's assets and liabilities. When I was appointed, the City's financial and accounting records were in disarray, the City lacked accounting software and computers, the City maintained many records by hand, and the City issued hand-written checks. Further, at the time of my appointment, the City's last audited financial statements were from 2017. While my professionals and I have made significant progress in modernizing the City's financial and accounting record keeping and invested substantial time and resources to create proper financial and accounting records and projections,

I.      **Introduction**

7.      The City of Chester, Pennsylvania has been in some form of financial oversight by

the Commonwealth for over 27 years, and unlike other cities who have rehabilitated and exited

oversight, Chester's financial situation has only worsened.  Although the City's economic hardship

was exacerbated by COVID-19, the City's problems existed long before the pandemic and will

persist into the foreseeable future absent radical action.  Even prior to the pandemic, the City's

general fund operated at seven- or eight-figure deficits in all but one year since 2013 for which the

City has completed audits.  And it is getting worse.  Because of the City's consistently underfunded

pension obligations, if no reorganization is undertaken, the City is projected to realize a $46.5

million deficit in 2023, a $3.6 million deficit in 2024, and a $12.4 million deficit in 2025, with

steadily increasing deficits each subsequent year corresponding to increased costs.

8.      I have worked tirelessly to reduce excess spending and increase efficiencies toward

the goal of balancing the budget.  But further budgetary cuts alone will not make a dent in the

substantial outstanding and ongoing pension obligations and retiree healthcare costs, and would

put the provision of vital and necessary services to the residents of the City at risk.  Past efforts to

bring  much-needed  revenue  into  the  City  have  come  at  the  expense  of  future  economic

development possibilities that could improve residents' quality of life and make Chester a more

desirable place to live.  Moreover, even if a monetization of the City's primary significant asset,

the water system, is realized, it will not address the ongoing systemic issue of the City's annual

---

including recreating basic accounting and financial records and obtaining audited financial
statements for 2018, work to correct the substantial deficiencies in the City's historical financial
and accounting records is ongoing.  As a result, amendments, modifications, or supplements to
this Declaration may become necessary and appropriate, and the City and I reserve all rights to
amend, modify, or supplement this Declaration as additional information becomes available and
the work of my professionals continues.

expenses significantly outpacing its annual revenues. Economic sustainability can only be achieved by balancing the budget through an adjustment of the City's obligations.

9.      The residents of Chester have borne too much burden for too long, and the City can no longer afford to mortgage its future to pay for past and present financial peril. I authorized the City to commence this chapter 9 bankruptcy case to utilize the tools available under the Bankruptcy Code to restructure and renegotiate the City's obligations, maximize its assets to achieve a balanced budget, and confirm a plan of adjustment. My goal in authorizing this case and seeking to confirm a plan of adjustment is not only to reach financial stability that allows for the continued provision of essential services to residents, but to enable the City to invest in capital projects and economic and cultural growth that will not just help Chester survive, but thrive.

## II.      The City of Chester

10.      Chester is the oldest city in Pennsylvania, first incorporated as a borough in 1701 and then as a city in 1866. The City is located just 18 miles south of Center City Philadelphia and is geographically bounded by Delaware County to the North, West, and South, and the Delaware River to the East. Interstate 95 and CSXT and Amtrak rail tracks run through the City, splitting the northwestern part of the City from the majority of the City's land area. The City is approximately 4.6 square miles.

11.      The financial decline that has contributed in part to Chester filing this case is the product of demographic and economic forces that have been mounting for decades. During World Wars I and II, the City thrived as an industrial and manufacturing community. However, since the mid-1950s, the City has been experiencing economic difficulties and facing several challenges, including, (i) a decreasing population, (ii) declining revenues, (iii) high municipal expenditures, and (iv) high levels of crime. Over time, these trends have mutually reinforced each other and

substantially eroded the City's tax base.  As more people leave the City, there is less economic activity and fewer jobs.  Less economic activity and fewer jobs induce more people to leave, further weakening the tax base.  Tax increases to make up for the decrease in economic activity and population, and decreased tax revenue, induces even more population loss and contributes to a long-term spiral of decline.  These trends have taken a substantial toll on the City's ability to generate revenue, provide services to the City's residents, maintain critical infrastructure that benefits the City's residents, and pursue the type of economic development projects that would revitalize the City.

