IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| In re: | : | Chapter 9 |
| | : | |
| CITY OF CHESTER, PENNSYLVANIA, | : | Case No. 22-13032 |
| | : | |
| Debtor. | : | |
| | : | |

**MOTION FOR ENTRY OF AN ORDER (I) APPOINTING A JUDICIAL MEDIATOR, (II) REFERRING CERTAIN MATERS TO MANDATORY MEDIATION, AND (III) GRANTING RELATED RELIEF**

The City of Chester ("Chester" or the "City"), as the debtor in the above-captioned chapter 9 case, hereby moves the Court, pursuant to Section 105(a) of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 9019-2 of the Local Rules of the Bankruptcy Court for the Eastern District of Pennsylvania (the "Local Bankruptcy Rules"), for the entry of an order (i) appointing a judicial mediator (the "Mediator") to mediate any and all issues related to a comprehensive resolution of the City's obligations and certain pending litigation (the "Mediation Issues," as more specifically detailed below) through a plan of adjustment (the "Plan"), (ii) referring such matters to mandatory mediation, and (iii) granting related relief.  The factual background supporting the relief sought herein is contained in the *Declaration of Michael Doweary in Support of the City of Chester, Pennsylvania's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code and First Day Pleadings* (the "Doweary Declaration") and the *Declaration of Vijay Kapoor in Support of the City of Chester, Pennsylvania's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code and First Day Pleadings* (the

"Kapoor Declaration"), filed contemporaneously herewith.[1]  In support of this Motion, the City respectfully states as follows:

### I.       Introduction & Factual Background

1.       Chester has been designated as a distressed city under the Pennsylvania Municipalities Financial Recovery Act of July 20, 1987, P.L. 246, No. 47 ("Act 47") since 1995 and been subject to financial oversight by the Commonwealth of Pennsylvania for nearly 27 years. Doweary Declaration ¶ 12.  Two years ago, on April 13, 2020, Pennsylvania Governor Thomas Wolf declared a fiscal emergency in the City under Act 47.  Doweary Declaration ¶ 21.  On June 22, 2020, the Commonwealth Court of Pennsylvania (the "Commonwealth Court") determined that a fiscal emergency as defined in Section 602(A) of Act 47 continued to exist, placed the City in receivership, and appointed Michael Doweary (the "Receiver") as the receiver for the City. Doweary Declaration ¶ 22.  Pursuant to an order entered by the Commonwealth Court on December 28, 2021, the City's receivership and Receiver's appointment were extended for up to two years.  Doweary Declaration ¶ 22.

2.       Notwithstanding the Receiver's best efforts to avoid this proceeding and after receiving authorization from Dennis M. Davin, then the Secretary of the Pennsylvania Department of Community and Economic Development ("DCED") on February 8, 2022, to file a municipal debt adjustment action on behalf of the City under the Bankruptcy Code, the Receiver directed the City to commence this chapter 9 case on November 10, 2022 (the "Petition Date").  Doweary Declaration ¶¶ 1, 3, & 5.

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Doweary Declaration or the Kapoor Declaration.

3. The Receiver directed the City to commence this chapter 9 case with the objective of allowing the City to adjust its debts through confirmation of a plan of adjustment and to emerge, after 27 years, from its financially distressed status with the ability to pay its obligations, provide necessary services to its residents, and become a proactive and creative partner in addressing the economic, social, and other broader challenges the City community faces. Doweary Declaration ¶¶ 9 & 28. The success of the City's efforts depends on the City's ability to resolve, by litigation or negotiation, critical issues with certain important creditors and stakeholders.

4. Extensive multi-party litigation will strain the limited resources available to the City and only cause further harm to the City and its constituents. Doweary Declaration ¶ 49. Indeed, the City continues to be perilously close to running out of cash. Doweary Declaration ¶ 27; Kapoor Declaration ¶¶ 11-12, 26-27, & 31. As a result, it is imperative to the success of this chapter 9 case and the citizens of Chester that it not devolve into endless litigation or other inefficient means of addressing the City's overwhelming obligations. Doweary Declaration ¶¶ 49-52.

