**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | : | |
|---|---|---|
| In re: | : | Chapter 9 |
| | : | |
| CITY OF CHESTER, PENNSYLVANIA, | : | Case No. 22-13032 |
| | : | |
| Debtor. | : | |
| | : | |

**MOTION OF DEBTOR TO REJECT THE PARKING AGREEMENT BETWEEN THE CITY AND PFS VII LLC EFFECTIVE AS OF THE PETITION DATE**

The City of Chester ("Chester" or the "City"), as the debtor in the above-captioned chapter 9 case, hereby moves the Court, pursuant to Section 365(a) of title 11 of the United States Code (the "Bankruptcy Code"), made applicable to this chapter 9 case by Section 901(a) of the Bankruptcy Code, and Rule 6006 of the Federal Rules of Bankruptcy Procedure, for the entry of an order authorizing the City to reject the Parking Agreement (as defined below) with PFS VII LLC ("PFS") effective as of the Petition Date. In support of this Motion, the City respectfully represents as follows:

**I.  Jurisdiction and Venue**

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3. Venue for this matter is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.  **Background**

### A.  **History of the City**

4.  Chester is the oldest city in Pennsylvania, first incorporated as a borough in 1701 and then as a city in 1866. The City is a city of the Third Class under Pennsylvania law[1] and operates under a Home Rule Charter.[2]

5.  During World War I and World War II, the City thrived as an industrial and manufacturing community. However, since the mid-1950s, the City has been experiencing economic difficulties and facing several challenges, including, (i) a decreasing population, (ii) declining revenues, and (iii) high municipal expenditures. In 1995, faced with multi-million dollar deficits and past due obligations, the City was designated as a distressed city under the Pennsylvania Municipalities Financial Recovery Act, Act of 1987, P.L. 246, No. 47 ("Act 47") and subjected to financial oversight by the Commonwealth of Pennsylvania. The City's financial challenges were exacerbated by the onset and continuing impact of the COVID-19. Additional information regarding the City's history and the facts contained herein is included in the *Declaration of Michael Doweary in Support of the City of Chester, Pennsylvania's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code and First Day Pleadings* (the

---

[1] Under Pennsylvania law, there are four classes of cities, the determination of a city's class is based on its population. Act of June 25, 1985, P.L. 275, No. 188. Third class cities are those "containing a population under two hundred and fifty thousand and which have not elected to become a city of the second class A." *Id.*

[2] All Pennsylvania municipalities, except for cities and counties of the first class, can adopt a home rule charter, which is "a written document defining the power, structure, privileges, rights and duties of the municipal government and limitations thereon." 53 Pa. Cons. Stat. §§ 2901, 2902. The Pennsylvania Constitution also recognizes that "[m]unicipalities shall have the right and power to frame and adopt home rule charters… . A municipality which has a home rule charter may exercise any power or perform any function not denied by the Constitution, by its home rule charter or by the General Assembly at any time." Pa. Const. art. IX, §2.

"Doweary Declaration") and the *Declaration of Vijay Kapoor in Support of the City of Chester, Pennsylvania's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code and First Day Pleadings* (the "Kapoor Declaration") filed contemporaneously herewith.

**B.    The PFS Agreements**

6.    On April 25, 2018, the City and PFS entered into a Master Asset Management Agreement dated April 25, 2018 (together, with all agreements attached as exhibits thereto, the "Original Agreement").  A copy of the Original Agreement is attached hereto as Exhibit A.  On September 5, 2018, the City and PFS amended and restated the Original Agreement by executing the Amended and Restated Master Asset Management Agreement dated September 5, 2018 (together, with all agreements attached as exhibits thereto, the "Amended Agreement" and, collectively, with the Original Agreement, and all other related documents, the "Parking Agreement").  A copy of the Amended Agreement is attached hereto as Exhibit B.

7.    Pursuant to the Parking Agreement, PFS agreed to finance, construct and install equipment and improvements to manage the on street and off street parking within the City or under the control of the City and all equipment and revenue associated therewith (the "Parking Assets").  The Parking Agreement called for the installation of at least 1,500 parking meters concentrated in three geographic areas including approximately 500 meters on the campus of Widener University.  Further, under the Parking Agreement the City assigned the Parking Assets to PFS during the 10-year term of the Parking Agreement, until September 5, 2028, however, the City retained title to and ownership of the Parking Assets, subject to the rights of PFS to acquire a security interest and to receive distributions from collections on the Parking Assets.  Any equipment installed by PFS would be owned by PFS until the end of the term of the Parking Agreement, after which the equipment would revert to ownership by the City.

