EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE | : | Chapter 9 |
| | : | |
| CITY OF CHESTER, | : | |
| | : | Bankruptcy No. 22-13032-AMC |
| DEBTOR | : | |
| | : | |

**ORDER FOR RELIEF UNDER CHAPTER 9 OF THE BANKRUPTCY CODE**

AND NOW, this 14th day of March 2023, for the reasons stated in the accompanying

opinion, the Court has determined that the City of Chester, Pennsylvania has met all of the

requirements under 11 U.S.C. § 109(c) and is eligible to be a debtor under chapter 9 of the

Bankruptcy Code. The Court has further determined that the City of Chester, Pennsylvania filed

this chapter 9 petition in good faith. As such, the Court hereby enters this Order for Relief

pursuant to 11 U.S.C. § 921(d) and grants relief to the City of Chester, Pennsylvania under

chapter 9 of the Bankruptcy Code.

_____
Honorable Ashely M. Chan
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **IN RE** | : | **Chapter 9** |
| | : | |
| **CITY OF CHESTER,** | : | |
| | : | **Bankruptcy No. 22-13032-AMC** |
| **DEBTOR** | : | |
| | : | |

Ashely M. Chan, United States Bankruptcy Judge

### OPINION

### I.    INTRODUCTION

In November 2022, over two decades after being designated as a distressed city under the
Municipalities Financial Recovery Act of July 10, 1987, P.L. 246, No. 47 ("Act 47"), the
City of Chester ("City" or "Debtor"), through its receiver appointed under Act 47, filed for
bankruptcy under 11 U.S.C. § 109(c) ("§ 109(c)"), seeking a determination from this Court
that the Debtor is eligible for the relief offered by chapter 9 of the Bankruptcy Code
("Chapter 9"). The mayor of the City and certain City Council members ("Elected Officials")
dispute that the Debtor is eligible for relief because the Elected Officials have not expressed
a desire to effect a plan to adjust the City's debts. One of the holders of certain bonds issued
by the Debtor, PHCC LLC d/b/a Preston Hollow Community Capital ("Preston Hollow"),
also disputes that the Debtor is eligible for relief based on its allegation that the Debtor failed
to engage in good faith negotiations with Preston Hollow prior to filing and that negotiations
were not impracticable.

Ultimately, the Court finds that the City satisfies all the statutory requirements of § 109(c)
such that it is eligible for relief under Chapter 9. The City, a municipality, was specifically
authorized by Pennsylvania's Secretary for Community and Economic Development to have

1

its receiver commence a Chapter 9 proceeding as required under Act 47; the City is insolvent

as evidenced in large part by its past and current inability to fund its substantial pension

obligations, which are presently due and enforceable, to its retirees and current City

employees; the totality of the circumstances, including the extensive pre and postpetition

efforts of the appointed receiver, who, pursuant to Act 47, acts on behalf of the City in

Chapter 9 proceedings, to balance the City's budget and negotiate with creditors reflects the

City's sincere desire to effect a plan to adjust its debts; and the record shows that the City

engaged in good faith negotiation efforts with its major creditor constituencies, including its

three unions, Delaware County, and Preston Hollow, and that negotiating with the City's

retirees with no representative in advance of the bankruptcy filing would have been

impracticable. Accordingly, the City may be a debtor under Chapter 9, and the Court will

enter an order for relief.

## II.      FACTUAL AND PROCEDURAL BACKGROUND

By way of background, the City of Chester is the oldest city in Pennsylvania,

incorporated as a borough in 1701 and as a city in 1866, and is a city of the Third Class under

Pennsylvania law. ECF Case No. 22-13032 ("ECF") 5 Declaration of Michael Doweary in

Support of the City of Chester ("Doweary Decl.") ¶¶ 10, 18. The City operates under a Home

Rule Charter. *Id.* at ¶ 18.

Since the mid-1950s, the City has experienced significant economic challenges,

including, *inter alia*, a decline in population,[1] declining revenues, and high expenditures. *Id.*

at ¶ 11. Over time, these trends have substantially eroded the City's tax base, taking a toll on

---

[1] As of July 1, 2021, the United States Census Bureau ("Census Bureau") estimated the City had a population of
32,535, a decline from 32,718 residents as of April 1, 2020, 33,972 residents as of April 1, 2010, and 66,039
residents in 1950. Doweary Decl. ¶ 16.

the City's ability to generate revenue, provide services to the City's residents, and maintain infrastructure that benefits the City's residents. *Id.* In 1995, faced with multi-million dollar deficits and past due obligations, the City was designated a distressed city under Act 47. *Id.* at ¶ 12. From 1996 to 2006, the City's financial condition continued to deteriorate when it needed to borrow money to meet payroll and deliver basic services to its citizens. *Id.* at ¶ 13.

In 2008, the City's situation temporarily improved when Harrah's Philadelphia Casino and Racetrack ("Harrah's Casino") opened and provided the City with significant annual host revenues. *Id.* Nevertheless, this infusion of revenue provided only temporary respite as revenues then declined and other sources of revenue remained stagnant. *Id.*

In 2009, Delaware County issued its General Obligation Bonds, Series 2009 ("Series 2009 Bonds"), in the principal amount of $28,950,000 as part of the overall financing to build Subaru Park, a world class soccer stadium, in the City of Chester. *Id.* at ¶¶ 13, 37. Pursuant to a contribution agreement ("Contribution Agreement"), dated February 15, 2009, between the City and Delaware County, the City agreed to make an annual payment to Delaware County on account of the Series 2009 Bonds representing 25% of the annual debt service incurred by Delaware County. *Id.* at ¶ 37. On June 27, 2010, Subaru Park opened, and while the City had hoped its opening would be a catalyst for economic development, those expectations have not yet been realized. *Id.* at ¶ 13.

Also in 2010, the City issued its Series 2010B bonds ("Series 2010B Bonds") in the principal amount of $3,985,000 to meet the obligations associated with allowing the Chester-Upland School District to become a sponsoring district for Delaware County Community College. *Id.* at ¶ 39.

3

From 2013 to 2019, the City ran general fund deficits between $2.2 million and $8.7
million each year, except in 2017.[2] *Id.* at ¶ 15. Moreover, from 2014 through 2020, the City
did not make its full annual legally required pension payments, otherwise known as its
minimum municipal obligation ("MMO"), to its pension funds established for the City's
employees – the Police Pension Plan ("PPP"), Paid Firemen's Pension Plan ("PFPP"), and
Officers and Employees Pension Plan ("OEPP," collectively with PPP and PFPP, "Pension
Plans").[3] *Id.*; ECF 6 Declaration of Vijay Kapoor in Support of the City of Chester,
Pennsylvania's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy
Code and First Day Pleadings ("Kapoor First Day Decl.") ¶ 14.

By the beginning of 2017, the City had accumulated $28 million of unpaid obligations
and defaulted on its 2016 Tax Revenue Anticipation Note ("TRAN"). Doweary Decl. ¶ 14. In
January 2017, the Pennsylvania Department of Community and Economic Development
("DCED") provided the City with a $2 million emergency loan ("2017 DCED Loan"). *Id.*
Furthermore, in August 2017, the City borrowed $12 million in unfunded debt to address
some of its outstanding liabilities. *Id.* Additionally, the City's largest long-term debt
obligations were incurred in 2017 in connection with two series of bonds the City issued to
attempt to resolve the $28 million in unpaid obligations. *Id.* at ¶ 34. The Series 2017A bonds
("Series 2017A Bonds") in the original amount of $12 million were used to pay certain
unfunded general liabilities and to fund required reserves. *Id.* The Series 2017B bonds
("Series 2017B Bonds, collectively with Series 2017A Bonds, "2017 Bonds") in the original

---

[2] The City did not run a deficit in 2017 because of loans it received that year. Doweary Decl. ¶ 15.
[3] Under Pennsylvania law, the City is required to pay at least the minimum amount to cover the cost of benefits for
current and future retirees as determined by actuarial analysis, which is called the MMO, each year by December 31.
Kapoor First Day Decl. ¶ 14. The City was able to pay the 2021 MMO in full due to certain actions taken by the
Receiver, including collecting revenue from a new 1% distressed pension tax that was expanded to be applied to the
City. *Id.* at ¶ 16.

amount of $7,210,000 were used to finance the acquisition of certain property leased by the
City. *Id.* Preston Hollow appears to currently hold the 2017 Bonds. *Id.* at ¶ 35.

On April 13, 2020, Pennsylvania Governor Tom Wolf issued a Declaration of Fiscal
Emergency ("Declaration") as to the City. *Id.* at ¶ 21. Under Act 47, the Governor may
declare a fiscal emergency when a municipality is insolvent or projected to be insolvent
within 180 days or when a municipality is unable to ensure the continued provision of vital
and necessary services. 53 P.S. § 11701.602(a). *See also* Doweary Decl. ¶ 21.

On June 1, 2020, Michael Doweary ("Receiver") was nominated pursuant to Act 47 by
Dennis M. Davin, the then-Secretary of the DCED ("Secretary"), to serve as receiver for the
City. Doweary Decl. ¶ 1. On June 22, 2020, the Commonwealth Court of Pennsylvania
("Commonwealth Court") entered an order ("Receiver Order") which, *inter alia*, appointed
the Receiver. *Id.* at ¶¶ 1, 22.

When the Receiver was appointed, the City was in the midst of discussions with Preston
Hollow regarding the possibility of refunding the 2017 Bonds. ECF 189 Supplemental
Declaration of Vijay Kapoor in Support of the Response of the City of Chester,
Pennsylvania, to PHCC LLC's Objection to the Eligibility of the City of Chester to be a
Debtor Under Chapter 9 of the Bankruptcy Code ("Kapoor Suppl. Decl.") ¶ 3. On August 3,
2020, Preston Hollow sent a term sheet to the City's mayor ("August 2020 Term Sheet"). *Id.*
at ¶ 4. While the August 2020 Term Sheet offered some immediate savings, it provided no
reduction in the principal on the 2017 Bonds and contemplated a substantial increase in the
City's payments to Preston Hollow with a net-present-value cost of almost $2 million over
the life of the 2017 Bonds. *Id.* at ¶ 5. Accordingly, upon review, the Receiver declined
Preston Hollow's proposal, as he considered the short-term savings insufficient to alleviate

5

the City's financial problems in a meaningful way and believed the long-term expenses

would have ultimately exacerbated the City's financial issues. *Id.* at ¶ 7.

