IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| In re: | : | Chapter 9 |
| | : | |
| CITY OF CHESTER, PENNSYLVANIA, | : | Case No. 22-13032 |
| | : | |
| Debtor. | : | Judge Ashely M. Chan |
| | : | |

**MOTION OF CITY OF CHESTER FOR ENTRY OF AN ORDER REQUIRING THE STORMWATER AUTHORITY OF THE CITY OF CHESTER TO PRODUCE DOCUMENTS PURSUANT TO BANKRUPTCY RULE 2004**

The City of Chester ("Chester" or the "City"), as the debtor in the above-captioned chapter 9 case, hereby moves the Court (the "Motion"), pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure ("Rule 2004") and Rule 2004-1 of the Local Rules for the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Local Rules"), for entry of an order substantially in the form attached hereto as **Exhibit A**, directing the Stormwater Authority of the City of Chester ("SAC") to produce the documents described in **Exhibit B**, and in support hereof, respectfully represents as follows.

### I.    Preliminary Statement[1]

In November 2016, the City formed SAC as a municipal authority for the purpose of (i) managing and operating the stormwater assets of the City, (ii) ensuring better compliance with changing statutory and regulatory requirements related to stormwater, (iii) avoiding the increasing burden on the taxing powers and daily operations of the City. As a municipal authority serving only a single municipality, pursuant to applicable Pennsylvania law, SAC and its assets remain

---

[1] Capitalized terms used but not otherwise defined in this Preliminary Statement shall have the meaning given to them in this Motion.

subject to the right of the City to re-acquire those assets in accordance with Section 5622(a) of the Pennsylvania Municipality Authorities Act, 53 Pa.C.S. §§ 5601-5623 (the "MAA").[2] As part of this chapter 9 case, the Receiver is considering and evaluating all of the City's assets (including property interests) with a view towards maximizing value and ultimately confirming a viable plan of adjustment that will allow the City to emerge from decades of financial oversight. Based on the information available, including a substantial rate increase implemented by SAC (which was met with notable public outcry) and an insider loan from SAC's Executive Manager and his church to allow SAC to make payroll in contravention of applicable laws on borrowings by municipal authorities, the City has significant concerns about the financial condition, operations, management and governance of the authority. The Receiver, in a coordinated effort with bankruptcy counsel and The Honorable Stefan Roots, the Mayor of the City of Chester, has repeatedly requested information from SAC to better understand its operations and its assets and ensure that the City's property interests will not be compromised or put at financial risk. These requests have been repeatedly and systematically ignored or responded to with arguments that rely on false premises and misconstrue the law.[3] The organized strategy employed by SAC's leadership to stonewall the City has prompted the filing of this Motion, which seeks nothing more than basic information about the City's property interests and statutory rights so that such interests and rights can be considered in the context of the financial restructuring which is the ultimate goal of this chapter 9 case.

---

[2] The MAA was amended in 2013 to enable municipalities to form authorities for the purpose of stormwater management and for those authorities to collect fees for the financing of stormwater planning, management, and implementation.

[3] Most recently, SAC effectively informed the Receiver that he would need to file a Right to Know request to obtain information from SAC.

2

## II. Jurisdiction and Venue

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G).

3. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory predicate for the relief requested herein is Rule 2004.

## III. Background

### A. The Bankruptcy

5. On November 10, 2022 (the "Petition Date"), pursuant to the authority granted by the Secretary of the Pennsylvania Department of Community and Economic Development ("DCED") to file a municipal debt adjustment action on behalf of the City under title 11 of the United States Code (the "Bankruptcy Code") and the Pennsylvania Municipalities Financial Recovery Act, Act of 1987, P.L. 246, No. 47, *as amended* 53 P.S. §§ 11701.101–11701.712 ("Act 47"), Michael Doweary, the Receiver for the City (the "Receiver"), commenced this case on behalf of the City under chapter 9 of the Bankruptcy Code.[4]

6. As referenced in the Doweary Declaration, the goal of this chapter 9 case is to formulate and confirm a viable plan of adjustment that will effectuate a financial restructuring of the City's obligations and assist the City in emerging from decades of financial oversight. *See* Doweary Declaration, ¶ 9.

