# EXHIBIT C

# Municipalities Financial Recovery Act

### Receiver's Recovery Plan

### City of Chester
### Delaware County, Pennsylvania



### As Filed with the Commonwealth Court of Pennsylvania

### By Michael Doweary, Chester Receiver



Receiver for the City of Chester
Commonwealth Keystone Building
400 North Street, 4th Floor |
Harrisburg, PA 17120-0225 |
Phone: 717.231.5558



# Table of Contents

| *Chapter* | *Page* |
|---|---|
| Executive Summary | 1 |
| History in Act 47 | 11 |
| Legacy Costs | 17 |
| Baseline Forecast and Financial Controls | 30 |
| Workforce | 42 |
| Asset Monetization | 55 |
| Economic Development | 59 |
| Governance and Operations | 78 |



# Executive Summary

The City of Chester has been subject to Commonwealth financial oversight under the Municipalities Financial Recovery Act (Act 47 of 1987) since 1995. While other communities have successfully exited oversight or made progress toward doing so, Chester continues to struggle with multi-million dollar deficits, past due obligations to its employee pension plans, and very marginal investments in the infrastructure that Chester residents and businesses use every day.

On April 13, 2020, following the onset of the novel coronavirus COVID-19, Governor Thomas Wolf declared a Fiscal Emergency in Chester. According to Act 47, the Governor may declare a fiscal emergency when a municipality is insolvent or projected to be insolvent within 180 days  or when that municipality is unable to ensure the continued provision of vital and necessary services, such as police patrol, fire suppression and public works functions. The pandemic has had a deeply negative impact on Chester's fiscal condition, cutting City government's largest revenues and halting critical services.

I was nominated by the Secretary of the Department of Community and Economic Development (DCED) Dennis M. Davin on June 1, 2020, and appointed by Commonwealth Court on June 22, 2020, to serve as Chester Receiver. Chester is just the second Pennsylvania city to head down this path, following Harrisburg, which had a Fiscal Emergency in 2011.

The City of Chester's government financial problems are deep, intertwined and complicated. These issues undercut the City's ability to provide vital and necessary services to its residents, and those who work in, or visit, Chester. This plan is my first step to put City government on a path to exit oversight. More importantly, it is my first step to put City government on a path to becoming a stable provider of critical services and a creative partner in addressing the economic, social and other broader challenges the community faces.

First, it is important to understand the severity of the immediate financial challenges.

## 1.1.   Two Cash Crises

City government has two cash crises – one in the General Fund that supports basic operations and one in the Police Pension Fund.

**General Fund Cash Crisis**

The City uses the General Fund to fund most of its daily operations. The General Fund collects revenues from sources like the real estate tax, earned income tax and the local share of gaming revenue, and then makes expenditures on municipal services like police and fire protection.

In April 2020, the Recovery Coordinator projected that the City would need to borrow $4.5 million to avoid running out of cash in the General Fund this year and provide a "modest cash cushion" entering 2021. Running out of cash would shutter the vital and necessary services that residents depend upon every day.

To avoid insolvency, the City furloughed 31 percent of its workforce, and the Commonwealth put expenditure controls in place through an Emergency Action Plan (the "EAP"). Partly due to that response,



pennsylvania

RECEIVER FOR THE CITY OF CHESTER

the Coordinator's most recent projection shows the City ending the calendar year in the black on a cash basis, though the margin is very thin.

While the City's situation has improved, please note the following important cautionary caveats:

- The pandemic's fiscal impact to date on the City's earned income tax – the largest source of City government funding – is still largely unknown. Due to the lag in the EIT collection cycle, the City only recently began to see the impact of the decrease in resident and commuter earnings during Q2 2020, in its August 2020 EIT receipts. At the time of this filing, there was less than one month of data to assess the impact of the decrease.

- Beyond uncertainty as to how much the pandemic has already cut EIT revenues, it is too early to determine the true impact the virus will have throughout the remainder of 2020 and extending through 2021. If there is another COVID-19 shutdown in the final months of the year, that could cut revenues even further.

- Due to the furloughs enacted in the spring, the City will pay higher unemployment claims costs for the rest of the year. The City's second quarter payment to the Commonwealth Department of Labor and Industry for these claims was close to $400,000 and the third quarter payment will also come due during this calendar year. Eventually, the City will be reimbursed 50 percent of those costs, but the timing of that reimbursement is unknown. The same is true of the timing for any other reimbursements from the federal or county government related to COVID-19.

- The City is involved in several litigation matters, including those related to the water and sewer system.[1] The City must defend its positions, as the associated and anticipated collateral costs for not doing so, may be insurmountable in the future for the City and its residents. But those processes carry the risk of costs beyond those projected in the cash flow.

The impact of COVID-19 is new and unexpected, but the City's struggle to finish the year without running out of cash is not. In recent years, the City has dealt with this problem by defaulting on its Tax Revenue Anticipation Note (TRAN) repayment (2016); falling behind on its payments for employee health insurance (2016); issuing new debt to cover current year obligations (2017); and pushing a portion of its current year obligations into the next year (2018 and 2019).

The City needs to break this cycle.

**Police Pension Fund Cash Crisis**

Separate from the General Fund, the City has three Funds that hold assets and pay benefits to retired employees and their surviving dependents. One of them, the Police Pension Plan, is dangerously close to insolvency.

The police pension plan spends $500,000 - $550,000 per month, mostly on monthly pension benefit payments to retirees. Other payments are for federal and state withholding taxes and administrative

---

[1] This is described in more detail below.



costs. The plan did not have enough cash on hand to make every payment in June or July, so the City converted about $500,000 of investments to cash.

At the end of July, the plan had $1.75 million left in assets. That is the total amount available for monthly pension payments and payouts to Deferred Retirement Option Plan (DROP) participants who may withdraw money from the fund at any time upon full retirement. The City's commitments to DROP participants accounted for about $400,000 at the end of July, and that commitment grows each month. Therefore, the police pension plan had less than three months' worth of cash or assets that could be converted to cash to make ongoing monthly pension benefit payments.

The City expects to receive $1.9 million in State pension aid later this year and, if the City puts the full amount in the police pension plan, that would extend the plan's life by less than four months. The City is hopeful that it may contribute another $1 million during this calendar year, though that depends on the General Fund's cash position. Unless something changes quickly, the plan will run out of cash and fail to make pension payments to retired police officers and their surviving beneficiaries in the first half of 2021.

Several factors have contributed to the severely depleted condition of the police pension fund including the City's lack of payments into the fund, an unprecedented number of disability retirements, and benefit provisions that allow pension spiking that the City will not be able to afford. For example, three police officers ages 44, 45 and 42 recently entered the DROP with pensionable salaries of $210,874, $207,414 and $143,311 respectively. Under the current benefit provisions, these officers will receive annual pensions of $108,073, $103,707 and $71,652 – significantly more than the median household income of Chester residents.

In this Plan, I require that an eligibility and compliance audit be conducted to ensure that only eligible retirees and their dependents are receiving pensions and retiree health care and that the benefits they are receiving are indeed the ones actually due to them. Furthermore, I am mandating a review of individuals who have retired and received disability pensions to ensure that they are indeed eligible for such a pension.

Some have pointed to a potential large one-time contribution to the pension, either backed by an asset sale or pension bonds, as the way out of this crisis, and that may have to be part of the overall strategy. However, unless there are also contemporaneous changes to the benefit levels and actions taken to stop abuse of provisions like the disability pensions, any large one-time contribution will only temporarily mask the cost of those unaffordable benefits and leave the City in the same situation years later, only at that point with less assets or more debt.

## 1.2    The Receiver's Approach

The immediate cash flow crises are not the only financial problem Chester faces. The City has run multi-million dollar deficits all but one year since 2012. In 2017, the City avoided a deficit, but it needed a $12 million unfunded debt borrowing and a $2 million emergency loan from the Commonwealth during the year. The current version of the 2021 budget projects a $3.7 million shortfall for next year and the multi-year projections after 2021 are similarly negative.



Beyond these financial obstacles, there are also legal challenges related to two critical City assets. The City is currently in Commonwealth Court fighting for its ability to repossess the water system assets of the Chester Water Authority. There is separate litigation related to the parking system.

Following my appointment as Receiver, I requested from the Commonwealth Court and was granted an extension until August 21, 2020, to file this Recovery Plan. According to the timeline set in Act 47, the 30-day extension plus the original 30-day timeline gave me approximately 60 days to produce this plan.

As I noted earlier, Chester City government's financial problems are deep, intertwined and complicated. Decades of financial problems cannot be fully unraveled in 60 days, especially in the middle of a pandemic.

I need time to put a full, multi-faceted plan in place to address the different elements of these crises. I also need to meet with the affected parties, some of which do not fully understand the severity of this situation. They need that understanding because they will have to be part of the solution.  I've already begun discussions with many of those parties, including the Pension Plan board members.

I am committed to gathering public input on the major options for dealing with these crises, including potential sale or lease of City assets. All options are on the table at this moment, but not all are equally beneficial to Chester's residents, and that will be my guiding principle for addressing this crisis.

While Chester has been under Act 47 oversight for twenty-five years, receivership provides an opportunity to chart a different course, to take actions to solve the problems that Chester faces, instead of pushing them out for several years for others to address.  My responsibility is to provide an unbiased and candid view of the City's finances and operations and to work with elected City officials and other stakeholders to do what is necessary to fix them.  If consensus cannot be reached, I am committed to using my powers as necessary to achieve fiscal recovery.

I very much believe in trying in good faith to achieve consensus among stakeholders.  I am sensitive to the fact that City residents did not elect me.  To date, I've enjoyed a very good working relationship with the City's Mayor, its Council members, and its staff.  The City did not challenge my appointment. Based on the interactions thus far with the City's elected officials and staff, I believe that they sincerely care about the City and are committed to its recovery.

The COVID-19 pandemic makes facilitating conversations with people outside of City Hall more difficult. Yet, I am committed to finding ways of safely doing so, even if that takes additional time and effort.  The guiding question that I will apply to all aspects of my work, especially in evaluating difficult decisions, is this:

What is in the best interest of Chester's residents?

While the answer to that question will no doubt differ based on the person answering it, I am committed to asking it in good faith and listening to what Chester's residents say.  The children and the families of Chester deserve the same opportunities that any other Pennsylvanian child and family have.

I have certain powers under Section 706 of Act 47, including the powers to prepare the recovery plan, to require the City or its authorities to take actions necessary to implement the plan, and to cause the sale, lease or other use of assets of the City or the authorities.  I may issue orders in which I direct City or authority officials to implement provisions of the plan or to refrain from taking actions that interfere with



the plan.[2] I may request writs of mandamus from Commonwealth Court to secure compliance with any such orders.

Furthermore, pursuant to Section 703(e) of Act 47, I may submit modifications to this plan to the Court, where again the Court would have 30 days to hold a hearing and act on the modification.  As in Harrisburg (the only other Pennsylvania city to enter receivership under Act 47), I respectfully request that the Court consider this document as an initial plan that seeks to address the immediate and critical issues facing the City.

I intend to file an amended plan as I work with stakeholders to address Chester's many financial challenges. If I cannot reach a consensus with stakeholders on items that remedy the City's financial situation, I will provide the amendments that I believe should be approved by Commonwealth Court as being in the best interests of the City of Chester and its residents.

In the meantime, we need to take action to address Chester's immediate and critical financial problems. The next section outlines this Plan's approach to doing so.

## 1.3    The Receiver's Plan

According to Act 47, this plan must do the following:

- Continue the provision of vital and necessary services

- Provide for the payment of lawful obligations of the City and its authorities

- Provide for timely deposits of required payments to the pension funds

To provide vital and necessary services, the City must have cash to pay its employees, vendors and other obligations in the General Fund for the rest of 2020 and throughout 2021. To that end, I am focused on the following:

- The City recently repaid its 2020 TRAN and currently does not expect to do another unfunded debt borrowing to fund operations for the rest of 2020. It is a priority to avoid doing so. Unfunded debt borrowings, like the one done in 2017, should be borrowings of last resort. They carry higher interest rates than other types of borrowing and shift the cost of services already delivered onto taxpayers for the next 10 years. As the multi-year projection shows, the next few years will have challenges of their own without adding a portion of the 2020 costs to them.

- I will work with the City Finance staff to minimize all obligations carried over from 2020 into the next year. Unexpected events do occur, particularly during unusual events like the pandemic. But the City needs to break the cycle of pushing this year's obligations into next year's payment cycle. Again, the 2021 budget will be difficult enough to balance without adding more obligations from 2020 to it.

---

[2] The relevant authorities here are the Chester Economic Development Authority (CEDA), the Redevelopment Authority of the City of Chester (CRA), the Chester Parking Authority, and the Stormwater Authority of the City of Chester.



As soon as this plan is filed, my team will pivot to the 2021 budget process. They will work with the City Finance staff and elected officials on the 2021 budget, and I will make any changes needed to ensure that the City has a realistic, balanced budget entering next year.

**Workforce**

The "vital and necessary" services provided to residents by the City of Chester are labor intensive, and as a result, personnel costs, including wages and benefits, constitute a significant portion of the City's expenditures. In the approved 2020 budget, employee salaries, wages, and benefits account for $42.9 million in costs, or 76 percent of General Fund expenses.

In 2017, the City took a critical step toward financial stability with the negotiation of three labor agreements. Those agreements cover the terms of compensation for police and firefighters through the end of 2021 and comply with the caps set in the Amended Recovery Plan.

I will use a similar approach and set a maximum annual allocation (i.e. a "cap") for the Teamsters whose collective bargaining agreement with the City expires at the end of this year. That maximum allocation will cap the amount that the City can pay to active Teamster members for all forms of compensation, including the City's share of the cost of medical, vision and dental insurance coverage.

I will also set a maximum annual allocation for all forms of compensation paid to non-union employees in 2021 and check the City's compliance against that cap periodically throughout 2021.

The controls established in the Emergency Action Plan are incorporated in this plan, and responsibility for approving different City actions are transferred from the Department of Community and Economic Development to me. As the Emergency Action Plan first established, the City may not rehire any personnel without my review and written approval. The City also shall not create new positions or add to the complement established in the 2020 Salary ordinance without my review and written approval.

For the remainder of 2020 and 2021, I will need to manage the City's headcount by initiating or approving any hiring; enacting layoffs and/or terminations if needed; converting full-time positions to part-time; restructuring department operations including through consolidations or outsourcing; or reassigning personnel, subject to the provisions of collective bargaining agreements if applicable. In making such decisions, I shall consult with the relevant City department heads, but I shall have the power to enact any such decisions.

The City's overtime expenditures have been significant in recent years. Police overtime costs have historically totaled approximately $2 million annually. Non-public safety overtime can only be spent subject to my approval and I will monitor overtime usage in police and fire.

**Economic Development**

Like many former manufacturing hubs in the Northeast, Chester is in the middle of a painful economic transition that has resulted in population decrease and overall disinvestment. The City's resurgence will be built upon a strong local economy and expanded tax base, which requires a strategic effort to attract and retain businesses. Building a strong local economy is critical as businesses provide economic opportunity to residents via jobs and procurement opportunities. In additional, businesses generate tax revenues for the city, help to attract private capital, and spur a virtuous cycle of investment and growth.



Unfortunately, the realities of the global pandemic, abrupt business closures, and economic downturn have only exacerbated the economic distress and inequities present in Chester.

In 2019, Mayor Kirkland created the Economic Development Committee (EDC). This committee includes key stakeholders from the public, private, and nonprofit community who are committed to increasing economic vitality in the city. The committee meets quarterly to prioritize the economic development goals, objectives, and strategies to help move Chester forward.

The EDC is tasked with identifying concrete actionable steps that the City and its partners can take to improve the business and development climate. Economic development goals were created in consultation with the Mayor, after which the EDC reviewed and shaped the specific objectives and tasks.

My team will work with the City and the EDC to achieve these goals.  Initial conversations have already begun and fostering economic development is a key to Chester's long-term financial health.

**Governance and Operations**

Chester must eliminate its structural budget deficit, but it also must address management and operational issues that are holding the City back.

The City is incorporated as a third-class city and operates as a Home Rule Charter community as approved by its citizens on April 20, 1980. The City government is organized with an elected Mayor, who serves as the Chief Executive, and a City Council of five members, one of whom is the Mayor. Each Council member serves as the department head for one of the five municipal departments: Public Affairs, Parks and Recreation, Streets and Highway, Public Safety, and Accounts and Finance. The Mayor makes the department head assignments at the annual organizational meeting of the Council.

According to the Department of Community and Economic Development's Handbook on City Government in Pennsylvania,[3] Chester is only one of two third class cities in Pennsylvania to adopt the commission form of city government.

Chester's poor financial performance raises the question whether this relatively unique form of government is effective. There is a pattern of the City government either failing to adopt a realistic budget, failing to follow that budget or both which results in consistent, large deficits.

Beyond reviewing Chester's form of government, my team will conduct an organizational assessment of each City department that will include a review of staffing, reporting structure, process and workflow, policies and procedures, and other pertinent factors affecting performance. My team is working first to advance the fire station consolidation study that was part of the 2018 Exit Plan and then will do departmental assessments, likely beginning with the Accounting and Finance Department.

The City is also a party to significant amounts of litigation.  I am already working closely with the City to address these matters in a way most beneficial to City residents and will work with the City to develop a

---

[3] The Pennsylvania Governor's Center for Local Government Services, *"City Government in Pennsylvania Handbook"*, 3rd Edition, November 2013.



comprehensive approach to its litigation and risk management in order to reduce claims against the City in the future and to address current matters.  I read Section 706 of Act 47 to provide me with the powers to initiate or settle litigation, direct litigation (including counsel and expert selection), and intervene as a separate party if necessary with respect to matters involving the City.

### Asset Monetization

The City of Chester has two significant business-type assets, its water system and its parking system.  Given the City's dire financial condition, every option must be on the table, and the City has little choice other than to explore the potential sale or lease of these assets.  As the City's Act 47 Coordinator recommended in the City's emergency action plan, "The City shall continue to work with its legal counsel and other professionals, as necessary, to formulate positions related to the (Chester Water) Authority and to City assets."

I am very cognizant of how these assets may potentially contribute to the City's financial recovery and therefore, with respect to the Chester Water Authority, I fully support the City's ongoing litigation to establish its sole ability to repossess the assets of the Chester Water Authority.[4]   The City has issued a request for proposals (the "RFP") for the purchase of the Water System and has received three proposals, from Aqua America, Pennsylvania American Water and the CWA itself.  According to the initial bids[5], the City could potentially receive between $60 million and $410 million if it sells the system.  Pursuant to the pending litigation, although the City was permitted to proceed with the RFP process, the City is currently enjoined from completing any transaction involving the disposition of the Water System.

With respect to the City's parking assets, the City has engaged a private manager with respect to certain assigned parking assets in the City. Under the master agreement related to this transaction, the City assigned to the manager the sole and exclusive provider of management, enforcement, and collection services with respect to the assigned parking assets. In return for assigning the parking assets to the manager, the manager will make certain capital investments in the City's parking assets and will also pay the City an upfront payment and recurring payments. The level of recurring payments to the City will be based on fee collections and related parking expenses.  Soon after the agreement was reached with the private manager, however, a court granted a temporary injunction involving the installation of parking meters in part of the City, and a hearing on the permanent injunction will be held in the future. The parties have been encouraged to explore a possible amicable resolution of the outstanding legal disputes.

While it may seem premature to discuss the potential use of monetization proceeds, I want to provide some initial thoughts, if the City reaches that point in the process.

As Section 707 of Act 47 requires, any such proceeds must first be applied to outstanding debt obligations applicable to the assets.  I may then direct the City to use any proceeds remaining to "restructure or

---

[4]  Section 706(a)(5) of Act 47 specifically empowers the Receiver "to require the distressed municipality or authority to cause the sale, lease, conveyance, assignment or other use or disposition of the distressed municipality's or authority's assets."  Section 707 provides guidance on how those proceeds may be used.
[5] Information published at https://chesterwaterproposal.com



provide escrow for the payment of future debt obligations or to meet operating and capital needs of the distressed municipality or authority." More specifically, I would apply the remaining proceeds as follows:

- **Repayment of debt obligations**, in particular those related to the Series 2017A bonds.

- **Payment of delinquent pension Minimum Municipal Obligations (MMOs), including accrued interest and penalties:** This liability is worth $28.8 million as of January 1, 2020 with the likelihood of rising above $40 million as of January 1, 2021. Addressing this obligation would have multiple benefits: improving the funding ratio of the pension plans; reducing the ongoing annual required contributions from the City's General Fund; and addressing the negative fund balance figure that is a drag on the City's credit rating.

- **Build a General Fund reserve**: The Government Finance Officers Association (GFOA) recommends "at a minimum, that general-purpose governments, regardless of size, maintain unrestricted budgetary fund balance in their general fund of no less than two months of regular general fund operating revenues or regular general fund operating expenditures." Chester's 2017 comprehensive annual financial report, which is the most recent competed at this time, shows a fund balance of -$15.3 million in the General Fund. This extraordinarily low number is the reflection of the cash crisis in the General Fund and the outstanding MMO liability. Chester has a "rainy day" reserve that is mostly empty, and building a General Fund reserve would replenish that resource.

Once the City has made sufficient progress in these areas, the remaining proceeds shall be used for the next tier of priorities:

- Establish and fund a trust to address the City's OPEB liabilities, which were over $252 million at the end of 2017. Should asset proceeds become available for this purpose, the City and I shall explore requiring that OPEB benefits not be enhanced as a condition of the deposit of such proceeds.

- Fund capital improvements to the City's capital assets

- Invest in economic development projects in the City in cooperation with a non-profit economic development corporation

There are several potential uses for asset monetization proceeds if the City reaches that point in the process. The City shall use these one-time revenues to fund non-recurring expenditures and address the City's structural problems, and shall not use the proceeds to fund ongoing operating expenditures.

As noted earlier, the potential use of asset sale proceeds to address the pension problem depends on contemporaneous changes to the benefit levels and actions taken to stop abuse of provisions like the disability pensions. Otherwise we will just bail water on a sinking ship without fixing the hole in the bottom of it.