12.     In 1995, faced with multi-million dollar deficits and past due obligations, and after nearly four-decades of decline, the City was designated as a distressed city under Act 47 and subjected to financial oversight by the Commonwealth of Pennsylvania.  The City has remained in various forms of supervision as a distressed city under Act 47 since 1995, a period of over 27 years.  While under Act 47 supervision and prior to my appointment as Receiver, the City adopted an initial Recovery Plan in 1996, and adopted Recovery Plan amendments in 2006, 2013, and 2016.

13.     Notwithstanding the City's placement under supervision, the City's fiscal condition continued to deteriorate from 1996-2006 when it needed to borrow money to meet payroll and deliver basic services to its citizens.  The City's fiscal situation temporarily improved as several economic development initiatives came to fruition, most notably the opening of Harrah's Philadelphia Casino and Racetrack in 2008 ("Harrah's Casino"), whereupon Chester began receiving significant annual host revenues.  However, the infusion of new revenue from Harrah's Casino only provided temporary respite and the gaming host community revenues declined while other major revenue sources showed little or no growth.  Subaru Park opened to much fanfare on

June 27, 2010.  Subaru Park seats approximately 18,500 fans, is the home of the Philadelphia Union, and is considered a world-class soccer stadium.  Nonetheless, Subaru Park has failed to provide a catalyst for economic development in the City.

14.    By the beginning of 2017, the City had accumulated approximately $28 million of unpaid obligations and had defaulted on its 2016 Tax Revenue Anticipation Note ("TRAN").  In January 2017, the DCED issued a $2 million emergency loan to help the City with immediate cash flow needs.  In August 2017, the City borrowed $12 million in unfunded debt to address a portion of its outstanding liabilities.

15.    According to the City's most recent available audits, from 2013 through 2019, the City ran general fund deficits of between $2.2 million and $8.7 million in each year except 2017.  The only reason the City did not have a general fund deficit in 2017 was the borrowings detailed in the preceding paragraph.  Further, from 2014 through 2020, the City did not make its full annual legally required pension payments to its pension funds, as described in more detail below.

16.    As of July 1, 2021, the United States Census Bureau (the "Census Bureau") estimated the City had a population of 32,535, a decline from 32,718 residents as of April 1, 2020, 33,972 residents as of April 1, 2010, and 66,039 residents in 1950.[3]  As of July 1, 2021, the Census Bureau estimates the median annual income of all households in the City was $32,867 and the median per capita annual income was $18,856 per year, with over 30% of the population living below the poverty line.  For the period 2016-2020, the median annual income in all households in Pennsylvania was $63,627, and in Delaware County the median annual income was $76,238.

---

[3] The statistics contained in this paragraph were derived from the U.S. Census Bureau Quick Facts available at:
https://www.census.gov/quickfacts/chestercitypennsylvania,
https://www.census.gov/quickfacts/delawarecountypennsylvania, and
https://www.census.gov/quickfacts/fact/table/PA/BZA210220.

Throughout Pennsylvania, approximately 10.9% of the population lives below the poverty line. The Census Bureau estimates just under 71% of the City's population is black or African American, 10% of the population is Hispanic or Latino, and 16.3% of the population is white (non-Hispanic or Latino). The median home value from 2016-2020 was $70,300, and only 37.1% of the population live in an owner-occupied housing unit. For this same period, the median home value in Pennsylvania was $187,500 and in Delaware County was $247,900. Eighty-four percent (84%) of the City's population has a high school diploma or higher, but only 13.5% of the population age 25 or older has a bachelor's degree or higher. Across Pennsylvania, 32.3% of the population age 25 or older has a bachelor's degree or higher.