5. This Motion is not the Receiver's first effort to reach a consensual resolution of the City's debt obligations. Prior to filing this chapter 9 case, the Receiver worked tirelessly to improve the City's distressed financial state. The Receiver also explored several strategic options, and engaged in good faith negotiations with the City's creditors and stakeholders to no avail. Kapoor Declaration ¶¶ 63-71.

6. The Receiver recognizes that this chapter 9 case presents unique challenges and will require the Court and parties in interest to address complicated legal and financial issues and navigate thorny political issues to adjust the City's debts successfully. In particular, to address the City's significant and complex financial problems, the City must address its $127.2 million

3

underfunded pension liability and, in order to do so, must monetize the Water Assets (as defined below) and resolve related litigation, both litigation currently pending and litigation that may be commenced depending on which actions the Receiver takes toward monetization. Kapoor Declaration ¶¶ 17 & 45. Similarly, retiree medical benefits, which the City pays on an as-incurred basis, are overwhelming and must be adjusted for the City to become financially stable. Kapoor Declaration ¶¶ 18-25. Contracts with the City's three unions need to be renegotiated or rejected. Kapoor Declaration ¶ 13; Doweary Declaration ¶ 20. And, certain bondholders claim enhanced rights to proceeds of any monetization of assets, while other creditors and parties in interest claim liens in certain assets and revenue streams. Doweary Declaration ¶ 33-43. All of this must be addressed in the context of a City that has lost substantial population over the last several decades, has one of the highest poverty rates in the Commonwealth, and already pays the second highest earned income tax in the Commonwealth (behind only the City of Philadelphia). Doweary Declaration ¶¶ 11-16; Kapoor Declaration ¶ 16.

7. To facilitate a resolution of the City's numerous and complex issues, the Receiver seeks the appointment of a judicial Mediator to lead a global mediation between the City and the Mediation Parties (as defined below).

8. Global mediations have proven to be effective and successful in complicated chapter 9 and chapter 11 cases, including the chapter 9 cases of San Bernardino, California, Stockton, California, and Detroit, Michigan. Mediation also played an important role in Puerto Rico's insolvency proceeding under a statute similar to chapter 9. Although the City's chapter 9 case is smaller by number of creditors and amount of debt as compared to Detroit and Puerto Rico, the issues presented in this case are similarly complex and their resolution is of paramount

4

importance to the City's residents and employees. Moreover, the unfunded pension obligations are similar in size to those in the Stockton and San Bernardino cases.

9. The appointment of a judicial Mediator at the outset of this chapter 9 case will assist all parties in resolving the issues critical to addressing the City's financial circumstances and promote productive settlement discussions among the relevant stakeholders. Given the City's current financial state, it lacks sufficient resources to employ a mediator with the experience and gravitas to navigate the complicated facts, legal issues, and political considerations attendant to this chapter 9 case. Accordingly, by this Motion, the City requests the appointment of a judicial Mediator to assist the City and its stakeholders in exploring a path to a viable plan of adjustment that balances the competing claims against the City and the limited resources available.

10. The prompt appointment of a judicial Mediator and commencement of the Mediation will promote the City's debt adjustment objectives and allow the City to move more efficiently toward resolving its overwhelming debt and ongoing cash flow issues. Accordingly, the Court should appoint the Mediator and refer the Mediation Issues to mandatory mediation.[2]

## II.    Jurisdiction and Venue

11. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

12. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

13. Venue for this matter is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2] The City believes the Court may properly appoint the Mediator and order mediation before entry of the order for relief in this chapter 9 case. Unlike the requirement of the Bankruptcy Code that the order for relief be entered before this Court, upon request of a party, may order the appointment of a committee pursuant to section 1102(a)(2) of the Bankruptcy Code, no such requirement is placed on the relief sought herein.

5

14. The statutory predicates for relief are Section 105(a) of the Bankruptcy Code and Local Rule 9019-2.

### III. Relief Requested

15. By this Motion, the City requests (a) the appointment of the Mediator to mediate the Mediation Issues with the goal of achieving a consensual plan of adjustment, (b) referring the Mediation Issues to mandatory mediation, and (c) granting related relief.