8. The City would receive an advance of $1 million once the 1,500 meters were installed, $300,000 payable initially, and an additional $350,000 payable at 1,000 and 1,500 meters installed, respectively. Additionally, once the 1,500 meters were installed, the City would receive a percentage of parking revenues annually.

9. To date, the City has only received an initial installment of $300,000 plus some rental payments for PFS's use of office space in City Hall.

**C.    The Widener University Litigation**

10. On January 2, 2019, Widener University filed a complaint in the Delaware County Court of Common Pleas (the "CCP") against the City, PFS, and certain other defendants seeking to enjoin PFS from installing parking meters on and around its campus in the City (the "Widener University Litigation"). On January 9, 2019, the CCP granted the temporary injunction, prohibiting the installation of parking meters on Widener University's campus. To date, the injunction remains in effect. As such, the parking at Widener University has not been able to generate any proceeds.

**D.    The Appointment of the Receiver and the Recovery Plans**

11. On June 22, 2020, the Commonwealth Court determined that a fiscal emergency as defined by Section 602(A) of Act 47 continued to exist in the City and declared the City to be in receivership under Section 702(c)(2) of Act 47. The same day, the Commonwealth Court appointed Michael Doweary as receiver for the City (the "Receiver"). Pursuant to an order entered by the Commonwealth Court on December 28, 2021, the City's Receivership and Receiver's appointment were extended for up to two years.

12. In August 2020, the Receiver submitted an initial Recovery Plan (the "Recovery Plan"), which was confirmed by the Commonwealth Court on October 19, 2020, to address the

4

City's economic, social and other challenges.  In April 2021, the Receiver submitted an amended recovery plan (the "Amended Recovery Plan" and together, with the Recovery Plan, the "Recovery Plans") for approval by the Commonwealth Court.  In formulating the Amended Recovery Plan, the Receiver evaluated the Parking Agreement and the objections raised by Widener University in the Widener University Litigation and determined that the Parking Agreement was below market and unlikely to ever result in payment to the City.  Accordingly, the Receiver included Initiative ASM02 in the Amended Recovery Plan to terminate the Parking Agreement and reach a resolution regarding the Widener University Litigation.

13. PFS objected to the approval of the Amended Recovery Plan based on the proposed termination of the Parking Agreement.  In June 2021, the Commonwealth Court approved the Amended Recovery Plan over the objection of PFS, finding that Initiative ASM02 was not arbitrary, capricious, or wholly inadequate to alleviate the fiscal emergency faced by the City.

**E.      The PFS Litigation in the Commonwealth Court**

14. On March 24, 2021, PFS initiated an action by filing a Petition for Review in the Commonwealth Court (the "PFS Litigation"), seeking a declaratory judgment and a writ of mandamus against the Receiver, alleging that the Receiver's attempts to terminate or void the Amended Agreement violated Act 47.  Widener University intervened in the PFS Litigation.  Both the Receiver and Widener University filed preliminary objections to the Petition for Review, but neither filed an answer.

15. On February 4, 2022, the Receiver's counsel notified PFS by letter (the "February 4 Letter") of the Receiver's intent to modify the Parking Agreement, pursuant to Section 706(a)(6) of Act 47, to eliminate the default and penalty provisions in the Parking Agreement which he deemed detrimental to the City's ability to exit fiscal oversight under Act 47.  On February 28,

2022, PFS sought to amend the Petition for Review in the PFS Litigation, and preclude the Receiver from modifying or terminating the Parking Agreement, as set forth in the February 4 Letter. PFS asserted that the February 4 Letter violated Act 47 by attempting to modify the Amended Recovery Plan without approval by the Commonwealth Court.

16. On May 27, 2022, the Receiver's counsel notified PFS by letter (the "May 27 Letter") of the Receiver's intention to terminate the Parking Agreement, effective as of August 1, 2022, pursuant to his authority under Section 706(a)(6) of Act 47. The Receiver and PFS agreed to a temporary stay of the termination while the PFS Litigation was pending.

17. On July 12, 2022, both PFS and the Receiver submitted briefing in the PFS Litigation on the issues raised by the Commonwealth Court, including whether the Parking Agreement was properly procured under the Third Class City Code and whether the Receiver had the authority to terminate the Parking Agreement under Act 47. On September 19, 2022, the Commonwealth Court issued a Memorandum and Order (the "PFS Order") denying PFS's application for relief. A copy of the PFS Order is attached hereto as Exhibit C. The Commonwealth Court found that the Parking Agreement was void due to the City's failure to comply with the advertising and competitive bidding requirements of the Third Class City Code, and upheld the Receiver's authority to terminate the Parking Agreement pursuant his authority under Section 706(a)(6) of Act 47. On October 5, 2022, PFS commenced an appeal of the PFS Order.