Also in August 2020, the Receiver filed his initial recovery plan ("Initial Recovery Plan")

which the Commonwealth Court approved on October 19, 2020. Doweary Decl. ¶ 23. The

Initial Recovery Plan proposed "long-term initiatives and structural solutions [] to improve

the [Debtor's] financial stability…" Kapoor First Day Decl. Ex. C at 2. Additionally, the

Receiver advised the Commonwealth Court that he intended to seek modification under

§ 703(e) of Act 47 and file an amended plan after further investigation and review of more

current financial reports. *Id.*

On April 7, 2021, the Receiver filed an amended recovery plan ("Amended Recovery

Plan"). *See* Doweary Decl. Ex. E Receiver's Amended Recovery Plan ("Amended Recovery

Plan"). The Amended Recovery Plan continued initiatives from the Initial Recovery Plan but

also added new initiatives, including, *inter alia*, creating organizational charts for the City's

departments and employees, creating consolidated collective bargaining agreements,

replacing the computer hardware in City Hall, correcting errors in the salary ordinance, and

completing the 2018 and 2019 financial audits because the most recent year-end audit was in

2017. *Id.* at 4–5. The Amended Recovery Plan also addressed the Debtor's legacy costs as

related to the PPP's critical funding status, *see id.* at 9, and work rules and other areas that

impact operations within the workforce, *see id.* at 11. Moreover, the Amended Recovery Plan

detailed the Receiver's goals respecting the disposition of the City's water system and

parking system. *Id.* at 85-88.

In June 2021, the Commonwealth Court confirmed the Amended Recovery Plan.

Doweary Decl. ¶ 24. Since then, the Receiver and his team have worked to implement the

Initial Recovery Plan and the Amended Recovery Plan to improve the City's financial position by taking steps to reduce expenditures such as reducing the City's workforce,[4] restricting overtime, implementing a hiring freeze, limiting discretionary purchases, and moving over one hundred retired employees from the City's expensive self-insured healthcare plans to a lower cost Medicare supplemental plan.[5] *Id.* at ¶ 25; Kapoor First Day Decl. ¶ 8. Despite these efforts, the City's Pension Plans remained severely underfunded, and the City remained unable to pay its obligations as they came due. Doweary Decl. ¶ 27.

In late spring 2021, the City and Preston Hollow began renewed negotiations with respect to a refunding of the 2017 Bonds. Kapoor Suppl. Decl. ¶ 8. On July 21, 2021, Preston Hollow sent a term sheet to the City's chief financial officer ("July 2021 Term Sheet"). *Id.* at ¶ 9, Ex. B. Similar to the August 2020 Term Sheet, the July 2021 Term Sheet offered short term savings in exchange for a substantial increase in payments and an increase in the present value of the City's debt service payments which would result in an ultimate cost to the City of approximately $2 million over the life of the 2017 Bonds. *Id.* at ¶ 10, Ex. B.

Subsequently, on August 5, 2021, Preston Hollow circulated proposed changes to the City's trust indenture for the 2017 Bonds ("Trust Indenture"). *Id.* at ¶¶ 12, 13, Ex. C. Most notably, the proposed amendments to the Trust Indenture included protections for Preston Hollow's interests in the event of the City's insolvency or declaration of bankruptcy. *Id.* at ¶13, Ex. C. Specifically, Preston Hollow sought in the event of a bankruptcy, *inter alia*, the grant of a statutory or judicial lien on certain of the City's revenues which would survive a bankruptcy and a lien from the City on receipts, proceeds from asset sales, cash, and

---

[4] In 2020, the City furloughed nearly one-third of the City's workforce, outside of the Police and Fire Departments. Kapoor First Day Decl. ¶ 8.
[5] Moving these retirees to a lower cost Medicare supplemental plan saved the City $900,000 in 2021. Kapoor First Day Decl. ¶ 8

revenues with respect to the water system. *Id.* at ¶¶ 14, 15, Ex. D. The Receiver determined

these demands were unreasonable in exchange for what would ultimately amount to an

increase in the overall costs of the 2017 Bonds. *Id.* at ¶ 16.

In August 2021, Delaware Valley Regional Planning Commission (together with

Delaware County, "Delaware County Bondholders") issued Series 2021 Notes on behalf of

the City in the amount of $750,000 to finance necessary repair and maintenance to

streetlights in the City. Doweary Decl. ¶ 41. The current outstanding amount on the Series

2021 Notes is $774,410.64.[6] *Id.*

In December 2021, the DCED issued a TRAN advance to the City in the amount of $5

million, which helped the City meet its general fund obligations. *Id.* at ¶ 29. The City also

received approximately $30.4 million in funding provided by the federal government under

the American Rescue Plan Act ("ARPA").[7] Kapoor First Day Decl. ¶ 26. Without the TRAN

advance, the ARPA funding, and actions taken by the Receiver to reduce expenditures, the

Receiver projected the City would have run out of cash during 2021. *Id.*

As of January 1, 2022, the Receiver calculated that funding the City's three Pension Plans

in full would require a contribution of at least $127,200,000, representing the City's largest

outstanding debt at the time. Doweary Decl. ¶ 31. Even with the Receiver's actions which

allowed the City to pay the 2021 MMO owed to the Pension Plans, the aggregate unpaid

outstanding MMO owed to the Pension Plans still totaled $39.8 million as of December 31,

2021, with interest accruing on that amount at the rate of the assumed return on investments

by the Police Pension Plan (approximately 7.5% per annum). Kapoor First Day Decl. ¶ 17.

---

[6] The Receiver indicates that the Series 2021 Notes are unsecured obligations, subject to annual appropriation of funds from the City's general or liquid fuels fund. Doweary Decl. ¶ 41.

[7] ARPA funding is restricted and can only be used to pay certain of the City's expenditures. Kapoor First Day Decl. ¶ 26.

On top of that, fully funding the Pension Plans would require an additional $87.4 million. *Id.*
Furthermore, the City's obligations related to "other post-employment benefits" ("OPEB"),
primarily retired employee medical and prescription insurance, were valued at $232.9 million
at the end of 2018, and cost the City over $5.5 million per year. *Id.* at ¶ 18; Doweary Decl.
¶29. Historically, the City had covered costs of OPEB on a pay-as-you-go basis with money
flowing out of the City's general fund to cover claims as they were received. Kapoor First
Day Decl. ¶ 20.

On January 14, 2022, the Receiver requested authorization to commence a Chapter 9 case
on behalf of the City from the Secretary. Doweary Decl. ¶ 3. On February 8, 2022, the
Secretary provided the Receiver with written authorization to file a municipal debt
adjustment action on behalf of the City under Act 47 ("Bankruptcy Authorization"). *Id.*, Ex.
B.

On June 10, 2022, Preston Hollow sent an email to the Receiver ("June 10 Email")
requesting a meeting to discuss a proposal regarding the treatment of the 2017 Bonds,
suggesting that some of the funding the City had received under ARPA be used, along with
other monies held by the indenture trustee, U.S. Bank, to retire the 2017 Bonds prior to their
stated maturities and offering, in exchange, to waive the call premium, resulting in $369,600
in savings to the City and reducing the City's 2023 debt service obligation by $924,000. ECF
148 Declaration of Charles Visconsi in Support of Objection to the Eligibility of the City of
Chester, Pennsylvania to be a Debtor Under Chapter 9 of the Bankruptcy Code ("Visconsi
Decl.") ¶¶ 4, 5, Ex. A.

On June 22, 2022, the Receiver responded to the June 10 Email stating "I wanted to both
respond to your idea as well as to invite further discussion as to a good faith resolution that is

fair to all involved[,]" but ultimately rejecting Preston Hollow's proposal, explaining that he

did not believe ARPA funds could be used in the proposed manner, and that even if they

could, the City needed the ARPA money to sustain basic operations. *Id.* at ¶ 6, Ex. B; Kapoor

Suppl. Decl. ¶ 23. The Receiver expressed that he would like to speak with Preston Hollow

further and would contact Preston Hollow in the coming weeks with some proposed dates.

Visconsi Decl. ¶ 6, Ex. B.

The Receiver continued to attempt to reduce excess spending and balance the City's

budget, but because of the City's consistently underfunded pension obligations, without

reorganization, the City was projected, as of September 13, 2022, to realize a $46.5 million

deficit in 2023, a $3.6 million deficit in 2024, and a $12.4 million deficit in 2025, with

steadily increasing deficits in each subsequent year. Doweary Decl. ¶ 7; Kapoor First Day

Decl. ¶ 28. Accordingly, on September 13, 2022, the Receiver made a presentation to the

Municipal Financial Recovery Advisory Committee ("MFRAC")[8] about the severe and

immediate financial issues facing the City; the concessions needed from unions, retirees, and

other creditor constituencies to avoid having to file a bankruptcy petition; and why he may

need to file for bankruptcy. Kapoor First Day Decl. ¶ 5. During this presentation, the

Receiver outlined that one option, among others, for addressing the City's budget deficits

included eliminating or substantially reducing its debt service obligations. Visconsi Decl. ¶ 7,

Ex. C at 26 ("To close deficits this big, we must consider extremely difficult actions. The

only options that would come close to doing this are…[e]liminating or substantially reducing

City debt service."); Kapoor Suppl. Decl. ¶¶ 28–29. The Receiver specifically stated in his

---

[8] MFRAC is an advisory committee established under Act 47 to meet and consult with the Receiver to provide non-binding recommendations and feedback to the Receiver on the implementation of the Recovery Plan. Kapoor First Day Decl. ¶ 5 n.3.

presentation that "[t]he Receiver is open to other ideas; however, they will need to close these deficits and they must result in recurring revenues covering recurring expenses." Visconsi Decl. Ex. C at 26. According to the Receiver's chief of staff ("Chief of Staff" or "Mr. Kapoor"), that portion of the MFRAC presentation was not, and was not intended to be, a new proposal to Preston Hollow. Kapoor Suppl. Decl. ¶ 29.

A few days after the MFRAC presentation, on September 16, 2022, the Receiver presented term sheets to the union representing the City's firefighters, Local 1400 of the International Association of Firefighters ("IAFF")[9] and the union representing certain of the City's non-uniform employees, the Teamsters.[10] Kapoor First Day Decl. ¶ 65. The Receiver met with representatives of the IAFF and Teamsters on the same day in meetings lasting approximately one hour each. *Id.* On September 21, 2022, the Receiver presented a term sheet to the union representing the City's police officers, Lodge No. 19 of the Fraternal Order of Police ("FOP," collectively with IAFF and Teamsters, "Unions") and met with representatives of the FOP.[11] *Id.* The term sheets proposed terms on which the City would be willing to enter into new collective bargaining agreements or amend existing ones. *Id.* With respect to the retirees, each Union took the position that it did not and could not represent former members who are current retirees and would not negotiate on their behalf. *Id.*

Meanwhile, on October 11, 2022, the Receiver sent a letter to Preston Hollow ("October 11 Letter") and the indenture trustee, U.S. Bank, explaining his position that the obligations under the 2017 Bonds are unsecured with respect to the assets of the City and that:

---

[9] The IAFF's collective bargaining agreement with the City expired at the end of 2021. Kapoor First Day Decl. ¶ 13 n. 7.

[10] The Teamsters' collective bargaining agreement with the City expired at the end of 2022. Kapoor First Day Decl. ¶ 13 n.7.

[11] The FOP's collective bargaining agreement with the City expired at the end of 2021. Kapoor First Day Decl. ¶ 13 n.7.