---

[4] The factual background regarding the City, including the events precipitating the chapter 9 filing, is set forth in detail in the *Declaration of Michael Doweary in Support of the City of Chester, Pennsylvania's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code and First Day Pleadings* [Docket No. 5] (the "Doweary Declaration") and the *Declaration of Vijay Kapoor in Support of the City of Chester, Pennsylvania's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code and First Day Pleadings* [Docket No. 6] (the "Kapoor Declaration"), which were filed on the Petition Date.

7. In an effort to achieve these goals, since before the Petition Date and continuing thereafter, the City has been engaged in the process of detailing and analyzing all of its rights, interests, assets and liabilities.

**B.    SAC and the Receiver's Recovery Plans**

8. The SAC was incorporated in November 2016 by the Chester City Council with a board of five (5) members,[5] all of whom are appointed by the City.[6] Although SAC is a separate legal entity from the City, it operates under the provisions of the MAA. Section 5622 of the MAA specifically provides that the City, as the incorporating municipality of SAC, has the unilateral right to re-acquire all assets of SAC. 53 Pa. C.S. § 5622.

9. Prior to the Petition Date, on April 23, 2020, DCED provided the City with an Emergency Action Plan as prescribed under Sections 602 and 603 of Act 47, which *inter alia* outlined the Commonwealth's expectations for the City during its fiscal emergency (the "Emergency Action Plan").

10. In August 2020, the Receiver submitted an initial Recovery Plan (the "Recovery Plan") for the City of Chester, which was confirmed by the Commonwealth Court of Pennsylvania (the "Commonwealth Court") on October 19, 2020. *See* Doweary Declaration, ¶ 23. The Recovery Plan explicitly provides that the Receiver "may issue orders in which [he] direct[s the] City or authority officials to implement provisions of this plan or to refrain from taking actions

---

[5] Inexplicably, however, according to the SAC Bylaws, the SAC Board is comprised of at least 5 but no more than 11 members all of whom are appointed by the City. Currently, the SAC board consists of 7 members which appears to violate the Articles of Incorporation. This Motion will further describe governance concerns later.

[6] Act 47 provides the Receiver with power over City authorities, which Act 47 defines as authorities where the City has the power of appointment. *See* 53 P.S. § 11701.701 (defining "authority" as "[a] municipal authority, parking authority, or any other authority or corporate entity that is directly or indirectly controlled by a distressed municipality or to which a distressed municipality has power of appointment. . . ."); 53 P.S. § 11701.706(a) (detailing the powers of the Receiver).

4

that interfere with the plan." *See* Recovery Plan, § 1.2, attached here as **Exhibit C**. SAC is one of the authorities referenced in the Recovery Plan. *Id.*

11. In April 2021, the Receiver proposed an amended recovery plan, which the Commonwealth Court confirmed in June 2021 (the "Amended Recovery Plan"). *See* Doweary Declaration, ¶ 24, a copy of the Amended Recovery Plan is attached as Exhibit E to the Doweary Declaration.

12. Persistent difficulties with the implementation of the Amended Recovery Plan and challenges between the Receiver and certain elected officials prompted the Receiver to seek a writ of mandamus in March 2022 directing the City's elected officials to comply with the Amended Recovery Plan and the Receiver's orders.

13. On November 8, 2022, the Receiver filed another modification to the recovery plan (the "Second Amended Recovery Plan"), which *inter alia*, noted that all options needed to be on the table, including monetization of the SAC and/or its assets, if necessary. The Recovery Plan, the Amended Recovery Plan, and the Second Amended Recovery Plan shall be referred to hereinafter as the "Recovery Plans".

14. As part of the ongoing litigation surrounding the Recovery Plans, the Commonwealth Court held a three-day evidentiary hearing on the Second Amended Recovery Plan from January 9-11, 2023. However, prior to the hearing, the Commonwealth Court severed the initiatives relating to SAC for separate consideration and evidence. In light of the extreme difficulty that the Receiver was having with City operations, rather than delaying the evidentiary hearing to address the SAC initiatives, the Receiver instead pursued a stipulation with SAC as further described in paragraph 18 herein.