PA  **pennsylvania**
RECEIVER FOR THE CITY OF CHESTER

## 1.4    Conclusion

As noted earlier, I see this plan as an initial first step.  I intend to file amendments to this plan as issues are addressed and the full impact of the scope of COVID-19 on the City's finances become better known. I respectfully request that the Court approve this initial plan.


Respectfully submitted,




Michael Doweary
Receiver for the City of Chester
August 20, 2020



# History in Act 47

The City of Chester entered the Act 47 program in 1995 after nearly four decades of economic decline. The City adopted its original Recovery Plan in 1996 and adopted Recovery Plan amendments in 2006, 2013, and 2016.

After the initial declaration of financial distress, the City's fiscal condition continued to deteriorate from 1996 to 2006 when the City needed to borrow money to meet payroll and deliver basic services. The City's fiscal situation temporarily improved as several economic development initiatives came to fruition, most notably the opening of Harrah's Philadelphia Casino and Racetrack in 2008, whereupon the City began receiving significant annual host fees. The City was able to establish a Reserve Fund with excess revenues, invest in capital improvements, and reduce Earned Income Tax rates, which were the highest in Delaware County.

However, the large infusion of new revenues provided only temporary respite. Gaming host community revenues (which then represented approximately one-third of the General Fund revenues) declined while other major revenue sources showed little or no growth.

At the same time, the City's expense growth increased significantly, some of which was due to internal decision making, including significant increases in police and fire personnel costs due to historically bad interest arbitration awards. The City has not made its full minimal municipal obligation (MMO) to the three pension plans since 2013, leading to a severely underfunded pension situation, particularly with the Police and Officers & Employees (non-uniform) plans. In addition, the City underpaid for its healthcare costs, accumulating an outstanding balance to its health insurance provider of almost $8 million by the end of 2016.

By the beginning of 2017, the City had accumulated approximately $28 million of unpaid obligations, which result in a largely negative General Fund balance. In addition, the City had defaulted on its 2016 Tax Revenue Anticipation Note (TRAN).

In January 2017, the Pennsylvania Department of Community and Economic Development (DCED) issued an emergency $2 million loan and arranged an advance on gaming host revenues from Harrah's to the City to help with immediate cash flow needs. Addressing these obligations and funding day-to-day operations left the City facing another cash deficit by the late summer of 2017.

In August 2017, the City closed a debt issuance with a principal amount of $19.2 million, including a $12 million unfunded debt borrowing to address a portion of its outstanding liabilities. A planned borrowing to finance a portion of the overdue pension payments could not be accomplished. By the end of 2017, the City still owed significant unpaid obligations, the largest of which was over $17 million in past due pension MMOs, without any realistic ability to pay that obligation.

The City's **legacy costs**, which consist of debt, pension, and other post-employment benefits, continued to place enormous pressure on the City's finances, including both the month-to-month cash flow and the long-term liabilities. The City was forced to largely abandon its small capital program and had no ability to support economic development efforts.



## 2.1    Progress Addressing Fiscal Challenges: 2016 Recovery Plan

Following Mayor Thaddeus Kirkland's administration taking office in January 2016, the City and the Recovery Coordinator forged a more cooperative working relationship and took important steps to move Chester in the direction of structural fiscal balance.

The key was the development and implementation of the 2016 Amended Recovery Plan that called for significant adjustments (over 100 specific recommendations) to both revenues and operating activities to reduce the structural deficit and addressing large outstanding payables. The City successfully implemented a significant number of recommendations, resulting in moderate improvement in its fiscal condition. Still, these positive steps were not sufficient to restore fiscal balance.

The City hired a full-time Chief Financial Officer (CFO) and a Deputy CFO, key Amended Recovery Plan recommendations, whose salaries were funded from a DCED grant. This strengthened the City's finance, accounting, budget, debt, and related functions, and improved the City's ability to understand and address its fiscal problems. In addition, with the assistance of the Recovery Coordinator, the City made further progress toward financial stability by negotiating three labor agreements in compliance with the Amended Recovery Plan.

Notably, the City and the Fraternal Order of Police (FOP), the labor union representing the City's police officers, took a critical first step to solving the pension crisis by enacting provisions in the new collective bargaining agreement that increased employee contributions and reduced benefits. In addition, the City took the following steps:

- Increased the resident Earned Income Tax (EIT) rate to 2.75 percent and the non-resident EIT rate to 1.00 percent;

- Transitioned to a self-insured health benefits structure for its employees, saving approximately $2 to $3 million annually;

- Made a portion of the City's required contributions to the pension plans, beyond the State pension aid, for the first time since 2013; and

- Implemented a new anti-blight program with third-party and state grant support

The City's 2017 revenues were basically equal to its expenses, which represented progress compared to previous years. Despite these accomplishments, Chester continued to suffer a significant (though smaller) structural deficit with the additional fiscal strain caused by a large amount of unpaid expenses, most notably the unpaid annual pension payments.

## 2.2    2018 Exit Plan

Act 199 of 2014 amended Act 47 provides that municipalities operating under a recovery plan shall be subject to a termination date five years from the effective date of the most recent recovery plan. Further, Act 199 requires that the Recovery Coordinator complete a report prior to the end of that five-year period,



evaluating the financial conditions of the municipality and including one of the following findings: 1) conditions in the municipality warrant a termination of distressed status; 2) conditions are such that the municipality should be disincorporated; 3) conditions are such that the Secretary of DCED should request the determination of a fiscal emergency; or 4) conditions are such that a three-year extension plan is warranted.

For the City of Chester, the relevant recovery plan for this timeline was the one adopted in May 2013, which set 2018 as the deadline for filing the financial condition report described above. Despite the progress described above, the City was clearly not able to emerge from distressed status at the end 2018, and the Recovery Coordinator recommended a three-year Exit Plan that would build on the City's new fiscal trajectory and operational improvements.

The Coordinator wrote the Exit Plan in 2018 that presented a series of recommendations to address past obligations and the City's fiscal imbalance. Notably, the Exit Plan also included the beginning of an economic development strategy to identify and address the underlying causes of the City's financial distress and support the expansion of the local economy.

The 2018 Exit Plan was created to improve the City's financial position through a combination of reductions in expenditures, improvements in productivity, strategies to expand the local economy, and increases in revenue. The Plan included recommendations regarding the City's legacy costs, workforce, asset monetization alternatives, and economic development strategies. A summary of the main initiatives in the Exit Plan is detailed below.

**Revenue Enhancement**

Though the City made progress in closing its structural deficit, significant challenges remained. Chester's pension MMO increased by $2.8 million in 2019, and other operating expenses were expected to increase at a rate faster than that of revenues.

To offset the resulting deficit, the Exit Plan recommended that the City increase its EIT rate to fund the pension as allowed in the Municipal Pension Plan Funding and Recovery Act. The Plan also recommended that the City increase the non-resident EIT rate from 1 percent to 2 percent, which would generate approximately $5.5 million in new annual funding for the pension program. The Exit Plan noted that, if the City was able to realize a different income source to the fund pension or reduce its MMO, then it should reduce or eliminate the EIT increases.

The Exit Plan also recommended that the City collaborate with the newly created Stormwater Authority of the City of Chester to identify overlapping activities between the two entities. The City was encouraged to continue its discussions with the Stormwater Authority to identify ways to defray Chester General Fund expenditures through subcontracting or reimbursement for services provided by the City or hiring existing City employees to perform Stormwater Authority tasks.

At the time of the Exit Plan's creation, Chester officials had identified over $900,000 in annual General Fund expenditures that supported Stormwater Authority-related activities. The Recovery Coordinator recommended that the City seek full reimbursement of these costs.



**City Assets**

The City of Chester has two significant business-type assets, its water system and its parking system. At the time of the Exit Plan's creation, the City and the Authority were participating in negotiations regarding the future of the water system.

The Recovery Coordinator did not take a position on whether or not the City should monetize the water system or any other City asset; instead, the Recovery Coordinator's sole recommendation was for the City to retain qualified financial and legal advisors to help the City formulate its positions with respect to any potential asset monetization.

The Exit Plan did recommend that any proceeds from any asset sale should be applied as follows: first, to address the City's pension problems; second, to establish and fund a trust to address the City's OPEB liabilities; third, to fund capital improvements to the City's capital assets; fourth, to establish a General Fund reserve account; and fifth, in cooperation with a non-profit economic development corporation, to undertake economic development projects in the City.

If the City's pension fund were to benefit from a one-time revenue infusion, it would have the dual effect of improving the funding ratio of the plan and reducing the ongoing annual required contributions from the City's General Fund.

**Cost Containment**

Like virtually every municipality in the country, the City's operating expenses were driven primarily by personnel costs. Chester made strides toward controlling these costs when the City and its unions agreed to new collective bargaining agreements in 2017. The Exit Plan recommended that the City build on this progress and continue to implement the cost reduction reforms in these agreements. The Exit Plan included recommendations to limit salary and benefits costs and reduce pension fraud and abuses that had contributed to the pension system's significant unfunded liability and had placed enormous pressure on the General Fund, particularly in the police pension plan.

**Economic development**

The key to securing the City's long-term fiscal health is expanding its economic base and therefore the growth of its own local tax revenues. Therefore, the Exit Plan emphasized the importance of the City successfully implementing a strategy to stimulate community and economic development and improve the overall quality of life for its residents and businesses. The Plan underscored the need to increase the capacity of its tax base and generate more revenue in order to continue providing the same level of services to its residents. A stronger local economy would not only result in more revenues for City government, but also likely relieve pressure on service demands.

## 2.3    Fiscal Standing since Exit Plan Adoption

After finishing 2017 with revenues nearly balanced to expenditures, the City finished the year 2018 with an operating deficit of $1.4 million and deferred a total of $3.4 million in combined pension MMO and past due 2018 obligations.

PA **pennsylvania**
**RECEIVER FOR THE CITY OF CHESTER**

In 2019, the City remitted payment for those past due 2018 obligations but deferred a total of approximately $6.4 million in combined pension MMO and 2019 vendor obligations, finishing the year with an operating deficit of over $4.8 million. The pattern of pushing a portion of each fiscal year's obligations into the next one has made it difficult to accurately analyze the financial performance on an annual basis.

Due to the structural budgetary imbalance remaining within the City and accumulation of outstanding pension and vendor obligations, Chester continues to face severe challenges financially, the largest and most severe of which being its dangerously underfunded pension funds. Years of overtime spiking, pension abuse, and underfunding resulted in significant increases in the City's MMO. In 2019, the City's MMO increased from about $6.5 million to $9.3 million, which resulted in the City implementing an increase in the non-resident EIT rate allowed through the Commonwealth's Municipal Pension Plan Funding Standard and Recovery Act to address the increase and provide much needed funding to the pension.

While some of the recommendations within the Exit Plan were implemented that marginally improved its fiscal condition, the City still entered 2020 with severe budgetary issues, including a police pension fund that is approaching insolvency.

This serious and immediate fiscal crisis was compounded by the onset of the COVID-19 pandemic and subsequent collapse in economic activity that exacerbated the City's pre-existing distressed condition. In April 2020, the Governor issued a Declaration of Fiscal Emergency applicable to the City, initiating the implementation of an Emergency Action Plan in late April. At the time of the EAP's creation, the City's police pension fund balance was $2.9 million, which is equal to less than six months of beneficiary payments. As described later in this Plan, the police pension is at risk to start missing monthly pension benefit payments to retired officers and their surviving beneficiaries in the first quarter of 2021.

The EAP mandated that the City implement the following provisions in order to ensure that vital and necessary services would be maintained during the state of fiscal emergency:

1. Freeze hiring and prohibit rehiring any furloughed personnel without DCED approval

2. Restrict overtime usage for non-public safety purposes

3. Eliminate benefits for employees who have been terminated or temporarily laid off

4. Freeze discretionary spending

5. Freeze application for grants and third-party funds requiring General Fund match or in-kind match without approval of DCED

6. Freeze debt issuance without DCED approval

7. Continue working with professionals to formulate positions related to asset monetization, but prohibit monetization without DCED approval

8. Provide DCED weekly financial reporting updates

**PA** pennsylvania
RECEIVER FOR THE CITY OF CHESTER

The provisions in the EAP are incorporated in this Receiver's Plan, with any requirements for DCED approval transferred to the Receiver.

Despite the implementation of these corrective actions, the Emergency Action Plan acknowledged that the City would come dangerously close to running out of cash in its General Fund this year. This is in addition to the threat of insolvency in the Police Pension Plan. Following the Declaration of Fiscal Emergency and implementation of the Emergency Action Plan, a receiver was appointed in mid-2020, whose plan is set forth in this document.

**PA** pennsylvania
RECEIVER FOR THE CITY OF CHESTER

# Legacy Costs

The City's legacy costs, which include pension liabilities, other post-employment benefit (OPEB) liabilities, and outstanding debt, are enormous obstacles to the City's sustained financial recovery. Legacy costs put significant strain on the City's operating budget and have limited the City's ability to address deferred capital maintenance and investment in economic development and other tax base expansion initiatives.

The fiscal burden created by these costs, particularly pension and OPEB costs, has developed and compounded over a significant period of time; however, the City does not have the luxury of time to address these issues.  The City now has no choice but to use creative and aggressive approaches to address these issues, not only for current and future employees, but to the fullest extent possible, for current retirees as well.  Chester must prioritize strategies to address remaining past due pension liabilities and reduce the ongoing annual costs associated with servicing its legacy costs.

## 3.1    Debt Service

Debt service costs include principal and interest payments due on all outstanding long-term debt, such as revenue bonds, long-term lease obligations, and Commonwealth loans. A summary of the City's outstanding debt is outlined in Figure 3.1.

Figure 3.1: City of Chester Outstanding Debt

| Issue | Purpose | Outstanding | Rate | Maturity |
|-------|---------|-------------|------|----------|
| Series 2017A Guaranteed Revenue Bonds | Unfunded Debt | $9,535,000 | 7.50% | 8/15/2027 |
| Series 2017B Guaranteed Revenue Bonds | Refunding | $6,525,000 | 7.50% | 8/15/2027 |
| Series 2010B Guaranteed Revenue Note | Education | $1,600,000 | 2.605% | 2/01/2025 |
| Series 2019 (Delaware County) | Economic Development | $5,446,500 | 2.13% | 7/15/2039 |
| DCED Act 47 Loan | Deficit Funding | $1,450,000 | 0.0% | 5/1/2027 |

The City faced a severe situation in 2017 with $28 million in unpaid obligations, including past due pension minimum municipal obligations (MMOs), health insurance premium payments, vendor payments, and workers compensation premiums. In January 2017, DCED issued an emergency $2 million loan to the City to help with its immediate cash flow needs. In August 2017, the City issued its Series 2017A Bonds in the amount of $12,000,000 for the purposes of paying certain unfunded General Fund liabilities and to fund required reserve funds. The City concurrently issued its Series 2017B Bonds in the amount of $7,210,000 to finance the acquisition of certain property leased by the City and to fund required reserves. The Series 2017B issue was, in effect, a refinancing of debt originally issued by the Chester Economic Development Authority.

The Series 2017 Bonds are limited obligations of the City, payable from pledged revenues, which consist of a subordinate pledge of Covanta Host fees, a subordinate pledge of Harrah's revenues, a subordinate pledge of Harrah's table gaming revenues, and a pledge of the additional city considerations between the City and Harrah's and directly deposited with the trustee as pledged revenues under the indenture.




subordinate pledge of Covanta Host fees, a subordinate pledge of Harrah's revenues, a subordinate pledge of Harrah's table gaming revenues, and a pledge of the Additional City Considerations between the City and Harrah's and directly deposited with the trustee as pledged revenues under the indenture. In addition, the timely payment of principal and interest is guaranteed by the City for which the City pledges its full faith, credit, and taxing power.

In 2010, the City issued its Series 2010B Bonds in the principal amount of $3,985,000 to meet the obligations associated with allowing the Chester Upland School District to become a sponsoring district for the Delaware County Community College. The sponsorship required an upfront $4.0 million payment in addition to annual membership payments. The debt service on the nearly $4.0 million borrowing is secured by the 1 percent of table gaming revenue guaranteed to Chester as a casino host community as well as a general obligation pledge from the City.

If the debt service and annual membership costs of being a sponsoring district exceed the funds generated by 1 percent of table gaming revenue, then the school district will make up the difference. Annual debt service is approximately $320,000 and the borrowing matures in 2025.

The Series 2010B Notes were borrowed through the Delaware Valley Regional Finance Authority ("DelVal"). DelVal has issued bonds to provide funds for these loans and loans to other municipalities and has entered into interest rate swap agreements with Bank of America, N.A., Barclays Bank, PLC, and Citigroup N.A.. The program's objective is to reduce the borrowing costs of participants in the DelVal loan program and to enhance the ability of the participants to manage their interest rate risk.

In 2009, Delaware County issued its General Obligation Bonds, Series 2009 in the principal amount of $28,950,000 as part of the overall financing to build a soccer stadium in Chester. The County refinanced the Series 2009 issue in 2019 resulting in reduced annual debt service. Pursuant to a contribution agreement between the City and Delaware County, Chester has agreed to an annual payment to the County representing 25 percent of the annual debt service incurred by the County.

In addition to these obligations, the City issues Tax Revenue Anticipation Notes (TRANs) each year to meet its cash flow needs early in the fiscal year before the City begins to receive money from its major tax sources. The City issued a TRAN for $5.9 million in January 2020 and repaid it in August 2020. The City will need to issue another TRAN in early January 2021 to meet its cash flow needs next year.

PA **pennsylvania**
RECEIVER FOR THE CITY OF CHESTER

## 3.2   Pension Obligations

The City administers three single employer defined benefit pension plans: the Police Pension Fund, the Paid Firemen's Pension Fund, and the Officers and Employees Retirement System.

The Police and the Officers & Employees' pension funds are severely underfunded and had unfunded actuarially accrued liabilities of approximately $55.2 million and $5.3 million, respectively as of 2019 (See Figure 3.2). The funded ratios for the Police Pension Fund and Officers and Employees Pension Fund were 33.6 and 33.1 percent, respectively, which would be very low. The actual funding status of the funds is much worse because those funding ratios treat the City's past due contributions as assets (receivables), even though the City did not actually contribute them.

Figure 3.2: Summary of Actuarial Data (as of 1/1/19) and Other Data (as of 7/31/20)

| Actuarial Categories | Fire | Police | Officers & Employees |
|---|---|---|---|
| Actuarial Accrued Liability | $39,891,425 | $83,195,607 | $8,028,817 |
| Actuarial Value of Assets[6] | $33,275,475 | $27,992,553 | $2,674,647 |
| Unfunded Actuarial Accrued Liability | $6,615,950 | $55,203,054 | $5,354,170 |
| Funded Percentage of Accrued Liability | 83.42% | 33.65% | 33.31% |

| Other Pension Data | Fire | Police | Officers & Employees |
|---|---|---|---|
| Pension Portfolio Value (as of 7/31/20) | $30,549,762 | $1,751,573 | $2,014,539 |
| Approximate monthly beneficiary payments net of employee contributions | $125,000 | $520,000 | $55,000 |

Years of overtime spiking, pension abuses, and underfunding has resulted in major increases in the City's MMO. In 2019, the City's MMO increased from about $6.5 million to $9.3 million. The following is a summary of the City's MMO over the past seven years compared to actual contributions.

---

[6] Please note the Actuarial Value of Assets, Unfunded Actuarial Accrued Liability and Funding Percentage include the City's outstanding MMO contributions for all three plans because they are treated as assets (receivables) from an accounting perspective. Figure 3.4 shows those outstanding contributions due to the pension plans.

PA  **pennsylvania**
RECEIVER FOR THE CITY OF CHESTER

Figure 3.3: City MMOs and actual contributions ($ Millions), 2013 – 2019

| Minimum Municipal Obligations | 2013 | 2014 | 2015 | 2016 | 2017[7] | 2018 | 2019 |
|---|---|---|---|---|---|---|---|
| Police | $2.91 | $3.82 | $5.41 | $4.74 | $5.24 | $5.32 | $7.55 |
| Fire | $0.00 | $0.21 | $0.61 | $0.12 | $0.56 | $0.55 | $0.95 |
| Officers & Other Employees | $0.61 | $0.71 | $1.03 | $1.03 | $0.75 | $0.64 | $0.81 |
| Total | $3.51 | $4.74 | $7.05 | $5.89 | $6.55 | $6.50 | $9.31 |

| City contributions | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|
| State Aid | $1.49 | $1.56 | $1.50 | $1.62 | $1.77 | $1.81 | $1.98 |
| City Contribution | $2.02 | $0.00 | $0.00 | $0.00 | $2.40 | $4.56 | $4.53 |
| Total | $3.51 | $1.56 | $1.50 | $1.62 | $4.17 | $6.37 | $6.51 |
| | | | | | | | |
| Outstanding Year-End Balance | $0.00 | $3.18 | $5.55 | $4.27 | $2.39 | $0.13 | $2.80 |

*Source: City of Chester Financial Audits (2013 – 2016), City of Chester Finance Department (2017 – 2019)*

The City's total outstanding contributions to the pension plans are more than the sum of the outstanding balances shown above. Interest and penalties are added to the outstanding MMOs for each year that they are not paid, which takes the total liability to $28.8 million as of January 1, 2020. The City will not be able to make the full MMO contribution in 2020 so the liability is projected to approach $40 million effective January 1, 2021.

Figure 3.4: Past Due Pension MMO Balances, Actual and Projected Year-End[8]

| Pension | January 1, 2020 Past Due MMO Balance | Projected 2020 Contributions | Projected 2020 Unpaid MMO | Projected Interest | Projected December 31, 2020 Past Due MMO Balance |
|---|---|---|---|---|---|
| Police | $26,907,111 | $4,541,512 | $6,155,254 | $1,716,177 | $34,778,542 |
| Fire | $1,027,364 | – | $953,107 | $1,104,416 | $3,084,887 |
| O&E | $873,871 | – | $1,041,780 | $939,411 | $2,855,062 |
| Pension Total | $28,808,346 | $4,541,512 | $8,150,141 | $3,760,005 | $40,718,492 |

While the City has repeatedly failed to contribute its Minimum Municipal Obligation to the pension plans, several factors have contributed to the severely depleted condition of the police pension fund including an unprecedented number of disability retirements that were calculated at 100 percent of the employee's salary, and other benefit provisions that allow pension spiking (i.e. employees working large amounts of overtime shortly before retirement) that the City will not be able to afford.