17.     The City's top employers include Crozer-Chester Medical Center ("Prospect Crozer"), a hospital that employs approximately 2,250 employees, Harrah's Casino, which employs approximately 1,400 employees, Kimberly Clark, a paper manufacturer that employs approximately 1,536 employees, and Widener University, which employs approximately 1,256 employees.

18.     Chester is a city of the Third Class under Pennsylvania law,[4] and operates under a Home Rule Charter.[5] The City government has an elected Mayor, currently Thaddeus Kirkland,

---

[4] Under Pennsylvania law, there are four classes of cities, the determination of a city's class is based on its population. Act of June 25, 1985, P.L. 275, No. 188. Third class cities are those "containing a population under two hundred and fifty thousand and which have not elected to become a city of the second class A." *Id.*

[5] All Pennsylvania municipalities, except for cities and counties of the first class, can adopt a home rule charter, which is "a written document defining the power, structure, privileges, rights and duties of the municipal government and limitations thereon." 53 Pa. Cons. Stat. §§ 2901, 2902. The Pennsylvania Constitution also recognizes that "[m]unicipalities shall have the right and power to frame and adopt home rule charters . . . . A municipality which has a home rule charter may exercise any power or perform any function not denied by this Constitution, by its home rule charter or by the General Assembly at any time." Pa. Const. art. IX, §2.

and a City Council with five members, one of whom is the Mayor.   The other councilmembers currently are William Morgan, Elizabeth Williams, Portia West, and Stefan Roots. Councilmembers are elected at-large for four-year staggered terms.  Under the City's Charter and Administrative Code, the Councilmembers may serve as the heads of four departments: Public Affairs; Accounts and Finance; Public Safety (which includes the City's fire department); Public Works, and Parks and Public Property.  The Mayor may make the department head assignments at City Council's annual organizational meeting and leads Public Affairs (which includes the City's police department).  The City has approximately 236 full time employees.  Forty-six of the City's non-fire and non-police employees are unionized and represented by the Teamsters.

19.    The City maintains a fire department with approximately 61 sworn personnel and two fire stations, and a police department with approximately 83 sworn officers.  The City's police officers are unionized and represented by the Fraternal Order of Police ("FOP").  The City's firefighters are unionized and represented by the International Association of Firefighters ("IAFF").  The City does not provide paramedic or ambulance service and, instead, relies on paramedic and ambulance service provided without charge in the City by Prospect Crozer.[6]

20.    As described in more detail in the Kapoor Declaration, the collective bargaining agreements[7] either need to be renegotiated or, to the extent such agreements did not terminate

---

[6] Prospect Crozer has approached the City regarding the continued provision of ambulance services, and although to date the City has not yet received a discontinuation of services letter, the City anticipates Prospect Crozer will request a payment for continuing to provide ambulance services.  The City lacks the equipment and trained personnel necessary to provide ambulance service to the City itself without a significant investment, which it has no financial ability to make. The City did not include any amount for this type of payment in the 2022 budget.  Further, Prospect Crozer is also seeking a property tax refund from the City in the amount of $340,530.49 plus interest stemming from a dispute over the value of a property located within the City.  Again, the City did not include any amount for this payment in its 2022 budget.

[7] The City's collective bargaining agreement with the Teamsters expires at the end of 2022 and the City's collective bargaining agreements with the FOP and IAFF expired at the end of 2021.

prepetition, rejected to free the City from numerous ambiguities and provisions preventing it from

taking decisive action with respect to employees, to make the changes that already apply to police

offers hired after 2017 applicable to all employees (including the elimination of retiree health care),

and to reduce the overall costs to the City resulting from certain practices by current employees

that spike pension liabilities, deepening the underfunding of the City's pension plans and

contributing to the City's persistent budget deficits.