#### A. The Mediation Parties

16. The City requests that at least the following parties be directed to participate in the mediation (collectively, the "Mediation Parties"): (a) the City as represented by the Receiver; (b) the three unions representing the City's unionized employees: Lodge No. 19 of the Fraternal Order of Police ("FOP"), Local 1400 of the International Association of Firefighters ("IAFF"), and Teamsters Local 107 ("Teamsters," and together with the FOP and IAFF, the "Unions"); (c) representatives of the City's current retirees or a retirees committee if one is formed after entry of an order for relief; (d) the trustees under the indentures for the 2010 Bonds and the 2017 Bonds and the majority bondholder, Preston Hollow Community Capital ("Preston Hollow"); (e) the Chester Water Authority ("CWA"); (f) Delaware County, Pennsylvania ("Delaware County"); (g) Delaware County Regional Water Quality Control Authority ("DELCORA"); and (h) any other parties the Mediator and the City agree in the future should participate in the mediation process or such other parties as the Court orders to participate.

#### B. The Proposed Mediation Procedures

17. The City further proposes that the Mediation be governed by the procedures set forth in Local Rule 9019-2, as supplemented by the following procedures (collectively, the "Proposed Mediation Procedures"):

6

a. **Mandatory Mediation.** The Mediation Parties shall proceed to Mediation regarding the Mediation Issues (as defined below). The Mediation shall be conducted on multiple days in multiple sessions. The Mediation will be subject to the confidentiality provisions set forth in Local Rule 9019-2(k)(1)-(6) and subject to Fed. R. Evid. 408. No communications or documents exchanged during the Mediation shall operate as an admission on any issue.

b. **Mediator.** The City seeks this Court's assistance in the identification and appointment of the Mediator. The Mediator selected by the Court shall not be compensated. Upon further approval of this Court, the Mediator shall have the discretion to appoint additional mediators with specialized knowledge or skill to oversee the mediation of particular Mediation Issues.

c. **Time, Place and Manner for the Mediation Sessions.** Unless otherwise expressly agreed by the Mediation Parties or directed by the Mediator, all mediation sessions shall take place either in-person or via Zoom at a time and location chosen by the Mediator. The Mediator, in consultation with the City and its counsel, shall determine the order, timing, participants and issues to be addressed in each mediation session. Within 14 days of the Mediator's appointment by the Court, the Mediator shall have an initial meeting with the City and its counsel to determine the order, timing, participants, and issues to be addressed in each mediation session. Within 5 days after the initial meeting between the City and the Mediator, the Mediator shall give notice to the Mediation Parties of the date, time, participants, and location of the initial mediation conference, and whether participation shall be in person or via Zoom. Each Mediation Party ordered by the Mediator to participate in a particular mediation session shall cause a principal, with settlement authority, and its counsel (if it has counsel), to attend the mediation session and each subsequent mediation session in which the Mediator requires such party to participate. Each Mediation Party shall provide a list of its participating representatives and counsel to the Mediator and counsel for the City no later than 5 days prior to the mediation. The Mediator shall have discretion to limit the number of participating representatives. The Mediator shall establish the deadlines, form, and page limits for the submission of mediation statements or other relevant materials in connection with the initial conference with the City, the initial mediation conference, and each subsequent mediation conference. Mediation statements shall not be subject to the page limits or timing set forth in Local Rule 9019-2(n)(2) but, instead, shall be subject to the directions provided by the Mediator. The Mediation shall continue throughout the duration of the City's bankruptcy case unless all Mediation Issues are resolved, the Mediator determines further mediation sessions would be futile, or the Court orders otherwise.

      d.    **Mediator's Reports.** The Mediator shall file quarterly status reports with the Court on or before the last business day of each calendar quarter, with the first such report being due on or before March 31, 2023. The status reports shall not breach mediation confidentiality or privilege, but shall state the dates on which mediation sessions were held, the parties that attended such sessions, whether a settlement or resolution was reached, whether, in the Mediator's view, progress is being made toward resolution, the anticipated dates and participants in mediation sessions for the next quarter, and whether further mediation on any particular issues is futile and should be discontinued.