18. Based on the Commonwealth Court's ruling in the PFS Order, on September 28, 2022, the Receiver's counsel sent a letter to PFS advising that the Parking Agreement would terminate at 12:00 a.m. on October 1, 2022 and requested an account of all parking equipment

6

installed in the City with a detailed plan for its removal without causing damage to property of the City.

19. Also, since the Commonwealth Court's ruling, the Receiver has been able to reach an agreement with Widener University that resolves the issue of placement of parking meters around campus and would dispense with the Widener University Litigation. That agreement provides the City with a $325,000 annual payment for ten years, for a total value of $3.25 million. The City may use these funds to fund general fund operations.

20. On October 14, 2022, PFS sent a letter to the Receiver asserting that PFS is owed a $12 million "buyout" from the City pursuant to the Parking Agreement. The Receiver disputes that PFS is entitled to any payment from the City. PFS also continues to assert a lien on the Parking Assets.

### F. The Chapter 9 Proceedings

21. On February 8, 2022, the Receiver received written authorization to file a municipal debt adjustment action on behalf of the City under the Bankruptcy Code and Act 47 (the "Bankruptcy Authorization") from the Secretary of the Pennsylvania Department of Community and Economic Development.

22. Pursuant to the authority granted by the Bankruptcy Authorization, on November 10, 2022 (the "Petition Date"), the City commenced this case under chapter 9 of the Bankruptcy Code.

### III. Relief Requested and Basis for Relief

23. The City believes that, (i) pursuant to the PFS Order, the Parking Agreement is void, and (ii) to the extent the PFS Order is not final, the Parking Agreement has been effectively terminated by the Receiver prior to the Petition Date. Nonetheless, out of an abundance of caution, by this Motion, the City seeks an order pursuant to Section 365(a) of the Bankruptcy Code, made

7

applicable by Section 901(a) of the Bankruptcy Code, rejecting the Parking Agreement effective as of the Petition Date.

24. The term "executory contract" is not defined in the Bankruptcy Code. "Although the Bankruptcy Code contains no definition of an executory contract, courts have generally relied on the following definition: '[An executory contract is] a contract under which the obligation of both the bankrupt and the other party to the contract are so far underperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other.'" *Sharon Steel Corp. v. Nat'l Fuel Gas Dist. Corp. (In re Sharon Steel Corp.)*, 872 F.2d 36, 39 (3d Cir. 1989) quoting Countryman, *Executory Contracts in Bankruptcy, Part 1*, 57 Minn. L. Rev. 439, 460 (1973). *See also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522 n. 6 (1984) (noting that although the Bankruptcy Code does not provide a definition of executory contract, the legislative history of Section 365(a) defines the term to mean a contract on which performance remains due on both sides).

25. Section 365 of the Bankruptcy Code permits the debtor's assumption or rejection of an executory contract, subject to court approval. *See* 11 U.S.C. § 365(a). Specifically, Section 365(a) provides, in relevant part, that the debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365 of the Bankruptcy Code enables a debtor to "relieve the bankruptcy estate of burdensome agreements which have not been completely been performed." *In re Rickel Home Ctrs., Inc.* 209 F.3d 291, 298 (3d Cir. 2002). *See also In re Gen. DataComm Indus., Inc.*, 407 F.3d 616, 617 (3d Cir. 2005) (noting rejection is permitted "to relieve the estate of onerous burdensome future obligations.")

26. Rejection of an executory contract is appropriate where the rejection would benefit the estate. *Sharon Steel*, 872 F.2d at 40. *See also In re Bildisco*, 682 F.2d 72, 79 (3d Cir. 1982) ("The usual test for rejection of an executory contract is simply whether rejection would benefit the estate.").

27. Generally, courts apply the business judgment test when evaluating the decision to reject an executory contract. *See In re Tayfur*, 505 B.R. 673, 677 (Bankr. W.D. Pa. 2014) ("The Bankruptcy Code does not set forth a standard for making a determination as to whether an assumption or rejection should be authorized, however courts have adopted the standard of the business judgment test."). *See also Bildisco & Bildisco*, 465 U.S. at 523 (recognizing the business judgement standard as the standard for rejection of executory contracts). Under the business judgment standard, a court must approve a debtor's business decision unless the decision is the product of bad faith, whim, or caprice. *See In re Tower Air, Inc.*, 416 F.3d 229 (3d Cir. 2005).