> [i]n light of these circumstances and in a good faith effort to avoid the City having
> to file a chapter 9 bankruptcy case, I would like to schedule a call in the near term
> to discuss the status and potential treatment of the 2017 Bonds outside of
> bankruptcy or under a plan of adjustment in any chapter 9 proceeding the City
> may file, and whether a consensual resolution may be reached with respect to the
> treatment of the 2017 Bonds[,]

and proposing two potential dates for a call. Visconsi Decl. Ex. D.

After the meetings with the Unions, the Chief of Staff emailed the president of the IAFF

on September 29, 2022, October 6, 2022, October 17, 2022, and October 28, 2022; the

Teamsters' representative on October 6, 2022, October 17, 2022, October 28, 2022, and

November 4, 2022; and the FOP on October 28, 2022, October 30, 2022, and November 2,

2022, providing additional information related to historic healthcare costs. Kapoor First Day

Decl. ¶ 66.

Additionally, on October 17, 2022, Preston Hollow attended a call with the Receiver.

Visconsi Decl. ¶ 10. According to Preston Hollow:

> [d]uring that call, the Receiver repeated the statements made in the October 11
> Letter that Preston Hollow did not hold a perfected security interest, as well as his
> intention to eliminate or substantially reduce the City's debt service payment on
> the [2017 Bonds]. Preston Hollow attempted to engage in a meaningful discussion
> with the Receiver; however, the Receiver expressed no willingness to
> compromise.

*Id.*

However, according to the Chief of Staff, "[t]he meeting focused on the issues raised in

the October 11 letter and the ways in which a potential plan of adjustment could modify the

[2017 Bonds] and the City's other obligations." Kapoor Suppl. Decl. ¶ 32.

On October 24, 2022, the Receiver and Chief of Staff met with representatives of the

Delaware County Bondholders regarding the treatment of their claims against the City and,

based on that meeting, the Receiver got the impression that a resolution would only be

Case 22-13032-amc   Doc 279-1   Filed 03/14/23   Entered 03/14/23 20:04:16   Desc Main
Exhibit A- Order and Opinion dated March 14, 2023   Page 15 of 47
Case 22-13032-amc   Doc 266   Filed 03/28/23   Entered 03/28/23 01:00:16   Desc Main
Document   Page 13 of 42   Page 15 of 47

achievable in bankruptcy. Kapoor First Day Decl. ¶ 70. Nevertheless, the Chief of Staff sent

a follow up email to the Delaware County Bondholders on November 1, 2022. *Id.* The next

day, the Delaware County Solicitor ("Solicitor") called the Chief of Staff indicating that the

Delaware County Bondholders would not agree to the Receiver's proposal for treatment of

Delaware County's claims. *Id.* The Solicitor did not offer a counterproposal. *Id.*

On November 3, 2022, the FOP asked to schedule a follow-up meeting with the Receiver,

but no follow-up meeting was ever scheduled. *Id.* at ¶ 66. On November 4, 2022, Preston

Hollow sent a letter to the Receiver and Chief of Staff, the City's mayor, the DCED, and

MFRAC ("November 4 Letter") to "correct the record regarding the City's obligations on the

[2017 Bonds]," to assert its position that it does hold a perfected security interest in certain

revenues of the City, and to "correct [the Receiver's] assertion that the City may impair our

interests in a chapter 9 bankruptcy case." Visconsi Decl. Ex. E. Preston Hollow explained

that "[it] remain[s] interested in supporting the Receiver's efforts to mitigate the City's

reported financial distress, but [] will vigorously challenge any efforts to impair the [2017

Bonds], to impair our rights as holders of the [2017 Bonds], or to impair the rights of the

indenture trustee for the [2017 Bonds]." *Id.* Preston Hollow concluded the November 4

Letter by reiterating "we remain interested in working with the Receiver, the City, DCED,

MFRAC and other stakeholders to find solutions so long as those do not attempt to

unilaterally erode [Preston Hollow's] interests...Let us know if there are items herein to

discuss." *Id.* The Receiver interpreted the November 4 Letter as "shutting down any future

negotiations." Kapoor Suppl. Decl. ¶ 36.

On November 7, 2022, the IAFF responded to the Chief of Staff's emails and declined to

counter the Receiver's proposal. Kapoor First Day Decl. ¶ 66. The Chief of Staff similarly

never received a counterproposal from the Teamsters' representative. *Id.*

On November 8, 2022, the Receiver filed a Modification to the Amended Recovery Plan

("Modified Recovery Plan," together with the Initial Recovery Plan and Amended Recovery

Plan, "Recovery Plans") with the Commonwealth Court, seeking to amend the City's fiscal

recovery plan a second time and contending that certain actions by the City's Elected

Officials have impeded his ability to carry out the goals of the Amended Recovery Plan and

the City's ability to provide vital and necessary services to its residents. *Id.* at ¶ 86; ECF 226

Commonwealth Court Opinion ("Commonwealth Court Op.") at 9.[12] The Modified Recovery

Plan's

> most contested initiatives [sought] to remove the City's elected officials from
> their appointed positions as department heads; suspend the administrative duties
> of the City's elected officials as they relate to day-to-day operations; and give
> Receiver the sole authority to take certain actions on the City's behalf, including
> entering into contracts and controlling and directing the expenditure of federal
> and state funds.

Commonwealth Court Op. at 10.

On November 9, 2022, the Receiver and Chief of Staff conducted a meeting with

approximately 150 of the City's retirees at City Hall[13] to inform them of the City's financial

issues and explain the City's concept to address its financial problems, including the

adjustment of OPEB for retirees. Kapoor First Day Decl. ¶ 67.

---

[12] On February 9, 2023, the City filed a request that this Court take judicial notice of an opinion and order rendered
by the Commonwealth Court of Pennsylvania on January 31, 2023 respecting the Modified Recovery Plan. *See* ECF
226. In the absence of any objection to the Court doing so, the Court takes judicial notice of the opinion and order.
ECF 234 Eligibility Hrg. Tr., Feb. 13, 2023 ("Eligibility Hrg. Tr.") 15:16-22.
[13] All the City's retirees were notified of the meeting via a letter mailed by the Receiver on October 14, 2022.
Kapoor First Day Decl. ¶ 67.

On November 10, 2022 ("Petition Date"), consistent with the Bankruptcy Authorization,
the City filed a voluntary petition under Chapter 9 of the Bankruptcy Code ("Voluntary
Petition"). ECF 1, Voluntary Petition. Contemporaneously therewith, the City filed the
declaration of the Receiver representing that "[t]he City has not been, and currently is not,
paying its debts as they come due, and the City's inability to do so will reach a tipping point
in 2023 when the various and creative measures the City has taken to date to barely keep the
lights on will no longer prevent it from running out of cash." Doweary Decl. ¶ 30.
Specifically, according to the declaration of the Chief of Staff submitted in support of the
Voluntary Petition,

> [f]or years, the City's obligations have exceeded revenue from taxes and other
> sources available to it, and the City has borrowed and deferred paying certain
> obligations, and relied on one-time federal rescue money to survive fiscally.
> Contributions to the City's severely underfunded defined benefit pension plans,
> debt repayment, and other post-employment benefits ('OPEB') (namely retired
> employee medical and prescription insurance), consume a disproportionate and
> increasing share of the City's annual budget. These expenses will increase
> dramatically in 2023 and beyond absent decisive action by the City.

Kapoor First Day Decl. ¶ 9.

Furthermore, the Chief of Staff averred that the City does not have the resources to
continue to pay OPEB at the level it has in the past, as the OPEB benefits are extremely
costly to the City.[14] *Id.* at ¶¶ 20, 21.

In addition to the City's many obligations already discussed *supra*, as of the Petition
Date, the annual obligation on account of the Series 2009 Bonds is approximately $343,483;
the annual debt service on the Series 2010B Bonds is approximately $320,000[15]; the annual

---

[14] In fact, the City spends more for retiree healthcare than it does for active employee healthcare. Kapoor First Day
Decl. ¶ 22. In 2021, the City spent $4,012,392 for medical and prescription costs for two health plans only available
to retirees. *Id.*
[15] The borrowing matures in 2025. Doweary Decl. ¶ 39.

debt service on the Series 2017A Bonds ranges from $1,741,625 to $2,042,500 between the

Petition Date and 2027; and the annual debt service on the Series 2017B Bonds ranges from

$1,112,625 to $1,298,625 between the Petition Date and 2027. Doweary Decl. ¶¶ 36, 37, 39.

The City also leases certain motor vehicles and pays approximately $275,278 per annum on

account of those leases; the Internal Revenue Service ("IRS") asserts the City owes $750,000

for withholding taxes it alleges the City failed to pay to the IRS prior to the Receiver's

appointment; and the City is currently paying $200,000 annually to repay the 2017 DCED

Loan, which matures in 2027.[16] *Id.* at ¶¶ 40, 42, 43.

As explained by the Chief of Staff's declaration, "with the exception of the City's

potential right to monetize the assets of the Chester Water Authority ('CWA'), which is the

subject of significant litigation, and the City's parking revenue potential, the City's assets are

limited in number, suffer from years of deferred maintenance, and have little market value."

Kapoor First Day Decl. ¶ 32. Even if the City could sell some or all of its assets, "the

proceeds of the sales would be insufficient to solve the City's severe and growing financial

problems. Using one-time revenues to pay for recurring costs does not solve the City's

fundamental problem of recurring costs exceeding recurring revenues." *Id.*

The City's primary sources of revenue are real estate taxes, earned income taxes, a

contractual share of slot and gaming table revenues generated by Harrah's Casino, and a

hosting fee it receives from Covanta Delaware Valley, L.P. ("Covanta"), the owner of the

---

[16] The outstanding balances on the City's long-term debt obligations are as follows: (i) the Series 2010B Guaranteed
Revenue Notes have an outstanding balance of $972,855; (ii) the Series 2017A Bonds have an outstanding balance
of $9,149,375; (iii) the Series 2017B Bonds have an outstanding balance of $6,107,250; (iv) the Series 2019
(Delaware County) Bonds have an outstanding balance of $5,961,525; (v) the DCED Act 47 Loan has an
outstanding balance of $1,200,000; and (vi) the Series 2021 Notes have an outstanding balance of $774,410.64.
Doweary Decl. ¶ 33.

Delaware Valley Resource Facility, a waste incineration plant constructed on the City's
waterfront in 1992. Doweary Decl. ¶ 44.