15. On January 31, 2023, the Commonwealth Court issued an order in the matter captioned *Neil R. Weaver, in his capacity as Acting Secretary of the Department of Community and Economic Development v. City of Cheste*r, Case No. 336 M.D. 2020 (the "Commonwealth Court Order"), attached as Exhibit A to the *Request for Judicial Notice of the Commonwealth Court of Pennsylvania's Memorandum and Order* [Docket No. 226], approving the majority of the initiatives in the Second Amended Recovery Plan.

16. On February 10, 2023, the Receiver filed the Modification of Amended Recovery Plan in response to the Commonwealth Court Order (the "Amended Plan Modifications").

17. On February 14, 2023, the Commonwealth Court entered an order approving the Amended Plan Modifications except for the parking and SAC initiatives included therein.

18. On March 6, 2023, the Receiver and SAC entered into a Stipulation, which provided *inter alia* that (i) within a reasonable time, but no longer than 30 days after a request, SAC would provide the Receiver with any information related to liens placed by SAC on Chester residents and/or businesses and make pertinent SAC individuals available to meet with the Receiver, if needed; (ii) any and all references to SAC in the initiatives set forth in the Second Amended Recovery Plan as modified by the Amended Plan Modifications shall be removed; and (iii) SAC's rights to object to any future inclusion of SAC in a future plan modification is reserved (the "Stipulation"). The Stipulation did not impact initiatives involving authorities that were part of the Recovery Plan or the Amended Recovery Plan.

19. Certain City elected officials appealed the Commonwealth Court Order, and the Pennsylvania Supreme Court (the "Supreme Court") assumed jurisdiction pursuant to the Supreme Court's King's Bench powers. On January 29, 2024 the Supreme Court entered an opinion affirming the Commonwealth Court Order in the matter captioned *Rick Siger, in His Capacity as*

6

*Acting Secretary of the Department of Community and Economic Development v. City of Chester,* Nos. 12 & 15 MAP 2023 (Pa.) (the "Supreme Court Opinion"), attached here as **Exhibit D**.

20. The Supreme Court Opinion recognizes that the Receiver has "general authority" which includes "powers to 'require the distressed municipality *or authority* to take actions necessary to implement the recovery plan,' to 'modify the recovery plan as necessary to achieve financial stability of the distressed municipality,' and to 'direct the distressed municipality *or authority* to take any other action to implement the recovery plan.'" (emphasis added). *See* Supreme Court Opinion, p. 10 (quoting 53 P.S. § 11701.709(a)).

21. The definition of authorities under Act 47 captures SAC. Under Act 47 authorities are defined as "[a] municipal authority, parking authority, or *any other authority or corporate entity that is directly or indirectly controlled by a distressed municipality or to which a distressed municipality has power of appointment*...." 53 P.S. § 11701.701 (emphasis added). In accordance with SAC's Articles of Incorporation, By-laws and Act 47, the City (and now the Receiver) maintain power of appointment over SAC.

22. Furthermore, according to the Second Amended Recovery Plan confirmed by the Supreme Court, the proper management of the debt and financial obligations of the City, along with SAC, is integral to the recovery of the City of Chester.

23. Section LEG09 of the Receiver's Amended Recovery Plan specifically provides "the distressed municipality *and authorities*" are required to pay their lawful financial obligations. *See* Amended Recovery Plan, p. 35 (emphasis added).

24. Additionally, under the Emergency Action Plan, the Recovery Plan and the Amended Recovery Plan, the City *and its authorities* are not to incur any other debt without the Receiver's written approval, which includes issuing new debt, including short-term cash

7

borrowings, and refunding or refinancing existing debt. *See* Recovery Plan, LEG07, p. 28, Amended Recovery Plan, LEG09, p. 35.