---

[7] The City recently completed its 2017 comprehensive annual financial report, which shows the City only contributing $1.72 million toward the pension plan that year. If that is accurate, then the $2.40 million shown as a City Contribution below was $0 and the outstanding balance would be $4.8 million.

[8] The City hopes to make an additional $1 million contribution in 2020 (likely to the police plan) which would marginally reduce the 2020 unpaid MMO, projected interest and MMO balance relative to the numbers shown here.



For example, three police officers ages 44, 45 and 42 recently entered the DROP with pensionable salaries of $210,874, $207,414 and $143,311 respectively.  Under the current benefit provisions, these officers will receive annual pensions of $108,073, $103,707 and $71,652 – significantly more than the median household income of Chester residents.

Officers hired after February 1, 20217 need to reach 20 years of service and age 55 to retire, but officers hired before that point only need to reach 20 years of service, regardless of age. The purchase of pre-employment military service time could accelerate the retirement date.  This allows officers to retire at a very young age which causes the pension fund assets to be drawn down much sooner than if an age, even age 50, were specified in the Plan. In 2020, for example, the City has 13 officers eligible to retire by the end of this calendar year, including those participating in the Deferred Retirement Option Plan (DROP) program. Six of those officers are in their 40s and only three would meet the retirement eligibility standard if a minimum age for retirement were specified in the pension plan, consistent with the Third-Class City Code.

The City has implemented some important changes for officers hired after 2/1/17 which included, among other provisions, changing the eligibility for retirement to age 50 and 25 years of service, disallowing the purchase of military service time for the purpose of entering the Deferred Retirement Option Program (DROP), and creating a new benefit structure for new hires limited to only those benefits mandated by the Third Class City Code, which included limiting the calculation of an officer's pension benefit to base pay and longevity. The City increased the employee contribution to 8 percent and disability pensions are now paid at 50 percent of final salary, instead of the 100 percent that created an incentive for officers to try to retire on a disability pension.

Those changes were significant but they were only first steps.  Changing pension benefits for officers hired after 2/1/217 will be very helpful for the City, but they will not provide immediate relief or even substantial relief in the near term, as the recent examples of officers retiring in their 40s with $100,000-plus pensions demonstrate.

Now the Police Pension Plan is dangerously close to insolvency.

The Plan spends $500,000 - $550,000 per month, mostly on monthly pension benefit payments to retirees. Other payments are for federal and state withholding taxes and administrative costs. The plan did not have enough cash on hand to make every payment in June or July, so the City converted about $500,000 of investments to cash.

At the end of July 2020, the plan had $1.75 million left in assets. That is the total amount available for monthly pension payments and payouts to DROP participants who may withdraw money from the fund at any time upon full retirement. The City's commitments to DROP participants accounted for about $400,000 at the end of July, and that commitment grows each month. Therefore, the police pension plan had less than three months' worth of cash or assets that could be converted to cash to make ongoing monthly pension benefit payments.

The City expects to receive $1.9 million in State pension aid later this year and, if the City puts the full amount in the police pension plan, that would extend the plan's life by less than four months. The City is hopeful that it may contribute another $1 million during this calendar year, though that depends on



the General Fund's cash position. Unless something changes quickly, the plan will run out of cash and fail to make pension payments to retired police officers and their surviving beneficiaries in the first half of 2021.

The City must address the police pension funding crisis if it is going to save the police pension plan and preserve the benefits that current retirees are receiving.  To do so, the City has no choice to partner with all relevant stakeholders in order to apply the same or substantially similar cost saving ideas and strategies that were applied to all post-2017 police hires to current officers. The benefits of current retirees must also be fully analyzed if the City is going to be able to make meaningful headway in addressing its police pension crisis. While such action will be difficult and require persistence and creativity, the failure to address this issue or not taking the difficult steps that need to be taken is even worse. Such inaction is unthinkable and will be even more harmful to not only the City and its taxpayers, but to all current and future police retirees, than taking the difficult steps that must be taken.

## 3.3    Other Post-Employment Benefits (OPEB)

Other Post-Employment Benefits ("OPEB") include benefits other than pensions provided to retiree employees including medical, prescription drug, dental, vision, hearing, life insurance, long-term disability, long-term care, death benefits, and any payments made to the retiree that are to be used for such coverage. The Government Accounting Standards Board (GASB) rules require the use of accrual-based accounting methods for disclosure of the liabilities related to OPEB costs. Accrual-based accounting recognizing costs when benefits are earned, not when the benefit is actually paid.

Like most other governments, Chester uses a "pay-as-you-go" approach for funding OPEB costs. Though the City is not required to pre-fund its OPEB obligation, this does not mean it is not a critical financial concern. As of the most recently completed audit in 2017, the City had an unfunded OPEB liability of over $250 million. City has begun to address this liability with new provisions in its renegotiated collective bargaining agreements, but the liability remains a key concern.

The City took steps in 2017 to address the OPEB issue and eliminated such benefits for newly hired employees after that date, but as with the changes to pension benefits, such changes, though significant, will not provide immediate relief.  Changes must be made to OPEBs provided to current employees as well.

PA **pennsylvania**
RECEIVER FOR THE CITY OF CHESTER

Figure 3.5: City of Chester OPEB Liability of Year-End 2017

| Category | Amount |
|---|---|
| Actuarial Value of Plan Assets | - |
| Unfunded Actuarial Accrued Liability | $252,858,136 |
| Annual OPEB Cost | $20,812,615 |
| Pay-as-you-go Contribution for 2017 | - |
| Net OPEB Obligation Beginning of Year | $79,135,523 |
| Net OPEB Obligation Year-End | $99,948,138 |
| Net Change in OPEB Obligation | $20,812,615 |

*Source: City of Chester Audited Financial Statements (2017)*

## 3.4    Initiatives

The pension crisis described briefly in this chapter is one of the most immediate threats to City government's ability to provide vital and critical services. Based on our analysis to date, the crisis has three facets:

- There is an urgent need to address the rapidly dwindling cash position of the severely depleted police pension plan. As described above, that plan only has enough assets on hand – including the investments that are being converted to cash to make monthly pension benefits – to last through the first part of 2021. There is a very real risk the police pension plan could fail to make payments to retired officers and their surviving dependents in early 2021.

- The City has not made its full Minimum Municipal Obligation payment to all three plans since 2013, and does not expect to do so in 2020, even with the distressed pension tax on residents and commuters. Making the MMO payments on an annual basis beginning in 2021 is a necessity, but that alone does not address the prior year MMO liability that grows each year as penalties and interest accrue. Those past due MMOs are worth $28.8 million right now and will approach $40 million on January 1, 2021.

- The level of benefits provided to police officers hired before 2017 and the resulting pension payouts to those officers upon retirement are not affordable and not sustainable, even in the near future. Those benefits include the ability to "spike" pension benefits by working large amounts of overtime before retiring and an early retirement provision that allows officers to retire in their 40s and early 50s. The combination of those benefits leads to situations in which retired police officers are currently scheduled to receive annual pension payments over $100,000 per year for decades. The unusually high frequency of disability pensions, which result in benefits paid sooner and at a higher level than assumed in the pension funding formula, creates an additional burden that pension plans were not designed to sustain.



Some have pointed to a large one-time contribution to the pension, either backed by asset monetization or pension bonds, as the way out of this crisis, and that may have to be part of the overall strategy. However, unless there are also contemporaneous changes to structural provisions that allow for the inflated and costly benefit levels and actions taken to stop abuse of provisions like the disability pensions, any large one-time contribution will only temporarily mask the cost of those unaffordable benefits and leave the City in the same situation years later, only at that point with less assets or more debt. Other cities in Pennsylvania have sold assets without addressing the underlying structural issues, which only provided temporary relief and are now facing the same fiscal shortfalls that existed before the sale of the asset. This does not serve the taxpayers or other stakeholders.  The underlying structural issues must be addressed and it is the Receiver's intent to do so by working with all stakeholders and taking all necessary and difficult actions to make the City fiscally viable once again.

We often use the analogy of a boat with a leak in it.  You can temporarily bail the water out to keep the boat from sinking, but eventually it will sink unless the leak is fixed.  If the structural plan issues that have created this funding crisis and allow it to continue are not fixed in a permanent manner in Chester, the problem will continue to grow and be handed to future generations who will have fewer options to solve them. Even worse, the benefits that current and future retirees enjoy will vanish due to the pension plan's insolvency and the lack of funding to pay them.  We think that would be an abdication of the role of the Receiver and it is in the best interest of all stakeholders to take the necessary and difficult steps to save the pension plan now.

Act 47 requires this Plan to provide for the "timely deposit of required payments to the pension fund in which the distressed municipality and each authority participates." The law also requires this Plan to continue "vital and necessary services." For 2020, those two goals conflict with each other. The City could only make the 2020 MMO payment if it either shut down vital and necessary services this year or incurred more debt that would endanger those same services in 2021 and beyond when debt repayment begins.

The Receiver needs additional time to put a multi-faceted plan in place to address the different elements of this crisis. He will also need to meet with the affected parties, some of which do not have a full understanding of the severity of this crisis. They need that understanding because they will have to be part of the solution.  The Receiver has already begun discussions with such parties, including the Pension Plan board members.

The Receiver is also committed to gathering public input on the major options for dealing with this crisis, including potential asset monetization or pension bonds. All options are on the table at this moment, but not all are equally beneficial to Chester's residents and that is the guiding principle for addressing this crisis.

The initiatives below provide an initial set of steps to address the three major elements of this crisis described above – the cash flow shortage in the police plan, the City's ability to make its annual MMO payments and the need to restructure benefits.



**LEG01: Address cash flow shortage in the police pension plan, benefit enhancement prohibition and Pension Workgroup formation**

Action must be taken quickly to avoid the Police Pension Plan from becoming completely insolvent.  We are not aware of another pension plan in the Commonwealth in this critical situation and consequently, the Receiver is considering steps not seen before for Pennsylvania public sector plans, but are common in ERISA-covered plans.  For example, under the Pension Protection Act of 2006, pension plans that are deemed to be in "critical" status must limit the payments of lump sums such as deferred retirement payments.

With respect to the Deferred Retirement Option Program (DROP), the City does not receive Commonwealth pension aid for individuals in DROP. For the police plan, every increase in the obligations to the DROP participants reduces the scarce amount of money available to make pension benefits to all retired officers and their surviving dependents, including those DROP participants once they fully retire. For that reason, the Receiver is considering a graduated payout of DROP monies whereby the recipient would still receive his or her full payments, but not immediately in a way that would effectively cause a "run on the bank."

Additionally, there shall be no enhancements to pensions or other post-employment benefits (OPEB), including retiree health insurance, during the term of this Plan. This prohibition includes changes in collective bargaining agreements, side letters or other similar documents that would increase the City's overtime payments to employees for whom overtime is currently included in their pension benefit calculation.

This prohibition on pension and OPEB benefit enhancements extends to all three plans and all employees. The fire pension plan has started to demonstrate some of the same problematic dynamics as the police plan and the officers and employee (i.e. non-uniformed) pension plan is badly underfunded. The City shall not offer an early retirement incentive program unless it is determined by the City's actuary to be at least cost neutral and approved in writing by the Receiver.

Ultimately, no one benefits from a severely distressed pension fund.  Every dollar spent to rehabilitate a pension fund is one dollar less that can be spent on other employee compensation or on delivering vital and necessary services.  The Receiver and the City shall immediately convene a working group which shall include members of the Receiver's team, City finance staff, the Mayor or his designee, one representative each from the City's unions (selected by the unions), a member of the City's business community and a community leader.[9]  The workgroup will endeavor to mutually agree upon the business community and community leader, however if consensus cannot be achieved, the Receiver shall appoint those individuals.

The workgroup will be tasked with developing a consensus agreement within 60 days of this Plan's filing on how to comprehensively address the City's pension situation. The Receiver's team shall provide technical assistance to this workgroup and the Receiver's Chief of Staff shall serve as the workgroup's Chair.

---

[9] The pension workgroup concept is modeled after successful similar endeavors in Lexington, KY, Chattanooga, TN and New Orleans, LA.



**LEG02: Ensure full compliance with distressed pension EIT tax increase**

In 2019, the City raised its non-resident EIT rate from 1 percent to 2 percent in accordance with the 2018 Exit Plan's requirement to levy a distressed pension tax. Because of the cash flow shortage in the General Fund and the legal and practical requirement to provide vital and critical services, the City does not expect to use all revenue from that tax increase for pension purposes.

Beginning in 2021, revenue generated by any distressed pension tax on residents and non-residents shall be directed to the pension fund. To that end, the City should create a separate account for the distressed pension tax revenue so it is clear that revenue will not be used for other purposes. The City shall ensure full compliance with the increased rate and other statutory provisions in the Municipal Pension Plan Funding and Recovery Act, maximizing possible revenue that can be directed to its depleted pension funds.

**LEG03: Prioritize one-time revenue windfalls to pay past due MMOs**

During the period covered by this Plan, the City may benefit from financial windfalls – unexpected, significant, one-time increases in revenues above budgeted levels. Windfalls differ from revenues that outperform budget targets over the course of a month or year. As the City has experienced, revenues fluctuate over time and stronger-than-expected performance during one period does not guarantee that performance will continue or that other revenues will not have offsetting shortfalls.

By their nature, these windfalls cannot be predicted but the City should have a plan for their use in case they occur. The City will use any financial windfalls of at least $250,000, subject to the Receiver's approval, to pay down the past due MMOs. Before the City directs its windfall benefits to the pension plans, the City shall review and validate that it does not need the windfall to cover the cost of providing vital and critical services during the current fiscal year.

**LEG04: Eliminate disability pension fraud and abuse**

The City has a relatively high number of former employees retired on disability pensions.

Some parties expressed concerns to the Receiver that the practice of granting employees disability pension benefits at a higher level than they would receive if they retired without a disability creates an incentive to take advantage of the system. Other parties noted that some police officers and firefighters granted disability pension benefits are no longer disabled and should be able to perform the duties of a police officer.

The City's recent collective bargaining agreements reduced disability pension benefits for police officers to eliminate this incentive. In accordance with the Pension Ordinances, the Mayor or the Pension Board also have the authority to request that individuals on a disability pension be reviewed by appropriate medical personnel for the purpose of determining whether the individual is physically or mentally fit for active service as a police officer or firefighter.



The City shall evaluate every police officer and firefighter currently receiving a disability pension benefit and determine whether the employee should remain on a disability pension or be ordered to report for active duty by the Mayor as appropriate. If ordered back to duty, the disability pension will end as appropriate and consistent with the terms of the pension plan. The City shall work with a third-party contractor for these reviews and recommendations if it does not have the capacity to make these determinations itself.

Where possible, the City should work with the Auditor General's office, and other appropriate officials, to investigate and remedy potential pension fraud and abuse. The Receiver will also research other issues, including court cases currently pending in the judicial system, in which benefit recipients are seeking to enhance their current retirement and disability benefits well after leaving the employ of the City.

*Please note that there is a related initiative in the Workforce chapter that addresses the impact of disability leave abuse on operations and overtime usage.*

**LEG05: Conduct eligibility audits for employees and retirees receiving pensions, retiree health care and active health care benefits**

Given the significant costs associated with employee pensions, retiree health care benefits and active health care benefits, the City shall contract with a qualified entity or entities to undertake eligibility audits for retirees and/or their beneficiaries receiving pensions or retiree health care as well as active employees and/or their dependents receiving health care benefits.  These audits shall include verifying that only eligible persons are receiving the respective benefit, that the respective benefit is actually due the person, and that the person is making the appropriate contribution.

**LEG06: Engage in negotiations with all stakeholders in the pension plan and OPEB to seek meaningful changes to promote the sustainability of the pension and OPEB benefits for all current and future retires.**

Given the dire financial condition of the police pension plan particularly but the growing financial concerns with the fire and non-uniformed employees, the City and the Receiver have an obligation to seek meaningful changes to such benefit structures.  The changes made to such plans applicable to employees hired after 2017 must be explored and, if possible, implemented to make the plans sustainable.  While the changes made to the pension plans in 2017 for employees hired after that date will be used as a blueprint, the Receiver will seek to apply all ideas to address the structural issues that have made this pension plan and OPEBs unaffordable currently and not sustainable in the future.  The goal of such efforts will be to bring the benefits into compliance or closer compliance with the Third-Class City Code and requiring benefit applicants comply with all current and future procedures for applications for disability and other benefits.



*Debt*

## LEG07: Debt management under receivership

Act 47 requires that the Receiver's Plan "provide for the payment of the lawful financial obligations of the distressed municipality and authorities," which the law defines as "debt obligations, municipal securities, lease rental obligations, legal obligations and consensual modifications of existing obligations."

The Receiver is evaluating the City's debt obligations as they currently stand. The required payments for the City's debt obligations as they exist as of August 1, 2020 are included in the cash flow projections for 2020 and the preliminary budget for 2021.

As provided in the City's Emergency Action Plan, the City and its authorities shall not incur any other debt without the Receiver's written approval. This includes issuing any new debt, including short-term cash borrowings; and refunding or refinancing existing debt. For any debt-related requests, the City shall provide a minimum of the following to the Receiver's office for review:

- Type of debt transaction

- Reason for the debt transaction

- Transaction costs, if any

- Principal amount of debt incurred

- Anticipated annual debt service payments, including interest, for all years

- Key terms of borrowing

- Proposed source for repaying debt

- City's total debt schedule before and after the transaction (i.e what's the net impact)

This extends without limitation to the Chester Economic Development Authority (CEDA), the Redevelopment Authority of the City of Chester (CRA), the Chester Parking Authority, and the Stormwater Authority of the City of Chester.

In undertaking any debt issuances, the City shall use independent, certified professionals as financial advisor, underwriter and bond counsel. All professionals supporting a bond transaction undertaken by the City should be selected competitively wherever possible. Professionals not selected through a competitive bid will be subject to the Receiver's review and approval.

## LEG08: Potential 2017 debt refinancing

The City's financial advisor identified an opportunity to refinance the 2017 debt that accounts for most of the debt service payments through 2027. The basic concept behind the potential restructuring is that the City could redistribute the remaining portion of the outstanding debt service payments so there are lower payments in the near term in exchange for higher payments in the future, with total debt payments exceeding the level that currently exists. The Receiver reviewed an initial proposal and determined that,

**PA** **pennsylvania**
RECEIVER FOR THE CITY OF CHESTER

while the concept is worthy of closer review, the terms of that proposal were not sufficiently beneficial to the City.

Working with the Receiver, the City shall seek to restructure the 2017 debt. The final debt restructuring proposal will be subject to the Receiver's review and approval. Once the potential savings are identified, the Receiver shall direct the City in how those savings may be applied to address the City's many financial challenges.

**PA** pennsylvania
RECEIVER FOR THE CITY OF CHESTER

# Baseline Forecast and Financial Controls

This chapter presents a summary of the changes to the City's fiscal health since the onset of the COVID pandemic earlier this year. It focuses on the General Fund, which is the City's general operating fund and accounts for all tax revenues, and the Debt Service Fund, which is used to account for the accumulation of resources for the payment of general long-term debt principal, interest, and related costs.

The City also has "non-major governmental funds" including Special Revenue Funds, the Capital Projects Fund, the Liquid Fuels Fund, and the Reserve Fund. In addition to the governmental funds, the City is also responsible for Trust and Agency Funds used to account for assets held by the City in a trustee capacity or as an agent for individuals, private organizations, and other government units. These funds are not available for use by the City to meet operating or capital expenditures. Trust and Agency funds include the Police Pension Fund, Paid Firemen's Pension Fund, and Officers and Employees Retirement System.

## 4.1.    2020 Amended Budget and 2021 Preliminary Budget Projection

The COVID-19 crisis could not have occurred at a worse time for Chester. Already facing severe challenges on multiple fronts, the pandemic and subsequent economic slowdown compounded what was already a dire situation for the City.

The City's General Fund budget depends on revenues collected from real estate tax, Earned Income Tax (EIT), Local Services Tax (LST), and rents and fees associated with Harrah's Casino. A significant threat to even one of these categories has the potential to severely affect the City's ability to operate as budgeted. In the case of the COVID-19 crisis, each of the City's revenue sources have a heightened risk of causing the City to experience a cash shortfall by the end of the year and beyond.

The City's largest source of General Fund revenue is from EIT, which is based on the earnings of Chester residents and the earnings of commuters who work Chester but live elsewhere. Because this tax is a percentage of overall earnings, an economic recession and the unemployment and loss of wages that follows will have significant impacts on EIT revenues.

While most data at this point is only available at the County level, the results appear troubling for Chester. Delaware County's low-income employment decreased by 43.5 percent from January 2020 through May 2020. Unemployment claims increased from 500 per week during the first quarter of 2020 to 7,460 near the beginning of the economic shutdown in March. Claims remained between 1,000 and 1,500 each week from mid-May into the summer. The City already experiences significantly higher unemployment rates than the County overall during normal economic times, meaning the COVID-19 impacts on employment and earnings could be even more in severe in Chester than in Delaware County as a whole.

Businesses in Chester will also suffer because of the pandemic. Since January 2020, small business revenue decreased in Delaware County by approximately 85 percent. Approximately one-half of workers employed in Chester work in "high risk" industries, meaning either: a) the business was able to continue physical operations in the state's Red Phase, but likely suffered a decrease in business volume; or b) the business was unable to continue physical operations and likely unable to perform work remotely. One key example of a high-risk business in Chester is Harrah's Casino, which contributes to the City's revenues in several ways, such as EIT and gaming-specific fees and land leases.



## Casino Host Revenues

Located in Chester, Harrah's Philadelphia Casino and Racetrack is City government's second-largest revenue source. Casino host revenues are set by the Pennsylvania Race Horse Development and Gaming Act (the "Gaming Act" or "Act 71") and an additional consideration payment (or land lease) agreement between the City and the casino.