III.     **Chester's Fiscal Emergency and the Receiver's Efforts to Stabilize the City's Finances**

21.     On April 13, 2020, Governor Wolf declared a fiscal emergency in Chester.

According to Act 47, the Governor may declare a fiscal emergency when a municipality is

insolvent or projected to be insolvent within 180 days or when a municipality is unable to ensure

the continued provision of vital and necessary services, such as police, fire, and public works

functions.

22.     On June 22, 2020, the Commonwealth Court determined that a fiscal emergency as

defined by Section 602(A) of Act 47 continued to exist in the City and placed the City in

receivership under Section 702(c)(2) of Act 47.   The same day, the Commonwealth Court

appointed me as Receiver.   Pursuant to an order entered by the Commonwealth Court on December

28, 2021, the City's Receivership and my appointment were extended for up to two years.

23.     In August 2020, I submitted an initial Recovery Plan (the "Recovery Plan"), which

was confirmed by the Commonwealth Court on October 19, 2020.   The Recovery Plan was my

"first step" to putting the City government "on a path to exit oversight" and "to becoming a stable

provider of critical services and a creative partner in addressing the economic, social and other

broader challenges the community faces."   Recovery Plan, p. 1.   The Recovery Plan identified two

"cash crises" that the City was facing: (a) in the general fund that supports basic operations and

(b) in the police pension fund. Id. at p.1–2. The Recovery Plan explained that I would focus on working to minimize the obligations carried into the next year and to "break the cycle of pushing this year's obligations into next year's payment cycle." Id. at p. 5.

24.    In April 2021, I proposed an amended recovery plan, which the Commonwealth Court confirmed in June 2021 (the "Amended Recovery Plan").[8] The Amended Recovery Plan provided an update on progress made, laid out steps to put the City government on a path toward financial stability, and took a holistic "view of what fiscal stability means shifting from the [Recovery Plan's] focus on not running out of cash to having annual budgets that are reasonably balanced and responsive to Chester's needs." Amended Recovery Plan, at p. 1.

25.    My team and I have worked diligently to implement the Recovery Plan, and more recently, the Amended Recovery Plan, and to improve the City's financial position by taking steps to reduce its expenditures, including significantly reducing its workforce, restricting overtime, implementing a hiring freeze, and limiting discretionary purchases.

26.    When I was appointed, the City's last audited financial statements were from 2017. The lack of reliable financial information and accounting records impeded my efforts. I recently retained Protiviti, Inc. to create and organize the underlying financial information and accounting records maintained by the City, which is necessary for the auditors to produce comprehensive audited financial statements for 2020 and 2021. The last audited financial statements are from 2018 with 2019 expected to be completed soon. I acquired new financial management software for the City, and replaced City computer hardware that had already reached the end of its useful life. The computer hardware was so old it was incapable of running current versions of basic office

_____

[8] A true and correct copy of the Amended Recovery Plan is attached hereto as Exhibit E.

software, incapable of receiving security and anti-virus updates, and ill-suited to accommodate work-from-home periods.

27.     Notwithstanding my efforts, the City's pension plans remain severely underfunded, the City is unable to pay its obligations as they come due, and the City lacks any viable path for addressing its severe financial issues while maintaining a basic level of services outside of bankruptcy.  The City further remains at perpetual risk of running out of cash.

## IV.    The City is Insolvent

28.     The City's financial issues are deep, intertwined, and complicated.  They undercut the City's ability to provide vital and necessary services to the people who live in, work in, or visit Chester.  They put City government in the position where it takes actions to ensure its own fiscal survival, rather than being a proactive and creative partner in addressing the economic, social, and other broader challenges the community faces.