### C. The Mediation Issues

18.    In order to implement a viable Plan to adjust the City's debt, multiple complex issues must be resolved. The City proposes that the issues to be mediated ("the "Mediation Issues") include:

    a.    Monetization of the Water Assets (as defined in the Kapoor Declaration) and resolution of all related litigation;

    b.    Monetization of the Sewage Assets (as defined in the Kapoor Declaration) and resolution of the related litigation;

    c.    Restructuring the 2017 Bonds (as defined in the Doweary Declaration) and the adversary proceeding commenced by the City on the Petition Date relating to the 2017 Bonds;

    d.    Restructuring amounts owed to Delaware County;

    e.    Negotiation of new collective bargaining agreements with the Unions;

    f.    The funding of the Pension Plans;

    g.    Adjustment of pensions and retiree medical and prescription benefits;

    h.    The terms of a plan of adjustment; and

    i.    Any additional issues and disputes that may be raised in the Mediation by any Mediation Parties, with the consent of the City and Mediator or an Order from this Court.

19. Additional issues and disputes may be raised in Mediation by any Mediation Parties and, with the consent of the City and Mediator or an Order from this Court, become Mediation Issues. A description of each of the Mediation Issues is set forth below.

### i. Monetization of the Water Assets and Resolution of Related Litigation

20. Issues related to the monetization of the Water Assets and the multiparty litigation pending in Pennsylvania state courts is more fully described in paragraphs 33-45 of the Kapoor Declaration.

21. The Water Assets represent hundreds of millions of dollars of contingent and potential value to the City that, if realized, would permit it to address the underfunded pension liabilities and invest in much needed improvements for the City. However, the outcome of the pending appeal to the Pennsylvania Supreme Court is uncertain and, if the City prevails, the City will still have to repossess the Water Assets and before it can engage in a sale process to realize the Water Assets' value.

22. There almost certainly would be further litigation in the Delaware County Court of Common Pleas (and, potentially, additional appeals) before the Water Assets could finally be monetized. Furthermore, although one-time proceeds from a Water Asset monetization are necessary to address the City's pension issues, they do not solve the City's other significant problem – namely, that its recurring revenues do not cover its recurring expenses.

### ii. Monetization of the Sewage Assets and Resolution of Related Litigation

23. Issues related to the monetization of the Sewage Assets and the multiparty litigation pending in Pennsylvania state courts is more fully described in paragraphs 56-60 of the Kapoor Declaration.

24. The City's interests in the Sewage Assets represent potential value that could assist the City in its restructuring efforts. Resolution of the proposed sale by DELCORA of the Sewage Assets and the related litigation pending in Delaware County Court of Common Pleas are important components to the City's efforts to confirm a Plan.

### iii. Restructuring the 2017 Bonds and the Related Adversary Proceeding

25. Issues related to the 2017 Bonds are more fully described in paragraphs 33-35 of the Doweary Declaration.

26. The City asserts the Series 2017 Bonds are unsecured because the purportedly pledged revenues are not special revenues and the written direction letters and financing statements are insufficient to create or perfect a security interest in such revenues. The City has commenced an adversary proceeding against the indenture trustee, Preston Hollow, and, with respect to the issues described below, Delaware County.

### iv. Restructuring Amounts Owed to Delaware County

27. Issues related to the obligations to Delaware County are more fully described in paragraphs 36-37 of the Doweary Declaration.

28. The City asserts the obligations owed to Delaware County are unsecured because the purportedly pledged revenues are not special revenues and the written direction letters and financing statements are insufficient to create or perfect a security interest in such revenues. The City has commenced an adversary proceeding against Delaware County, and, with respect to the issues described above relating to the 2017 Bonds, the indenture trustee and Preston Hollow.

### v. Negotiation of New Collective Bargaining Agreements with the Unions

29. Issues related to the Unions and the negotiation of new collective bargaining agreements are more fully described in paragraphs 13, 24 and 65 of the Kapoor Declaration.