28. A court may approve rejection of an executory contract retroactive to the date the motion is filed to avoid exposing the estate to postpetition administrative expenses after balancing the equities of the case. *In re Chi-Chi's, Inc.,* 305 B.R. 396, 399 (Bankr. D. Del. 2004). *See also Stonebriar Mall Ltd. P'ship v. CCI Wireless, LLC (In re CCI Wireless, LLC)*, 297 B.R. 133, 140 (D. Colo. 2003) (holding that the court "has authority under 365(d)(3) to set the effective date of rejection at least as early as the filing date of the motion to reject.").

29. The Receiver asserts that, pursuant to the PFS Order, the Parking Agreement is *void ab initio*, and even if it is not void, the Parking Agreement has been effectively terminated by the Receiver. To the extent that the Parking Agreement remains in effect, performance by both PFS and the City remains due as there are continuing covenants binding both parties. *See* Amended Agreement Sections 2 and 7 obligating PFS to manage, collect and distribute the Parking Assets,

9

Section 10 Duties of the Manager, Section 11 Covenants of the City, and Section 12 Reports (binding both parties). Accordingly, the Parking Agreement constitutes an executory contract.

30. In the exercise of his business judgment, long before the Petition Date, the Receiver determined that the Parking Agreement does not provide any benefit to the City or its constituents. After his review and evaluation of the Parking Agreement, the Receiver concluded that the terms of the Parking Agreement were oppressive to the City, overly vague, and deprived the City and its residents of parking revenue. Rather than protecting the interests of the City, it diverts to private entities funds that should assist the City in achieving financial well-being. To date, PFS has failed to complete its installation of the meters contemplated under the Parking Agreement, despite execution of the Parking Agreement more than four years ago. Therefore, no revenues have been generated by the Parking Assets and the City has not received any proceeds from the Parking Assets in the four years since the execution of the Parking Agreement.

31. Even if PFS had completed the installation of the parking meters, the parking meters were expensive and cost the City's citizens and visitors more per minute than parking in nearby Center City Philadelphia. Given this extraordinary expense, that burdensome cost to the City's constituents outweighs any benefit that could be derived from the Parking Assets under the Parking Agreement.

32. Moreover, if the Receiver does not reject the Parking Agreement, the Receiver will be hindered from finalizing the resolution of the Widener University Litigation that was negotiated by the City.

33. The City should be given an opportunity to free itself from the chokehold PFS has on the parking situation and allow the Receiver an opportunity to put in place a fair and equitable solution that generates a benefit to the City, its citizens and visitors to the City.

### IV. Reservation of Rights

34. The City files this Motion without prejudice to or waiver of its rights pursuant to Section 904 of the Bankruptcy Code, and nothing herein is intended to, shall constitute, or shall be deemed to constitute the City's consent, pursuant to Section 904 of the Bankruptcy Code, to this Court's interference with (a) any of the political or governmental powers of the City, (b) any of the property or revenues of the City, or (c) the City's use or enjoyment of any income-producing property.

### V. Notice

35. Notice of this Motion will be provided to the following (or their counsel, if known) (a) PFS, (b) Widener University, (c) the U.S. Trustee; (d) the City's largest unsecured creditors as identified on the list filed under Bankruptcy Rule 1007(d); and (e) any party that has requested notice pursuant to Federal Rule of Bankruptcy Procedure 2002. The City submits that, in light of the nature of the relief requested herein, no other or further notice need be given.

### VI. No Prior Request

36. No prior request for the relief sought in the Motion has been made to this or any other Court.

WHEREFORE, the City respectfully requests that the Court (i) enter an order substantially in the form attached hereto as **Exhibit D**, granting the relief requested herein, (ii) approve the rejection of the Parking Agreement, (iii) order PFS to provide to the City within fifteen (15) days from this Court's entry of an order approving this Motion, an inventory of all parking equipment installed in the City with a detailed plan for its removal without causing damage to property of the City (as further detailed in the proposed form of order), and (iv) grant any further relief the Court may deem just and proper.

November 10, 2022

Respectfully submitted,

*/s/ Tobey M. Daluz*

Tobey M. Daluz (PA Bar No. 60685)
Margaret A. Vesper (PA Bar No. 329793)
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Tel: (215) 864-8148
Email: daluzt@ballardspahr.com
vesperm@ballardspahr.com

and

Matthew G. Summers*
Laurel D. Roglen*
Chantelle D. McClamb*
Ballard Spahr LLP
919 N. Market Street, 11th Floor
Wilmington, DE 19801
Tel: (302) 252-4465
Email: summersm@ballardspahr.com
roglenl@ballardspahr.com
mcclambc@ballardspahr.com

(**Pro Hac Vice* motions to be submitted)

*Attorneys for the City of Chester*