With respect to the City's tax revenues, the Receiver explained that as of July 1, 2021,
the Census Bureau estimated the median annual income of all households in the City was
$32,867 and the median per capita annual income was $18,856 per year, with over 30% of
the population living below the poverty line. *Id.* at ¶ 16. By way of comparison, for the
period from 2016 to 2020, the median annual income of all households in Pennsylvania was
$63,627, and in Delaware County the median annual income was $76,238. *Id.* Despite this
discrepancy, the City's residents pay a 3.75% earned income tax, the second highest resident
earned income tax in Pennsylvania, behind only Philadelphia. Kapoor First Day Decl. ¶ 16. It
is apparent that "[t]he City's residents are already subject to a heavy tax burden and…cannot
afford to pay more." Doweary Decl. ¶ 29. Furthermore, the median home value in Chester
from 2016 to 2020 was $70,300, and only 37.1% of the population live in an owner-occupied
housing unit. *Id.* at ¶ 16. For this same period, the median home value in Pennsylvania was
$187,500 and in Delaware County was $247,900. *Id.*

Although the City believes its discussions with various creditor constituencies were
constructive and that significant data was conveyed to creditors, the City was unable to reach
a comprehensive agreement for restructuring its outstanding obligations prior to filing this
Chapter 9 case. Kapoor First Day Decl. ¶ 71. According to the Chief of Staff:

> the feedback received from creditors to date has led the City to determine that
> such a comprehensive agreement is unlikely in the near term or without this filing.
> Further negotiation with all of the City's various stakeholders is impracticable in
> light of the City's cash crisis and urgent need to move forward with its
> restructuring. The City requires a centralized forum within which parties may
> negotiate and ultimately be bound.

*Id.*

17

On November 15, 2022, the Court entered an order establishing the deadline for parties to

file any objections to the City's eligibility to be a debtor in a Chapter 9 case ("Eligibility

Objections Order"). ECF 49 Order Approving Form of Notice of Commencement of Case

and Manner of Service, Establishing Deadline for Objections, and Granting Related Relief

("Eligibility Objections Order"). Pursuant to the Eligibility Objections Order, any eligibility

objections were to be filed "no later than December 19, 2022," ("Objection Deadline") and

were required to "state the facts and legal authorities in support of such objections…"

Eligibility Objections Order ¶¶ 6–7.

On November 22, 2022, this Court entered an order clarifying that the automatic stay was

not in effect with respect to proceedings in the Commonwealth Court relating to the

Receiver's proposed Modified Recovery Plan. ECF 80 Automatic Stay Order.

Subsequently, two substantive objections to the City's eligibility to be a Chapter 9 debtor

were filed by the Objection Deadline.[17] On December 19, 2022, the Elected Officials and

Preston Hollow filed objections to the City's eligibility under Chapter 9 (collectively

"Eligibility Objections"). *See* ECF 146 Elected Officials' Objection to Voluntary Petition

---

[17]     The Court also received a letter from Sara I. Bingnear, a retired City employee appearing to act *pro se*, on
December 14, 2022. ECF 129. Ms. Bingear expressed her concern about the City filing for bankruptcy, explaining
that she saw "no way [] to survive without filing for [bankruptcy]" herself if this bankruptcy goes through and
asking the City "not [to] take these [retirement/health] benefits away from [her] or the others." *Id.* The Court
observes that this letter did not address any of the statutory criteria relating to the eligibility of a municipality to be a
debtor in Chapter 9 as set forth in § 109(c). However, since the filing of this letter, on January 4, 2023, this Court
entered an order directing the appointment of an Official Committee of Retirees, *see* ECF 174 Order Under Section
1102(A)(2) of the Bankruptcy Code Directing the Appointment of an Official Committee of Retired Employees
("Order Appointing Retiree Committee"). As of February 6, 2023, the United States Trustee filed a notice that an
Official Committee of Retired Employees had been appointed, and the Court is confident in its ability to adequately
represent Ms. Bingnear's interests and concerns. *See* ECF 215.
         The Chester Water Authority ("CWA") filed a limited objection to the Debtor's eligibility on December 19,
2022 "reserve[ing] its rights" to object to the Court confirming any plan that "purports to require the 'monetization'
of the CWA's assets without the CWA's consent or entering any order to the effect that the Debtor has the power to
do so." *See* ECF 145 Chester Water Authority's Limited Objection and Reservation of Rights to Debtor's Eligibility
("CWA Limited Objection") 1. Nonetheless, the CWA notes that it is "not at this time objecting to the Debtor's
eligibility to file [this] bankruptcy petition." *Id.*

("Elected Officials' Objection"); ECF 147 Objection to The Eligibility of the City of Chester filed by PHCC LLC d/b/a Preston Hollow Community Capital ("Preston Hollow's Objection").

The Elected Officials object to the Voluntary Petition because "they did not authorize it" and the City does not yet desire to effectuate a plan of debt adjustment because the City Council did not "adopt a resolution expressing [this] desire." Elected Officials' Objection ¶¶1, 15, 19. They argue the City's Home Rule Charter vests all legislative power with the City Council and thus the Elected Officials must authorize this bankruptcy filing in order for the City to be eligible for relief under Chapter 9. *Id.* at ¶¶ 1, 3, 4, 5.

Preston Hollow objects to the Voluntary Petition because it alleges the City did not negotiate in good faith or engage in meaningful discussions with it, *see* Preston Hollow's Objection ¶ 1, nor were these negotiations impracticable because Preston Hollow expressed a "willingness to discuss," *see id.* at ¶ 25.

On December 22, 2022, anticipating that its ability to pay its employees on January 6, 2023, would be placed in severe jeopardy without assistance, the City filed an emergency motion seeking court approval of a $5 million TRAN loan, which the Court granted on December 27, 2022. ECF 151 Emergency Motion of Debtor for a Comfort Order Authorizing Debtor to Obtain a Loan from the Commonwealth of Pennsylvania; ECF 157 Order Approving the Emergency Motion of Debtor for a Comfort Order Authorizing Debtor to Obtain a Loan from the Commonwealth of Pennsylvania. Without this loan, the City would have only had $2,851,000 in cash on hand on December 31, 2022, amounting to approximately nineteen days of operating expenses. Kapoor First Day Decl. ¶ 27.

Meanwhile, from January 9-11, 2023, the Commonwealth Court held a three-day hearing on

the Receiver's proposed Modified Recovery Plan. Commonwealth Court Op. 11.

On January 17, 2023, the City filed its responses to the Eligibility Objections. ECF 188

City of Chester's Response to the Elected Officials' Objection ("Debtor's Response to

Elected Officials"); ECF 189 Response of the City of Chester, PA, to Preston Hollow's

Objection ("Debtor's Response to Preston Hollow"). In its response to the Elected Officials,

the City argues that the Elected Officials' argument is premised on a flawed interpretation of

Act 47 because the Home Rule Charter and the Pennsylvania Constitution limit the Elected

Officials' authority, and that the Elected Officials lack standing to object to this bankruptcy.

Debtor's Response to Elected Officials ¶¶ 3–5, 7–10, 13-16. In its response to Preston

Hollow, the City argues that Preston Hollow's Objection fails to consider other creditor

constituencies and ignores two years of negotiations the City engaged in with Preston

Hollow, that the City needed to act quickly to preserve its assets, and a mutually acceptable

agreement was impracticable unless Preston Hollow was willing to substantially restructure

the City's obligations under the 2017 Bonds which it refused to agree to do. Debtor's

Response to Preston Hollow ¶¶ 11, 31-62.

On January 31, 2023, the Elected Officials filed a reply in support of their objection

asserting four primary arguments. ECF 206 Elected Officials Memorandum in Support of

Their Objection ("Elected Officials' Reply"). First, the Elected Officials argue they have

standing to object because they have legally protected interests as elected officials, and the

Court is prohibited from interfering with the City's governance and political powers under 11

U.S.C. § 904. Elected Officials' Reply 3–4. Second, they argue that Act 47 preserves their

power, *see id.* at 5–6, albeit conceding that Act 47 gives the Receiver the power to "file a

Chapter 9 proceeding and to act on the municipality's behalf in the bankruptcy," *see id.* at 7.

Third, even though they did not brief this issue in their objection, the Elected Officials assert

in their reply that this is an involuntary bankruptcy which is not permitted by the Bankruptcy

Code, purportedly because they were not the individuals who filed this instant petition. *Id.* at

9. Finally, the Elected Officials argue that the City does not desire to effectuate a plan of debt

adjustment as required by 11 U.S.C. § 109(c)(4) because there is no evidence the City, as

opposed to the Receiver, desires to do so. *Id.* at 10.

That same day, Preston Hollow filed a reply in support of its objection making three

primary arguments. *See* ECF 207 Reply in Support of Objection to Eligibility ("Preston

Hollow's Reply"). First, Preston Hollow asserts the City fails to show negotiations were

impracticable because the City's bond obligations are relatively minor compared to the City's

pension obligations, and Preston Hollow attempted to negotiate a consensual resolution.

Preston Hollow's Reply ¶¶ 1-2, 4–5. Second, Preston Hollow argues the record does not

support the Receiver's argument that the City engaged in negotiations but rather a pattern

that the Receiver refused to engage in any meaningful discussions. *Id.* at ¶ 3. Finally, Preston

Hollow asserts that if the Receiver wanted a reduction in the bonds' principal, it was up to

him to request it. *Id.* at ¶ 4.

Also on January 31, 2023, the Commonwealth Court issued a lengthy, thorough opinion

("Commonwealth Court Opinion") and order approving in part the Receiver's proposed

Modified Recovery Plan. Commonwealth Court Op. 2. In considering the Receiver's

proposed modifications, the Commonwealth Court was guided by § 703(e) of Act 47, which

provides that: "[t]he [C]ourt *shall confirm* the modification within 60 days of receipt of

notification of the modification *unless it finds clear and convincing evidence that the*

*recovery plan as modified is arbitrary, capricious or wholly inadequate to alleviate the fiscal emergency* in the distressed municipality." *Id.* at 13 (emphasis in original). Furthermore, the Commonwealth Court noted that pursuant to § 704(b) of Act 47, the Court's confirmation of a plan modification "*shall not be construed to []…change the form of government* of the distressed municipality." *Id.* (emphasis in original).

With respect to the Receiver's proposals to have the Chief of Staff report solely to the Receiver and not take any directives from the mayor or City Council; to grant the Receiver sole authority to act on the City's behalf with regard to entering into contracts and directing the expenditure of federal and state funds; and to require that City Council pass any budget or budget amendment as he directs, the Commonwealth Court determined that "any initiatives that give Receiver *exclusive* authority over internal administrative matters, while concomitantly stripping the Mayor and City Council of duties *expressly granted* to them by the City's governing documents, effectuate 'a wholesale change of municipal government.'" *Id.* at 15–16 (emphasis in original).