25. Act 47 explicitly provides the Receiver with the power to "***require the distressed municipality or authority to cause the sale, lease, conveyance, assignment or other use or disposition*** of the distressed municipality's or ***authority's assets*** in accordance with section 707." 53 P.S. § 11701.706(a)(9) (emphasis added). Here, the assets of SAC as an authority under the MAA and Act 47, are assets that can be monetized under the direction of the Receiver. Because the Receiver seeks to maximize values of all the City's assets for the benefit of the City and its residents, the Receiver is concerned about any potential mismanagement or diminution in value of SAC's assets.

    **C.**    **The Rule 2004 Requests Directed at SAC**

26. On June 16, 2023, in furtherance of its goal of proposing and confirming a viable plan of adjustment, and in an effort to identify and analyze the City's assets and liabilities, which include SAC and its assets, counsel to the City reached out to SAC's counsel and requested certain documents and information (the "Initial 2004 Request"), attached here as **Exhibit E**.

27. On June 30, 2023, in response to the Initial Document Request, SAC produced certain responsive documents (the "Initial Production"). The correspondence from SAC which accompanied the Initial Production, is attached here as **Exhibit F**.

28. On October 27, 2023, after reviewing and analyzing the Initial Production, the City followed up those items that were included in the Initial 2004 Request but were not produced by SAC (the "Supplemental 2004 Request"), attached here as **Exhibit G**.

29. On both November 9 and 10, 2023, having received no response to the Supplemental 2004 Request, counsel for the City sent correspondence to SAC's counsel inviting

8

SAC to meet and confer regarding the request for documents in connection with Local Rule 2004-1 and alerting SAC of the City's intent to file a motion pursuant to Rule 2004 seeking the information requested (the "2004 Notice"), which e-mail correspondence is attached here as **Exhibit H**.

30. On November 13, 15, and 27, 2023, following multiple exchanges between the parties regarding the Supplemental 2004 Request, SAC produced additional responsive documents (the "Supplemental Production").

31. The Initial Production and the Supplemental Production were most notable for the documents that were not included than those that were transmitted by SAC. Missing from the production were basic items that one would expect from a well-run stormwater authority including: (i) a comprehensive mapping of all authority-owned stormwater assets, (ii) an up-to-date capital improvement plan with cash flow projections, and (iii) operation and maintenance records.

32. More recently, on March 25, 2024, the City again requested certain additional documents from SAC (the "Second 2004 Request"), attached here as **Exhibit I**. SAC has not responded to the Second 2004 Request.

D.   **SAC Financial and Governance Issues**

33. SAC appears to be experiencing financial issues, which has led to a significant increase in rates charged to the residents of the City. SAC's meeting minutes reflect that SAC took the extraordinary action of borrowing $25,000 from Faith Temple Holy Church and $15,000 from Dr. Horace Strand, SAC's Executive Manager and the Pastor of the church, to meet SAC's payroll obligations. *See* Minutes from October 10, 2023 Board of Directors Meeting of

9

Stormwater Authority of the City, attached here as **Exhibit J**.[7] There is no information as to the method or process by which SAC incurred such borrowings in accordance with the requirements for the valid incurrence of indebtedness set forth in the MAA. 53 Pa. C.S. § 5608. Further, without complete information about all outstanding indebtedness, the City cannot fairly assess the reasonableness and uniformity of the rates imposed on City residents by SAC. 53 Pa. C.S. § 5607(d)(34).

34. Although SAC is required to set reasonable and uniform rates in accordance with the MAA, it is unclear whether the proper guidelines were taken into account by SAC when it raised rates effective October 21, 2023. Chester homeowners now pay nearly double the rate charged when SAC first began charging Chester residents in 2017.[8] Indeed, Chester residents pay among the highest rates in the Commonwealth, and perhaps in the country, for stormwater fees, which has led to public outcry.[9]

35. In addition to financial and other management issues that have arisen at SAC (which are referenced in greater detail herein), the Receiver has concerns regarding the corporate governance of SAC. Presently, based on the publically available information on the SAC website, the board members of SAC—who each earn a salary on account of such position—include: Livia

---

[7] It is also unclear whether SAC had the legal authority to borrow this money in the manner that it did and whether the borrowings may have given rise to defaults under other debt or grant obligations.