Since 2017, Harrah's has paid the City $1.5 million on a quarterly basis ($6 million annually) for its slots operations, plus a monthly land lease payment equal to 2 percent of its gross terminal revenue for slots operations. If the total paid to the City is less than $10 million in a year, the City receives the difference as a reconciliation payment in the first quarter of the next year.

Harrah's also remits payment to the City under Act 71 and its land lease agreement for the operations of table games. Under the land lease agreement, the City receives 2 percent of gross table operations revenue. Additionally, the City receives payments equal to an additional 1 percent of table revenues under Act 71 to be used toward debt service by the City.

In total, the City has received $11.2 to $12.9 million per year since 2016. Forecasting these revenues during the pandemic is difficult, though the $10 million guarantee for slots revenue described above gives Chester some projection. Harrah's closed for part of 2020 because of the pandemic and the future of the gaming industry, like other forms of entertainment and tourism activity, is unknown at this time.

|  | 2016 | 2017 | 2018 Unaudited | 2019 Unaudited | 2020 Budget |
|---|---|---|---|---|---|
| Slots – Land Lease | 4,136,907 | 3,644,080 | 3,947,722 | 3,539,249 | 2,142,953 |
| Slots – Act 71 | 5,822,703 | 6,000,000 | 6,000,000 | 6,000,000 | 6,000,000 |
| Reconciliation | - | 355,473 | 1,679,270 | - | 152,444 |
| Total Slots | 9,959,610 | 9,999,554 | 11,626,991 | 9,539,249 | 8,295,397 |
|  |  |  |  |  |  |
| Table Gaming – Land Lease | 870,624 | 805,254 | 853,968 | 1,108,872 | 598,300 |
| Table Gaming – Act 71 | 435,312 | 402,627 | 426,984 | 554,436 | 299,150 |
| Total Table Gaming | 1,305,935 | 1,207,881 | 1,280,952 | 1,663,309 | 897,450 |
|  |  |  |  |  |  |
| **Total Gaming** | **11,265,546** | **11,207,435** | **12,907,943** | **11,202,557** | **9,192,847** |

The City of Chester has recently begun to experience these and other direct and ripple effects from the COVID-19 crisis. The pandemic's impact on gaming revenues was apparent in the first half of the year and the City will not receive any reconciliation payment until early 2021, which will be too late to meet the City's cash flow needs this year. The pandemic's impact on the earned income tax is only starting to become visible. Because of the lag in the EIT collection cycle, the City only started to see the drop in resident and commuter earnings that occurred during the Q2 2020 business shutdown beginning in August 2020. The full magnitude of these impacts will become clearer as the year progresses and will linger into 2021.



At the onset of the pandemic, the City took several actions to address the anticipated fiscal fallout. The City laid off more than one-third of its workforce, reducing its expenditures on salaries, wages and benefits such as medical insurance. The City's Minimum Municipal Obligations to the employee pension plans are not affected by the layoffs and there will be an increase in unemployment related expenditures following the furloughs. But the net fiscal impact is that the furloughs have given the City a chance to make it through this year without running out of cash in the General Fund.

In late June and early July 2020, with the approval of the Pennsylvania Department of Community and Development and the Chester Receiver, the City rehired 28 employees, most of whom returned as part-time employees, regardless of whether they held full-time position prior to the pandemic.

The net effect of the workforce reductions is a decrease of approximately $220,000 in salaries per pay period, as well as estimated reductions of approximately 20 percent on benefit costs.

In addition to the furloughs, the City implemented stronger restrictions on overtime and worked closely with its collective bargaining units to limit that form of cash compensation. The City is currently taking the steps necessary to be reimbursed for COVID-related expenditures, though the money available through the federal and county government cannot be used for "revenue replacement" (i.e. backfilling EIT or other revenues lost during the pandemic).

 Further, a freeze has been placed on discretionary purchases and services have been scaled back in areas where there is either less demand for service or less labor available to deliver it. The City expects that it will not make the full Minimum Municipal Obligation (MMO) payment to the three pension plans this year so that there is enough cash to sustain critical and vital services.

Because of all these changes, the 2020 budget approved entering this year no longer provides a realistic depiction of the City's revenues and expenditures for the rest of this year. Further, since the impacts of the pandemic and general slowdown in economic activity will carry into next year, the City will need to rethink its 2021 budget as well. Using financial results through July and revised projections, the Act 47 Coordinator developed an Amended 2020 forecast and a Preliminary 2021 Budget.

**pennsylvania**
RECEIVER FOR THE CITY OF CHESTER

Figure 4.1: General Fund Revenue Sources by Category and Budget Version

| Revenue Source | 2020 Approved Budget | 2020 July YTD | 2020 Aug-Dec | 2020 Amended Budget | 2021 Preliminary Budget |
|---|---|---|---|---|---|
| Current Real Estate Tax | 9,061,706 | 7,377,814 | 622,828 | 8,000,641 | 8,000,000 |
| Delinquent Real Estate Tax | 1,519,716 | 749,023 | 592,172 | 1,341,195 | 1,000,000 |
| Earned Income Tax | 15,163,243 | 8,690,516 | 5,860,000 | 14,550,516 | 15,000,000 |
| Local Services Tax | 502,774 | 242,570 | 65,000 | 307,570 | 450,000 |
| Business Privilege Tax | 1,826,016 | 1,820,926 | 230,000 | 2,050,926 | 1,200,000 |
| Gaming Host Community | 11,840,000 | 4,987,523 | 5,207,124 | 10,194,647 | 11,700,000 |
| Fines | 200,000 | 61,528 | 20,000 | 81,528 | 190,000 |
| Licenses & Permits | 1,769,100 | 854,701 | 725,000 | 1,579,701 | 1,730,000 |
| Grants | 2,963,096 | 1,962,982 | 1,328,022 | 3,291,004 | 2,042,600 |
| State Pension Aid | 1,900,000 | - | 1,900,000 | 1,900,000 | 1,800,000 |
| Charges for Services | 674,548 | 62,686 | 9,428 | 72,115 | 430,950 |
| Covanta Host Community | 5,048,745 | 3,340,358 | 1,250,000 | 4,590,358 | 4,750,000 |
| Rubbish fees | 1,540,097 | 1,237,585 | 139,000 | 1,376,585 | 1,400,000 |
| Reimbursements | 1,383,050 | 831,361 | 786,434 | 1,617,796 | 1,200,000 |
| Miscellaneous | 971,540 | 656,408 | 100,822 | 757,230 | 614,500 |
| Total Revenue | 56,363,631 | 32,875,982 | 18,835,830 | 51,711,812 | 51,508,050 |

*Source: City of Chester Financial Reports and Act 47 Coordinator (2020)*

**PA** pennsylvania
RECEIVER FOR THE CITY OF CHESTER

Figure 4.2: General Fund Expenditure Sources by Category and Budget Version

| Expenditure Source | 2020 Approved Budget | 2020 July YTD | 2020 Aug-Dec | 2020 Amended Budget | 2021 Preliminary Budget |
|---|---|---|---|---|---|
| Salaries and Wages | 18,485,391 | 9,365,783 | 5,896,436 | 15,262,219 | 15,320,964 |
| Overtime | 1,950,000 | 917,324 | 415,401 | 1,332,725 | 1,600,000 |
| Health Insurance | 9,492,453 | 5,390,237 | 3,100,000 | 8,490,237 | 8,300,000 |
| Pension | 10,215,141 | 1,750,000 | 2,065,000 | 5,000,000 | 10,200,000 |
| Other Benefits | 2,712,526 | 983,191 | 1,358,772 | 2,341,963 | 3,565,342 |
| Insurances | 1,314,365 | 1,075,302 | 441,909 | 1,517,211 | 1,551,596 |
| Contract/Professional Services | 2,624,125 | 2,830,976 | 1,077,250 | 3,908,226 | 3,800,000 |
| Utilities | 1,410,695 | 726,642 | 535,751 | 1,262,393 | 1,290,166 |
| Materials & Supplies | 129,000 | 85,509 | 14,900 | 100,409 | 102,618 |
| Equipment & Maintenance | 736,836 | 614,435 | 809,274 | 1,423,709 | 1,300,000 |
| Other | 464,900 | 347,672 | 220,250 | 567,922 | 580,416 |
| Debt Service | 4,202,960 | 2,817,762 | 1,206,500 | 4,024,262 | 4,400,000 |
| Debt Reduction | 1,000,000 | 4,065,216 | - | 4,065,216 | |
| Operating Expenditures | 54,738,392 | 30,970,049 | 17,141,443 | 49,296,492 | 52,011,102 |
| Transfers | 786,305 | 542,708 | 31,358 | 574,066 | 727,000 |
| Capital Improvements | 500,000 | - | 275,000 | 275,000 | 2,000,000 |
| Economic Development | - | - | - | - | 500,000 |
| Total Expenditures | 56,024,697 | 31,512,756 | 17,447,801 | 50,145,558 | 55,238,102 |

*Source: City of Chester Financial Reports and Act 47 Coordinator (2020)*

Figure 4.3: General Fund Summary Results by Budget Version

| | 2020 Approved Budget | 2020 July YTD | 2020 Aug-Dec | 2020 Amended Budget | 2021 Preliminary Budget |
|---|---|---|---|---|---|
| Revenues | 56,363,631 | 32,875,982 | 18,835,830 | 51,711,812 | 51,508,050 |
| Operating Expenditures | (56,024,697) | (31,512,756) | (18,632,801) | (50,145,558) | (55,238,102) |
| Surplus (Deficit) | 338,934 | 1,363,226 | 203,029 | 1,566,255 | (3,730,052) |

*Source: City of Chester Financial Reports and Act 47 Coordinator (2020)*

## 4.2.    2020 Year-End Monthly Cash Projection

In addition to developing an amended 2020 budget, the City must monitor its liquidity position on a month-to-month basis to avoid a cash deficit. Figure 4.4 depicts the monthly cash projection for the City for the second half of 2020, which reflects the timing of adjusted cash receipts and expenditures. The projections show very thin positive cash margins from September through year-end. The projected low point at the end of October ($0.9 million) is equivalent to seven days of cash.

pennsylvania
RECEIVER FOR THE CITY OF CHESTER

Figure 4.4: Revised Cash Projection, August-December 2020

|  | August | September | October | November | December |
|---|---|---|---|---|---|
| Cash Receipts | 5,353,858 | 2,089,491 | 4,992,972 | 4,737,637 | 1,661,873 |
| Cash Expenditures | (3,957,995) | (2,705,942) | (5,472,348) | (2,749,119) | (2,562,397) |
| TRAN Repayment | (1,578,018) | (97,500) | - | - | - |
| Cash Surplus (Deficit) | (182,155) | (713,951) | (479,376) | 1,988,518 | (900,525) |
| Beginning Balance | 2,273,609 | 2,091,453 | 1,377,502 | 898,126 | 2,886,644 |
| Ending Balance | 2,091,453 | 1,377,502 | 898,126 | 2,886,644 | 1,986,119 |

*Source: City of Chester Financial Reports (2020) and Act 47 Coordinator (2020)*

## 4.3.   Baseline Multi-Year Financial Forecasts, 2021-2024

The COVID-19 crisis has worsened financial challenges the City was already facing for the coming years. Absent corrective action, the financial forecast based on known current and future developments, and reasonable growth assumptions indicates accelerating operating deficits from 2021-2024.

### Revenue Forecast

Overall, revenue growth is anticipated to remain essentially stagnant. The revenue forecast presented below is based in part on the following growth assumption highlights:

- Real estate tax revenue will return to 95 percent of the 2020 budgeted amount after decreasing in the 2020 Amended and 2021 Preliminary Budgets, with no change in millage or assessments.

- EIT revenues will modestly recover from the COVID-19 economic crisis in 2022 and continue to grow with inflation.

- Local Services Tax and Business Privilege Tax revenues will remain relatively stagnant as employment is anticipated to remain steady beyond 2021.

- Gaming revenue, which will be lower than anticipated in 2020 due to the Casino closure during the COVID-19 crisis, will increase in 2021 because of the reconciliation payment; from 2022 forward, this revenue will remain steady.

- Per the Covanta agreement, revenue for the Covanta host revenues will increase with inflation.

**PA**
**pennsylvania**
RECEIVER FOR THE CITY OF CHESTER

Figure 4.5: General Fund Revenues by Category, 2019-2024

| Revenue Source | 2019 Unaudited | 2020 Amended | 2021 Preliminary | 2022 Forecast | 2023 Forecast | 2024 Forecast |
|---|---|---|---|---|---|---|
| Current Real Estate Tax | 7,629,451 | 8,000,641 | 8,000,000 | 8,080,000 | 8,257,760 | 8,439,431 |
| Delinquent Real Estate Tax | 1,521,591 | 1,341,195 | 1,000,000 | 1,010,000 | 1,032,220 | 1,054,929 |
| Earned Income Tax | 13,879,933 | 14,550,516 | 15,000,000 | 15,000,000 | 15,450,000 | 15,913,500 |
| Local Services Tax | 504,938 | 307,570 | 450,000 | 450,000 | 463,500 | 477,405 |
| Business Privilege Tax | 1,843,205 | 2,050,926 | 1,200,000 | 1,200,000 | 1,236,000 | 1,273,080 |
| Gaming Host Community | 11,202,557 | 10,194,647 | 11,700,000 | 12,322,047 | 12,753,319 | 13,199,685 |
| Fines | 183,724 | 81,528 | 190,000 | 191,900 | 196,179 | 200,574 |
| Licenses & Permits | 1,828,900 | 1,579,701 | 1,730,000 | 1,747,300 | 1,786,265 | 1,826,277 |
| Grants | 1,754,921 | 3,291,004 | 2,042,600 | 2,063,026 | 2,108,413 | 2,154,798 |
| State Pension Aid | 1,976,513 | 1,900,000 | 1,800,000 | 1,818,000 | 1,858,541 | 1,900,173 |
| Charges for Services | 531,900 | 72,115 | 430,950 | 435,260 | 444,966 | 454,933 |
| Covanta Host Community | 5,101,814 | 4,590,358 | 4,750,000 | 4,797,500 | 4,965,413 | 5,139,202 |
| Rubbish | 1,296,521 | 1,376,585 | 1,400,000 | 1,414,000 | 1,445,532 | 1,477,912 |
| Reimbursements | 1,447,230 | 1,617,796 | 1,200,000 | 1,212,000 | 1,239,028 | 1,266,782 |
| Miscellaneous | 403,355 | 757,230 | 614,500 | 750,000 | 766,725 | 783,900 |
| Total Revenue | 51,106,552 | 51,711,812 | 51,508,050 | 52,491,033 | 54,003,860 | 55,562,579 |

*Source: City of Chester Financial Reports and Act 47 Coordinator (2020)*

**Expenditure Forecast**

The baseline expenditure forecast relies upon various factors. The primary expense driver in the City's General Fund budget is personnel-related costs. With the large number of layoffs that occurred in the City this year, the expense forecast for salaries, wages, and most other personnel-related costs is lower than it would have been in prior years. However, the City will need to continue controlling costs, particularly overtime accrual, moving forward. In general, the cost of doing business in the City will continue to increase overall. Highlights of the expense growth rate assumptions include:

- Salaries and wages, as well as overtime and employee benefits, will increase at an annual rate of 1.5 to 3 percent, depending on the bargaining unit.

- The City, which is self-insured, will experience an annual growth of 4.5 to 5.0 percent for health insurance expenditures from 2021 forward.

- Pension obligations will increase by 3 percent annually[10].

---

[10] The Receiver notes that this assumption needs to be revisited during the 2021 budget process. In recent years, Chester's MMOs have increased by much more than 3 percent. From 2013 to 2019, the MMOs increased from $3.5 million to $9.3 million, or 17.7 percent per year. Given the City's inability to make its MMO payments (including in 2020) and the frequency with which employees retire sooner and with higher monthly benefits than assumed in the pension calculations, future pension contributions will likely be much higher than shown here, even without accounting for the large liability associated with past due MMOs.

- Other sources of expenditures for the City, such as professional services, utilities, and others, will increase at a heightened inflation factor.

Figure 4.6: General Fund Expenses by Category, 2019-2024

| Expenditure Source | 2019 Unaudited | 2020 Amended | 2021 Preliminary | 2022 Forecast | 2023 Forecast | 2024 Forecast |
|---|---|---|---|---|---|---|
| Salaries and Wages | 18,499,909 | 15,262,219 | 15,320,964 | 16,089,825 | 16,432,294 | 16,783,005 |
| Overtime | 2,099,103 | 1,332,725 | 1,600,000 | 1,624,000 | 1,648,360 | 1,673,085 |
| Health Insurance | 10,646,420 | 8,490,237 | 8,300,000 | 8,698,557 | 9,125,005 | 9,572,321 |
| Pension | 4,528,490 | 5,000,000 | 10,200,000 | 10,506,000 | 10,821,180 | 11,145,815 |
| Other Benefits | 2,887,464 | 2,341,963 | 3,565,342 | 3,618,822 | 3,673,104 | 3,728,201 |
| Insurances | 1,112,731 | 1,517,211 | 1,551,596 | 1,598,609 | 1,647,047 | 1,697,117 |
| Contract/Professional Services | 2,444,202 | 3,908,226 | 3,800,000 | 3,915,140 | 4,033,768 | 4,156,395 |
| Utilities | 1,371,178 | 1,262,393 | 1,290,166 | 1,329,258 | 1,369,534 | 1,411,168 |
| Materials & Supplies | 81,489 | 100,409 | 102,618 | 105,728 | 108,931 | 112,243 |
| Equipment & Maintenance | 1,193,353 | 1,423,709 | 1,300,000 | 1,339,390 | 1,379,974 | 1,421,925 |
| Other | 493,339 | 567,922 | 580,416 | 598,002 | 616,122 | 634,852 |
| Debt Service | 3,477,922 | 4,024,262 | 4,400,000 | 4,282,369 | 4,238,705 | 4,201,958 |
| Debt Reduction[11] | 1,951,905 | 4,065,216 | - | - | - | - |
| Operating Expenditures | 50,787,505 | 49,296,492 | 52,011,102 | 53,705,700 | 55,094,025 | 56,538,085 |
| Transfers | 700,396 | 574,066 | 727,000 | 739,560 | 752,336 | 765,334 |
| Capital Improvements | - | 275,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 |
| Economic Development | - | - | 500,000 | 500,000 | 500,000 | 500,000 |
| Total Expenditures | 51,487,900 | 50,145,558 | 55,238,102 | 56,945,260 | 58,346,361 | 59,803,419 |

*Source: City of Chester Financial Reports and ESI (2020)*

Despite corrective measures implemented in 2020 in response to the COVID-19 crisis, the baseline forecast estimates an operating deficit of $3.7 million in 2021, largely due to the Preliminary Budget accounting for the cost of the City's full MMO and an appropriate Capital Improvement Fund transfer of $2 million and an investment in economic development initiatives of $500,000. As revenues and expenditures begin to experience pre-COVID growth rates in 2022 and beyond, the City is forecasted to experience an annual deficit of between $4.2 and $4.5 million each year through 2024. Again, this baseline projection is subject to revision since it does not account for the likelihood that the City's pension contributions will grow by more than three percent or the past due MMO liability that is expected to climb to $40 million on January 1, 2020.

[11] Though categorized as "debt reduction," the obligations here are not debt in the traditional sense. These are obligations carried over from prior years, like unpaid vendor bills or past due federal tax withholdings.

pennsylvania
PA  RECEIVER FOR THE CITY OF CHESTER

Figure 4.7: General Fund Balance Forecast, 2019-2024

|  | 2019 Unaudited | 2020 Amended | 2021 Preliminary | 2022 Forecast | 2023 Forecast | 2024 Forecast |
|---|---|---|---|---|---|---|
| Revenues | 51,106,552 | 51,711,812 | 51,508,050 | 52,491,033 | 54,003,860 | 55,562,579 |
| Expenditures | 51,487,900 | (50,145,558) | (55,238,102) | (56,945,260) | (58,346,361) | (59,803,419) |
| Surplus (Deficit) | (381,349) | 1,566,255 | (3,730,052) | (4,454,227) | (4,342,502) | (4,240,840) |
| | | | | | | |
| Beginning Fund Balance | | | 1,986,119 | (1,743,932) | (6,198,160) | (10,540,661) |
| Ending Fund Balance | | | (1,743,932) | (6,198,160) | (10,540,661) | (14,781,501) |

*Source: City of Chester Financial Reports and ESI (2020)*

The City's operations are not sustainable at the current levels. Even before the pandemic, revenues have continued to stagnate as expenses have increased.

## 4.4.  Initiatives

**FIN01: Continue financial controls in the Emergency Action Plan; improve financial reporting**

The financial controls enacted in the 2020 Emergency Action Plan are incorporated in this Plan and shall remain in place until the Receiver gives written notice that they have been changed. Any references to approvals that must be granted by the Department of Community and Economic Development shall instead be provided in writing by the Receiver.

The City shall also continue to issue the financial reports required in the Emergency Action Plan, specifically including the following:

- A projection of the City's daily General Fund cash receipts, expenditures, and cash balance position for the next 14 days.

- A projection of the City's monthly General Fund cash receipts, expenditures, and cash balance position through the year-end.

- Year-to-date General Fund budget versus actual results.

- Overtime usage reports for all units of City government, including police and fire

- Pension investment and account activity statements for all employee pension funds.

- Other reports as requested and required by the Receiver.

The Receiver and City Finance team will revisit the frequency with which some of these reports are delivered. It is important that the City provide timely information regarding its monthly cash flow but doing so every week has created a series of reports with numbers that change because they are incomplete or in draft status. This undermines the credibility or usefulness of the cash flow projections that will be critical for the rest of the year.

Other reports, like those on usage of overtime or health insurance expenditures, may need additional context for them to be useful. The actual-to-budget report needs to be developed so that the figures give



a more meaningful picture of financial activity. For example, it is much more useful from a management perspective to know how much each department has spent of its salary budget, versus looking at the total salary spending across all departments.