29.     For years, the City's obligations have exceeded revenue from taxes and other sources available to it, and the City has borrowed and deferred paying certain obligations, and relied on one-time federal rescue money to survive fiscally.  Contributions to the City's severely underfunded defined benefit pension plans, debt repayment, and other post-employment benefits ("OPEB") (namely retired employee medical and prescription insurance), consume a disproportionate and increasing share of the City's annual budget.  These expenses will increase dramatically in 2023 and beyond absent decisive action by the City.  The City's residents are already subject to a heavy tax burden and, with the exception of an adjustment to the real property tax rate that I support to restore revenue from real property taxes to the levels that existed prior to a reassessment in 2021, cannot afford to pay more.  In December 2021, DCED issued a TRAN advance to the City in the amount of $5 million, which was critical to the City's ability to meet

12

general fund obligations this year before bi-annual property tax revenues were collected.  Without

the 2022 TRAN advance, the City would have run out of cash during 2022, and the 2023 budget

relies on receipt of a similar $5 million TRAN advance the City expects to receive in December

2022 or early January 2023.[9]  The City repaid the remaining 2022 TRAN advance in order to

ensure availability of a TRAN advance to similarly fund the City's obligations until 2023 property

tax revenue is collected.  Moreover, after years of being unable to do so, the City needs to start the

process of repairing and improving its infrastructure and investing in economic development.

30.     The City has not been, and currently is not, paying its debts as they come due, and

the City's inability to do so will reach a tipping point in 2023 when the various and creative

measures the City has taken to date to barely keep the lights on will no longer prevent it from

running out of cash.  Simply put, the City is insolvent.  It is not paying its debts as they come due.

It is unable to pay its debts as they come due.  And, it is in desperate need of a restructuring in

bankruptcy that can put the City on sound financial footing and allow it to focus on reversing the

long-standing trends that have harmed its residents and led to decades of financial supervision.

### A.      The City's Defined Benefit Pension Plans Are Severely Underfunded

31.     As described in more detail in the Kapoor Declaration, the City's underfunded

pension plans represent the City's largest outstanding debt and funding the City's three pension

plans in full would require a contribution of at least $127,200,000 as of January 1, 2022, according

to analysis performed by the City's actuary.

---

[9] DCED has further supported the Receiver's efforts by paying certain of the professional costs
and expenses incurred in connection with this bankruptcy case.

B.     **OPEB**

32.     Further, as described in more detail in the Kapoor Declaration, the City's total OPEB obligations (primarily related to medical and prescription drug coverage for retired employees) were valued by the City's actuary at the end of 2018 to total $232.9 million.

C.     **The City's Long-Term Debt Obligations**

33.     The City also has long-term debt obligations.  A summary of the City's outstanding debt is set forth in the following table.

| **Issue** | **Purpose** | **Outstanding** | **Rate** | **Maturity** |
|---|---|---|---|---|
| Series 2010B Guaranteed Revenue Note | Education | $972,855 | 2.605% | 2/1/2025 |
| Series 2017A Guaranteed Revenue Bonds | Unfunded Debt | $9,149,375 | 7.50% | 8/15/2027 |
| Series 2017B Guaranteed Revenue Bonds | Refunding | $6,107,250 | 7.50% | 8/15/2027 |
| Series 2019 (Delaware County) | Economic Development | $5,961,525 | 2.13% | 7/15/2039 |
| DCED Act 47 Loan | Deficit Funding | $1,200,000 | 0.0% | 5/1/2027 |
| Series 2021 Notes | Streetlight Financing | $774,410.64 | 1.5% | 12/31/2028 |

1.     **The 2017 Bonds**

34.     The City's largest long-term debt obligations were incurred in 2017 in connection with two series of bonds the City issued to resolve nearly $28 million in unpaid obligations, including past due MMOs, health insurance premium payments, vendor payments, and workers compensation premiums.  The Series 2017A Bonds in the original amount of $12 million were used to pay certain unfunded general liabilities and to fund required reserves.  The Series 2017B bonds in the original amount of $7,210,000 were used to finance the acquisition of certain property

leased by the City, effectively refinancing debt originally issued by the Chester Economic Development Authority.