30. The City's police officers are unionized and represented by the FOP, whose collective bargaining agreement with the City expired at the end of 2021. The City's firefighters are unionized and represented by the IAFF, whose collective bargaining agreement with the City also expired at the end of 2021. Certain of the City's non-uniform employees are unionized and represented by the Teamsters, whose collective bargaining agreement with the City expires at the end of 2022.

31. The negotiation of new collective bargaining agreements or rejection of existing collective bargaining agreements are a critical component of the City's restructuring efforts.

### vi.     Funding of the Pension Plans

32. Issues related to the underfunded Pension Plans are more fully described in paragraphs 14-17 of the Kapoor Declaration.

33. The most severe deferred obligations the City relate to the City's three defined benefit pension plans established for the City's employees: the Police Pension Plan ("PPP"), the Paid Firemen's Pension Plan ("FPP"), and the Officers and Employees Pension Plan ("OEP," and, together with the PPP and FPP, the "Pension Plans"), which covers eligible employees not in the PPP or FPP.

34. The aggregate unpaid MMO owed to the Pension Plans totaled $39.8 million as of December 31, 2021, and interest accrues on this amount at the rate of the assumed return on investments by the PPP (approximately 7.5% per annum). The $39.8 million in prior year MMO represents approximately 69% of the City's entire 2022 general fund budget. Further, fully funding the Pension Plans will require an additional $87.4 million, on top of the past outstanding MMO's of $39.8 million. Thus, the total contribution required to fund the City's three Pension Plans in full is at least $127,200,000. Resolving this shortfall is a critical component of a Plan.

### vii. Adjustment of Retiree Medical and Prescription Benefits

35. Issues related to retiree medical and prescription benefits are more fully described in paragraphs 18-25 of the Kapoor Declaration.

36. The City's OPEB obligations (primarily medical and prescription drug coverage for retired employees) cost the City over $5.5 million per year. According to valuations from the City's actuary, the City's total OPEB liability for all retirees at the end of 2018, was $232.9 million. With the exception of the Medicare supplemental plan, the City is self-insured for active and retiree health care costs.

37. Given the size of the City's OPEB obligations, it is critical to the City that retiree healthcare be substantially modified for all employees and existing retirees.

### viii. Negotiation of a Consensual Plan of Adjustment

38. Resolution of the Mediation Issues, either through mediation or litigation is essential to the City's ability to confirm a plan of adjustment.

39. The Receiver authorized the City to commence this chapter 9 bankruptcy case to utilize the tools available under the Bankruptcy Code to restructure and renegotiate the City's obligations, maximize its assets to achieve a balanced budget, and confirm a plan of adjustment. The Receiver's goal in authorizing this case and seeking to confirm a plan of adjustment is not only to reach financial stability that allows for the continued provision of essential services to residents, but to enable the City to invest in capital projects and economic and cultural growth that will not just help Chester survive, but thrive

40. Resolution of the Mediation Issues is essential to this effort.

### IV. Basis for Relief

41. Local Rule 9019-2(e) provides that this Court "may assign any matter in the case for mediation." L.B.R. 9010-2(e)(1) ("The court (A) on its own motion, (B) by approving a

12

stipulation by the parties, or (C) on motion of a party may assign any matter in the case for mediation…"). Further, Section 105 of the Bankruptcy Code provides that this Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 104(a). *See also In re Atl. Pipe Corp.*, 304 F.3d 135, 140 (1st Cir. 2002) ("There are four potential sources of judicial authority for ordering mandatory non-binding mediation of pending cases, namely (a) the court's local rules, (b) an applicable statute, (c) the Federal Rules of Civil Procedure, and (d) the court's inherent powers."); *In re A.T. Reynolds & Sons, Inc.*, 424 B.R. 76, 85 (Bankr. S.D.N.Y. 2010) ("While it goes without saying that a court may not order a party to settle, this Court has authority to order the parties to participate in the process of mediation, which entails discussion and risk analysis."), *rev'd on other grounds*, 452 B.R. 374 (S.D.N.Y. 2011).

42. The appointment of the Mediator at the outset of this case is paramount to the City's strategy for negotiating a confirmable Plan and preventing this case from becoming a morass of costly litigation that further harms Chester's citizens.