As such, the Commonwealth Court determined that the Receiver "lacks the authority to unilaterally enter into contracts on the City's behalf[,]" reasoning that the Receiver's enumerated powers in § 706(a) of Act 47 do not include the authority to enter into contracts. *Id.* at 17. Rather, § 706(a)(6) of Act 47 gives the Receiver authority "'[t]o *approve, disapprove, modify, reject, terminate or renegotiate* contracts and agreements with the distressed municipality…'" *Id.* at 18 (emphasis in original). Additionally, the Commonwealth Court observed that § 117.01(a) and (b) of the City's Administrative Code provides that all contracts and agreements wherein the City is a party shall be prepared by the City Solicitor when requested by City Council and each contract and agreement before its

execution shall be submitted by the City Solicitor to City Council or the director of the

proper department and that each contract or agreement wherein the City is a party shall be

signed on behalf of the City by the director of the department having jurisdiction over the

subject matter and by the City Clerk. *Id.* at 18–19. Accordingly, based on all the foregoing,

the Commonwealth Court determined that "to the extent Receiver seeks to completely usurp

the power to execute contracts from City Council and the directors of City

departments…such an initiative also effectuates an impermissible change in the form of

government." *Id.* at 19.

However, the Commonwealth Court found that "nothing in the City's Charter or

Administrative Code [would] preclude Receiver from removing Council members from their

positions as department heads or from appointing non-Council members as department

heads, *if* the [Commonwealth Court] finds that such changes are not arbitrary, capricious, or

wholly inadequate to alleviate the City's fiscal emergency." *Id.* at 17. The Commonwealth

Court concluded based on the evidence presented at the hearing on the Modified Recovery

Plan that administrative changes of that nature "are not only permissible, but necessary."[18] *Id.*

at 28. Furthermore, while the Commonwealth Court determined that permitting the Receiver

to have *sole* authority and control over the Chief of Staff would violate the City's Home Rule

Charter and Administrative Code, the Commonwealth Court explained that it also believes

that having a Chief of Staff oversee day-to-day operations of all City departments would help

---

[18] In particular, the Commonwealth Court observed that:

> all of this evidence, viewed together, demonstrates the City officials' continued lack of
> transparency and lack of cooperation with Receiver and his team…This type of adverse behavior
> obstructs Receiver's ability to work amicably and productively with City officials to achieve the
> City's fiscal recovery goals…The Court agrees with Receiver that if the City officials responsible
> for carrying out the goals of the recovery plan 'are incapable of doing so or refuse to do so and
> face no repercussions, then nothing will ever change and…Receiver will not be able to ensure the
> provision of vital and necessary services' to the City's residents.

Commonwealth Court Op. 27.

alleviate obstacles the Receiver and his team have experienced by giving employees much

needed clear direction, and as such, the Commonwealth Court revised the proposed Modified

Recovery Plan initiative relating to the creation of the Chief of Staff position to permit the

Chief of Staff to report to the Receiver but without changing the form of government

pursuant to the Home Rule Charter and Administrative Code. *Id.* at 28–29.

Finally, the Commonwealth Court observed that:

> [t]he credible evidence presented at the hearing demonstrates that the City's
> elected officials are not empowering Receiver in the eyes of the City's employees.
> Rather, the evidence shows that City officials frequently ignore Receiver's advice
> and directives, and even direct other employees in their departments to ignore his
> directives. City officials also have historically overlooked issues such as the
> unauthorized payroll payments to an incarcerated employee, the former police
> chief allowing his friends to boost their pensions by working extra overtime
> before retirement, and the City's seven-year default on its MMO payments. These
> incidents, together with the evidence of widespread nepotism within the City's
> government, demonstrate a pattern of City officials taking care of their own and
> intentionally turning their backs on wrongdoing within their departments. Further
> exacerbating these problems is the Mayor's assignment of Council members as
> department heads based on their loyalty to City Council and the Mayor's own
> inclination in a particular year, rather than on the person's actual qualifications to
> oversee a particular area. These practices cannot continue.

*Id.* at 39.

Accordingly, the Commonwealth Court approved the Receiver's proposed initiatives

aside from modifying initiatives relating to the Receiver's ability to hire contractors on

behalf of the City; budget; direct the expenditure of federal and state funds; and enter into

contracts and agreements on behalf of the City to give the Receiver authority to act in those

areas without removing such authority from the City's Elected Officials pursuant to the

Home Rule Charter and Administrative Code. *Id.* at 40.

On February 13, 2023, the Court held a hearing to determine the City's eligibility under

Chapter 9 of the Bankruptcy Code ("Eligibility Hearing"). ECF 232. At the Eligibility

24

Hearing, counsel for the City stated "[w]e believe today that criterias[sic] 1 and 3 that the City is a municipality and that the City is insolvent are not disputed." ECF 234 Eligibility Hrg. Tr., Feb. 13, 2023 ("Eligibility Hrg. Tr."), 12:8-10. No party voiced any objection to or disagreement with that statement. Counsel for the Elected Officials also conceded that "[w]e're not disputing that Act 47 at least facially gives the receiver the authorization to file the case." *Id.* at 22:10-12. The Eligibility Hearing having concluded, this matter is ripe for disposition.

## III.   DISCUSSION

For the reasons described more fully below, the Court concludes that the Debtor has met its burden and established that it is eligible for relief under Chapter 9 of the Bankruptcy Code. Therefore, the Court will enter an order for relief under 11 U.S.C. § 109 pursuant to 11 U.S.C. § 921(d).

### A. Applicable Legal Principles

#### a.   11 U.S.C. § 109

The City bears the burden of establishing its eligibility for relief under Chapter 9 by a preponderance of the evidence. *In re City of Vallejo*, 408 B.R. 280, 289 (9th Cir. B.A.P. 2009); *In re City of Stockton, Cal.*, 493 B.R. 772, 794 (Bankr. E.D. Cal. 2013). However, the eligibility criteria should "be construed broadly to provide access to relief in furtherance of the Code's underlying policies." *In re Hamilton Creek Metro. Dist.*, 143 F.3d 1381, 1384 (10th Cir. 1998).

Pursuant to § 109(c),

> [a]n entity may be a debtor under chapter 9 of this title if and only if such entity--
> (1) is a municipality;[19]

---

[19] No objectors dispute that Chester is a municipality, and indeed, Chester does qualify as a municipality. A municipality is a "political subdivision or public agency or instrumentality of a State." 11 U.S.C. § 101(40). The

Case 22-13032-amc   Doc 279-1   Filed 08/28/23   Entered 08/28/23 01:00:16   Desc Main
Case 22-13032-amc   Doc 266   Opinion dated March 14, 2023   Page 28 of 47
Exhibit A- Order and Opinion dated March 14, 2023   Page 26 of 42

(2) is specifically authorized, in its capacity as a municipality or by name, to be a
debtor under such chapter by State law, or by a governmental officer or
organization empowered by State law to authorize such entity to be a debtor under
such chapter;
(3) is insolvent;
(4) desires to effect a plan to adjust such debts; and
(5)(A) has obtained the agreement of creditors holding at least a majority in
amount of the claims of each class that such entity intends to impair under a plan
in a case under such chapter; (B) has negotiated in good faith with creditors and
has failed to obtain the agreement of creditors holding at least a majority in
amount of the claims of each class that such entity intends to impair under a plan
in a case under such chapter; (C) is unable to negotiate with creditors because
such negotiation is impracticable; or (D) reasonably believes that a creditor may
attempt to obtain a transfer that is avoidable under section 547 of this title.

11 U.S.C. § 109(c)(1)–(5).

Even if a municipality is eligible for Chapter 9 relief under § 109(c), the Court may

dismiss a case that is not filed in good faith under § 921(c). *In re City of Stockton, Cal.*, 493

B.R. at 784; 11 U.S.C. § 921(c). If the case is not dismissed under § 921(c), the court is

directed under § 921(d) to enter an order for relief under Chapter 9. 11 U.S.C. § 921(d).

**b.  Act 47**

Pennsylvania's Act 47 governs the treatment of municipalities experiencing severe

financial difficulties, and Chapter 7 of Act 47 governs receivership in municipalities. *See* 53

P.S. §§ 11701.102, 11701.702. Regarding the Receiver's powers, § 706 of Act 47 allows the

Receiver, in relevant part:

(3) To require the distressed municipality or authority to negotiate
intergovernmental cooperation agreements between the distressed municipality

---

common thread "t[ying] these entities together is their ability to exercise various sovereign powers" like the power
to tax, the power of eminent domain, or the police power. *In re Cty. of Orange*, 183 B.R. 594, 602 (Bankr. C.D. Cal.
1995). Chester is the oldest city in Pennsylvania and was incorporated as a borough in 1701 and as a city in 1866.
Doweary Decl. ¶ 10. The City maintains a fire department with approximately 61 sworn personnel and a police
department with approximately 83 sworn officers, and has the ability to tax its residents. *Id.* at ¶¶ 19, 44.
Accordingly, the City's ability to exercise various sovereign powers makes it a "political subdivision" of
Pennsylvania such that it is a municipality within the meaning of § 101(40).

and other political subdivisions in order to eliminate and avoid deficits, maintain sound budgetary practices and avoid interruption of municipal services…

(5) To require the distressed municipality or authority to cause the sale, lease, conveyance, assignment or other use or disposition of the distressed municipality's or authority's assets in accordance with section 707…

(7) To direct the distressed municipality or authority to take any other action to implement the recovery plan…

(9) To file a municipal debt adjustment action under the Bankruptcy Code (11 U.S.C. § 101 et seq.) and to act on the municipality's behalf in the proceeding. The power under this paragraph shall only be exercised upon the written authorization of the secretary. The filing of a municipal debt adjustment action under this paragraph and any plan of the receiver accepted by the Federal court shall be considered a modification of the recovery plan, except that the modification shall not be subject to judicial review under section 709. A recovery plan submitted to and approved by the Federal court under a Federal municipal debt adjustment action may include Federal remedies not otherwise available under this chapter…

53 P.S. § 11701.706.

Under § 703 of Act 47, the Receiver is charged with proposing a recovery plan for the City, *see* 53 P.S. § 11701.703, and § 704 of Act 47 limits the Elected Officials' powers once such a recovery plan is confirmed, *see* 53 P.S. § 11701.704. Section 704, in relevant part, provides:

(a) Effect of confirmation. -- The confirmation of the recovery plan and any modification to the receiver's plan under section 703 shall have the effect of:
  1. imposing on the elected and appointed officials of the distressed municipality or an authority a mandatory duty to undertake the acts set forth in the recovery plan;
  2. suspending the authority of the elected and appointed officials of the distressed municipality or an authority to exercise power on behalf of the distressed municipality or authority pursuant to law, charter, ordinance, rule or regulation to the extent that the power would interfere with the powers granted to the receiver or the goals of the recovery plan…
(b) Form of government. -- Confirmation of the recovery plan and any modification to the plan under section 703 shall not be construed to:
  1. change the form of government of the distressed municipality or an authority; or

27

    2. except as set forth in subsection (a), affect powers and duties of
elected and appointed officials of the distressed municipality or an
authority.