[8] *See* Anthony Wood, *A 'rain tax' spurs a storm of controversy in the Philly region, and a court case with broad implications,* Philadelphia Inquirer, (Mar. 10, 2024), https://www.inquirer.com/news/stormwater-fees-chester-philadelphia-taxes-20240310.html#:~:text=The%20typical%20homeowner%20now%20pays,a%20national%20stormwater%2Dmanagement%20expert, attached here as **Exhibit K**.

[9] When comparing Chester's stormwater rates with those of other Pennsylvania municipalities with significantly higher populations the disparity for the stormwater rates borne by the residents of Chester becomes even more stark. The average stormwater monthly residential rate for – Chester is $15.60 per month, while the average stormwater monthly fees for Pittsburgh in 2022 was $5.96, for Erie in 2022 was $2.00, and for Philadelphia in 2022 was $15.80. See Warren Campbell & Emily G. Davis, Western Kentucky University Stormwater Utility Survey 2023, SEAS FACULTY PUBLICATIONS, PAPER 8 (June 2023), https://digitalcommons.wku.edu/seas_faculty_pubs/8.

Smith, Chair; Portia West, Vice Chair; Joan Neal, Secretary; Bill Riley, Treasurer; John Shelton, Joy Taylor, and Fred Green. Dr. Strand serves as Executive Manager and Steve Hann is SAC's appointed Solicitor.

36. In addition to holding paid SAC board positions, Mr. Green and Ms. West are both members of Chester City Council for which they also receive a salary. Ms. Taylor also serves as the City Controller, which is an elected position for which she receives a salary from the City.

37. Article II, Section 202 of the City's charter provides that no councilmember should "hold any other compensated position in the City of Chester government." The City Solicitor, Kenneth Schuster, has advised SAC, Mr. Green and Ms. West that their SAC board positions and continued service as City Council members violate the City's charter. *See* e-mail correspondence attached here as **Exhibit L**. Mayor Stefan Roots has also raised this issue publicly at City Council meetings.

38. On February 21, 2024 and February 22, 2024, Ms. West and Ms. Taylor respectively tendered their resignations from the SAC board to Livia Smith, while rumors also circulated regarding Mr. Green's impending resignation from SAC's board. Despite these resignations or intentions to resign, since such time, Mr. Green, Ms. West, and Ms. Taylor have all continued to act as board members of SAC.[10]

39. Coupled with the dearth of standard operating documents that SAC failed to produce (or that may not exist), all of the foregoing occurrences have crystalized the concerns of the Mayor and the Receiver regarding SAC and acted as a catalyst prompting Mayor Roots to request certain information from SAC.

---

[10] For additional background on this matter *see* Kenny Cooper, *Chester Mayor Stefan Roots accuses 2 City Council members of violating city charter and receiving 2 salaries*, WHYY NEWS (April 29, 2024), https://whyy.org/articles/chester-city-charter-councilmembers-mayor-accuses-violation/.

11

40. On March 12, 2024, by e-mail correspondence attached here as **Exhibit M** (the "March Request"), Mayor Roots requested that Dr. Strand provide by March 15, 2024 copies of the following documents on behalf of SAC: (a) a copy of the February 2024 bank statement[11]; (b) any budget-to-actual report for 2023 and 2024; (c) a copy of the annual budget for the fiscal year ending June 2024; (d) any cash flow projections for fiscal year ending June 2024; (e) terms of SAC's agreement with PENNVEST regarding renegotiation of recent loan repayments; and (f) for all buildings owned by SAC—(i) a description of the square footage and use of the property, including the number of employees that work at the location and personal property assets at the location, (ii) the date that each property was acquired and the acquisition documents including any related financing documents, and (iii) copies of any current leases or subleases related to the properties (collectively, the "Requested Information").

41. That same day, Dr. Strand confirmed receipt of the March Request, but stated that the Requested Information would not be able to be reviewed and complied by March 15, 2024. *See* Exhibit M. Mayor Roots responded that the any information that was immediately available should be provided by the requested date of March 15, and a date certain should be given for producing information not then readily available. *Id.* To date, Dr. Strand and SAC have not otherwise responded to this request.