Similar improvements are needed in the City's operating budget that should have enough detail that the City's leaders, staff and residents can use it as a statement of priorities, a description how limited resources will be allocated, and a measuring stick against which financial activity can be tracked throughout the year.

Finally, the City needs to continue working with its external auditor to complete the year-end audits. Throughout the process of writing this plan, parties who need to understand the City's financial performance during a particular year have said it is difficult to do so because year-end audits are produced years after the cash-based results are provided. With the recent release of the 2017 audit, the City now has two outstanding (2018 and 2019).

### FIN02: Cash flow monitoring and controls for 2020 and 2021

Section 703 of Act 47 requires that this Plan provide for the "continued provision of vital and necessary services." To provide vital and necessary services, the City must have cash to pay its employees, vendors and other obligations in the General Fund for the rest of 2020 and throughout 2021.

Earlier this year the Emergency Action Plan projected that the City would need to borrow $4.5 million to avoid running out of cash in the General Fund this year and provide a "modest cash cushion" entering 2021. Because of the expenditure cuts and the financial controls put in place, the most recent projection shows the City making it through 2020 without borrowing money. The high-level projections (see Figure 4.4 above) show the City finishing 2020 with a little less than $2 million in General Fund cash, though the balance drops below $1.0 million at the end of October. These projections assume the City will make its debt payments as scheduled but not the full $10 million contribution to the employee pension plan.

While the City's situation has improved, the Receiver notes the following important cautionary caveats:

- As noted above, the pandemic's fiscal impact to date on the City's earned income tax – the largest source of City government funding – is still largely unknown. Because of the lag in the EIT collection cycle, the City only started to see how much resident and commuter earnings dropped during Q2 2020 in its August 2020 EIT receipts. At the time that the Receiver filed this plan, there was less than one month of data on how steep the drop will be.

- Beyond uncertainty as to how much the pandemic has already cut EIT revenues, it is unknown what further impact the virus will have during the rest of 2020 and 2021. If there is another shutdown to slow the spread of the virus in the final months of the year, that could cut revenues at Harrah's again, as it did during the first half of the year. Any reconciliation payment to bring the City's slot revenues up to $10 million total would not occur until early 2021.

- Due to the furloughs enacted in the spring, the City will pay higher unemployment claims costs for the rest of the year. The City's second quarter payment to the Commonwealth Department of Labor and Industry for these claims was close to $400,000 and the third quarter payment will



also come due during this calendar year. Eventually, the City will be reimbursed 50 percent of those costs, but the timing of that reimbursement is unknown. The same is true of the timing for any other reimbursements from the federal or county government related to COVID-19.

- The City is involved in several litigation processes, including those related to the water system. The City must defend its positions in these processes – not doing so could cost the City residents far more than the initial cost of legal services, and for years into the future. But the Receiver recognizes those processes carry the risk of costs beyond those projected in the cash flow.

The impact of COVID-19 is new and unexpected, but the City's struggle to finish the year without running out of cash is not. In recent years the City has dealt with this problem by defaulting on its Tax Revenue Anticipation Note (TRAN) repayment (2016); falling behind on its payments for employee health insurance (2016); issuing new debt to cover current year obligations (2017); or pushing a portion of its current year obligations into the next year (2018 and 2019).

Figure 4.6 shows $1.95 million in "debt reduction" expenditures in 2019 and another $4.0 million in 2020. That is not repaying debt in the traditional sense – that is paying obligations carried over from prior years, like unpaid vendor bills or past due federal tax withholdings.

The City needs to take immediate action to break this cycle.

- Shortly before this Plan was filed, the City repaid its 2020 TRAN in full. That was an important and necessary first step to finishing 2020 in the black on a cash basis.

- The City currently does not expect to do another unfunded debt borrowing to fund operations during 2020, and it is the Receiver's intention to take actions as needed to avoid doing so. Unfunded debt borrowings, like the one done in 2017, should be borrowings of last resort. They carry higher interest rates than other types of borrowing and shift the cost of services already delivered onto taxpayers for the next 10 years. As the multi-year projection shows, the next few years will have challenges of their own without adding a portion of the 2020 costs to them

- The Receiver will work with the City Finance staff to minimize all obligations carried over from 2020 into the next year. Unexpected events do occur, particularly during unusual events like the pandemic. But the City needs to break the cycle of pushing this year's obligations into next year's payment cycle. Again, the 2021 budget will be difficult enough to balance without adding more obligations from 2020 to it.

### FIN03 – Adopt a realistic, balanced budget for 2021

Figures 4.5 (revenues), 3.6 (expenditures) and 3.7 (combination) show the 2021 budget as it currently stands. At this time there is a $3.7 million gap between revenues and expenditures that needs to be closed. Chester's situation is not unique. Many Pennsylvania governments will struggle to balance revenues and expenditures during the pandemic and recession, and most governments are not as far into the process as Chester is. Local governments usually adopt their budget in November or December, so there is still time to close the deficit.

**PA pennsylvania**
RECEIVER FOR THE CITY OF CHESTER

However, Chester is unusual in the frequency and degree to which actual results vary from the budget. The table below shows the City's actual results consistently falling short of the budget with multi-million dollar deficits from 2013 through 2016.

Figure 4.8: General Fund Budget versus Actual Results, 2013 - 2016

|  | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| Budget Surplus/ (Deficit) | $0 | $0 | $0 | $0 |
| Actual Surplus / (Deficit) | $(2,227,095) | $(8,687,450) | $(7,979,333) | $(8,241,655) |

The City's performance in 2017 was more positive in that annual revenues and expenditures were nearly balanced. The 2017 comprehensive annual financial report shows a $7.7 million positive result at the end of that year, but that apparent surplus was due to the City borrowing $12 million through an unfunded borrowing loan to cover some of its unfunded obligations. The City also received a $2 million emergency loan from the Commonwealth in 2017. The City then returned to deficits in 2018 ($3.4 million unaudited) and 2019 ($4.8 million unaudited).

The Receiver does not know yet where the deficits have been created by failing to adopt a realistic budget, failing to follow that budget or both. But that trend must end.

The Receiver's team will work with the City Finance staff and elected officials on the 2021 and 2022 budgets, and the Receiver shall make any changes needed to ensure that the City has a realistic, balanced budget entering each year. The budgeted expenditures shall include the City's full Minimum Municipal Obligation (MMO) payment both years. For the reasons described at length throughout this Plan, that will be difficult and may require position reductions beyond the 2020 furloughs, tax increases, or both.

**PA** pennsylvania
RECEIVER FOR THE CITY OF CHESTER

# Workforce

The services provided to residents by the City of Chester are labor intensive, and as a result, personnel costs, including wages and benefits, constitute a significant portion of the City's expenditures. In the approved 2020 budget, employee salaries, wages, and benefits account for $42.9 million in costs, or 76 percent of General Fund expenses.

As noted in the Exit Plan, personnel costs for police and fire services soared from 2013-2016 due to problematic interest arbitration awards in 2011 and 2012 for police and fire employees that failed to recognize the City's financial position, and in fact made it worse. Understanding that controlling personnel costs is essential to financial recovery, the City and its bargaining units negotiated new labor agreements in 2017. While helpful, those agreements were the first step.  The City must continue to focus on bringing employee wages and benefits in line with the City's revenues to close the City's deficit.

Figure 5.1 below shows the personnel expenditures across all employees according to the baseline projection described in the prior chapter.

Figure 5.1: Baseline Workforce Expenditure Projection, 2020-2024

| Total Workforce | 2020 Amended | 2021 Forecast | 2022 Forecast | 2023 Forecast | 2024 Forecast |
|---|---|---|---|---|---|
| Salaries and Wages | 15,136,789 | 15,755,387 | 16,089,825 | 16,432,294 | 16,783,005 |
| Overtime | 1,460,069 | 1,776,250 | 1,802,894 | 1,829,937 | 1,857,386 |
| Health Insurance | 8,493,262 | 8,499,315 | 8,907,443 | 9,344,131 | 9,802,188 |
| Other Benefits | 2,918,387 | 4,024,704 | 4,085,074 | 4,146,351 | 4,208,546 |
| Pension | 3,815,000 | 10,300,000 | 10,609,000 | 10,927,270 | 11,255,088 |
| Total | $31,823,507 | $40,355,655 | $41,494,236 | $42,679,983 | $43,906,214 |

*Source: Historic City of Chester Financial Statements and Salary Ordinances, Act 47 Coordinator projection*

## 5.1.   Employee Complement

In response to the COVID pandemic and anticipating significant revenue loss, the City furloughed 133 employees in March 2020, including 83 full-time employees and 50 part-time employees. The City rehired 25 employees in June of 2020, most of whom were former full-time employees that returned in a part-time status. As of July 2020, the City has a complement of 231 total positions, 192 of which are full time and 39 of which are part-time, many of which are previously full-time positions within the Teamsters bargaining unit (see Figure 5.2). All positions that were vacant in the 2020 approved Salary Appropriation were removed at the time of the furloughs, with the exception of vacant uniformed police positions, of which there are approximately 13.

pennsylvania
**PA** RECEIVER FOR THE CITY OF CHESTER

Figure 5.2: Total Appropriated City Position Count by Employee Group, 2016-2020

| Group | 2016 | 2017 | 2018 | 2019 | January 2020 | July 2020 |
|---|---|---|---|---|---|---|
| FOP | 107 | 106 | 98 | 97 | 94 | 94 |
| Police Cadets | 10 | 8 | 4 | 4 | 6 | 6 |
| IAFF | 67 | 67 | 59 | 60 | 52 | 52 |
| Fire Cadets | 5 | 10 | 4 | 4 | 5 | 5 |
| Teamsters | 75 | 75 | 74 | 72 | 69 | 26 |
| Crossing Guards | 32 | 32 | 32 | 32 | 32 | - |
| Nonunion | 63 | 2 | 61 | 52 | 63 | 42 |
| Nonunion Part-Time | 25 | 20 | 12 | 11 | 13 | 6 |
| Total Positions | 384 | 320 | 344 | 332 | 334 | 231 |

*Source: City of Chester Salary Ordinances (2016-2020)*

City employees are organized into four main groups. Three labor unions cover most of the City's workforce, and the other employees are collectively referred to as non-union (see Figure 5.3).

Figure 5.3: City Position Count by Employee Group as of July 1, 2020

| Group | Covered Positions | Contract Term | Full-Time Positions | Part-Time Positions |
|---|---|---|---|---|
| FOP | All uniformed Police Officers, except those at the rank of Major and above | 1/1/2017 – 12/31/2021 | 94 | - |
| IAFF | Fire Fighters, except Commissioner | 1/1/2017 – 12/31/2021 | 52 | - |
| Teamsters | Clerks, highway department employees, code enforcement officers, crossing guards | 1/1/2017 – 12/31/2020 | 4 | 22 |
| Nonunion | Various, includes FOP and IAFF Cadets | N/A | 42 | 17 |
| Total | | | 192 | 39 |

*Source: City of Chester Internal Records (2020)*

## 5.2.    Salaries and Compensation

As noted, personnel costs account for most of the General Fund budget, and salaries and other forms of cash compensation constitute a significant portion of those costs. Controlling or reducing personnel expenditures requires making changes to the employee complement (how many employees the City has) and controlling growth in employee compensation (how much each employee receives in wages and benefits).

New agreements for all bargaining units began in 2017, within which the City took steps to control costs significantly compared to the prior contracts. From 2013 to 2016, the City increased wages by as much as 18 percent, depending on the bargaining unit.  Those increases were in large part due to the 2011 and 2012 interest arbitration awards for the City's uniformed personnel.  Since 2017, however, the largest

pennsylvania
PA RECEIVER FOR THE CITY OF CHESTER

annual increase has been 3 percent (see Figure 5.4). The City must not only continue to control salaries and wages for current employees within each bargaining unit, it must try to lower all compensation costs, including wages, for new employees if it is going to improve its overall financial position. The City's collective bargaining agreement with the Teamsters expires at the end of 2020 and the agreements with the FOP and IAFF expire at the end of 2021.

Figure 5.4: Wage Increases by Employee Group, 2017-2021

| Group | 2017 | 2018 | 2019 | 2020 | 2021 |
|-------|------|------|------|------|------|
| FOP | 1.5% | 2.0% | 3.0% | 3.0% | 3.0% |
| IAFF | 0.0% | 0.5% | 1.5% | 1.5% | 1.5% |
| Teamsters | 3.0% | 3.0% | 3.0% | 3.0% | NA |
| Nonunion | 0.0% | 3.0% | 3.0% | 1.5% | NA |

*Source: City of Chester FOP, IAFF, and Teamsters Collective Bargaining Units, City of Chester Salary Ordinances (2017-2020)*

## Overtime and Premium Pay

The City's overtime expenditures have been significant in recent years. Overtime costs in the Police Department have historically totaled approximately $2 million annually. Various factors have led to these significant overtime costs, and many of those factors are addressed elsewhere in this Plan. For example, past minimum staffing provisions and the amount of time positions remained vacant contributed to excessive overtime expenses. As discussed elsewhere, overtime pay also had an indirect impact on the City's pension costs and funding as well.

The City's collective bargaining agreements historically had overly lenient definitions of what time could be counted toward an employee's eligibility for overtime. In some of the new bargaining agreements, these provisions have been amended to track the obligations under the Fair Labor Standards Act (FLSA) for calculating overtime.

However, the Teamsters agreement still provides for the overtime rate to be paid for all hours worked over eight hours per day, instead of calculating overtime after an employee works 40 hours in a week. In addition, Saturday and Sunday work is at the overtime rate. These provisions could drive up the City's overtime costs, and continued effort should be made to ensure the overtime practices reflect the City's obligations under the FLSA only.

The City must also work to develop work schedules and deploy staff in a manner to improve efficiency and reduce overtime. Each department head must be accountable for his or her overtime expenditures.

## Paid Leave Costs

City employees currently receive a significant number of paid leave days annually, well in excess of many public employers and far greater than those provided by private employers. This impacts the City operationally and financially. Days off, especially paid vacation and personal leave, require the City to hire additional employees to backfill employees on leave; to call back other employees and pay them overtime to fill the open shift; or to cut the level of services provided during the employee absence.



Like any kind of paid leave, sick leave can drive overtime expenses higher by creating vacancies that must be filled or work backlogs that must be reduced by employees working overtime. That potential is especially high with sick leave since the employee absences are unplanned and management has less time to adjust staff schedules to compensate for the absence. If overtime is not used, then fewer services are provided by the City.

In the Recovery Plan and the Exit Plan, it was recommended that the City undertake a thorough analysis and study, and jointly develop with the relevant bargaining units a reduction in the number of paid leave days, following the guidelines set forth in those plans. In addition, it was recommended that the City explore other leave models, such as paid time off. The expectation was that changes would be implemented effective January 1, 2017.

Although some limited changes were implemented in the most recent bargaining agreements, most of the guidelines set forth in those plans were not. The Receiver will revisit these guidelines to address leave issues that hamper City services or drive up personnel costs unnecessarily.

## 5.3.   Healthcare and Other Fringe Benefits

Employee benefit costs include spending for health care, insurance, pensions, uniforms, and Social Security contributions. In the approved 2020 budget, employee benefits accounted for 42 percent of total operating spending. Health care and pension costs (which are addressed in the separate Legacy Cost chapter) are the most volatile and the most expensive components of employee benefits.

### Health Benefits

The City transitioned to a self-insurance structure in 2017. Under the new plan, the City pays premiums based on actual medical expenses incurred by its employees rather than a set monthly premium. As a result of the new self-insurance structure, annual health insurance costs dropped by $1.75 million in 2017. However, despite the cost reduction in the short-run, expenses under this structure have been more volatile and there is a risk of large unexpected expense spikes, potentially affecting long-term costs. The City carries a stop-loss policy provision to help control large cost fluctuations. Overall, the City should continually reevaluate the costs and benefits of the self-insurance structure as a part of an overall strategy to control employee benefit expenses. The City also has to fully evaluate plan redesign though increased cost sharing, including increased deductibles, that will reduce the City's out of pocket expenses on healthcare.

### Other Benefits

In addition to health insurance, the City provides a variety of other benefits including dental and vision coverage. In many cases, these fringe benefits are required by a collective bargaining agreement. As with all other City expenses, the costs to provide these benefits must be controlled to the greatest extent possible. In most, if not all, instances, the City is responsible for the full cost of providing these additional benefits.

### Work-Related Injury and Other Employee Leave Costs

The City's workers' compensation and work-related injury leave costs are significant. These costs include direct costs, such as the costs for the workers' compensation self-insurance plan and the overtime costs



incurred in replacing injured workers, as well as indirect costs, such as the costs to the various pension plans that result from increased disability retirements.

In addition to the recommendations contained elsewhere in this Plan, the City must work to address the number of work-related injuries suffered by employees and to actively address those employees currently on a leave of absence. It also has to improve its oversight, monitoring and management of such issues.

## 5.4.  Initiatives[12]

**WF01: Ensure the total cost of active employee compensation adheres to the maximum allocations**

In 2017, the City took a critical step toward financial stability with the negotiation of three labor agreements. Those agreements cover the terms of compensation for police and firefighters through the end of 2021 and comply with the caps set in the Amended Recovery Plan.

The Receiver will use a similar approach and set a maximum annual allocation (i.e. a cap) for the Teamsters whose collective bargaining agreement with the City expires at the end of this year. That maximum allocation will cap the amount that the City can pay to Teamster members for all forms of compensation paid to current employees, including the City's share of the cost of medical, vision and dental insurance coverage.

This maximum allocation for the Teamsters will be lower than the $6.6 million limit shown in the 2018 Exit Plan, but the Receiver cannot provide the exact amount yet due to two complications related to the pandemic.

On the revenue side, the City is only now starting to see the pandemic's full impact on the earned income tax, which is Chester's largest source of revenue. The pandemic caused a wide-spread shutdown of businesses and reduction in jobs and earnings during the second quarter of 2020. Some businesses are still closed or have reduced activity. There is a one-quarter lag in the earned income tax collection cycle, so the revenues associated with that Q2 2020 shutdown only started to arrive in August 2020.  At the time that this Plan will be submitted to the Court, the City will not even have a full month of revenue results to evaluate the pandemic's impact in this critical area and therefore the Receiver may need to revise his projections.

On the expenditure side, the City furloughed a large portion of its non-public safety workforce in March 2020, including Teamsters members. Some employees have returned, but in a part-time instead of full-time capacity. There is an open question of how many employees the City will be able to rehire, and that question cannot be answered until the Receiver knows more about the pandemic's impact on the revenues that fund employee compensation.

Rehiring will also have to be evaluated within the context of the 2021 budget. As described in other chapters, the City must break its run of years in which it does not contribute at least the Minimum

---

[12] Please see the Legacy Cost chapter for additional requirements related to employee pension and other-post employment benefits.



Municipal Obligation (MMO) to the employee pension plans. It is likely the City will have to trim other expenses to make room for those pension payments, which are currently projected at $10.2 million.

The City needs to work through the early stages of the 2021 budget process and consult with the Receiver on how many employees will return to work. The Receiver will then set the maximum annual allocation that will govern negotiations between the City and the Teamsters. The Receiver will also set a maximum annual allocation for all forms of compensation paid to non-union employees in 2021 and check the City's compliance against that cap periodically throughout 2021.

**WF02: Employee health insurance cost control provisions**

The City transitioned to a self-insurance structure in 2017. Under the new plan, the City pays premiums based on actual medical expenses incurred by its employees rather than paying a set monthly premium to an insurance company ("fully insured").

Thus far, the results of switching to self-insured status are positive.  Annual health expenditures dropped by $1.75 million in 2017. However, the City has more risk in this arrangement. If there are years where there are more or more expensive health insurance claims than the budget assumes, the City would have to cover the additional expenditures. While the City carries a stop-loss policy to address large individual claims, the City's precarious cash flow situation heightens the risk associated with being self-insured.

The City needs stability in its health insurance costs and it needs to contain the growth in these costs, so it can allocate its resources to other priorities, like making annual required contributions to the employee pension plans.

Once the Receiver's team evaluates the current and recent total cost of employee health insurance and the existing employee cost sharing provisions, the Receiver shall set the City's maximum monthly contributions per eligible employee toward the cost of all employee insurance coverage, including medical, prescription drug, vision and dental coverage. The maximum monthly contribution will include all payments toward health insurance premiums and benefit costs, as well as any taxes, surcharges, penalties, assessments, and other charges and costs which the City may be required to pay under federal or state laws, including the Patient Protection and Affordable Care Act of 2010 ("ACA"), or any other federal or state amendments, regulations, statutes or regulations70.

The maximum contributions will differ according to coverage levels (single, dual, family). The maximum monthly contributions will apply to all active employees and any retired employees whose health insurance cost sharing provisions are tied to the City's active employees.

Employees will be responsible for paying the difference between the City's maximum contribution and the total monthly cost of the health insurance. The Receiver intends to implement this cap beginning with the non-represented employees and Teamsters effective January 1, 2021.



### Employee Complement

**WF03: Receivership controls to manage staffing levels and personnel**

As noted above, the City implemented a furlough in March 2020 that cut the full-time employee complement from 278 to 192, a decrease of 31 percent. Some employees were brought back on a part-time basis. As noted above, it is unclear whether the City will be able to rehire any more employees in 2020. It is also unknown yet whether the City will be able to bring back more employees in 2021, or whether it will have to cut more positions to create a balanced budget that includes the City's Minimum Municipal Obligation to the employee pension funds.

As the Emergency Action Plan first established, the City may not rehire any personnel without the Receiver's review and written approval. The City also shall not create new positions or add to the complement established in the 2020 Salary ordinance without the Receiver's review and written approval.

For the remainder of 2020 and 2021, the Receiver shall manage the City's headcount by initiating or approving any hiring; enacting layoffs and/or terminations if needed; converting full-time positions to part-time; restructuring department operations including through consolidations or outsourcing; or reassigning personnel, subject to the provisions of collective bargaining agreements if applicable.  In making such decisions, the Receiver shall consult with the relevant City department heads, but he shall have the power to enact any such decisions.