35.     The Series 2017 Bonds are limited obligations of the City, payable from certain purportedly pledged revenues, including an asserted subordinate pledge of Covanta Host fees (as described below), an asserted subordinate pledge of Harrah's Casino slots revenue, an asserted subordinated pledge of Harrah's Casino table gaming revenues, and an asserted pledge of additional consideration between the City and Harrah's Casino directly deposited with the trustee as pledged revenues under the trust indenture executed and delivered in connection with the 2017 Bonds.  The current indenture trustee of the Series 2017 Bonds is U.S. Bank, National Association, and, upon information and belief, all or substantially all of the Series 2017 Bonds are held by Preston Hollow Community Capital ("Preston Hollow").[10]  The City asserts the Series 2017 Bonds are unsecured because the purportedly pledged revenues are not special revenues and the written direction letters and financing statements are insufficient to create or perfect a security interest in such revenues.

36.     The monthly payments on account of the 2017 Bonds consist of principal and interest, with the amount of principal to be repaid increasing materially each year between now and maturity as set forth in the table below.

| Series 2017A | Principal | Interest | Total Debt Service |
|---|---|---|---|
| 12/31/2023 | $1,190,000.00 | $551,625.00 | $1,741,625.00 |
| 12/31/2024 | $1,260,000.00 | $462,375.00 | $1,722,375.00 |
| 12/31/2025 | $1,305,000.00 | $367,865.00 | $1,672,865.00 |
| 12/31/2026 | $1,700,000.00 | $270,000.00 | $1,970,000.00 |

---

[10] The City believes Preston Hollow holds a controlling majority share, if not the entirety, of the Series 2017 Bonds.

| | | | |
|---|---|---|---|
| 12/31/2027 | $1,900,000.00 | $142,500.00 | $2,042,500.00 |
| **Total** | $7,355,000.00 | $1,794,365.00 | $9,149,365.00 |

| Series 2017B | Principal | Interest | Total Debt Service |
|---|---|---|---|
| 12/31/2023 | $900,000.00 | $372,375.00 | $1,272,375.00 |
| 12/31/2024 | $950,000.00 | $304,875.00 | $1,254,875.00 |
| 12/31/2025 | $1,065,000.00 | $233,625.00 | $1,298,625.00 |
| 12/31/2026 | $1,015,000.00 | $153,750.00 | $1,168,750.00 |
| 12/31/2027 | $1,035,000.00 | $77,625.00 | $1,112,625.00 |
| **Total** | $4,965,000.00 | $1,142,250.00 | $6,107,250.00 |

### 2.    The Series 2009 Bonds

37.    In 2009, Delaware County issued its General Obligation Bonds, Series 2009, in the principal amount of $28,950,000 as part of the overall financing to build Subaru Park in Chester. Delaware County refinanced the Series 2009 Bonds in 2019, reducing the annual debt service. Pursuant to the Contribution Agreement, dated February 15, 2009, between the City and Delaware County, Chester has agreed to an annual payment to the County representing 25% of the annual debt service incurred by the County.  The annual obligation totals approximately $343,483.

38.    The Series 2009 Bonds are limited obligations of the City, payable from certain purportedly pledged revenues, including an asserted subordinated pledge of Harrah's Casino gaming host  community revenues, and an asserted pledge of additional consideration between the City and Harrah's Casino directly deposited with the trustee as pledged revenues under the indenture executed and delivered in connection with the 2017 Bonds. The City asserts the Series

2009 Bonds are unsecured because the purportedly pledged revenues are not special revenues and the written direction letters and financing statements are insufficient to create or perfect a security interest in such revenues.