43. The Mediation Issues, as well as the Mediation Parties, would benefit from the Mediation. Litigating all, or even some, of the Mediation Issues would entail extensive discovery costs and professional fees and expenses. Mediation provides the least costly and most efficient means to resolve the Mediation Issues.

44. Further, litigation would extend the timeline of this chapter 9 case, potentially beyond the Receiver's term which currently ends in December 2023, compounding the costs borne by the already financially troubled City that is continuously at risk of running out of cash and further delaying the fundamental changes the citizens of Chester deserve. As described herein,

resolving the Mediation Issues both expeditiously and efficiently is critically important to the success of this chapter 9 case.

45. If successful, the Mediation would result in a global resolution of the most challenging issues facing the City in this case. If unsuccessful, the Mediation would still inform parties as to the key issues in this case, and potentially narrow such issues, assisting the City in determining how to proceed. Therefore, the Mediation has little downside and will confer a benefit even if the Mediation Parties do not reach a global resolution. *See, e.g., Garland v. Rockford Mfg. Co.*, 2019 U.S. Dist. LEXIS 154292, at *5 (E.D. Tenn. Aug. 20, 2019) ("[E]ven if the parties' dispute is not settled during the mediation process, mediation often forces the parties to reevaluate their claims and positions and serves to narrow and classify issues.") (internal quotations omitted). Mediation will not prejudice any of the Mediation Parties' rights if it fails to produce a global or partial resolution. And, mediation could be required at many different times during this chapter 9 case. Given the complexity of the Mediation Issues, appointment of the Mediator now will enable the Mediator to become familiar with the Mediation Parties, the Mediation issues and the central aspects of the chapter 9 case.

46. The Mediation Procedures are designed to facilitate an orderly process for negotiating the core issues in this bankruptcy case and, moreover, are designed to provide the Mediator, City, other Mediation Parties, and this Court the ability to address additional issues in Mediation.

47. The City believes the proposed Mediation and Mediation Procedures will benefit all parties in interest in this case. Accordingly, the City respectfully submits that the Court appoint the Mediator and provide the Mediation Parties the opportunity to reach a resolution of the most important issues affecting the City and its citizens.

## V. Reservation of Rights

48. The City files this Motion without prejudice to or waiver of its rights pursuant to Section 904 of the Bankruptcy Code, and nothing herein is intended to, shall constitute, or shall be deemed to constitute the City's consent, pursuant to Section 904 of the Bankruptcy Code, to this Court's interference with (a) any of the political or governmental powers of the City, (b) any of the property or revenues of the City, or (c) the City's use or enjoyment of any income-producing property.

## VI. Notice

49. Notice of this Motion will be provided to the follow (or counsel if known) (a) the Mediation Parties identified in this Motion; (b) the Office of the United States Trustee; (c) the City's largest unsecured creditors as identified on the list filed under Bankruptcy Rule 1007(d); and (d) any party that has requested notice pursuant to Federal Rule of Bankruptcy Procedure 2002. The City submits that, in light of the nature of the relief requested herein, no other or further notice need be given.

## VII. No Prior Request

50. No prior request for the relief sought in the Motion has been made to this or any other Court.

WHEREFORE, the City respectfully requests that the Court grant the relief requested herein, appoint a judicial Mediator, refer the Mediation Issues to mandatory mediation, and such further relief the Court may deem just and proper.

[*Remainder of page intentionally left blank*]

November 10, 2022

Respectfully submitted,

/s/ Tobey M. Daluz

Tobey M. Daluz (PA Bar No. 60685)
Margaret A. Vesper (PA Bar No. 329793)
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Tel: (215) 864-8148
Email: daluzt@ballardspahr.com
       vesperm@ballardspahr.com

and

Matthew G. Summers*
Laurel D. Roglen*
Chantelle D. McClamb*
Ballard Spahr LLP
919 N. Market Street, 11th Floor
Wilmington, DE 19801
Tel: (302) 252-4465
Email: summersm@ballardspahr.com
       roglenl@ballardspahr.com
       mcclambc@ballardspahr.com

(*Pro Hac Vice motions to be submitted)

*Attorneys for the City of Chester*