53 P.S. § 11701.704(a)–(b).

**B. The City of Chester is entitled to be a Chapter 9 debtor because it satisfies
each eligibility requirement under 11 U.S.C. § 109(c).**

Ultimately, the Court finds that the City is eligible for relief under Chapter 9 of the

Bankruptcy Code because it is a municipality and it has established that: (a) it was

specifically authorized to file this Voluntary Petition under state law; (b) it is insolvent within

the meaning of § 101(32)(C); (c) it desires to effect a plan to adjust its debts; (d) it negotiated

in good faith with its creditors or it was impracticable to negotiate with certain creditors; and

(e) it filed this Voluntary Petition in good faith.

    **a. The City was specifically authorized to file this Voluntary Petition by
a governmental officer empowered by Pennsylvania state law.**

The Receiver had valid authority to file this bankruptcy case on behalf of the City

because of the express powers granted to him under Act 47.[20] To be eligible for relief, the

---

[20]    As a threshold matter, the Court finds that the Elected Officials do not have standing to object to the City's
eligibility to be a debtor under Chapter 9 because they do not have a "personal stake in the outcome of the
controversy," *see In re city of Detroit*, 504 B.R. 97, 139 (Bankr. E.D. Mich. 2013) (internal citations omitted), and
are not "creditor[s] of [the] debtor … or [] able to assert an equitable claim against the estate." *In re Wolf Creek
Valley Metro. Dist. No. IV*, 138 B.R. 610, 616 (D. Colo. 1992). *See also* 11 U.S.C. § 1109(b); 11 U.S.C. § 901(a).
However, even if the Elected Officials had standing, the Court would still find their arguments regarding the
Debtor's Chapter 9 eligibility unavailing.
    Despite their initial objection to the Receiver's authority to file for bankruptcy on behalf of the City, the
Elected Officials stated at the Eligibility Hearing on February 13, 2023, that they do not "disput[e] that Act 47 at
least facially gives the [R]eceiver the authorization to file the case." Eligibility Hrg. Tr. 22:10-12. Indeed, Act 47
explicitly provides the Receiver with the authority to file a bankruptcy petition and act on behalf of the City in a
bankruptcy action. 53 P.S. § 11701.706(a)(9).
    As such, the City of Chester's Home Rule Charter is limited by Act 47. The General Assembly "may limit
the functions to be performed by home rule municipalities" as it has done through Act 47. *See Spahn v. Zoning Bd.
of Adjustment*, 602 Pa. 83, 102 (Pa. 2009) (citing *Ortiz v. Commonwealth*, 681 A.2d 152, 156 (Pa. 1996)) (finding
the General Assembly can limit the functions of a municipality, and also abrogate local ordinances where the matter
is of statewide concern). In fact, the City's Home Rule Charter itself expressly limits the Elected Officials' authority
by only granting them any powers and functions "not denied by the Constitution of Pennsylvania, the General
Assembly of the Commonwealth of Pennsylvania, or this Charter." *See* City of Chester Home Rule Charter, art. I, §
102. The Elected Officials' power to govern and make decisions for the City, therefore, is not an absolute power and
is specifically limited by Act 47.

City must be specifically authorized to be a debtor "under such chapter by State law, or by a

governmental officer or organization empowered by State law to authorize such entity to be a

debtor under such chapter[.]" 11 U.S.C. § 109(c)(2). Unlike the other factors for eligibility

under § 109(c), determination of whether the City is authorized to be a Chapter 9 debtor is

governed by Pennsylvania state law. *See In re City of Stockton, Cal.*, 493 B.R. at 783. Under

Act 47, the Receiver has the power to "file a municipal debt adjustment action under the

Bankruptcy Code [] and to act on the municipality's behalf in the proceeding" with written

authorization of the Secretary of the DCED. 53 P.S. §§ 11701.103 (defining "Secretary" for

purposes of Act 47 as "[t]he Secretary of Community and Economic Development of the

Commonwealth"), 11701.706(a)(9). Once authorization is granted, the Receiver "shall

consult with the [Act 47 municipal financial recovery] advisory committee" prior to filing the

municipal debt adjustment action. 53 P.S. § 11701.711(e).

Here, the Secretary of the DCED authorized the Receiver to commence a municipal debt

adjustment action in writing, *see* Doweary Decl. ¶ 3, and the Receiver subsequently

consulted with MFRAC regarding the City's financial problems, *see id.* at ¶ 4. The Receiver,

therefore, followed all the procedural requirements of Act 47 for initiating a municipal debt

---

For these same reasons, the Court finds the Elected Officials' assertion in one sentence of their initial objection that this is "not a voluntary bankruptcy" disingenuous and equally unavailing, given the express powers granted to the Receiver in Act 47 related to bankruptcy. Furthermore, the Elected Officials' belated attempt to further brief this argument in their reply will not be considered by the Court because of the Elected Officials' failure to provide developed legal reasoning or cite authority in their initial objection. *See In re Boy Scouts of America and Delaware BSA LLC*, 642 B.R. 504, 638 n. 584 (Bankr. D. Del. 2022) (refusing to consider argument where mere phrase "substantive consolidation" appeared in objection without any briefing). *See also In re Basquez*, Case No.: 6:18-bk-19790-WJ, 2020 WL 6929242, at *2–3 (Bankr. C.D. Cal. November 16, 2020). It is not enough to merely mention an argument in such a cursory manner in an initial pleading and leave the Court to do counsel's work. *See, e.g., United States v. Alonso*, 48 F.3d 1536, 1544 (9th Cir. 1995) ("an issue merely 'adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation'" is insufficient.); *Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993) (holding that "casual mention of an issue in a brief is cursory treatment insufficient to preserve the issue …" and refusing to consider [] argument made "in passing in a short footnote in [] opening brief, without argument or relevant citation.").

adjustment action, and thus the City has been specifically authorized by Pennsylvania state

law to be a Chapter 9 debtor under § 109(c)(2).[21]

### b. The City is insolvent pursuant to 11 U.S.C. § 101(32)(C) because it is not paying, and cannot pay, its debts as they become due.

The City's current and long-term inability to pay its debt obligations as they become due

establishes that it is insolvent under the Bankruptcy Code. The term "insolvent" means:

> (C) with reference to a municipality, financial condition such that the municipality is—
> (i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or
> (ii) is unable to pay its debts as they become due.

11 U.S.C. § 101(32)(c).

Each test is to be applied as of the time of the Chapter 9 filing. *See In re Hamilton Creek*

*Metro Dist.*, 143 F.3d at 1384–85.

---

[21] Section 261(a) of Act 47 allows a municipality to apply to the Secretary for written authorization to file a Chapter 9 bankruptcy if one of the following conditions is met:

  i.   Imminent jeopardy of an action by a creditor, claimant or supplier of goods or services which is likely to substantially interrupt or restrict the continued ability of the municipality to provide health or safety services to its citizens.
  ii.  One or more creditors of the municipality have rejected the proposed or adopted [recovery] plan, and efforts to negotiate resolution of their claims have been unsuccessful for a ten-day period.
  iii. A condition substantially affecting the municipality's financial distress is potentially solvable only by utilizing a remedy exclusively available to the municipality through [Chapter 9].

53 P.S. § 11701.261(a)(1)–(3).

However, if the municipality is in a state of fiscal emergency under § 602, as Governor Thomas Wolf declared in the City of Chester on April 13, 2020, § 261(a.1) provides that the City "shall not be authorized under (a) to apply to the department to file a municipal debt adjustment" because, pursuant to 53 P.S. § 11701.609, the distressed municipality may only file a municipal debt adjustment action under the Bankruptcy Code to the extent authorized under Chapter 7 of Act 47, which the Receiver has done as discussed *supra*. *See* 53 P.S. § 706(a)(9). Nevertheless, as discussed in the Bankruptcy Authorization, the Secretary in determining whether to grant the Receiver authorization considered § 261(a) of Act 47 as guidance, and "identified a condition substantially affecting the City of Chester's financial condition under 53 P.S. § 11701.261(a)(3)" - the outstanding amount owed to its pension funds, unfunded pension liabilities, and post-retirement OPEB obligations which together all exceed the City's ability to pay, and found that condition is potentially solvable only by utilizing a remedy exclusively available to the City through the Bankruptcy Code. Doweary Decl., Ex. B at 4-5.

The first prong "looks to current, general non-payment," and the second prong "is an equitable, prospective test looking to future inability to pay." *Id.* at 1384. Because the City's prolonged financial distress satisfies both tests, the Court finds that the insolvency requirement under § 109(c)(3) is satisfied.

Under the first prong, a payment is "due" if it is "presently, unconditionally owing and presently enforceable." *Id.* at 1385. Under this definition, it is clear that the City is insolvent because it is currently unable to fund, and historically has failed to fund, its substantial obligations under the Pension Plans, which are unconditionally owed and presently enforceable. In fact, the City has been unable to even pay the MMOs from 2013 through 2020, let alone the full amounts due under the Pension Plans for those years and beyond. Over $100 million remain due and owing to the Pension Plans, which the City lacks the resources to pay, in addition to its other substantial debt obligations discussed *supra*. Because the City has not been paying its debt obligations as they become due and its revenues are insufficient to pay off its MMO obligations and tax obligations, *inter alia*, the City is insolvent pursuant to the first prong under § 101(32)(C)(i).

In addition, the City also is insolvent under § 101(32)(C)(ii). As to the second prong, courts consider "longer term budget imbalances and whether the City has sufficient resources to maintain services for the health, safety, and welfare of the community." *In re City of Detroit, Mich.*, 504 B.R. 97, 168 (Bankr. E.D. Mich. 2013). This is a prospective test, "requir[ing] the petitioner to prove … an inability to pay its debts as they become due..." *In re Boise Cnty.*, 465 B.R. 156, 172 (Bankr. D. Idaho 2011).

The City's baseline general fund projections show a $46.5 million deficit in 2023, followed by a $3.6 million deficit in 2024, a $12.4 million deficit in 2025, a $14.4 million

deficit in 2026, and a $16.3 million deficit in 2027. Kapoor First Day Decl. ¶ 28, Ex. B.
Moreover, the City lacks the funds necessary to continue to pay OPEB benefits at the rate it
has historically. *Id.* at ¶ 18. Even if the City could sell all or some of the assets identified by
the Receiver in the future, which include, *inter alia*, land, City Hall, two fire stations, and a
police station, the proceeds would be insufficient to cover the City's past due payments on
the MMOs, its OPEB obligations, operational liabilities, and its other long-term debt
obligations. *See id.* at ¶ 32.