42. On April 1, 2024, the Receiver sent a letter to SAC's Chairwoman Livia Smith following up on the March Request (the "April Request"), attached here as **Exhibit N**, and asking

---

[11] The March Request references a request for a February 2023 bank statement; however, Mayor Roots' intention was to seek February 2024 bank statements.

12

again for the Requested Information as well as the 2025-2029 rate projections. None of these items have been provided by SAC.

43. On April 8, 2024, SAC responded to the Receiver's letter through its counsel, Hamburg, Rubin, Mullin, Maxwell & Lupin, PC (the "<u>April Response</u>"), attached here as **Exhibit O**. The April Response states, *inter alia*, that "absent a proper request made under the Pennsylvania Right to Know Law, [SAC] is under no obligation to provide the material requested in [the April Request]." The April Response further asserts that the April Request exceeds the scope of the Stipulation and the Receiver's initiatives related to SAC were severed and have not been adjudicated in any Pennsylvania Court.

### IV. Relief Requested and Basis for Relief

44. The City seeks entry of an order, pursuant to Rule 2004 and Local Rule 2004-1 directing SAC to produce the documents described in Exhibit B, which includes the Requested Information from the March and April Requests as well as the Second 2004 Request.

45. Rule 2004 provides that "[o]n motion of any party in interest, the court may order the examination of any entity." Fed. R. Bankr. P. 2004(a). Regarding the scope of the examination a party may engage in, Rule 2004 provides:

> The examination of an entity under this rule or of the debtor under § 343 of the Code may relate only to the acts, conduct, ***or property*** or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge.

Fed. R. Bankr. P. 2004(b) (emphasis added). Courts have noted that the "scope of a Rule 2004 examination is unfettered and broad . . . [and] is commonly recognized as more in the nature of a fishing expedition." *In re Washington Mutual, Inc.*, 408 B.R. 45, 49 (Bankr. D. Del. 2009) (internal citations omitted); *see also*, *e.g.*, *In re Mezvinsky*, No. 00-10745DWS, 2000 Bankr. LEXIS 1067, at *21 (Bankr. E.D. Pa. Sept. 7, 2000); *In re Valley Forge Plaza Associates*, 109

B.R. 669, 674 (Bankr. E.D. Pa. 1990) (the "scope of a 2004 examination is even broader than that of discovery permitted under the Fed. R. Civ. P., which themselves contemplate broad, easy access to discovery."). "Legitimate goals of Rule 2004 examinations include discovering assets, examining transactions, and determining whether wrongdoing has occurred." *Washington Mutual*, 408 B.R. at 50.

46. Section 541(a) of the Bankruptcy Code provides that the commencement of a bankruptcy case creates an estate comprised of "all legal and equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a); *In re NDEP Corp.*, 193 B.R. 710, 712 (Bankr. D. Del. 1995) ("Under Section 541 of the Code, [debtor's] bankruptcy filing [] created an estate composed of all [debtor's] legal or equitable interests as of the commencement of the case wherever located and **by whomever held**.") (emphasis added). The term "property of the estate" has been broadly interpreted to include "all kinds of property, including causes of action, disputed, contingent or reversionary interests, and all other forms of property." *Feiler v. Sims (In re Feiler)*, 218 F.3d 948, 956 (9th Cir. 2000). The term "property of the estate" means, and is synonymous with, "property of the debtor" in chapter 9 proceedings. *See* 11 U.S.C. § 902(1); *In re City of San Bernardino*, 530 B.R. 489, 499 (C.D. Cal. 2015) ("there is no meaningful distinction" between "property of the estate" and "property of the debtor" in Chapter 9).