This Plan also incorporates all other cost-control provisions of the Emergency Action Plan including:

- Receiver approval is required for overtime incurred by non-police and non-firefighter personnel. Overtime usage for the police and fire departments shall be submitted to the Receiver for weekly review, and the Receiver will monitor this closely because of its impact on the budget and pension liabilities.

- The 2020 Emergency Action Plan stated that City is still providing benefits for recently terminated and laid off employees. The City shall determine whether it has a legal obligation to continue providing benefits for those individuals. Where a legal obligation does not exist, the City shall cease providing benefits for those former employees and ensure that appropriate notice is provided to impacted individuals.

### General Workforce Provisions

In prior Recovery and Exit Plans, and during the preparation of this plan, the Act 47 Coordinator raised several possibilities for containing or reducing personnel costs while still providing quality services to the City's residents. In many cases, these concepts would require changes to the collective bargaining agreements for union employees:

They include:

- Ensuring that leave days are paid at the employee's regular base hourly rate of pay for the number of hours usually worked by that employee on his or her regular work shift or by the average hours



usually worked by that employee on his or her regular work shifts. Where applicable the paid leave should be expressed in hours rather than days.

- Reducing premium or "holiday" pay for those services provided on a 24 hours per day, 7 days per week basis, including police and fire services, except for Christmas, Thanksgiving, and New Year's. Employees who work other holidays would receive paid time off, scheduled with management approval to minimize overtime, instead of additional cash compensation. The Receiver shall also evaluate and seek to change the manner in which paid time off is accrued each year as well as the practice of paying employees to accrue and receive payment for unused paid leave time.

- Empowering management to determine the maximum number of employees from each platoon, shift, department or other organizational unit who can take vacation, compensatory, and personal leave at any given time and to set different thresholds throughout the year. This would help the City reduce overtime and maintain services throughout the year.

- Prohibiting employees who work less than 75 percent of their scheduled hours per month from earning paid leave for that month.

- Eliminating the sick leave payout at the time of retirement/resignation for all new hires and capping and reducing sick leave payouts at retirement (or "severance pay") for current employees.  Eliminating the sick leave payout for current employees if they leave the employ of the City for any reason prior to reaching the normal retirement age.

- Using other paid leave models, such as combining all types of leave (personal, vacation, sick) into one paid time off allocation

- Striking any provisions from collective bargaining agreements, memoranda of understanding, settlements or related documents that address non-mandatory subjects of bargaining.

- Adding a force majeure clause protect the taxpayers in the event that the whole or a segment of the contract imposes a burden on the City and cannot be performed due to causes that are outside the control of the parties, such as natural disasters, declarations of emergencies (e.g. a pandemic) or other reason that could not be avoided.

- Eliminating any provision in any collective bargaining agreement or any practice that mandates a minimum staffing requirement per shift or total complement manning.

- Eliminating any provision that mandates the payment of overtime in a manner that is not required by applicable provisions of the Fair Labor Standards Act.  These would include provisions that count any form of leave time as time worked toward the applicable overtime hours worked threshold and those that pay overtime for time worked in a day.

- Eliminating the payment of "premium pay" for working on certain days of the week when overtime or the designated premium payment is not required by law.

- Setting a new graduated new hire salary scale of at least six years that is based on fixed dollar amounts each year and that the employee progresses through a graduated series of steps at which he or she will receive fixed dollar salaries that will not be impacted by any general wage increase.

- Include an automatic reopener for each collective bargaining agreement if the City's revenues fall short of projected revenues by a certain percent or more in any given year.

**PA** pennsylvania
RECEIVER FOR THE CITY OF CHESTER

- Explore regionalization of City services with surrounding communities to determine the feasibility of and possible cost savings to be achieved in such arrangements.
- Eliminating any restriction on implementing layoffs or furloughs and subcontracting of any work performed by City employees.

Some of these provisions are sometimes described as "non-economic" since they do not directly set the terms of base salary or health insurance compensation. Most of these provisions have an economic impact, such as creating additional vacancies that lead to overtime or mandating higher staffing levels than the City might otherwise choose.

The Receiver needs to better understand the financial impact of these provisions as they relate to individual bargaining units and discuss their operational value with City management and the bargaining units before requiring that their elimination. Once the Receiver has that information, he will incorporate the savings associated with changing these provisions into the maximum annual allocations for each collective bargaining unit.

**WF04: Fully implement the Work-Related Injury Review Panel**

Throughout the process for preparing this Plan, the Receiver heard from multiple parties that Chester has an unusually high number of employees out on work-related injury leave, particularly in the police and fire departments.

This issue impacts the City operationally, as it reduces the number of officers and firefighters who can be deployed to serve the City. It impacts the morale of the employees who are not injured and expected to fill the void created by any abuse of long-term leave. And it impacts the City financially if these absences drive up overtime.

The City was expected to take steps to address this issue by convening a Work-related Injury Review Panel, but it has reportedly not done so. The City shall use the expedited review panel and, to the extent allowed by labor law, review work-related injury leave cases to confirm their legitimacy and discourage future fraudulent claims.  The City will also improve its monitoring and management of all injury-related leave and injury leave payments and costs.

*Please note that there is a related initiative in the Legacy Cost chapter that addresses abuse of disability pension benefits.*

## Collective Bargaining Units

**Teamsters**

In prior Recovery and Exit Plans, and during the preparation of this plan, the Act 47 Coordinator raised several possibilities to reduce the cost of services delivered by the Teamsters such as:

- Exploring alternative scheduling options to allow for employee availability outside of traditional business hours without incurring overtime costs. This arrangement would allow the City to staff



and utilize the Community Room more frequently to generate additional revenue without increasing personnel costs (Exit Plan initiative WF13).

- Eliminating the following provision from the collective bargaining agreement to give the City maximum flexibility to reduce its workforce: "Any employee that has completed their probationary period as outlined Article 7 of this agreement by February 28, 1995 shall not be laid off during the term of this agreement."

- Eliminating restrictions on assigning, transferring or outsourcing bargaining unit work to give the City more flexibility to lower costs. This could include pursuing intermunicipal agreements or shared service arrangements with other public sector entities that provide the same service and sunsetting programs. It could also include subcontracting opportunities for snow plowing, streets repair, and code enforcement.

- Exploring the costs savings that could result from creating a defined contribution pension plan for civilian employees,[13] including the Teamsters.

All options and concepts are on the table for evaluation and, in the Teamsters' case, inclusion in the upcoming negotiations on a new collective bargaining agreement. However, the Receiver also recognizes that the Teamsters situation has changed in the pandemic such that there were only four full-time employees left in that bargaining unit after the Spring 2020 furloughs. Some concepts may not be applicable anymore and require discussion with the employee bargaining unit.

**Fraternal Order of Police (FOP)**

The City and the FOP have a collective bargaining agreement that covers the terms of employment through the end of 2021. As discussed at length elsewhere in this Plan,[14] the parties need to quickly and sufficiently negotiate changes to the costly pension benefit provisions, especially for officers hired before 2017.  That is the top priority and failure to address it will result in an insolvent pension fund that risks retired police officers and their surviving beneficiaries missing monthly benefit payments as soon as February 2021.

With that priority noted, pension benefits are not the only item that needs to be addressed. In prior Recovery and Exit Plans, and during the preparation of this plan, the Act 47 Coordinator raised other issues including the following:

- The FOP has indicated that the current patrol shift schedule implemented in early 2017 is ineffective and negatively impacts morale. That schedule was implemented to reduce personnel costs within the Department by eliminating certain supervisory positions and providing more officers per shift. The Receiver's team will need to review whether the financial and operating objectives of that schedule change have been achieved and, if not, whether that is due to problems with the schedule itself or its implementation. The Receiver also acknowledges that the

---

[13] The City must maintain defined benefit plans, pursuant to Pennsylvania's Act 600, for police and fire personnel.
[14] Please see the Legacy Cost chapter for more information.



FOP provided the City with additional flexibility to minimize overtime at the start of the fiscal emergency by agreeing to a Memorandum of Understanding regarding officers swapping shifts.

- The Coordinator recommends that the City evaluate its shift schedule for the Detective Bureau. For a new schedule to be implemented, the City would have to comply with any bargaining obligation it may have with respect to the FOP.

- The Exit Plan calls for the Police Department to eliminate specialty assignments for police officers and, in some cases, use civilian personnel instead (Recommendation WF03). The City made some progress on this initiative in 2020, by temporarily eliminating seven specialty units. The City redeployed those officers to patrol positions to increase staffing and decrease overtime. The Coordinator notes that the City should go farther and eliminate another 10 specialty units, determine where civilians should be used in place of officers, and make the temporary redeployment permanent.

- The Exit Plan states that some of the 43 non-patrol positions within the Public Affairs Department should be eliminated so the associated expenditures can be reallocated to improve public safety or meet other obligations. The Receiver will review these positions within the context of the 2021 budget.

The Receiver has heard from several parties that lack of manpower in the Police Department is a concern both operationally and financially, as a factor driving high overtime usage. Some have suggested the City try to hire more full-time police officers, which will be difficult unless there are savings elsewhere to cover those costs. Others have suggested the City hire and deploy part-time officers to complement the full-time officers (Exit Plan recommendation WF05).

All options and concepts are on the table for evaluation, and the Receiver is committed to reviewing the structure, schedule and other elements that drive staffing in all City departments, especially police and fire. An evaluation of related issues in the Fire Department is underway (see below) and a similar evaluation should be conducted on the police department. The Receiver will provide more information on the timing and scope of that evaluation once progress is made on the pension issues which are the top priority.

**Fire Fighters Local 1400**

In prior Recovery and Exit Plans, the Act 47 Coordinator raised several possibilities that could be used to contain or reduce costs while still providing quality fire suppression and protection services to the City's residents.

They include:

- Evaluating whether an alternative work schedule would improve operations and reduce costs (Exit Plan recommendation WF10). The Exit Plan notes that, according to Local 1400 representatives, the fire fighters' schedule could be modified to produce cost savings to the City. If an alternative



schedule is identified, the City would need to work with Local 1400 to appropriately implement it.

- Explore intermunicipal service agreements with surrounding municipalities (Exit Plan recommendation WF11). While Chester has a full-time paid Fire Department, many of its neighboring municipalities use volunteer departments. The City reportedly responds to calls in the surrounding municipalities when their volunteers are not available. This arrangement shifts the cost of providing fire protection in neighboring municipalities to Chester's residents and taxpayers.

  While the City must first resolve the station consolidation and staffing issues described below, the City could then explore the possibility of providing fire services to neighboring municipalities for a fee. Any intermunicipal agreement shall be submitted to the Receiver for his review and written approval to verify that it is financially beneficial to the City of Chester and its residents.

- Ensure the City is obtaining full reimbursement for services. The IAFF reports the City may not be fully reimbursed for costs associated with the Department's response to incidents like car accidents and "lift" assists, which require fire fighters to assist the non-City owned ambulance team with lifting citizens into the back of an ambulance. The City should ensure that its fee schedule is up to date, that collection rates are as high as possible, and that the City is reimbursed to the fullest extent possible.

- Explore in-house and other local training options (Exit Plan recommendation WF12): The City should consider in-house and other statewide or local training options that would allow for smaller, more frequent fire training opportunities for new firefighters.

All options and concepts are on the table for evaluation, and the Receiver is committed to reviewing the structure, schedule and other elements that drive staffing in all City departments. The City was supposed to execute a feasibility study regarding fire company consolidation to determine the viability of that option described in the 2018 Exit Plan (Recommendation WF07). The City has received proposals from outside subject matter experts but has not selected one or contracted with the vendor. Finishing this process is the priority.

### WF05: Continue the feasibility study regarding fire company consolidation

The Department currently operates out of two Fire Companies, East and West. The Coordinator's Recovery Plan and the Exit Plan required the City to explore whether the Department's two companies could be consolidated into one, while still maintaining an adequate response time.

During the Coordinator's public meeting on the Three-Year Exit Plan, many members of the local community and surrounding municipalities expressed concern about fire station consolidation and the reduction of manpower in the Chester Fire Department.

Local 1400 did its own analysis, and a report was produced by the International Association of Fire Fighters, the Local Union's national affiliate. That report, titled Geographic Information System Emergency

pennsylvania
RECEIVER FOR THE CITY OF CHESTER

Services Response Capabilities Analysis, concludes that the Department should not reduce staff and that the Department should maintain Stations 81 and 82 to ensure adequate response times.

While high-quality fire service is essential to public safety, the City has the very difficult responsibility of correcting severe financial distress without unduly harming vital services. The City must consider all options to address its condition including fire station consolidation.

The City shall engage a qualified consultant to conduct this analysis. **The City shall meet** and work with Local 1400 in good faith to discuss and resolve any potential conflicts between the two studies and to identify other potential costs savings opportunities and operational efficiencies that may generate budgetary relief. **If it is determined by that adequate response times can be maintained from one location, then the Department shall consolidate the two existing companies.**

If the City reaches the point of consolidating stations, it shall comply with its obligations with respect to the Fire Fighters Local 1400 in the event a Fire Company is closed. Eliminating one fire company would allow the City to reduce staff by approximately 20 Fire Fighters, one Battalion Chief, and two Captains.



# Asset Monetization

The City of Chester has two significant business-type assets, its water system, and its parking system. Notably, both assets are currently subjects of litigation.

This chapter focuses on the steps that the City must take to improve the overall financial results for the City, including a review of the appropriate uses of both assets.

## 6.1.  Water System

The Chester Water Authority ("CWA") was organized by the City in 1939 under the Municipality Authorities Act of 1935. CWA now operates the water system (the "Water System") in accordance with the provisions of a successor statute, the Municipality Authorities Act, 53 Pa.C.S. §5601 *et seq.* (the "Authorities Act"). CWA is an operating authority; it does not lease its water system back to the City.

The Recovery Coordinator recommended to the City that the City engage a qualified counsel and a qualified financial advisor to advise it on the possibility of entering into an asset transaction involving the Water System to provide moneys to address the City's balance sheet problems, particularly the City's underfunded pensions plans. Several years ago, the City did engage such professionals and entered into certain negotiations with CWA.

The City is currently before the Commonwealth Court fighting for its ability to repossess and sell the assets of the Chester Water Authority, which could provide it with a significant infusion of needed funds. The City has issued a request for proposals (the "RFP") for the purchase of the Water System and has received three proposals, from Aqua America, Pennsylvania American Water and the CWA itself.  According to the initial bids[15], the City could potentially receive between $60 million and $410 million if it sells the system. Pursuant to the pending litigation, although the City was permitted to proceed with the RFP process, the City is currently enjoined from completing any transaction involving the disposition of the Water System.

## 6.2.  Parking Assets

The City has engaged a private manager with respect to certain assigned parking assets in the City. Under the master agreement related to this transaction, the City assigned to the manager the sole and exclusive provider of management, enforcement, and collection services with respect to the assigned parking assets. In return for assigning the parking assets to the manager, the manager will make certain capital investments in the City's parking assets and will also pay the City an upfront payment and recurring payments. The level of recurring payments to the City will be based on fee collections and related parking expenses.

The City received approximately $300,000 of the planned $1,000,000 upfront payment and budgeted to receive the remaining $700,000 in fiscal year 2020. However, due to litigation, as described below, the

---

[15] Information published at https://chesterwaterproposal.com



remaining $700,000 payment has not been made, nor has the City received any of the expected revenue from the parking venture.

Soon after the agreement was reached with the private manager, Widener University filed a complaint in the Court of Common Pleas of Delaware County seeking a temporary and permanent injunction to prohibit the installation of parking meters on and around its campus. The Court granted the temporary injunction, and a hearing on the permanent injunction will be held in the future. In the meantime, the City, the private manager and Widener have been encouraged to explore a possible amicable resolution of the outstanding legal disputes.

## 6.3.   Initiatives[16]

**ASM01: Determine rights regarding the water system and explore monetization alternatives**

The City has retained qualified financial and legal advisors to help the City formulate its positions with respect to the litigation regarding the water system. The Receiver hereby directs the City to continue litigating for its ability to repossess and sell the assets of the Chester Water Authority.  Furthermore, subject to the next paragraph, the Receiver authorizes the City to continue with the RFP process (in compliance with any court order) and to continue to consult with the City's counsel and financial advisor on the best approach to monetizing the water system so as to address the City's financial problems.

The City will consult with the Receiver regarding all material steps to be taken by the City with respect to the Water System. The City must obtain the prior written consent of the Receiver prior to accepting a proposal under the RFP process and/or prior to consummating any transaction regarding the water system. The City must obtain the prior written consent of the Receiver prior to accepting any proposal related to the resolution of the outstanding litigation regarding the water system.

**ASM02: Determine rights regarding parking assets and explore monetization alternatives**

The City has retained qualified legal advisors to help the City defend the claims filed by Widener. The City must determine whether it has the right to install parking meters in and around the Widener Campus. The City should also explore a possible amicable resolution of the dispute with Widener. Ultimately, the City must determine the appropriate approach to generate revenue and maximize the revenue generated from its parking assets**.**

The Receiver hereby directs the City to continue to consult with the City's counsel on the best approach to resolving the litigation with Widener, which may include an amicable resolution or continued litigation. The City must also undertake a review of the available options for monetizing the Parking Assets so as to address the City's financial problems**.**

---

[16] The City's Emergency Action Plan mandated that "the City shall not sell, lease, or otherwise monetize any assets in value over $10,000 without DCED approval."   The Receiver incorporates that mandate into this Plan, but replaces the requirement for DCED approval with the requirement for the Receiver's approval.



The City will consult with the Receiver regarding all material steps to be taken by the City with respect to the Parking Assets. The City must obtain the prior written consent of the Receiver prior to accepting a proposal regarding a resolution of the Widener litigation. The City must obtain the prior written consent of the Receiver prior to proceeding with modifications to the agreement with the private manager. The City must also obtain the prior written consent of the Receiver prior to the spending of any proceeds of any transaction regarding the Parking Assets.

**ASM03: Prioritize use of potential monetization proceeds**

The City shall consult with the Receiver regarding all material steps to be taken by the City with respect to any City assets. The City must obtain the prior written consent of the Receiver prior to spending any revenues generated from the monetization of City assets. If the City is able to generate revenue from the sale of any City assets, it must first determine what debt obligations must be defeased in accordance with applicable covenants and specifically obligations related to the Series 2017A Bonds, and repay those first.

At the direction of the Receiver, the City shall then direct any proceeds generated from any asset monetization to the following immediate priorities:

- **Payment of delinquent pension Minimum Municipal Obligations (MMOs), including accrued interest and penalties:** As described in the Legacy Cost chapter, this liability is worth $28.8 million as of January 1, 2020 with the likelihood of rising above $40 million as of January 1, 2021. Addressing this obligation would have multiple benefits: improving the funding ratio of the pension plans; reducing the ongoing annual required contributions from the City's General Fund; and addressing the negative fund balance figure that is a drag on the City's credit rating (see below).

  Use of asset proceeds could be part of an overall strategy for addressing the City's pension crisis, particularly as it relates to retiring this outstanding liability. However, unless there are also changes to the benefit levels and actions taken to stop abuse of provisions like the disability pensions, any large one-time contribution will only temporarily mask the cost of those unaffordable benefits and leave the City in the same situation years later, only at that point with less assets. Therefore, the application of asset proceeds to the pension crisis shall be predicated on changes to the cost of benefits.  Furthermore, should asset proceeds become available for this purpose, the City and Receiver shall explore requiring that pension benefits not be enhanced as a condition of the deposit of such proceeds.

- **Build a General Fund reserve**: The Government Finance Officers Association (GFOA) recommends "at a minimum, that general-purpose governments, regardless of size, maintain unrestricted budgetary fund balance in their general fund of no less than two months of regular general fund operating revenues or regular general fund operating expenditures." Chester's 2017 comprehensive annual financial report, which is the most recent competed at this time, shows a fund balance of -$15.3 million in the General Fund. This extraordinarily low number is the reflection of the cash crisis in the General Fund and the outstanding MMO liability.

PA **pennsylvania**
RECEIVER FOR THE CITY OF CHESTER

Fund balance is not just a figure in an accounting report. Fund balance (and specifically cash reserves) helps the City pay its obligations early in the year before tax revenues arrive, without having to issue Tax Revenue Anticipation Notes and paying interest on borrowed money to fund basic operations early in the year. Fund balance provides a buffer against unexpected revenue shortfalls or unbudgeted expenditures. Fund balance would have helped the City avoid furloughing 31 percent of its workforce in Spring 2020 due to the pandemic.

Chester established a rainy day fund in 2007 that was intended to provide a contingency against unanticipated shortfalls. The minimum standard used to establish that fund was 5 percent of General Fund revenues, which is still far short of the GFOA standard. At the end of 2017, the rainy day fund had less than $16,000 or 0.03 percent of General Fund revenues. The City needs to rebuild this reserve, first by paying off the unpaid MMOs that drag fund balance below zero, and then by creating a meaningful cash reserve.

Once the Receiver determines that the City has made sufficient progress in these two areas, asset monetization proceeds shall be used for the next tier of priorities:

- Establish and fund a trust to address the City's OPEB liabilities, which were over $252 million at the end of 2017.  Should asset proceeds become available for this purpose, the City and Receiver shall explore requiring that OPEB benefits not be enhanced as a condition of the deposit of such proceeds.

- Fund capital improvements to the City's capital assets

- Invest in economic development projects in the City in cooperation with a non-profit economic development corporation

There are several potential uses for asset monetization proceeds if the City reaches that point in the process. The City shall use these one-time revenues to fund non-recurring expenditures and address the City's structural problems, and shall not use the proceeds to fund ongoing operating expenditures.



# Economic Development

## 7.1.    Economic Development Landscape

Like many former manufacturing hubs in the Northeast, Chester is in the middle of a painful economic transition that has resulted in population decrease and overall disinvestment. The city's resurgence will be built upon a strong local economy and expanded tax base, which requires a strategic effort to attract and retain businesses. Building a strong local economy is critical as businesses provide economic opportunity to residents via jobs and procurement opportunities. In additional, businesses generate tax revenues for the city, help to attract private capital, and spur a virtuous cycle of investment and growth.