### 3. The Series 2010B Bonds

39.     In 2010, the City issued its Series 2010B Bonds in the principal amount of $3,985,000 to meet the obligations associated with allowing the Chester-Upland School District to become a sponsoring district for Delaware County Community College.  The sponsorship required an upfront $4 million payment in addition to annual membership payments.  The debt service on the 2010B Bonds is purportedly secured by the table gaming revenue guaranteed to Chester by Harrah's Casino as a casino host community.  Annual debt service is approximately $320,000 and the borrowing matures in 2025.

### 4. DCED Act 47 Loan

40.     In January 2017, DCED issued an emergency $2 million no-interest loan to the City to help with its cash flow needs.  The City is paying DCED $200,000 per annum to repay the loan, which matures in 2027.  This loan is unsecured.

### 5. 2021 Street Light Financing

41.     In August 2021, Delaware Valley Regional Planning Commission issued Series 2021 Notes on behalf of the City in the amount of $750,000 in order to finance necessary repair and maintenance to streetlights in the City.  The current outstanding amount on the Series 2021 Notes is $774,410.64.  The Series 2021 Notes are unsecured obligations, subject to annual appropriation of funds from the City's general or liquid fuels fund.

D.      **Additional Obligations**

1.      **Vehicle Leases**

42.     The City leases certain motor vehicles and pays approximately $275,278 per annum on account of those leases.

2.      **Tax Obligations**

43.     The Internal Revenue Service also asserts the City owes it $750,000 for withholding taxes it alleges the City failed to pay to the IRS prior to the Receiver's appointment.

E.      **The City Lacks Sufficient Resources to Pay Its Obligations**

44.     The City's primary revenue sources are real estate taxes, earned income taxes, a contractual share of slot and gaming table revenues generated by Harrah's Casino, and a hosting fee it receives from Covanta Delaware Valley, L.P. ("Covanta"), the owner of the Delaware Valley Resource Recovery Facility (the "Incinerator Facility"), a waste incineration plant constructed on the City's waterfront in 1992.  Prior efforts to drive revenue and economic development led to construction of Harrah's Casino, the Incinerator Facility, and Subaru Park, but these projects failed to generate sufficient revenue for the City, and failed to spur additional economic investment in the City.  Currently, Chester's waterfront area includes a state prison, a toilet paper manufacturing facility, a soccer stadium, a trash incinerator, and a wastewater treatment facility.

45.     As described in more detail in the Kapoor Declaration, the City's financial situation is dire.  If left unchecked, the City's deteriorating financial condition will only get worse.  The time to stop the downward spiral is now.  Unfortunately, despite good faith efforts by the City to negotiate with its creditors (where such negotiations could be had), no reasonable alternative for the restructuring of the City's operations and obligations exists other than through this chapter 9

case.  This bankruptcy provides an opportunity to effect real and lasting change to benefit the residents of Chester.

**V.**     <u>**Facts in Support of First Day Pleadings**</u>

46.      To preserve the City's ability to function efficiently within chapter 9 and provide uninterrupted services to its citizens, a number of pleadings (the "<u>First Day Pleadings</u>") designed to achieve a seamless transition into chapter 9 have been filed contemporaneously with this Declaration.  Generally, the First Day Pleadings seek: (a) to establish procedures for the smooth and efficient administration of this chapter 9 case; (b) ensure that the City receives the benefit of certain protections afforded under the Bankruptcy Code; and (c) lay the groundwork for a successful adjustment of the City's liabilities.  I have reviewed each of the First Day Pleadings with the City's outside counsel, and I believe the relief sought in each of the First Day Pleadings is tailored to meet the goals described above and, ultimately, will promote the City's ability to complete the chapter 9 process and confirm a plan of adjustment.