    Furthermore, it is apparent that further budget cuts alone will not make a dent in the
substantial outstanding and ongoing pension obligations and retiree healthcare costs and
would put the provision of vital and necessary services to the community at risk. Doweary
Decl. ¶ 8. Moreover, the City believes it cannot increase revenue by taxing its residents at a
higher rate because the City's residents already face a heavy tax burden and simply lack the
financial wherewithal to pay more. Based on all the foregoing circumstances and because the
City is in a state of "bona fide financial distress [] not likely to be resolved" without this
bankruptcy, *see In re City of Stockton Cal.*, 493 B.R. at 788, the City is also insolvent under
§101(32)(C)(ii), as required for the City to be a Chapter 9 debtor pursuant to § 109(c)(3).[22]

---

[22] In its eligibility objection, Preston Hollow requested that the Court enter an order setting deadlines to allow parties
to conduct discovery as to whether the City satisfies the insolvency requirement under § 109(c)(3) without providing
any evidence in support of its assertion that the City is not insolvent. Preston Hollow's Objection ¶¶ 2, 28. At the
January 3, 2023 status conference to establish dates and procedures with respect to the Eligibility Objections, when
pressed respecting its basis for believing discovery on insolvency necessary, Preston Hollow could not identify any
specific basis for suspecting that the City is not actually insolvent; any types of documents which would demonstrate
that the City is not substantially delinquent in funding its obligations under the Pension Plans; or any basis for
asserting that the declarations submitted in support of the City's eligibility are not sufficient to establish the City's
insolvency. ECF 178 Status Conference Hearing Tr., Jan. 3, 2023 ("Status Conf. Hr. Tr."), 21:13-24:6. In fact, at the
same status conference, counsel for the FOP and counsel for the then-Ad Hoc Committee of Retirees confirmed that
they are aware of no reason that the City would not be delinquent in its obligations to fully fund the Pension Plans.
*Id.* at 28:6-29:21. Thus, there is no reason for this Court to question the insolvency of the City given the City's
substantial delinquency in funding its Pension Plans.

### c. The City desires to effect a plan to adjust its debts.

Few published cases have addressed the requirement under § 109(c)(4) that the debtor must possess a desire to effect a plan of adjustment, but those that have considered the issue indicate that "no bright-line test exists for determining whether a debtor desires to effect a plan" because it is a highly subjective inquiry. *See In re City of Vallejo*, 408 B.R. 280, 295 (9th Cir. BAP 2009). In *In re City of Vallejo*, the Bankruptcy Appellate Panel surveyed the case law under § 109(c)(4):

> Petitioners may satisfy the subjective requirement with direct and circumstantial evidence. They may prove their desire by attempting to resolve claims []; by submitting a draft plan of adjustment []; or by other evidence customarily submitted to show intent [internal citations omitted]. The evidence needs to show that the 'purpose of the filing of the chapter 9 petition not simply be to buy time or evade creditors.' *See* Collier ¶ 109.04 [3][d], at 109–32.

*In re City of Vallejo*, 408 B.R. at 295.

In *In re City of Stockton, Cal.*, the court expanded:

> [t]he cases equate 'desire' with 'intent' and make clear that this element is highly subjective [citation omitted].
>
> At the first level, the question is whether the chapter 9 case was filed for some ulterior motive, such as to buy time or evade creditors, rather than to restructure the City's finances [internal citations omitted].
>
> Evidence probative of intent includes attempts to resolve claims, submitting a draft plan, and other circumstantial evidence (internal citation omitted).

*In re City of Stockton, Cal.*, 493 B.R. at 791.

Accordingly, the Court will examine the direct and circumstantial evidence related to the City's desire to effect a plan of adjustment, including any attempts to resolve claims; submission of a draft plan; and other circumstantial evidence.

As a threshold matter, there is absolutely no evidence that the Debtor filed this action with an ulterior motive such as evading creditors. Second, the Debtor, through the Receiver and Mr. Kapoor, attempted to resolve claims with its creditors for months prior to filing this

bankruptcy proceeding to no avail. As discussed *infra*, the Debtor was unable to reach an

agreement with its creditors and was running out of time, based on financial projections, to

file this Chapter 9 bankruptcy before its assets and cash flow were compromised. Third, the

Debtor submitted a memorandum of law in support of its eligibility to be a debtor under

Chapter 9 with its Voluntary Petition, which states that the Debtor "is presently developing a

plan of adjustment[] and is seeking mediation with its major constituencies to expedite and

mediate a path towards such a plan of adjustments [sic]." ECF 7 Memorandum of Law in

Support of Statement of Qualifications Pursuant to Section 109(c) ¶ 80. Fourth, the Debtor

filed its motion requesting that the Court appoint a judicial mediator and refer all significant

issues to mandatory mediation at the outset of this case, further confirming its desire to

expeditiously effect a plan of adjustment. ECF 16 Motion for Entry of an Order Appointing a

Judicial Mediator. Finally, the Receiver's pre- and post-petition efforts in implementing the

Recovery Plans by taking steps to reduce the City's expenditures, reducing its workforce, and

limiting discretionary purchases, *inter alia*, are also probative of the Debtor's intent to effect

a plan of adjustment. *See In re City of Stockton, Cal.*, 493 B.R. at 791. Consequently, the

Court finds that the Debtor is taking every possible action that it can to effect a plan of

adjustment and, therefore, the Debtor has established that it desires to effect a plan of

recovery to adjust its debts.[23]

---

[23] The Elected Officials' argument that the City does not desire to effect a plan because the Elected Officials have not expressed such a desire is unavailing. Section 706 of Act 47 explicitly grants the Receiver the power to act on behalf of the City in this proceeding, such that his actions can evince the City's intent. 53 P.S. § 11701.706(a)(9).

### d. The City has established that it negotiated in good faith with certain creditor constituencies, and that it was impracticable to negotiate with other creditor constituencies prior to filing.

In order to satisfy § 109(c)(5), the City has four options, three of which are focused on negotiations with creditors. As mentioned *supra*, § 109(c)(5) provides that a municipality satisfies this requirement when it:

> (A)    has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;
> (B)    has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;
> (C)    is unable to negotiate with creditors because such negotiation is impracticable; or
> (D)    reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

11 U.S.C. § 109(c)(5).

The first and fourth options do not apply in this case because the City has not obtained the agreement of a majority of the claims of any class of creditors that will be impaired under a plan in this bankruptcy proceeding, nor has the City suggested that it believed that there was a creditor that would attempt to obtain a transfer that would be avoidable under the Bankruptcy Code. However, the second and third options do apply here.

The City asserts that it negotiated in good faith with various creditor constituencies, but that it was impracticable to negotiate with all its creditors, particularly its approximately 268 retirees who were not represented prepetition by the Unions or any other identifiable representative. ECF 7 Memorandum of Law in Support of Statement of Qualifications Pursuant to Section 109(c) ¶ 100. Moreover, the City contends that it was impracticable to delay this filing for extended and potentially futile creditor negotiations where the City's

35

financial situation is so dire that it is dangerously close to running out of money to pay for

basic expenses and is projected to have a net negative cash position by the end of 2023.

### i. The City negotiated with its Unions, the Delaware County Bondholders, and Preston Hollow in good faith.

In considering what is required to support a finding that a debtor negotiated in good faith

for purposes of Chapter 9 eligibility, the Court adopts the persuasive analysis set forth by the

court in *Mendocino Coast*. As explained in *Mendocino Coast*:

> First, the greater the disclosure about the proposed bankruptcy plan, the stronger
> the debtor's claim to have attempted to negotiate in good faith. A creditor might
> be justified in rejecting the overture of a debtor proposing a frivolous or unclearly
> described adjustment plan, but a creditor is less justified in ignoring a substantive
> proposal.
>
> Second, the municipality's need to immediately disclose classes of creditors and
> their treatment in the first communication will depend upon how material that
> information would be to the creditor's decision about whether to negotiate.
>
> Third, the creditor's response, and the amount of time the creditor has to respond,
> may also be factors. If a creditor has had a relatively short time to respond to the
> municipality's offer to negotiate, a lack of detail in the opening communication
> might weigh against a municipality rushing to file. On the other hand, where a
> creditor has been apprised of the possibility of a debt adjustment and declined to
> respond after a reasonable period of time, or where the creditor has explicitly
> responded with a refusal to negotiate, its position as an objector is significantly
> weakened.

*See In re City of Detroit*, 504 B.R. at 174 (citing *In re Mendocino Coast Recreation & Park*

*Dist.*, 2013 WL 5423788, at *8-9 (N.D. Cal. Sept. 27, 2013)).  In addition to these three

factors, the Court also will examine the City's intentions regarding these meetings, and the

nature of the meetings. *See In re City of Detroit*, 504 B.R. at 176 (finding City did not

negotiate in good faith because it "affirmatively stated that the meetings were not

negotiations" and the presentational format of the meetings "gave little opportunity for

creditor input or substantive discussion.").

As to the Unions, the City engaged in well-documented meetings with the IAFF,
Teamsters, and FOP, and numerous attempts at follow-up communication prior to filing the
Voluntary Petition. *See In re City of Stockton,* 493 B.R. at 793. The Receiver made proposals
to the Unions as evidenced by the term sheets provided to the IAFF and Teamsters on
September 16, 2022, and to the FOP on September 21, 2022, proposing new or amended
collective bargaining agreement terms. In addition, the Receiver and Chief of Staff were
transparent about the City's financial distress and the severity of changes that might be
necessary. The City also met with each Union in September, giving "opportunity for creditor
input," and repeatedly followed up with the Unions. *See In re City of Detroit,* 504 B.R. at
176; Kapoor First Day Decl. ¶ 65. Finally, the Receiver gave the Unions a reasonable time to
respond to the City's proposals prior to the City's November 10, 2022, filing. All of these
actions taken by the Receiver support the finding that the City's efforts to negotiate with the
Unions were reasonable and in good faith.

As to the Delaware County Bondholders, the City appears to have had a constructive
meeting, which included proposals to such creditors a few weeks prior to the Petition Date,
and attempted to follow up with Delaware County representatives about a week before,
giving Delaware County a reasonable amount of time to respond. While the Solicitor did not
agree to the Receiver's proposal and did not offer a counterproposal, the Court has no basis
to conclude that the Receiver did not negotiate in good faith with the Delaware County
Bondholders. *See In re Stockton, Cal.,* 493 B.R. at 793.

With regard to Preston Hollow, such creditor argues that the City did not negotiate in
good faith. Although it brands the City's October 2022 proposal as a "take-it-or-leave-it
ultimatum that was not made in good faith," Preston Hollow ignores the Receiver's

37

prepetition attempts to negotiate in 2020 and 2021. *See In re Stockton, Cal.*, 493 B.R. at 793

(finding the ask with respect to the objecting creditors was reasonable and the City did not

adopt a take-it-or-leave-it posture). Furthermore, the Receiver's analysis of Preston Hollow's

2020, 2021, and 2022 proposals were reasonable both in light of the City's position that

Preston Hollow failed to properly perfect its security interest and the City's dire financial

condition. In addition, the Receiver's October 11 Letter was transparent about the City's

financial challenges and how the City might modify the 2017 Bonds in a plan of adjustment,

which was further discussed on the conference call on October 17, 2022 ("October 2022

Meeting"), wherein the Receiver attempted to explore whether a consensual resolution with

Preston Hollow could be reached. Moreover, the October 2022 Meeting was requested by the

Receiver "in a good faith effort to avoid" this voluntary filing, *see* Visconsi Decl., Ex. D at 2,

and the small group format of the meeting was tailored to discuss issues specific to Preston

Hollow. *See In re City of Detroit*, 504 B.R. at 176.