47. As Pennsylvania courts have recognized, pursuant to section 5622 of the MAA, the City, as the incorporating municipality of SAC has the unilateral right to re-acquire all assets of SAC. 53 Pa. C.S. § 5622; see *Cnty. of Del. v. Del. Cnty. Reg'l Water Quality Control Auth.*, 272 A.3d 567, 568-569 (Pa. Cmwlth. 2022) ("[T]his Court reconfirmed that a municipality, per section 5622(a) of the Municipality Authorities Act (MAA), 53 Pa.C.S. §5622(a), possesses the

14

unilateral power to dissolve and/or obtain an authority that it had created or the authority's assets.") (citing *In re Chester Water Authority Trust*, 263 A.3d 689 (Pa. Cmwlth. 2021) (*en banc*)); *Salem Twp. Mun. Auth. v. Twp. of Salem*, 820 A.2d 888, 890 n. 1 (Pa. Cmwlth. 2003) (same); *City of Lebanon v. Commonwealth*, 912 A.2d 338, 339 (Pa. Cmwlth 2006) (same).

48. Furthermore, under the MAA and Act 47, it is the Receiver who has the authority to direct the City to take action to re-acquire and then dissolve SAC, after providing for its liabilities. *See* 53 Pa.C.S. §5622(a); 53 P.S. § 11701.701; 53 P.S. § 11701.706(a)(5).

49. Setting aside all of the legitimate concerns that the City holds with respect to the operations, management, financial status and governance issues at SAC, the City would still be entitled to the documents the City has requested from SAC. The documents listed on Exhibit B directly relate to the City's property interests in SAC and its assets. Such interests constitute property of the estate pursuant to Bankruptcy Code Section 541. Therefore, the relief requested by this Motion is warranted and falls squarely within the legitimate goals of Rule 2004. The City is entitled to production of all of the requested documents under Bankruptcy Rule 2004. The unfortunate facts and allegations swirling around SAC provide an additional basis for the relief requested.

50. The information sought by this Motion is preliminary and the City reserves the right to seek further discovery as necessary, including the authority to conduct depositions at the appropriate time, if necessary.

### III.     Local Rule 2004-1(a) Certification

51. The detailed recitation included herein of the exchanges between the City, SAC and their respective counsel, provide proof that the parties have reached an impasse and further efforts

15

to meet and confer about the outstanding information requests would be futile. Despite the foregoing, a courtesy copy of this Motion was provided to counsel for SAC prior to its filing.

### IV.     Reservation of Rights

52.     The City files this Motion without prejudice to or waiver of its rights pursuant to Section 904 of the Bankruptcy Code, and nothing herein is intended to, shall constitute, or shall be deemed to constitute the City's consent, pursuant to Section 904 of the Bankruptcy Code, to this Court's interference with (a) any of the political or governmental powers of the City, (b) any of the property or revenues of the City, or (c) the City's use or enjoyment of any income-producing property.

### V.     Notice

53.     Notice of this Motion will be provided to the following (or their counsel, if known) (a) the Office of the United States Trustee; (b) SAC; and (c) any party that has requested notice pursuant to Federal Rule of Bankruptcy Procedure 2002. The City submits that, in light of the nature of the relief requested herein, no other or further notice is required.

### VI.     No Prior Request

54.     No prior request for the relief sought in the Motion has been made to this or any other Court.

### VII.     Conclusion

WHEREFORE, the City respectfully requests the entry of an order substantially in the form attached hereto as **Exhibit A**, compelling SAC to provide documents responsive to the City's outstanding document requests within seven (7) days, and granting such other and further relief the Court may deem just and proper.

| | |
|---|---|
| May 9, 2024 | Respectfully submitted,<br><br>*/s/ Tobey M. Daluz*<br>Tobey M. Daluz (PA Bar No. 60685)<br>Margaret A. Vesper (PA Bar No. 329793)<br>Ballard Spahr LLP<br>1735 Market Street, 51st Floor<br>Philadelphia, PA 19103<br>Tel: (215) 864-8148<br>Email: daluzt@ballardspahr.com<br>       vesperm@ballardspahr.com<br><br>-and-<br><br>Matthew G. Summers*<br>Laurel D. Roglen*<br>Nicholas J. Brannick*<br>Ballard Spahr LLP<br>919 N. Market Street, 11th Floor<br>Wilmington, DE 19801<br>Tel: (302) 252-4465<br>Email: summersm@ballardspahr.com<br>       roglenl@ballardspahr.com<br>       brannickn@ballardspahr.com<br><br>(*Admitted *pro hac vice*)<br><br>*Attorneys for the City of Chester* |