Chester benefits from strong community anchors that are actively engaged in civic affairs. From governmental to private industry, to nonprofits and academia – all are eager to play their part in the revitalization of the City. A few key economic development players are described below.

### Government and Quasi-Government

**Chester Economic Development Authority:** The Chester Economic Development Authority (CEDA) was created by the City in 1995 to support economic, housing, and community development activity. As stipulated by a cooperative agreement with the City, at the direction of City Council, CEDA acts as the project manager for several federal programs including CDBG, HOME and ESG grants. CEDA also provides grant support and expertise for project specific federal, state, and local funding requests, while maintaining and marketing multiple parcels of land throughout the City.

**Mayor's Economic Development Committee:** Newly formed in 2019, the EDC is tasked with identifying actionable steps to improve the economic vitality of Chester. Members include prominent leaders in business, nonprofit, and government sectors.

### Non-Profit Entities and Public-Private Partnerships

**Riverfront Alliance of Delaware County:** The Riverfront Alliance of Delaware County (RADC) is a collection of private sector and non-profit entities seeking to "develop and implement programs and activities that serve as the catalyst for the physical, economic, and social development of all Delaware county waterfront communities."[17] The organization is focused on increasing homeownership, improving public safety, and helping to market the region as a desirable residential and business location.

**Delaware County Chamber of Commerce:** The Delaware County Chamber of Commerce promotes the collective interests of the region through business attraction, by supporting the cultural, social, and economic education of the community, and acting as an accessible resource to the local business community. In recent past, the Chamber co-hosted the State of the City of Chester address and cooperated with the City to submit an application to compete for Amazon HQ2.

---

[17] Riverfront Alliance of Delaware County. http://www.delcoriverfront.com



### Private Industry and Anchor Institutions

**Talen Energy Stadium:** Talen Energy Stadium opened on June 27, 2010 and is a world-class soccer venue that seats 18,500 and acts as host to national and international soccer, football, lacrosse, and rugby sporting events. The stadium has received regional and national recognition and was designated the "Best Sports/Recreation Project of the Year" by Mid-Atlantic Construction Magazine Sporting.[18] Talen also acts as host to cultural and entertainment events including the Rock Allegiance Music Tour, the 5k Blacklight Run, and community career fairs.

**Widener University:** The *Wall Street Journal* named Widener University one of the top 10 best Philadelphia-area colleges. The University is situated on 110 acres in the city and educates students from 48 states and 37 countries, offering more than 60 degree options, including top-ranked nursing, engineering, social work, and graduate law degrees. The university also acts as a strong community anchor, providing a variety of public services including reduced tuition for Chester City employees, tax preparation services for low income Delaware County residents, access to the Widener Child Development Center, and access to the Widener Women's Leadership Forum.[19] In addition, the growth of Widener has sparked a renaissance along Providence Avenue.

**Harrah's Casino:** Harrah's Philadelphia Casino and Racetrack is situated six miles south of the Philadelphia Airport along the Delaware River. The casino has 100,000 square feet of gaming entertainment, with more than 2,900 slot machines and live table games. In addition, the facility is described as a "major destination for harness racing on the East Coast" with full-card simulcasting with an indoor wagering area.[20] Harrah's is a symbol of the innovative revitalization of a former industrial site and acts as a strong community partner, supporting the City with host fee payments and offering Delaware County residents job training and skills based occupations.

**Crozer Keystone Health System:** Crozer is the leading healthcare provider in Delaware County, comprising four hospitals, outpatient centers, urgent and sports club. It is also the largest employer in the County. It recently named a new CEO who has indicated a high level of interest in being an active stakeholder in the revitalization of Chester.

## 7.2.  Economic Snapshot

Between 2010 and 2019, the overall population of Chester decreased slightly, from approximately 34,500 to slightly below 34,000. This continues a decades long trend of population decline in the city; however, the city's median income has increased approximately six percent and the number of people with bachelor's degrees in the city also increased over the same period.

Notably, the share of foreign-born residents has jumped eight percent during this period. Additionally, prior to the COVID-19 pandemic, the unemployment rate in Chester had fallen to its lowest point, 7.5

---

[18] About Talen Energy Stadium. https://www.philadelphiaunion.com/stadium/about
[19] Widener University Community Outreach. http://www.widener.edu/civic_engagement/community_outreach/default.aspx
[20] Visit Philadelphia. Harrah's Philadelphia Casino and Racetrack. http://www.visitphilly.com/museums-attractions/philadelphia/harrahs-chester-casino-racetrack/

**PA** **pennsylvania**
RECEIVER FOR THE CITY OF CHESTER

percent in February, since before the Great Recession. Unemployment rose sharply since the onset of the pandemic however and now hovers around 17.6 percent. Overall, Chester has experienced mixed economic change over the past several years: while the city's educational attainment is increasing, the population is also falling; the median income is increasing but remains behind the rest of the state.

Figure 7.1: Selected Demographics

| Characteristic | 2010 | 2018 | Growth |
|---|---|---|---|
| Population | 34,464 | 33,977 | -1% |
| All Households Median Income | $16,472 | $17,455 | 6% |
| Bachelor's Degree or Higher | 2,998 | 3,737 | 20% |
| Foreign-born Population | 1,275 | 1,384 | 8% |

*Source: ACS (2018)*

Figure 7.2: Racial Distribution in Chester

| Race/Ethnicity | 2010 | 2018 |
|---|---|---|
| White | 11.7% | 12.5% |
| Black or African American | 76.5% | 69.2% |
| Asian | 0.3% | 0.9% |
| Hispanic or Latino (Any Race) | 7.1% | 9.3% |

*Source: ACS (2018)*

Figure 7.3: Age Distribution in Chester



*Source: ACS (2018)*

pennsylvania
RECEIVER FOR THE CITY OF CHESTER

Figure 7.4: Unemployment Rate in Chester



*Source: Bureau of Labor Statistics (2020)*

Figure 7.5: Home Sale Values in Chester



*Source: Zillow (2020)*

**pennsylvania**
RECEIVER FOR THE CITY OF CHESTER

Figure 7.6: Rental Prices in Chester

## Median Rental Prices 2009-2019


$1,047
2009


$1,079
2015


$1,159
2019

*Source: Zillow (2020)*

## Revenue Base Analysis

Chester's path out of fiscal distress hinges on its ability to stimulate community and economic development that expands the City's tax base and enhances local tax revenues. The dynamics of the City's primary revenue sources outlined below have important implications for the City's best options in terms of economic development strategies.

Most the City's revenue is driven by four key sources – Earned Income Tax (EIT), gaming host and community fees related to the casino, real estate taxes, and Covanta host fees. These four revenue sources combined represent 77 percent of the City's operations. As shown in Figure 7.7 below, smaller sources account for the remaining 23 percent.

**PA pennsylvania**
RECEIVER FOR THE CITY OF CHESTER

Figure 7.7: Revenue Source as a Percent of Operations (2019)



*Source: City of Chester Finance Department (2020)*

**Earned Income Tax (EIT)**

Earned Income Tax revenue represents 27 percent of the City's operations. The City's resident EIT rate is currently 2.75 percent and its non-resident EIT rate is 2.00 percent. In efforts to address Chester's structural budgetary imbalance, both the resident and non-resident EIT rates have been increased in recent years.

In 2017, the City increased its resident EIT rate from 2.10 percent to 2.75 percent. The resident EIT rate ranks as one of the highest in Pennsylvania among cities of the third class. In 2019, the City used provisions in the Municipal Pension Plan Funding and Recovery Act ("MPPFRA") to increase its non-resident EIT rate from 1.00 to 2.00 percent. The MPPFRA provision allowed the City to increase the rate above the maximum rate otherwise allowed by law in order to fund the City's pension obligations.

**Gaming Host Community Fees**

The City receives a significant portion of its revenue (22 percent of operations) through host fees from Harrah's Philadelphia Casino and Racetrack. Slots revenue accounts for 19 percent of operations and table gaming accounts for an additional 3 percent. Per 2017 state legislation, the City's host community slot revenue is the greater of 2 percent of gross terminal slots revenue at Harrah's or $10 million.

Harrah's host community revenue is received in quarterly payments of approximately $1.5 million and monthly payments associated with an "Additional Considerations Agreement" with Harrah's. Monthly



payments are also based on 2 percent of gross terminal revenue and historically have been about $450,000 per month. Since 2018, quarterly payments from Harrah's have equaled exactly $1.5 million, which has exceeded 2 percent of gross terminal revenue and helped the City's cash flow situation. Accounted for in separate revenue categories but also notable, Harrah's pays about $1.4 million in annual real estate taxes and prior to the onset of COVID-19, employed a staff of about 600 that pay earned income and local services tax.

**Real Estate Tax**

Real estate tax revenue accounts for approximately 18 percent of the City's operations. In 2020, for the first time in over a decade, the City increased its real estate tax millage rate to 36.663 mills (this is the total millage rate which captures General Purpose Real Estate millage as well as Library and Debt Service millage). This represented a 10 percent increase from the previous millage rate. Chester's current real estate tax collection rate is about 81 percent. The City's market and assessed values are generally stagnant with the exception of a spike coinciding with the expiration of the Keystone Opportunity Zone properties, Harrah's and Wharf at Rivertown (See Figure 7.8).

Figure 7.8: Market and Assessed Value of Real Estate in Chester[21]



**Overall tax burden**

According to the City's economic development personnel, the most common barrier cited by development professionals is the high tax burden. Figure 7.9 below provides a comparison of Chester's tax rates to the average municipality in Delaware County. After holding off on raising real estate taxes for over a decade, the City increased its rate by about 10 percent in 2020 to a total municipal real estate tax rate of 36.663

---

[21] In 2021 Delaware County will implement a new assessment for all properties, including those in Chester. Prior to 2021 the City kept its own assessments, separate from the County's.



mills which dwarfs the Delaware County average of approximately 9.117 mills[22]. The City's resident EIT rate (2.75 percent) and its non-resident EIT rate (2.00 percent) are both significantly higher than the county averages of 0.96 percent and 1.03 percent, respectively. While not as dramatic, the City's LST flat rate and BPT millage rates for wholesale, retail, and other businesses are all higher than the average Delaware County municipality. In addition, the recent creation of the Chester Stormwater Authority has introduced a quarterly storm water fee of $8.25 per residence and $8.25 per 1,139 square feet for commercial property.

Figure 7.9: Municipal Tax Rates, City of Chester vs. Average Delaware County Municipality

| | Resident EIT (%) | Nonresident EIT (%) | Real Estate (mills) | LST ($) | BPT Wholesale (mills) | BPT Retail (mills) | BPT Other (mills) |
|---|---|---|---|---|---|---|---|
| City of Chester | 2.75% | 2.00% | 36.663 | $52.00 | 2.000 | 3.000 | 4.190 |
| Delaware County Avg. | 0.96% | 1.03% | 9.117 | $50.24 | 1.018 | 1.508 | 2.132 |

*Source: Pennsylvania DCED Municipal Statistics Office (2020)*

In short, Chester's tax rates as they relate to economic development undermine the City's competitive advantage to developers. However, the City's overall tax structure – including incentives – is of interest to developers. Finding a balance between reasonable tax rates and competitive incentives is key to attracting more development in Chester and expanding the City's tax base.

**Covanta Host Community Fees**

Host community fees from Covanta's Energy-from-Waste facility located in Chester account for 10 percent of the City's operations. Per requirements of the City's 2017 unfunded debt borrowing, these revenues are initially deposited to a debt service fund lockbox to pay bond holders. After annual debt service requirements are met, revenues are available for general operating purposes.

## 7.3.    Economic Development Goals

In 2019, Mayor Kirkland created the Economic Development Committee. This committee includes key stakeholders from the public, private, and nonprofit community who are committed to increasing economic vitality in the city. The committee meets quarterly to prioritize the economic development goals, objectives, and strategies to help move Chester forward. Members include individuals from the following organizations.

[22] This is the City's own millage rate, not including the County or Chester Upland School District. The City's use of its own assessment, separate from the County, may be a factor in comparing tax rates across municipalities.



| Public Sector | •Chester Economic Development Authority<br>•Riverfront Alliance of Delaware County<br>•City of Chester<br>•Delaware County Commerce Center<br>•CSMI Education Management |
|---|---|
| Private Sector | •Harrah's Casino<br>•Zinter's Candy<br>•Power Home Remodeling Group<br>•Philadelphia Union<br>•Kimberly-Clark<br>•Caesars Entertainment<br>•Len Laury Insurance Agency |
| Community | •Engaged residents |

The EDC is tasked with identifying concrete actionable steps that the City and its partners can take to improve the business and development climate. Economic development goals were created in consultation with the Mayor, after which the EDC reviewed and shaped the specific objectives and tasks.

**GOAL 1: INCREASE JOBS AND ECONOMIC OPPORTUNITY IN CHESTER**

Objective 1.1- Grow the talent pipeline

Objective 1.2- Connect residents to current job openings

Objective 1.3- Increase resident, business owner, and community stakeholder awareness of existing workforce development programs

Objective 1.4- Develop an enhanced communication strategy to ensure stakeholders are aware of new and existing workforce development programs and initiatives

Objective 1.5- Create incentives for participation in workforce development programs

Objective 1.6- Provide additional resources and support to businesses that are willing to hire previously incarcerated individuals and those with a criminal record

pennsylvania
**PA** RECEIVER FOR THE CITY OF CHESTER

**GOAL 2: ATTRACT AND RETAIN COMMERCIAL AND RESIDENTIAL DEVELOPMENT**

Objective 2.1- Beautify the gateways (access points)

Objective 2.2- Improve capital infrastructure around existing businesses

Objective 2.3- Support the Riverfront Alliance master Plan process

Objective 2.4- Actively seek transit-oriented development in downtown by the Chester Transportation Center

Objective 2.5- Leverage grant and incentive programs for economic development

Objective 2.6- Support developments with positive social impacts and clear community benefits

Objective 2.7- Develop package of incentives to retain existing businesses

**GOAL 3: IMPROVE THE QUALITY OF LIFE IN THE CITY**

Objective 3.1- Promote a vibrant and active city (e.g. creative placemaking)

Objective 3.2- Continue to promote safe and clean environment

Objective 3.3- Identify programming that helps to improve quality of life for current residents and workers

**GOAL 4: IMPROVE THE OVERALL PERCEPTION OF THE CITY**

Objective 4.1- Share the positive Chester story

Objective 4.2- Create a publicly accessible map to highlight proposed, ongoing, and recently completed developments

## 7.4.   Recent Development Projects

New development projects in form of new retail, office, housing, and other forms of public space represent a form of new investment and demonstrate the latent demand for a diverse mix of housing and amenities in Chester. Most activity is redevelopment, which not only brings new amenities, but serves to repurpose and revitalize previously worn down and dilapidated structures.

![pennsylvania RECEIVER FOR THE CITY OF CHESTER]

Figure 7.10: Map of Anticipated, Ongoing, and Recent Development Projects in Chester



*Source: ESI (2020)*



### Biamp Systems



In July of 2019, Biamp Systems, a leading supplier of professional audio and video solutions based in Beaverton, Oregon, purchased Community Loudspeakers, a local manufacturer of industrial stadium sound systems. Community Loudspeakers has been located at their Chester location since 1981 and has produced sound systems for several local stadiums including Subaru Park.

*Source: Biamp Loudspeakers (2019)*

### Arbor Estates



Arbor Estates is a joint public/private development between the City of Chester and CCIP to add additional affordable housing development for homeownership in Chester. The development includes four owner-occupied semi-detached units each with three bedrooms and 1.5 baths, with a total of 1,500 square feet. Homebuyers may be eligible to receive down payment and closing cost assistance funds from the Chester's Homebuyer's Assistance Program or assistance from the Riverfront Alliance of Delaware County's Employer Assisted Housing Program.

*Source: Delco Times (2019)*

### Deshong Park Development



Over the past several years, several stakeholders including Widener University, the Pennsylvania Humanities Council, Chester Arts Alive, and Strong Cities Strong Communities (SC2) Team, among others have invested in revitalizing Deshong Park, the site of Alfred Deshong's former 27-acre estate and mansion gifted to Chester in 1913. Recently, the clock tower at the park was restored and now includes four murals deigned by local artists at the base of the tower.

*Source: Pennsylvania Humanities Council (2019)*

### Eyre Park Trail



The Eyre Park Trail is a planned boardwalk trail and levee allowing pedestrian access through marshland nearby the Chester Creek. The trail is adjacent to Chester High, potentially allowing students to do hands on studies of the local environment.

*Source: Temple University Community and Regional Planning Department (2012)*





### East Coast Greenway Connectors

Chester is currently applying for funding applications to connect Highland Avenue & Norris Street to the East Coast Greenway, a walking and biking route stretching 3,000 miles from Maine to Florida. These connectors would integrate Chester's existing trails and parks to other trails in the area.

*Source: East Coast Greenway (2020)*



### Crozer Arboretum

The Crozer Arboretum within Crozer-Chester Medical Center recently underwent a partial restoration of the portion of the Chester Creek Trail. The Arboretum was formerly part of the Crozer Theological Seminary, now partially used as office space for the medical center. The Crozer Arboretum represents a hub of green space for the City of Chester and its residents and has remained free and open to the public.

*Source: Crozer Arboretum Garden (2019)*



### Avenue of the States and Engle Street Repairs

Currently, both the Avenue of the States (one of Chester's main commercial areas) and Engle Street have plans for transportation projects including extensive street repairs. These repairs will help improve the safety of pedestrians traveling through downtown Chester.



### Keystone Fitness and Wellness Center

Keystone Fitness and Wellness Center had its grand opening in March of 2020 with the goal of increasing access to health care services and programs to residents of Chester. The center provides art classes, music performances and music classes, exercise and fitness guidance, and job training and employment readiness resource in addition to its various health services.

*Source: Philadelphia Business Journal (2020)*



### Barry Bridge Park and Boat Launch

In 2013, Chester expanded and improved the Barry Bridge Park just north of Subaru Field. The project included the creation of a large public greenfield area, the relocation of a parking lot, the installation of a riverfront plaza, and the installation of a recreational pier for fishing and other riverfront activities. The project also included the restoration of a recreational boat launch to provide more public access to the Delaware River.

*Source: Delco Times (2013)*



### American Wood Design Expansion



American Wood Design recently relocated from Claymont Delaware to a renovated facility in Chester on Fulton Street. Since opening in Chester, American Wood Design has added approximately new 30 jobs to the City and has recently installed computer numerical control (CNC) machines to design and produce architectural grade millage work and commercial cabinetry.

*Source: American Wood Design (2019)*

### Kapelski Learning Center



Originally built in 1970, Widener hired Kimmel Bogrette to begin renovations on the Kapelski Learning Center. The renovation will reinvigorate the hall to focus the space on diverse and flexible learning environments. The new Learning Commons will include seminar rooms, a music classroom, specialty labs for social science and psychology, large lecture auditoriums, as well as a new atrium. The building will also house additional faculty and staff offices and support spaces as well as collaboration rooms and various lounges. Construction of the project is expected to conclude towards the end of 2020.

*Source: Kimmel Bogrette Architects (2020)*

### Kimberly Clark Co-Generation Conversion



Kimberly Clark is investing $150 million into a former coal-power tissue mill to run on natural gas. The mill produces toilet paper and paper towels and employs more than 800 people over a 1.8-million-square-foot facility on the 61.5-acre campus. The conversion help with reducing carbon dioxide emissions around Chester.

*Source: Kimberly Clark (2018)*

### Silvercare Nursing & Rehab Campus



Silvercare Nursing and Rehabilitation is in the process of redeveloping the former site of Community and Sacred Heart Hospital into a comprehensive senior health care complex and all-ages urgent care center. The existing southern-most building on the campus will include an urgent care, a blood drawing station, and adult day care services. The north side of the campus will be home to senior living apartments; a separate building will host a respite care unit for the mildly mentally challenged. Once the facility is fully operational, Silvercare expects to hire at least 300 new employees.

*Source: Delco Times (2019)*



**pennsylvania**
RECEIVER FOR THE CITY OF CHESTER



### Search and Rescue

The Search & Rescue building, facing the Chester Transportation Center is set to undergo an extensive façade restoration. This restoration will make the city feel more welcoming as people exit the SEPTA regional rail station.



### Murphy Ford Showroom

The Murphy Ford car dealership near I-95 recently expanded their main showroom, providing the dealership with additional space to present cars in a modern and pleasing environment. The Murphy Ford Dealership originally opened in Chester in 1955 and remains one of the top Ford dealerships in the Delaware County. This dealership is also the only Motor Trend Certified dealership in the Greater Philadelphia Area.

*Source: Murphy Ford (2018)*



### West 7th Street Bridge

The West 7th Street Bridge which provides a traffic thoroughfare over the Chester Creek closed for demolition in September of 2018. The original two-span steel-through-girder bridge was originally built in 1920 and previously carried a two-lane highway and sidewalks over Chester Creek between Penn Street and Sproul Street. The two bridge will span a similar length, at 180 feet, and is expected to be completed in 2020.

*Source: ChesterMatters Blog (2018)*



### Lloyd Street Bridge

In 2016, Amtrak began the process of preparing to demolish the Lloyd Street Bridge, which runs over Amtrak's right-of-way and SEPTA's Wilmington Regional Rail Line. The bridge originally opened in 1899, with major repairs done in 1947, but was closed to motorists in 2011 after nearly 65 years without major rehabilitation projects done on the bridge. PennDOT, Amtrak, SEPTA, and the City are working together to rebuild a similar bridge in the same location.

*Source: Delco Times (2017)*



### Morton Avenue

Morton Avenue, between Route 291 (4th Street) and U.S. 13 (9th Street), as part of a $16.6 million project to rehabilitate eight bridges over Interstate 95 and CSX Railroad in Chester, underwent a four-month repaving and street improvement.

*Source: Google Maps Capture (2020)*



### Agri-Kind Facility



In 2019, Agri-Kind received operating approval from the Pennsylvania Department of Health, becoming the Philadelphia area's first state licensed medical marijuana grower and processor. Agri-Kind invested $18.2 million in opening its 62,000-square-foot complex in Chester and expects to spend an additional $48 million in the next two phases of the project. Once the facility is fully operational, Agri-Kind is expected to employ over 85 people as growers, trimmers, extractors, chemists, compliance staff and security. Since opening in 2019, Agri-Kind has hosted several job fairs meant to hire local Chester residents.