**A.**     <u>**Motion to Establish Procedures and Deadlines to Determine Eligibility**</u>

47.      To provide expedient and effective notice of the commencement of the City's chapter 9 case and to address any eligibility issues, the City has filed a Motion for Entry of an Order (A) Directing and Approving Form of Notice of Commencement of Case and Manner of Service and Publication of Notice, (B) Establishing a Deadline for Objections to Eligibility, and (C) Granting Related Relief (the "<u>Notice and Scheduling Motion</u>").  In the Notice and Scheduling Motion, the City proposes December 16, 2022 as the deadline for filing any objections to the City's eligibility, which is 36 days after the Petition Date and 14 days after the final publication of the Notice of Commencement.  Setting a prompt deadline for filing objections to the City's eligibility to be a chapter 9 debtor will promote the efficient administration of the case, eliminate uncertainty

created by the absence of an express timing provision in the Bankruptcy Code or Bankruptcy Rules for such objections in chapter 9 cases, and expedite the Court's consideration of any objections and the entry of an order for relief in this case.

**B.**      **Application to Appoint Donlin, Recano & Company, Inc. as Claims and Noticing Agent**

48.      I recognize that the number of creditors and parties in interest in this chapter 9 case may impose heavy administrative burdens upon the Court and the Clerk's office.  To relieve the Court and the Clerk's Office of these burdens, the City seeks entry of an order appointing Donlin, Recano & Company, Inc. ("DRC") as the City's claims and noticing agent.  DRC may, among other things (a) serve as the Court's agent to mail notices to creditors of the City and other parties in interest, including notice of the commencement of the case; (b) provide computerized claim and objection database services; and (c) provide expertise, consultation and assistance in claims process and with other administrative tasks.  The City obtained and reviewed engagement proposals from three claims and noticing agents before selecting DRC based on its capability, experience, and pricing.

**C.**      **Mediation Motion**

49.      The City is without resources to extensively litigate a resolution through this chapter 9 case.  Accordingly, a prolonged bankruptcy case will only cause further harm to the City. It is imperative to the City's successful adjustment of debt that the City's chapter 9 case not devolve into endless litigation or other inefficient means of addressing the City's overwhelming obligations.  As a result, the City has filed a Motion for Entry of an Order (I) Appointing a Judicial Mediator, (II) Referring Certain Matters to Mandatory Mediation, and (III) Granting Related Relief (the "Mediation Motion").  Through the Mediation Motion, the City seeks the appointment

of a judicial mediator to mediate any and all issues related to the comprehensive resolution of the City's obligations (the "<u>Mediation Issues</u>") under a plan of adjustment.

50.      I recognize that this chapter 9 case presents unique challenges and will require the Court and parties in interest to address complicated legal and financial issues to adjust the City's debts successfully.  The City requests that the following parties be directed to participate in the mediation (collectively, the "<u>Mediation Parties</u>"): (a) myself, on behalf of the City, (b) representatives from the City's unions, (c) representatives of the City's current retirees or a retirees committee if one is formed after entry of an order for relief; (d) the Trustees under the indentures for the 2010 Bonds and the 2017 Bonds and the majority bondholder, Preston Hollow; (e) the Chester Water Authority; (f) Delaware County, Pennsylvania; (g) Delaware County Regional Water Quality Control Authority; and (h) any other parties the Mediator and the City agree in the future should participate in the mediation process or such other parties as the Court orders to participate.

51.      The appointment of a mediator at the outset of this chapter 9 case will assist all Mediation Parties in addressing these issues and promote productive settlement discussions among the relevant stakeholders.  In fact, judicial mediators have played central roles in prominent chapter 9 cases filed in the last decade, including the chapter 9 cases of the City of San Bernardino, California and the City of Detroit, Michigan.

52.      The prompt appointment of a mediator and commencement of mediation will promote the City's debt adjustment objectives and reduce the risk this case devolves into endless litigation and delays.

## VI.    <u>Conclusion</u>

53.    I respectfully request that all of the relief requested in the First Day Pleadings be granted along with such other relief as is just and proper.

[*remainder of page intentionally left blank*]

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.


Dated: November 10, 2022

Michael Doweary
Receiver for the City of Chester