While Preston Hollow did express in the November 4 Letter its willingness to continue to

attempt to work with the Receiver, it was reasonable for the Receiver to conclude from

Preston Hollow's vigorous opposition to any impairment of its claim, and after three prior

unsuccessful attempts at modifying the treatment of the 2017 Bonds, that, while both parties

were willing to work together, they were simply too far apart and could not reach terms

satisfactory to avoid a bankruptcy filing. Thus, the Court finds that the record of

communications between the City and Preston Hollow, the financial details disclosed in the

October 11 Letter, and the reasonable time for Preston Hollow to respond to the October 11

Letter support the finding that the City negotiated in good faith with Preston Hollow even

though the parties ultimately could not reach a consensual resolution outside of bankruptcy.

Based upon the foregoing, the Court finds that the City negotiated in good faith with the

Unions, the Delaware County Bondholders, and Preston Hollow, thereby satisfying

§109(c)(5)(B).

### ii. It was impracticable for the City to negotiate with its unrepresented retirees.

"[I]mpracticability of negotiations is a fact-sensitive inquiry that 'depends on the

circumstances of the case.'" *In re New York City Off-Track Betting Corp.*, 427 B.R. 256, 277

(Bankr. S.D.N.Y. 2010) (internal citations omitted). With respect to the retirees, it is

"impracticable to negotiate with [] retirees for whom there is no natural representative," *see*

*In re City of Stockton, Cal.*, 493 B.R. at 794, particularly where, as here, the retirees were not

represented by any of the City's three Unions prior to the Petition Date, *see* Kapoor First Day

Decl. ¶ 65. *See also In re Cty. Of Orange*, 183 B.R. 594, 607–08 (Bankr. C.D. Cal. 1995)

(finding it was impracticable for Debtor to enter into prepetition negotiations with over 200

participants). Here, the retirees, who could potentially assert hundreds of millions of dollars

related to the City's underfunded pension liability and unfunded OPEB obligations, had no

natural or appointed representative, Kapoor First Day Decl. ¶ 67, and indeed, an order

directing the appointment of a committee to speak on behalf of the retirees was not entered

by this Court until January 4, 2023. ECF 174 Order Directing the Appointment of an Official

Committee of Retired Employees. Consequently, given the volume of potential retiree claims

and the retirees' lack of centralized representation prior to filing, it was impracticable for the

City to begin prepetition negotiations with its retirees and, as such, to formulate a plan of

adjustment for its debts without Chapter 9.

Accordingly, the Court finds the City also has satisfied § 109(c)(5)(C).[24]

### e. The City filed this Voluntary Petition in good faith.

Even if a municipality is eligible under § 109(c), the Court may dismiss a case that is not

filed in good faith. *In re City of Stockton, Cal.*, 493 B.R. at 784. Section 921(c)'s "good

faith" requirement serves a policy objective, "assuring that the chapter 9 process is being

used ... consistent with the reorganization purposes of the Bankruptcy Code." *Id.* at 794.

Nonetheless, if all the eligibility criteria in § 109(c) are satisfied, there is a "strong

presumption in favor of [C]hapter 9 relief." *Id.* To determine whether the Debtor's petition

was filed in good faith, the Court considers: (i) whether the City's financial problems are

those contemplated by Chapter 9; (ii) whether the reasons for filing are consistent with

Chapter 9; (iii) the extent of the City's prepetition efforts to address the issues; (iv) the extent

the alternatives to Chapter 9 were considered; and (v) whether the City's residents would be

prejudiced by denying Chapter 9 relief. *See In re City of Stockton, Cal.*, 493 B.R. at 795

(applying good faith presumption "in view of the [City's] multi-year effort to ratchet down

expenses ... its cash insolvency, its service insolvency, its good faith negotiations or efforts

to negotiate with creditors, and its inability to achieve significant further reductions ..."). *See*

*also* 6 Collier on Bankruptcy ¶ 921.04[2], 16th Ed. Given the Court's determination that the

City has satisfied all the eligibility criteria in § 109(c), the Court finds that there is a strong

presumption in favor of Chapter 9 relief herein.

---

[24] Section 109(c)(5)(C) also provides an adequate, independent reason for concluding that the City has satisfied this requirement for eligibility with respect to Preston Hollow. *See In re City of Stockton, Cal.*, 493 B.R. at 794. It is "impossible to negotiate with a stonewall," *see id.*, where, as discussed *supra*, Preston Hollow's position remained virtually unchanged since 2020. The City is not required to wait until "it has reached an impasse after extensive prepetition negotiations" to invoke § 109(c)(5). *In re Valley Health System*, 383 B.R. 156, 162-63 (Bankr. C.D. Cal. 2008). Indeed, negotiations may also be impracticable where the City had to act "to preserve its assets" given its precarious financial position, as the City did here. *See id.* at 163.

First, the financial problems, discussed *supra*, that the City has faced since the mid-1950s are the types of financial problems contemplated by, and meant to be addressed in, a Chapter 9 filing. Second, the City's decision to file this Voluntary Petition and pursuit of a plan of recovery in the face of its "crippling liabilities" and insufficient revenue to meet its current and future liabilities is entirely consistent with Chapter 9's objective of providing protection to a financially distressed municipality from creditors while it develops a plan to adjust its debts. ECF 89 First Day Hearing Transcript, November 15, 2022 ("Hearing Transcript Nov. 15"), 10:1-12. Third, as discussed *supra*, the City has been and remains insolvent despite the Receiver's and Mr. Kapoor's extensive prepetition efforts to cut expenses and find sources of funding. Fourth, despite the City's prepetition negotiations with its creditors to avoid a bankruptcy filing, such efforts have not been fruitful and, at this point, Chapter 9 relief appears to be the only viable option to bring all relevant parties to the table in order to reach a resolution and a plan of adjustment. Finally, given that the City's residents are burdened by high taxes while essential services are diminishing, the City's residents will be prejudiced should this Court deny Chapter 9 relief. Indeed, the City's goal in this Chapter 9 case is to confirm a plan that "provides [a] permanent solution for the City of Chester and its residents." *Id.* at 13:12-14. Accordingly, the Court finds the City filed this petition in good faith.

## IV.    CONCLUSION

For the reasons set forth above, the Court concludes that the City of Chester is eligible to be a debtor under Chapter 9 of the Bankruptcy Code pursuant to 11 U.S.C. § 109(c) and that the Bankruptcy Petition was filed in good faith. Accordingly, the Court will enter an order for relief forthwith, as required by 11 U.S.C. § 921(d).

Case 22-13032-amc   Doc 279-1   Filed 08/28/23   Entered 08/28/23 11:00:16   Desc Main
Exhibit A- Order and Opinion dated March 14 2023   Page 44 of 47

Case 22-13032-amc   Doc 266   Filed 03/14/23   Entered 03/14/23 16:04:00   Desc Main
Document      Page 42 of 42

Date: <u>March 14, 2023</u>

_____
Honorable Ashely M. Chan
United States Bankruptcy Judge

Case 22-13032-amc    Doc 279-1    Filed 03/28/23    Entered 03/28/23 11:00:16    Desc
Exhibit A- Order and Opinion dated March 14    2023    Page 45 of 47

Case 2:22-mc-00249-UA    Document 3    Filed 02/24/23    Page 1 of 3    Page ID #:14

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Digital Egg Investments, LLC | **CASE NUMBER:** |
| | CV-**2:22-mc-00249** |
| Plaintiff(s) | |
| v. | |
| Green Standard New Technology Solutions, LLC, Jeric S. Devela, and Charles Yanez | **WRIT OF EXECUTION** |
| Defendant(s) | |

**TO:**  **THE UNITED STATES MARSHAL FOR THE CENTRAL DISTRICT OF CALIFORNIA**

You are directed to enforce the Judgment described below with interest and costs as provided by law.

On __12/21/2022_____ a judgment was entered in the above-entitled action in favor of:

Digital Egg Investments, LLC

as Judgment Creditor and against:

Green Standard New Technology Solutions, LLC and Jeric S. Devela

as Judgment Debtor, for:

$ __621,580.03_____   Principal,
$ _____0.00_____   Attorney Fees,
$ _____0.00_____   Interest **, and
$ _____0.00_____   Costs, making a total amount of
$ _____621,580.03*__   JUDGMENT AS ENTERED
*Judgment was reduced to $245,000 on 4/12/22 by stipulation between the parties.

**NOTE:  JUDGMENTS REGISTERED UNDER 28 U.S.C. §1963 BEAR THE RATE OF INTEREST OF THE DISTRICT OF ORIGIN AND CALCULATED AS OF THE DATE OF ENTRY IN THAT DISTRICT.**

Case 22-13032-amc    Doc 279-1    Filed 03/28/23    Entered 03/28/23 11:00:16    Desc
Exhibit A- Order and Opinion dated March 14    2023    Page 46 of 47

Case 2:22-mc-00249-UA   Document 3   Filed 02/24/23   Page 2 of 3   Page ID #:15

WHEREAS, according to an affidavit and/or memorandum of costs after judgment it appears that further sums have accrued since the entry of judgment **in the** Middle **District of** Pennsylvania ,
to wit:

$ _____ 1,915.90 _____ accrued interest, and

$ _____ 0.00 _____ accrued costs, making a total of

$ _____ 246,915.90 _____ **ACCRUED COSTS AND ACCRUED INTEREST**

Credit must be given for payments and partial satisfaction in the amount of $ 0.00 which is to be credited against the total accrued costs and accrued interest, with any excess credited against the judgment as entered, leaving a net balance of:

$ _____ 246,915.90 _____ **ACTUALLY DUE** on the date of the issuance of this writ of which

$ _____ 246,915.90 _____ Is due on the judgment as entered and bears interest at .58 percent per annum, in the amount of $ 3.89 per day, from the date of issuance of this writ, to which must be added the commissions and costs of the officer executing this writ.

CLERK, UNITED STATES DISTRICT COURT

Dated: 2/24/2022

By: _Yvette Louis_
Deputy Clerk

Case 2:22-mc-00249-JAA  Document 31  Filed 02/14/23  Page 3 of 3  Page ID #:160

The following are name(s) and address(es) of the judgment debtor(s) to whom a copy of the Writ of Execution must be mailed unless it was served at the time of the levy.  This information must be filled in by counsel requesting this writ.

```
Green Standard New Technology          Jeric S. Devela
Solutions, LLC                          21250 Fibre Court
c/o Frank Tsaur as Registered Agent     Walnut, CA 91789
407 Vista Rambla
Walnut, CA 91789-2130
```

## NOTICE TO THE JUDGMENT DEBTOR

You may be entitled to file a claim exempting your property from execution.  You may seek the advice of an attorney or may, within ten (10) days after the date the notice of levy was served, deliver a claim of exemption to the levying officer as provided in Sections 703.510 - 703.610 of the California Code of Civil Procedure.