*Source: Philadelphia Business Journal (2019)*

### Agronomed Medical Marijuana Dispensary



Agronomed additional medical marijuana dispensary will include office and storage space, along with the dispensary. This facility will also host a joint clinical research effort between Agronomed, Colorado-based Franklin CR LLC, and Drexel University School of Medicine to provide physicians with more evidence-based research to make clinical decisions for their patients. The land being used for the facility has been vacant for over 25 years.

*Source: Delco Times (2019)*

### Candlewood Suites



After several decades without a new hotel development in Chester, the Candlewood Suites, an 89-room extended stay hotel, opened in the summer of 2019. The hotel's developer, VB Hospitality LLC, chose the Chester location because of its proximity to Kimberly Clark, Harrah's Casino, and convenient access to Philadelphia International Airport and the region. The rooms, both studios and suites, feature full kitchens and other extended stay amenities. The hotel currently employs roughly 500 hotel workers, of which 90 percent are local Chester hires.

*Source: Delco Times (2019)*

### Larimer Beer Company



The Larimer Beer Company, situated across the street from Subaru Park, celebrated its grand opening in Chester in July of 2019. The independent beer company produces its own experimental beer in a three-barrel system on premises, as well as hosting more than 3,000 square feet of indoor and outdoor space for residents and visitors to use before and after Philadelphia Union games. The presence of the brewery encourages visitors to the stadium to spend more time around Chester before and after events.

*Source: Delco Times (2019)*

**PA** pennsylvania
RECEIVER FOR THE CITY OF CHESTER



### The Wharf Building

The Wharf Building, formerly the Chester Waterside Station of PECO, was converted into Class-A office space. The building is currently occupied by Power Home Remodeling, voted the best place for Millennials to work in the country, and the front office for the Philadelphia Union. The Wharf's former machine shop is now used as a 16,500 square foot indoor training facility. The Wharf building and adjacent Philadelphia Union soccer stadium will serve as the center piece in NBBJ masterplan for the Chester Riverfront.

*Source: Daily News (2015)*



### DTLR

DTLR is one of the country's most successful lifestyle retailers with over 250 stores in 19 states and recently opened a store on the Avenue of the States in 2018. Since opening, DTLR has partnered with Tandem Music Group, a Chester-based music publishing and entertainment company, to organize a number of events including annual block parties that attract over 500 people to the Avenue of the States each year.

*Source: City of Chester (2018)*

## 7.5.    Initiatives

**ECD01: Update development policies and procedures**

It is critical that City government review its development policies and procedures to make government more business friendly. The focus should be on reducing the regulatory burdens that restrict new investment, while simultaneously increasing the services that support private investment in the city. Specifically, regulatory constraints in the form of existing land use policies have impeded growth and development in the City.  The City should consider a development review process to identify key steps in the plan review, permitting, and inspection process.  And further, the City should improve License and Inspection enforcement to ensure that it is consistent throughout all neighborhoods.

In addition, the City should update its Comprehensive Plan (Vision 2020), which was created in 2012 and serves as the backbone for long-term land use planning decisions. An updated comprehensive plan will help the City be strategic in its use of local and federal funds by identifying the locations for investment and defining the This type of prioritization helps signal to the private sector which areas will see future investment from the public side instilling a system that replaces uncertainty with clarity and delays with fee based revenue for the municipality.

**ECD02: Increase Blight Remediation**

The City of Chester faces costly negative impacts associated with blight including depressed property values, public safety challenges, and stagnant economic development. The issue of blight has significant quality of life and economic development implications for the city and its residents and is an issue that can be effectively mitigated with adequate professional support. The City has made progress in recent years, improving internal efforts to identify and mitigate residential blight and landlord negligence. Grant funding would allow the City to build on its progress in this area and contract professional assistance to



bring legal action against several large landlords who are not adequately maintaining both occupied and vacant properties in the city.

Prior to the onset of COVID-19, the City was in communication with the Public Interest Law Center to bolster its blight mitigation and prevention efforts. Channeling grant funds to a partnership with the Public Interest Law Center or similar organization would bolster the City's ability to enforce provisions of Pennsylvania's Neighborhood Blight Reclamation and Revitalization Act (Act 53) as well as its municipal ordinances related to blight. These efforts would more strictly enforce necessary blight remediation for properties in the city and could lead to the award of damages for the City to fund its costs enforcing remediation.

### ECD03: Support Strategic Growth at the Waterfront

The waterfront is one of the City's greatest assets. The Riverfront Alliance, in coordination with the City, secured funding for a Comprehensive Waterfront Development Plan. A draft plan was completed in June 2020 that included an analysis of potential uses and phasing of development along the waterfront. Early recommendations include securing funding for adjacent infrastructure projects, supporting pop-up retail, sports complex, and flexible work space, as well as creating an independent entity to facilitate development.[23]The City should build upon the momentum and prioritize this growth area as recipient for local, state and federal funds to bolster and ensure the success of the coming private investment.

### ECD04: Support Central Business District Revitalization

The Chester downtown corridor is in the midst of revitalization, led by the local community. The Avenue of the States is being positioned as an opportunity for redevelopment into a cultural arts district by an informal collaborative of local leaders with deep community ties.[24] Redevelopment plans include not just cultural arts, but commerce, health services, and affordable housing.[25] This is adjacent to other significant development including the Candlewood Suites - an 89 room hotel adjacent to City Hall and the Avenue of the Arts.

The City should continue to support this transformation by strengthening its relationships with the local business community through public-private partnerships and identifying ways to strategically support long-term investment throughout the Central Business District, such as adopting a Main Street strategy and prioritizing investment efforts in support of that approach.

### ECD05: Support Improvements at the Chester Transportation Center

The connection to a regional transportation network is a significant City asset and a great opportunity to expand on future Transit Oriented Design (TOD) growth in the municipality. The confluence of commuter rail, the I-95 corridor, and the proximity of the Philadelphia International Airport have created a unique opportunity for the municipality.  The Chester Transportation Center will act as the City's principal public

---

[23] Chester Waterfront Master Plan, Report Draft 6/26/20, Riverfront Alliance of Delaware County
[24] Abello, O.P. Next City. Chester Artists Revitalizing Corridor on Their Own Terms. June 2018.
https://nextcity.org/features/view/chester-artists-revitalizing-city-on-their-own-terms
[25] https://delco.today/2020/07/rap-producer-songwriter-jahlil-beats-tries-to-bring-affordable-housing-to-chester/



transit hub in the future. The City should seek grant funding support and technical assistance to perform the needed long-range planning for the community and to continue to make capital improvements to the station and surrounding area.  This will strengthen the downtown business district and enable increased connections to the waterfront entertainment district.

**ECD06: Leverage Public-Private Partnerships**

In recent years, the City of Chester has made significant progress in forming meaningful partnerships to advance economic development goals. Due to recent turnover of leadership, it will provide an opportunity to strengthen relationships with key stakeholders for the benefit of Chester.

In 2019, Delaware County government added three new Councilmembers. Today, there is an opportunity to bolster and deepen the relationship between City and County government and build upon a collective vision for a thriving Chester and Delaware County. Tactically, the City and County can work together to leverage federal grant dollars, in ways that Chester alone cannot.

In 2020, Crozer Keystone Health System installed a new President and CEO. Crozer is Chester's largest employer and provides key health services for city residents. The new CEO has indicated interest in partnering with Chester for sponsoring community events, opening facilities for community use, and collaborating on key revitalization initiatives.

Forging these bonds between Chester and all vested stakeholders provides the City with the support and resources needed to effectively do the long-term planning needed to position the City for its comeback. Having these relationships in place and actively working at the table with Chester will promote the buy-in needed to leverage funding resources and make the implementation of plans attainable.  The City and its constituency cannot achieve the growth and development it desires without the collective support of the region and the Commonwealth.



# Governance and Operations

Overcoming the City's fiscal challenges is an enormous undertaking. While Recovery Plan focuses several key areas detailed in other chapters, including legacy costs, the workforce, economic development, and City assets, other actions are required to emerge from distressed municipality status and remain fiscally solvent over the long term. Of course, Chester must eliminate its structural budget deficit, but it also must address management and operational issues that are holding the City back. This chapter includes other recommendations to improve both the City's fiscal and managerial capacity.

## 8.1.  Form of Government

Chester is incorporated as a City of the Third Class and operates as a Home Rule Charter community as approved by its citizens on April 20, 1980 (the "Home Rule Charter"). The City government is organized with an elected Mayor, who serves as the Chief Executive, and a City Council ("Council") of five members, one of whom is the Mayor. Council members are elected at large for four-year staggered terms and together form the legislative branch of the City government. The Mayor has no right to veto the Council's legislation.

Under the City's Administrative Code, each Council member serves as the department head for one of the five municipal departments: Public Affairs, Parks and Recreation, Streets and Highway, Public Safety, and Accounts and Finance. The Mayor makes the department head assignments at the annual organizational meeting of the Council.

The governing structure set forth in the City's Home Rule Charter is a variation of the commission form of city government.

The commission form of city government used by the City is also known as the Galveston Plan (the "Commission Plan" or the "Galveston Plan"). The Galveston Plan was devised in Galveston, Texas in 1901 and became one of the three basic forms of municipal government in the United States. The other forms of municipal government include the mayor-council plan (with a strong executive mayor usually having veto power) (the "Mayor-Council Plan") and the council-manager plan (with a strong executive manager) (the "Council-Manager Plan").

It is important to note that the City's Home Rule Charter does depart from the traditional Galveston Plan structure in certain key respects.  The City's Home Rule Charter gives the following substantial powers to the Mayor:

- The Mayor is elected directly by the citizens and is not appointed to the office by the Council;[26]

- The Mayor participates as a member of Council with full voting rights;[27]

- The Mayor is the presiding officer of Council;[28]

---

[26] Home Rule Charter, Section 201.
[27] Home Rule Charter, Section 201.
[28] Home Rule Charter, Section 201.



- The Mayor assigns the individual Council members to head specific departments at the annual reorganization meeting of the Council;[29]

- The Mayor is the Chief Executive of the City[30] and is required to supervise the conduct of all city officers;[31] and

- The Mayor may appoint an assistant to assist in the administration of the functions of the Mayor, such assistant to serve at the pleasure of the Mayor.[32]

According to the Department of Community and Economic Development's Handbook [33] on City Government in Pennsylvania, the City is only one of two third class cities in Pennsylvania to adopt the commission form of city government.  Critics of this form of government cite the following drawbacks:

- **Lack of a visible leader:** Under a Commission Plan, the mayor splits department management with the other four Council members, diluting the powers of the mayor itself.  Because this form of government is so rare in Pennsylvania, residents are accustomed to holding one elected or appointed position accountable for running the organization as a whole, whether that is the mayor (Strong Mayor form) or a city manager (Council-Manager form). That accountability gives the mayor responsibility and a popular mandate to act as needed. Chester's Mayor does not have that authority or that mandate in this form of government.

- **Lack of efficiency:** Due to the lack of centralized management, the Commission Plan has a bad reputation in terms of efficiency.  In practicality, the Commission Plan creates five separate bodies, each led by an elected official, in one government.  As a result, there can be inefficiencies, redundancies and sometimes competition for scarce resources.

- **Lack of professionalism:** Critics contend the Commission Plan discourages professionalism by leaving the degree to which a department hires and retains professional managers dependent on which five officials hold office at any point. Because individual Council members oversee individual departments, the focus of the government's legislative body is not on the needs of the organization as a whole or City residents as a collective, but rather whatever components of the organization happen to account for a majority of the Council votes at any point. This increases the likelihood that individual Council members will act in the narrow interests of their specific department, or that all will do so via "horse trading", as one Council members votes in favor the others' proposals with the expectation that they will return the favor. It also weakens the chance for coordination or proper vetting of individual proposals.

---

[29] Home Rule Charter, Section 603.
[30] Home Rule Charter, Section 301.
[31] Home Rule Charter, Section 303.
[32] Home Rule Charter, Section 305.
[33] The Pennsylvania Governor's Center for Local Government Services, *"City Government in Pennsylvania Handbook"*, 3rd Edition, November 2013.



- **Lack of separation of powers:** Under the Commission Plan, there is no distinction between the legislative and administrative functions of a city.  Thus, many administrative decisions can become unnecessarily political. Additionally, because administrative and legislative functions become "unified", there is an absence of checks and balances. In comparison, under a Mayor-Council Plan, a council can refuse to confirm the mayor's appointments and the mayor can veto the council's legislation.

The current Mayor and administrative team have made some progress in overcoming these drawbacks. In particular, the appointment of a Chief Financial Officer has improved coordination and centralization of budget and finance functions.

But Chester's poor financial performance raises the question whether this relatively unique form of government is effective. There is a pattern of the City government either failing to adopt a realistic budget, failing to follow that budget or both which results in consistent, large deficits.

Figure 8.1: General Fund Budget versus Actual Results, 2013 - 2016[34]

|  | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| Budget Surplus/ (Deficit) | $0 | $0 | $0 | $0 |
| Actual Surplus / (Deficit) | $(2,227,095) | $(8,687,450) | $(7,979,333) | $(8,241,655) |

The most familiar form of government for cities is the Mayor-Council Plan because it is patterned after our traditional national and state governments. There is a separation of powers between the executive and legislative branches, and consequently, there are checks and balances.  Under a Mayor-Council Plan, the City has one elected official who is accountable for running government operations. Many Pennsylvania cities also have a senior administrator (Business Administrator, Chief Administrative Officer, City Manager) with deeper management experience, if the mayor's strengths are in other areas. In either case, the mayor is clearly accountable for City government's operations and, as a result, decisions become centralized, coordinated and cohesive.

To transition to a Mayor-Council Plan or a Manager-Council Plan, the City would need to amend its Home Rule Charter.  The Home Rule and Optional Plan Law provides that an existing home rule charter can be amended through the initiative procedure and referendum or ordinance of the governing body.  53 Pa. C.S.A. § 2941.  The petition or ordinance must contain the complete text of wording proposed to be added to the charter and identify any provisions to be deleted.  Amendments to a home rule charter can also be proposed to the voters by a government study commission under its authority to recommend actions it deems advisable consistent with its functions. 53 Pa. C.S.A. § 2923. Amending the City's Home Rule Charter is akin to the Commonwealth amending its Constitution; thus, the City must carefully adhere to the specific timelines and procedures set forth in the Home Rule and Optional Plan Law.

---

[34] The 2017 comprehensive annual financial report shows a $7.7 million positive result at the end of that year, which was due to the City borrowing $12 million through an unfunded borrowing loan to cover some of its unfunded obligations. The City also received a $2 million emergency loan from the Commonwealth in 2017.



## 8.2.    Departmental operations

As noted above, Chester City government has five departments, each led by one the City Council members.

### Public Affairs

The Public Affairs Department includes the Mayor's office, the Office of City Planning, the City Solicitor's Office, and the Police Department. There are 117 positions in the Public Affairs Department (not including crossing guards), the vast majority of which are in the Police Department. This includes vacant positions in the police department. The overall complement of Police Officers has declined recently due to retirement and attrition. The 2020 Salary Appropriation has a police complement of 94 uniformed police positions and 10 other positions, including a Commissioner, Chief of Police, Major, Chief of Staff, and six part-time Police Cadets.

### Accounts and Finance

The Accounting and Finance Department includes the Director's Office, the Treasurer's Office, the Assessor's Office, the Office of the City Clerk, the Human Resources Office, the Purchasing Office and the Controller's Office. There are 18 positions in the Accounting and Finance Department, plus a temporary, grant-funded Deputy Chief Financial Officer (CFO).

### Public Safety

The Public Safety Department consists of the Director's Office, the Fire Department, Licenses and Inspections Department, the Health Department and the Community Health Education Department. Overall, the Public Safety Department has 71 budgeted positions, of which 59 are within the Fire Department. The Fire Department has 39 firefighters and another 13 positions above that rank (eight captains and five Battalion Chiefs). The other seven positions in the Department are the Commissioner, the Administrative Secretary and five cadets.

### Streets

The Streets Department includes the Director's Office, the City Engineer's Office and the Highway Department. There are six full-time positions and eight part-time positions in the Streets Department.

### Parks, Recreation, and Public Property

The Parks, Recreation, and Public Property Department includes the Director's Office, Building Maintenance Department, Parks Department, Recreation Department, and the Summer Food program. There are three full-time positions and eight part-time positions in the Parks, Recreation, and Public Property Department.

## 8.3.    Initiatives

**ADM01: Consider Amendment to Home Rule Charter to Change Form of Government**

The Receiver will consider the issues related to the form of government as the Receiver interacts with the City officials going forward.  If the Receiver comes to the conclusion that a change in the form of government would be beneficial to the City, and if the Receiver believes a specific form of government



would be better for the City, the Receiver will amend this Plan to recommend a change in the form of government.

**Operations**

The Receiver's team will undertake an organizational assessment of each City department that will include a review of staffing, reporting structure, process and workflow, policies and procedures, and other pertinent factors affecting performance. Those assessments will identify ways to operate City functions more efficiently to enhance services or reduce costs. The assessments will start with the Accounting and Finance Department and recommend actions to improve timely and accurate internal financial reporting, completion of its independent financial audits, and general financial management and processing activities. As these assessments are completed, the Receiver will have more direction for the City.

For now, the Receiver carries forward these recommendations from the Act 47 Coordinator.

**ADM02: Pursue Stormwater Authority subcontracting and cost sharing opportunities**

In early 2018, the City created the Stormwater Authority of the City of Chester to reduce stormwater runoff through outreach, education, construction, and operation and maintenance of a storm water system. The Stormwater Authority and the City have had discussions regarding the overlap of certain activities currently performed by the City's public works department such as inlet maintenance and repair.

The City shall continue its discussions with the Stormwater Authority to identify ways to defray Chester General Fund expenditures through subcontracting or reimbursement for services provided by the City or hiring existing City employees to perform Stormwater Authority tasks. The two entities should also explore ways that Stormwater Authority investments in vehicles and equipment can be used to support the City's aging fleet. While the level and nature of subcontracting activities are still being discussed by the Stormwater Authority and the City, City officials have identified over $900,000 in annual General Fund expenditures that currently support Stormwater Authority related activities. The City should seek full reimbursement of these costs from this partnership.

The City should also approach the Stormwater Authority about sharing overhead costs such as financial management, fee collection, and engineering services to avoid duplication between the two organizations. Eliminating redundancies and streamlining operations will improve coordination and could lower the costs for both organizations and the City and Authority tax/rate payers.

**ADM03: Pursue revenues from interactive gaming and the legalization of sports gaming**

Act 42 of 2017 was passed last October and authorized, among other things, an expansion of gaming to include online gambling as well as sports wagering, if permitted by federal law. The Supreme Court recently ruled that the Professional and Amateur Sports Protection Act of 1992, which prohibited state-authorized sports gambling with some exceptions, was unconstitutional. The Supreme Court decision, along with the Act 42 legislation, presents the opportunities for new tax revenues.

Under Act 42, tax revenues generated from sports wagering will be overseen by the Commonwealth Financing Authority rather than going straight to the local communities that host the casinos where the gambling takes place. The City should work with the Commonwealth Financing Authority to ensure new gaming funds are allocated to casino host communities. The City should also lobby the state legislature to



amend Act 42, as necessary, for casino host communities to receive host community revenues similar to those received for slots and table gaming activities.

Act 42 also outlines the local share assessment for Interactive Gaming related taxes, which, in the case of Harrah's Philadelphia, requires that 50 percent of such revenues are distributed to an authority created by the host county and 50 percent is deposited into a restricted receipts account to be established by the Commonwealth Financing Authority to be used exclusively for grants for projects in the public interest in the Commonwealth. Since Chester hosts Harrah's Philadelphia, the City should work with the County and the Commonwealth Financing Authority to ensure these revenues benefit the City's residents.

### ADM04: Appoint a city-wide fleet manager

The City's fleet management is disjointed with each department responsible for its own vehicles while the Finance Department handles issues related to insurance and contract maintenance.

Most fleet management responsibilities are already being performed by City personnel; however, the efforts are uncoordinated and may unintentionally increase workload or decrease their effectiveness. Police department estimates their personnel charged with handling fleet mechanical and repair issues spend between 14-16 hours per week on these tasks.

The City shall centralize fleet management under a single manager.

The fleet manager will be responsible for developing a vehicle replacement and acquisition policy and perform cost versus benefit analysis regarding decisions to purchase or lease vehicles. The fleet manager will also monitor and evaluate the condition of vehicles and equipment; ensure that all fleet vehicles and motorized equipment are properly titled and licensed; enforce the City's preventative maintenance policy; dispose of fleet vehicles or equipment when they become uneconomical to maintain; conduct an annual fleet utilization review; and establish a vehicle take-home policy.

### ADM05: Revisit license and inspections enforcement processes and enforce ordinances

The City should implement a performance measurement program for its License and Inspections enforcement practices and fee and fine collections. The Deputy Director of Public Safety should lead the performance measurement effort, which would include, but not be limited to, tracking the number and type of inspections performed each month by each inspector, the fees and fines associated with the inspections, and the collection rates for the fees and fines.

As noted in the Economic Development chapter of this Exit Plan, the City must also ensure that its inspectors are properly licensed and certified.

### ADM06: Develop comprehensive plan to address City litigation

The City is also a party to significant amounts of litigation.  The Receiver is already working closely with the City to address these matters in a way most beneficial to City residents.  The Receiver will work with the City to develop a comprehensive approach to its litigation and risk management in order to reduce claims against the City in the future and to address current matters.  While the Receiver believes that Section 706 of Act 47 already provides him with the powers to do so, the Receiver wishes to make clear

**PA** **pennsylvania**
RECEIVER FOR THE CITY OF CHESTER

with respect to matters involving the City that he has the abilities to initiate or settle litigation, direct litigation (including counsel and expert selection), and intervene as a separate party if necessary.

*[End of document]*