# EXHIBIT D

**[J-34A-2023 and J-34B-2023]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| RICK SIGER, IN HIS CAPACITY AS ACTING SECRETARY OF THE DEPARTMENT OF COMMUNITY AND ECONOMIC DEVELOPMENT | : : : : : : | No. 12 MAP 2023<br><br>Appeal from the Order of the Commonwealth Court Order dated January 31, 2023 at No. 336 MD 2020. |
| v. | : : | ARGUED:  May 24, 2023 |
| | : | |
| CITY OF CHESTER | : : : : | |
| APPEAL OF: CITY OF CHESTER, MAYOR THADDEUS KIRKLAND AND CITY COUNCIL OF THE CITY OF CHESTER | : : : | |
| RICK SIGER, IN HIS CAPACITY AS ACTING SECRETARY OF THE DEPARTMENT OF COMMUNITY AND ECONOMIC DEVELOPMENT | : : : : : : | No. 15 MAP 2023<br><br>Appeal from the Order of the Commonwealth Court Order dated February 14, 2023 at No. 336 MD 2020. |
| v. | : : | ARGUED:  May 24, 2023 |
| | : | |
| CITY OF CHESTER | : : : : | |
| APPEAL OF: CITY OF CHESTER, MAYOR THADDEUS KIRKLAND AND CITY COUNCIL OF THE CITY OF CHESTER | : : : | |

# ORDER

**PER CURIAM**                                        **DECIDED:  January 29, 2024**

      **AND NOW,** this 29th day of January, 2024, because the Justices are unable to reach consensus regarding the disposition of the Commonwealth Court's order, the order of the Commonwealth Court is **AFFIRMED** by operation of law.

**[J-34A-2023 and J-34B-2023]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| RICK SIGER, IN HIS CAPACITY AS ACTING SECRETARY OF THE DEPARTMENT OF COMMUNITY AND ECONOMIC DEVELOPMENT | : : : : : : : | No. 12 MAP 2023<br><br>Appeal from the Order of the Commonwealth Court Order dated January 31, 2023 at No. 336 MD 2020. |
| v. | : : : | ARGUED:  May 24, 2023 |
| CITY OF CHESTER | : : : : | |
| APPEAL OF: CITY OF CHESTER, MAYOR THADDEUS KIRKLAND AND CITY COUNCIL OF THE CITY OF CHESTER | : : : | |
| | | |
| RICK SIGER, IN HIS CAPACITY AS ACTING SECRETARY OF THE DEPARTMENT OF COMMUNITY AND ECONOMIC DEVELOPMENT | : : : : : : : | No. 15 MAP 2023<br><br>Appeal from the Order of the Commonwealth Court Order dated February 14, 2023 at No. 336 MD 2020. |
| v. | : : : | ARGUED:  May 24, 2023 |
| CITY OF CHESTER | : : : : | |
| APPEAL OF: CITY OF CHESTER, MAYOR THADDEUS KIRKLAND AND CITY COUNCIL OF THE CITY OF CHESTER | : : : | |

*Justice Wecht delivers the Opinion of the Court with respect to Parts I, II, III, IV(A), IV(B)(ii)-(v), and IV(B)(vii)-(viii) and an opinion in support of affirmance.*

## OPINION

**JUSTICE WECHT**                                    **DECIDED: January 29, 2024**

Because the people of Pennsylvania receive many essential government services through their municipalities, the fiscal health of our cities is a matter of tremendous importance. For several decades, municipalities facing financial peril have been subject to a comprehensive remedial scheme under a law commonly known as Act 47.[1] If a fiscal emergency reaches a critical stage, Act 47 allows the Governor and the Department of Community and Economic Development ("Department") to resort to a drastic measure—the appointment of a receiver for the municipality.[2]

This appeal concerns the authority of a receiver for a financially distressed municipality under Act 47. Since 2020, Michael T. Doweary (the "Receiver") has served as the Receiver for the City of Chester (the "City"). In late 2022, finding the existing recovery plan inadequate to address the City's challenges, and due in no small part to the failure of local officials to cooperate with his efforts, the Receiver sought the Commonwealth Court's approval of numerous modifications to that plan. The Commonwealth Court confirmed certain of the Receiver's proposed initiatives, struck others, and allowed the Receiver to amend the modification request to address various deficiencies. The City, Mayor Thaddeus Kirkland, and the City Council[3] sought this

---

[1]    Municipalities Financial Recovery Act, Act of July 10, 1987, P.L. 246, No. 47, *as amended*, 53 P.S. §§ 11701.101-11701.712 ("Act 47").

[2]    *See* Chapter 7 of Act 47, *Id.* §§ 11701.701-11701.712.

[3]    Because the City, the Mayor, and City Council are jointly represented and have filed a single brief, unless individually specified, hereinafter we refer to the Appellants collectively as the "City."

Court's review of several initiatives that the Commonwealth Court had confirmed.[4]  In light of the City's assertions that certain confirmed initiatives unlawfully deprive its elected officials of their authority to govern on behalf of the City's residents, this Court assumed jurisdiction pursuant to our King's Bench powers.[5]   We affirm the order of the Commonwealth Court.

## I.  Act 47

### A.  Overview

Because this Court has had few opportunities to address Act 47, it is helpful to begin with a brief discussion of the law generally, its purpose and structure, and the particular provisions that apply to the instant dispute.  "As its formal name implies, Act 47 is designed to offer relief to any city that is considered to be financially distressed."[6]  Act 47 embodies the stated "public policy of the Commonwealth to foster fiscal integrity of municipalities so that they provide for the health, safety and welfare of their citizens; pay principal and interest on their debt obligations when due; meet financial obligations to their employees, vendors and suppliers; and provide for proper financial accounting procedures, budgeting and taxing practices."[7]   The failure to perform these essential functions, the General Assembly has declared, adversely affects "the health, safety and

---

[4]     The Receiver has not sought this Court's review of the various initiatives that the Commonwealth Court rejected, and they consequently are not at issue in this appeal.

[5]     PA. CONST. art. V, § 2; 42 Pa.C.S. § 502; *see Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 884 (Pa. 2020).

[6]     *Wilkinsburg Police Officers Ass'n ex. rel. Harder v. Commonwealth*, 636 A.2d 134, 135 (Pa. 1993).

[7]     53 P.S. § 11701.102(a).

welfare not only of the citizens of the municipality but also of other citizens in this Commonwealth."[8]

The General Assembly included within Act 47 numerous express statements of its intent in crafting the statutory scheme, as well as legislative findings that reinforce that purpose.  Given the parties' focus upon the General Assembly's declarations, we set forth these provisions at some length.  The legislature stated its intent as follows:

> (1) It is the intent of the General Assembly to:
>
> > (i) Enact procedures to provide municipalities showing early indicators of financial distress with training and technical and financial assistance.
> >
> > (ii) Enact procedures and provide powers and guidelines to ensure fiscal integrity of municipalities while leaving principal responsibility for conducting the governmental affairs of a municipality, including choosing the priorities for and manner of expenditures based on available revenues, to the charge of its elected officials, consistent with the public policy set forth in this section.
> >
> > (iii) Enact procedures for the adjustment of municipal debt by negotiated agreement with creditors.
> >
> > (iv) Provide for the exercise of the Commonwealth's sovereign and plenary police power in emergency fiscal conditions to protect the health, safety and welfare of a municipality's citizens when local officials are unwilling or unable to accept a solvency plan developed for the benefit of the municipality.
> >
> > (v) Provide for the exercise of the Commonwealth's sovereign and plenary power to establish and abolish local government units and provide essential services in areas of this Commonwealth in which the fiscal integrity of existing local government units cannot be sustained.[9]

These statements reflect the legislature's embrace of varying degrees of intervention within distressed municipalities, from the mere provision of "training and technical and financial assistance" to the exercise of the power to "abolish local

---

[8]     *Id.*

[9]     *Id.* § 11701.102(b)(1).

government units."   As discussed below, the escalating severity of the remedies referenced in these declarations correlates to actions authorized under different chapters of Act 47.

The General Assembly also reinforced its statement of intent with a number of specific findings and declarations.   The legislature declared: that "[p]olicies of certain municipalities are so ineffective and the financial conditions so severe that the provision of vital and necessary services is threatened"; that "[s]ustained failure of a municipality to enact or implement a fiscal plan to adequately address or prevent insolvency after repeated opportunities to do so . . . constitutes a fiscal emergency"; and that such failure "signifies . . . a breakdown in the function of municipal government," "a dereliction of its elected officials' paramount public duty to safeguard the health, safety and welfare of its citizens," and "a threat to the fiscal stability of neighboring communities."[10]   The General Assembly further noted that municipalities "may face such deteriorated economic conditions that all reasonable efforts to restore economic viability have failed," and that in such circumstances, "[i]t is the intent of the General Assembly that, for municipalities incapable of continuing to function as general purpose units of local government, procedures exist to ensure the provision of essential and vital public services to the residents of those areas absent a functioning municipal government."[11]

Consistent with the General Assembly's acknowledgment that different financial situations may require different interventions, Act 47 provides a suite of options depending upon the severity of a municipality's financial condition.   Chapter 2 concerns determinations of municipal "financial distress" and the appointment of a coordinator to prepare a recovery plan.   Chapter 3 authorizes the provision of emergency financial aid

---

[10]    *Id.* § 11701.102(b)(3)-(4).

[11]    *Id.* § 11701.102(b)(6).

to distressed municipalities, including grants and interest-free loans.  Chapter 6 concerns the Governor's power to declare a "fiscal emergency" where a municipality's situation transcends mere "financial distress."  Chapter 7—our focus in this appeal—addresses the appointment of a receiver where necessary to respond to a fiscal emergency.  And Chapter 4 allows for the most severe of interventions—disincorporation of economically nonviable municipalities.

### B.  Receivership under Act 47

This matter implicates the receivership provisions of Chapter 7.  The appointment of a receiver under Act 47 is a rare occurrence.  Prior to the City of Chester, only the City of Harrisburg had gone through the Act 47 receivership process since its creation in 1987.[12]  Perhaps due to the overall infrequency of their use, this Court has not had occasion to address Act 47's receivership provisions.  As we lack precedent on this matter, the language of Act 47 is not only our primary guide; it is our sole guide. Accordingly, before considering the parties' contrary views of the Receiver's authority, and in order to understand the Commonwealth Court's decision, it is necessary to review the governing statutory language.

Before a receiver may be appointed, the municipality must be in a state of fiscal emergency pursuant to the Governor's declaration under Chapter 6.  After such a declaration, Section 702 authorizes the Governor to direct the Secretary of the Department to file a petition in the Commonwealth Court seeking the appointment of a

---

[12]    *See* Department of Community and Economic Development, Act 47 Financial Distress, https://dced.pa.gov/local-government/act-47-financial-distress/  (last visited September 19, 2023); *see also Commonwealth v. RBC Capital Markets Corp.*, 368 M.D. 2018, 2021 WL 4096634, at *8 (Pa. Cmwlth. Sept. 9, 2021) (unreported) (noting that the City of Harrisburg was under Act 47 receivership from December 2, 2011, to March 1, 2014).

specific individual as the receiver for the distressed municipality.[13]    Although the
Commonwealth Court approves the appointment, the court plays no role in the selection
of a receiver.  Section 702(a) provides that the Commonwealth Court "shall have no
authority to appoint anyone other than the individual named in the petition as the
receiver."[14]  Within thirty days of the appointment, the receiver must develop a recovery
plan for the municipality and provide it to the Commonwealth Court, the Secretary of the
Department, and certain officials within the municipality.[15]

The recovery plan that the receiver develops must provide for certain matters, and
may address others.  The mandatory initiatives include the "[c]ontinued provision of vital
and necessary services" to the residents of the municipality;[16] the "[p]ayment of the lawful
financial obligations of the distressed municipality"; and, particularly relevant here, the
"[t]imely deposit of required payments to the pension fund in which the distressed
municipality and each authority participates."[17]    The recovery plan may also provide
contractual authority relating to the "sale, lease, conveyance, assignment or other use or
disposition of the assets of the distressed municipality," the "approval, modification,
rejection, renegotiation or termination of contracts or agreements," and the "execution of

---

[13]    53 P.S. § 11701.702(a).

[14]    *Id.*

[15]    *Id.* §§ 11701.702(e)(4), 11701.703.

[16]    "Vital and necessary services" are defined to include:  police and fire services;
ambulance and rescue services; water supply and distribution; wastewater services;
refuse collection and disposal; snow removal; payroll and pension obligations; and
fullfillment of payment of debt obligations or any other financial obligations.  *Id.*
§ 11701.701.

[17]    *Id.* § 11701.703(b)(1).

new contracts or agreements."[18]  A recovery plan may not authorize certain enumerated actions, none of which are relevant to the initiatives presently at issue.[19]

Importantly, both with regard to the initial confirmation of the recovery plan and any later modification thereto, Act 47 sets forth a highly deferential standard of review for the Commonwealth Court.  After receipt of the receiver's proposed recovery plan, and following an optional hearing on the matter, the Commonwealth Court "shall confirm" the plan or modification "unless it finds clear and convincing evidence" that the plan or modification "is arbitrary, capricious or wholly inadequate to alleviate the fiscal emergency in the distressed municipality."[20]

Once confirmed, the recovery plan triggers a set of legal obligations and presumptions.  Notably, confirmation of the recovery plan or modification "shall have the

---

[18]    *Id.* § 11701.703(b)(2).

[19]    The recovery plan may not:

(1) Unilaterally levy taxes.

(2) Unilaterally abrogate, alter or otherwise interfere with a lien, charge, covenant or relative priority that is:

(i) held by a holder of a debt obligation of a distressed municipality; and

(ii) granted by the contract, law, rule or regulation governing the debt obligation.

(3) Unilaterally impair or modify existing bonds, notes, municipal securities or other lawful contractual or legal obligations of the distressed municipality or authority.

(4) Authorize the use of the proceeds of the sale, lease, conveyance, assignment or other use or disposition of the assets of the distressed municipality or authority in a manner contrary to section 707.

*Id.* § 11701.703(c).

[20]    *Id.* § 11701.703(d)-(e) (emphasis added).

effect of . . . imposing on the elected and appointed officials of the distressed municipality or . . . authority a *mandatory duty* to undertake the acts set forth in the recovery plan," and "*suspending the authority of the elected and appointed officials of the distressed municipality* or . . . authority to exercise power on behalf of the distressed municipality or authority pursuant to law, *charter*, ordinance, rule or regulation to the extent that the power would interfere with the powers granted to the receiver or the goals of the recovery plan."[21] The confirmation, moreover, "*shall not be construed to* . . . change the form of government of the distressed municipality."[22] And, "except as set forth in subsection (a)," the confirmation shall not be construed to "affect powers and duties of elected and appointed officials of the distressed municipality."[23]    Subsection (a), notably, is the provision that allows for the "suspending" of the local officials' authority where such authority conflicts with the powers of the receiver or the goals of the plan.

Section 706 spells out certain powers and duties that inhere in the receiver, as well as a number of limitations upon that power.[24]  Some of the receiver's enumerated powers are highly specific, while others are more general.  On the specific side, the receiver is empowered, for instance, to "require the distressed municipality or authority to negotiate intergovernmental cooperation agreements between the distressed municipality and other political subdivisions" and to "file a municipal debt adjustment action under the Bankruptcy Code (11 U.S.C. § 101 et seq.) and to act on the municipality's behalf in the

---

[21]    *Id.* § 11701.704(a)(1)-(2) (emphasis added).

[22]    *Id.* § 11701.704(b)(1) (emphasis added).

[23]    *Id.* § 11701.704(b)(2).

[24]    The restrictions upon the receiver's power are enumerated in Section 706(c), and they are identical to the items listed in Section 703(c), relating to limitations upon the contents of a recovery plan.  *See id.* § 11701.706(c); *supra* n.19.  None of these matters are implicated by the initiatives presently under review.

proceeding."[25]  The receiver's more general authority includes the powers to "require the distressed municipality or authority to take actions necessary to implement the recovery plan," to "modify the recovery plan as necessary to achieve financial stability of the distressed municipality," and to "direct the distressed municipality or authority to take any other action to implement the recovery plan."[26]

Act 47 anticipates that disagreements may arise between the receiver and a municipality's elected and appointed officials.  Section 708 provides that the "receiver may issue an order to an elected or appointed official of the distressed municipality" to "implement any provision of the recovery plan" and to "refrain from taking any action that would interfere with the powers granted to the receiver or the goals of the recovery plan."[27] In addition to the receiver's power to issue orders to the local officials, Act 47 authorizes the receiver to petition the Commonwealth Court to issue a writ of mandamus upon a municipal official in order to secure compliance with the receiver's orders.[28] Concomitantly, the municipality's elected and appointed officials are entitled to petition the Commonwealth Court to enjoin any impermissible actions on the part of the receiver.[29]

Receivership is a measure of limited duration.  Section 710 provides that a receivership expires two years after the receiver's appointment, but allows the Commonwealth Court, upon petition of the Secretary of the Department, to extend the receivership for up to another two years.[30]  Even after a receivership expires, however,

---

[25]   53 P.S. § 11701.706(a)(3), (9).

[26]   *Id.* § 11701.706(a)(1), (2), (7).

[27]   *Id.* § 11701.708(a).

[28]   *Id.* § 11701.709(a).

[29]   *Id.* § 11701.709(b).

[30]   *Id.* § 11701.710(a)-(b).  The Commonwealth Court in this case, on December 28, 2021, granted a petition to extend the City's receivership for up to two years.

the Secretary may determine that the municipality remains in a state of financial distress, and the recovery plan may remain in effect, redesignated as a coordinator's plan under Chapter 2 of Act 47.[31]

## II. Background

### A. Facts

The City of Chester's fiscal difficulties are not of recent vintage. The City has been designated as a financially distressed municipality since 1995. For twenty-five years, attempts to improve the financial condition of the City under various recovery plans proved less than sufficient. On April 13, 2020, then-Governor Tom Wolf issued a declaration of fiscal emergency under Act 47, and the Commonwealth Court approved the appointment of the Receiver in June of that year.

The Commonwealth Court confirmed the Receiver's initial recovery plan in October 2020. The Receiver sought an amendment to the plan in April 2021, which the Commonwealth Court confirmed. Difficulties between the Receiver and the City's officials began to reveal themselves in March 2022, when the Receiver sought a writ of mandamus directing the City's elected officials to comply with the recovery plan and with the Receiver's orders. After an evidentiary hearing, the Commonwealth Court granted, in part, the Receiver's request for a writ of mandamus. Notably, the court found that Councilman William Morgan, a member of City Council who also headed the City's Department of Finance and Human Resources, had failed to cooperate with the Receiver and had "engaged in conduct that has impeded Receiver's ability to carry out the goals" of the recovery plan.[32] The Commonwealth Court thus ordered Councilman Morgan and

---

[31]    *Id.* § 11701.710.1(a)-(b).

[32]    *Neil R. Weaver, in his Capacity as Acting Sec'y of the Dep't of Cmty. and Econ. Dev. v. City of Chester*, 336 M.D. 2020 (Pa. Cmwlth. January 31, 2023) (unreported) ("*Weaver*"), slip op. at 7 (quoting *Davin v. City of Chester*, 336 M.D. 2020 (Pa. Cmwlth. (continued…)

his team to "immediately share any future correspondence or information they receive relating to the City's finances with Receiver," and specified that Councilman Morgan "shall not direct any employee to act or take any action that in any way interferes with the operations" of the Finance department.[33]

Nonetheless, neither the first plan modification nor the writ of mandamus proved sufficient. On November 8, 2022, the Receiver filed another modification to the plan (the "Plan Modification"),[34] this time proposing numerous new initiatives that would significantly alter operations within the City's government. All told, the Plan Modification included thirty-three proposed initiatives, which fell into five categories: (1) administrative duties and professional management; (2) core internal administrative functions and ethics; (3) parking services; (4) monetization of the Stormwater Authority of the City of Chester; and (5) economic development. The Commonwealth Court ultimately severed the initiatives relating to the Stormwater Authority and parking services, concluding that they involved complex issues that required separate consideration and evidence. The remaining initiatives were the subject of a three-day evidentiary hearing that the Commonwealth Court held from January 9-11, 2023.[35]

---

March 22, 2022) (unreported), slip op. at 9-10). Rick Siger now serves as the Secretary of the Department and was substituted as a party to this litigation, as reflected in the caption above.

[33]    *Id.*

[34]    On December 9, 2022, the Receiver revised the Plan Modification to reflect compromises with City officials about the language of some initiatives. Because this was the version of the Plan Modification that the Commonwealth Court considered, any citations to the Plan Modification in this Opinion refer to the December 9, 2022 version of the document.

[35]    The Receiver testified on his own behalf and presented the testimony of his Chief of Staff, Vijay Kapoor, and the City's COO, Leonard Lightner. The City offered the testimony of Mayor Kirkland, Councilman Morgan, and City Solicitor Kenneth Shuster.

The most contested initiatives, and those most relevant to the instant appeal, involved the suspension of the administrative duties of the City's elected officials with regard to day-to-day operations and the concomitant empowerment of the Receiver to take certain actions that were committed to the City government.  As background, the City's Home Rule Charter provides that either the City Council or the Mayor may assign the heads of the City's administrative departments.[36]  Since Mayor Kirkland took office in 2016, he has appointed department heads each January.[37]  Although he is not required to do so, Mayor Kirkland appoints exclusively City Council members as department heads, thus giving them administrative responsibilities in addition to their legislative roles.

The performance of the City's elected officials, in their roles as department heads, was a significant impetus for the Plan Modification.  The testimony at the hearing revolved primarily upon instances of mismanagement and malfeasance on the part of the City officials that, the Commonwealth Court found, "exemplify the City officials' lack of transparency, lack of cooperation, and disrespect of Receiver and his team."[38]  The Plan Modification was designed to empower the Receiver to avoid such problems in the future.

Perhaps the most glaring incident was Councilman Morgan's involvement in a phishing scam that cost the City approximately $400,000 in June 2022.  As Councilman Morgan explained, he had an e-mail exchange with the City's insurance broker that was intercepted by individuals seeking to steal from the City, which the scammers successfully accomplished by arranging a fake payment to the City's insurer.[39]  Although Councilman Morgan discovered the incident in July 2022, he did not inform the Receiver for three

---

[36]    City of Chester's Home Rule Charter §§ 601, 603; *see* City's Br., Appendix. C.

[37]    *Weaver*, slip op. at 17 (quoting Notes of Testimony ("N.T."), 1/10/2023, at 243-44).

[38]    *Id.* at 11.

[39]    N.T., 1/11/2023, at 17.

months.  He also did not inform the Mayor, the City Solicitor, or other members of City Council.[40]  Councilman Morgan failed to inform the Receiver of the loss of $400,000 of the City's funds notwithstanding the Commonwealth Court's earlier writ of mandamus, which specifically ordered Councilman Morgan to immediately share any information about the City's finances with the Receiver.  At the hearing, Councilman Morgan acknowledged that his three-month delay in reporting the phishing incident was a violation of the Commonwealth Court's mandamus order, for which he apologized.[41]  Although Councilman Morgan testified that he "learned [his] lesson" and has taken steps to avoid such problems in the future,[42] the Receiver's Chief of Staff, Vijay Kapoor, testified that "[n]o action was taken with respect to Councilman Morgan," that "no new policies were created," and that "there's no accountability there."[43]

The Receiver further produced evidence of another incident of questionable financial practices involving Councilman Morgan.  The City had reimbursed Councilman Morgan for his purchase of $1,500 in gift cards, which purportedly were used for a Toys for Tots Christmas collection.  Mayor Kirkland approved the reimbursement without checking Councilman Morgan's receipts or confirming that the purchases actually totaled $1,500.[44]  Upon review of the receipts of the toy purchases, Mr. Kapoor explained that they did not add up to $1,500, and not all of them appeared to have been purchased with the gift cards for which Councilman Morgan was reimbursed.[45]  The Receiver's team

---

[40]     *Id.* at 19-20.

[41]     *Id.* at 19.

[42]     *Weaver*, slip op. at 21 (quoting N.T., 1/11/2023, at 30).

[43]     N.T., 1/9/2023, at 118; *Weaver*, slip op. at 21 (quoting Mr. Kapoor).

[44]     *Weaver*, slip op. at 22 (citing N.T., 1/10/2023, at 227).

[45]     *Id.* at 22-23 (quoting N.T., 1/11/2023, at 51).

repeatedly directed the City to investigate the matter and to report its findings, but multiple inquiries to the City Solicitor produced "no substantive update," "no report," and "no conclusions."[46]

The Receiver additionally detailed instances of financial mismanagement within the City's payroll practices.   While members of the Receiver's finance team were performing a backpay calculation process for a collective bargaining agreement, they discovered that the City had been making unauthorized payments for several months to an employee who was incarcerated.   After discovering the questionable payments, the Receiver asked the City's former interim COO about the employee, and was told: "Oh, he's in jail."[47]  Upon further investigation, the Receiver discovered that the payments were being made to an employee in the Parks and Recreation Department who had been imprisoned on child rape charges.[48]   Not only had the City been continuing to pay this imprisoned employee, but Mr. Kapoor testified that "he was getting paid in excess of the number of hours in a week for a normal payroll amount."[49]   The Receiver's investigation revealed that the City had been paying this employee for sick leave and vacation time. This was erroneous for several reasons.   The employee's collective bargaining agreement did not provide for vacation or sick time to paid out in this manner.   As Mr. Kapoor explained:  "That is not how vacation or sick time is done.  It's not paid out that way.  It's use it or lose it."[50]  Moreover, Mr. Kapoor noted that "this would not be the type

---

[46]     *Id.* at 23 (quoting N.T., 1/11/2023, at 53-54, 56).

[47]     *Id.* at 31 (quoting N.T., 1/9/2023, at 102) (emphasis omitted).

[48]     *Id.* (citing N.T., 1/9/2023, at 103).

[49]     *Id.* (quoting N.T., 1/9/2023, at 103-04) (emphasis omitted).

[50]     *Id.*

of situation where you would be able to use sick leave.  You don't get to use sick leave for being incarcerated."[51]

With regard to this incident as well, the Receiver's efforts to investigate and remedy the matter hit a wall when the Receiver sought the assistance of the City's leaders. Seeking to have the improperly paid employee terminated and removed from the City's payroll, the Receiver reached out to Councilwoman Portia West, who also served as the head of the Parks and Recreation Department, in which the employee had worked. Despite three attempts to contact Councilwoman West, the Receiver's team received no response.  When Mr. Kapoor finally reached the Councilwoman and asked why she had not responded, she said that she did not remember getting any e-mails about it.  "And then she looked through her phone and found the e-mail."[52]  In the view of the Receiver's team, this incident further illustrated the difficulties with having the members of City Council perform the administrative function of leading the City's departments.  As Mr. Kapoor explained, in most municipalities an issue such as this immediately would have been handled by the human resources department and solicitor.  "But what happened here was that . . . Councilwoman West did not want to move to terminate the individual . . . so he stayed on [the payroll]."[53]

Beyond these specific and recent examples of administrative failures and fiscal mismanagement, the Receiver's evidence further detailed longstanding problems with the City's financial practices.  The City's pension fund is significantly underfunded because the City failed to make the minimum annual payments necessary to maintain the fund

---

[51]    *Id.*

[52]    *Id.* at 32 (quoting N.T., 1/9/2023, at 106).

[53]    *Id.* (quoting N.T., 1/9/2023, at 106-07).

from 2013 until 2020, when the Receiver was appointed.[54]  Due to this failure, the City

owes approximately $40 million in back-due payments to its pension plan.[55]  Mayor

Kirkland testified that he was unaware that the mandatory payments were not being made

at any point during his tenure, explaining that "there is a lot that falls on [his] shoulders,"

and that some matters "fall through the cracks."[56]  Mayor Kirkland further stated that he

had never received any information from the Auditor General about the City's missed

payments, and that he would expect such a notification to go to the City's CFO.[57]  Mr.

Kapoor, by contrast, testified that the Auditor General's compliance audits were indeed

sent to Mayor Kirkland and, in any event, as *ex officio* chairperson of the City's pension

fund, Mayor Kirkland had a duty to know whether the pension plan was adequately

funded.[58]

Beyond the continuous failure to meet its pension obligations, the Commonwealth

Court previously had found that the City's Finance Department, under the leadership of

Councilman Morgan, engaged in practices that caused significant harm to the City's

finances.  These included "failing to complete monthly bank reconciliations, making late

and/or inaccurate federal tax payments, making improper 'hazard' payments to certain

employees, and [Councilman Morgan] allowing himself and other City officials to remain

---

[54]     Act 47 defines "pension obligations" as a "vital and necessary service."  53 P.S.
§ 11701.701.  The funding of pension plans is so important to the legislative scheme that
it is one of the three listed items that a receiver's recovery plan *must* provide for, as
distinguished from the matters that a recovery plan *may* address.  *See id.*
§ 11701.703(b)(1)(iii) ("The recovery plan shall provide for . . . [t]imely deposit of required
payments to the pension fund in which the distressed municipality . . . participates.").

[55]     *Weaver*, slip op. at 33 (quoting N.T., 1/9/2023, at 45-46).

[56]     *Id.* at 34 (quoting N.T., 1/10/2023, at 217-18).

[57]     *Id.* (citing N.T., 1/10/2023, at 218-19).

[58]     *Id.* (quoting N.T., 1/11/2023, at 81-82).

on an expensive health care plan that had been discontinued."[59]  The Receiver testified

that the City's late and inaccurate tax payments to the IRS, for instance, have resulted in

approximately $1 million in penalties, and that the City has an outstanding balance of

about $750,000 in penalties, which "obviously negatively impacts the City's ability to

recover."[60]

The City's financial condition was so dire that, by the end of 2022, the Receiver

and his team were concerned that the City would completely run out of funds, and that it

would not even have enough money in its checking account to cover its payroll

expenses.[61]  The City was able to acquire sufficient funds to continue operating only

through receipt of a "tax revenue anticipation note" from a federal bankruptcy judge, which

authorized the Commonwealth to provide the City with $5 million, to be repaid when the

City receives income from property taxes for the year.[62]

The Receiver produced evidence suggesting that many of the City's failures are a

result of its hiring practices and selection of administrative department heads, which were

driven more by nepotism than qualifications.   With regard to selecting City Council

members as department heads, the Receiver stated that, "[o]ther than being designated

by the Mayor, there are no further qualifications" that are evaluated, and there is no

requirement that they "demonstrate basic competence" in the matters that they oversee.[63]

As for the City's hiring practices, the Receiver testified that there are "significant

---

[59]     *Id.* at 28 (citing *Davin*, slip op. at 9-10).

[60]     N.T., 1/10/2023, at 29.

[61]     *Weaver*, slip op. at 33 (quoting N.T., 1/9/2023, at 48-49).

[62]     *Id.*  The Receiver ultimately filed a Chapter 9 bankruptcy petition in the United
States Bankruptcy Court for the Eastern District of Pennsylvania on November 10, 2022.
*Id.* at 8 n.7; *see also In re City of Chester*, 649 B.R. 633 (Bankr. E.D. Pa. 2023).

[63]     *Weaver*, slip op. at 35 (quoting Plan Modification at 28).

relationships that aren't disclosed" and "aren't managed properly."[64]   For instance, the former human resources director was Councilwoman West's niece; another human resources employee was the daughter of the deputy director of public works; and Mayor Kirkland's former son-in-law had been the Chief of Staff.[65]   The Mayor's son-in-law was removed from the Chief of Staff position because the Receiver "couldn't tell what he was actually doing."[66]   But at the Mayor's request, he was then made the economic development officer.  During the year that the Mayor's son-in-law served in that capacity, the Receiver explained:  "I'm not sure what he accomplished.  I know he personally acquired several downtown properties during that time period, but what was done to advance economic developments on behalf of the City, I don't know."[67]   Mr. Kapoor testified that, as economic development officer, the Mayor's son-in-law never attended any operational meetings, never attended the Receiver's weekly meetings with City Council, and "it was sort of an ongoing joke that you never see him around City Hall."[68]

The City's personnel issues not only affected job performance, but also led to conflict with the Receiver and his team.   The Receiver explained that he frequently encounters a problem where he or the COO, Mr. Lightner, gives directions to City employees that the City's elected officials immediately contradict, leaving the employees uncertain of whose instructions to follow.   The Receiver testified that directives to employees get "undermined by elected officials who say that they're responsible for that department," and because they run five separate "fiefdoms," it is "next to impossible to

---

[64]   *Id.* at 37 (quoting N.T., 1/10/2023, at 35).

[65]   *Id.* at 37, 41 (citing N.T., 1/10/2023, at 36, 46-47).

[66]   *Id.* at 41 (quoting N.T., 1/9/2023, at 206-07) (bracketed material altered).

[67]   *Id.* (quoting N.T., 1/10/2023, at 46).

[68]   *Id.* at 41-42 (quoting N.T., 1/9/2023, at 207).

get past or through the elected official to get to the department and implement whatever needs to happen in that area."[69]  Mr. Lightner concurred, testifying that the contrary orders from the City's elected officials leave employees questioning the chain of command. When directed to do something, he explained, they often are "hesitant or not sure, so they have to confirm" with a member of City Council.[70]

The Receiver's relationship with City officials has also deteriorated into outright hostility.  The Receiver testified that Mayor Kirkland has explicitly threatened him on two occasions.  On one occasion, the Receiver testified, a disagreement over how the Mayor was managing a program that was unsupported by the budget led to the Mayor "stand[ing] over the top of me and challeng[ing] me to a fight, and finger in my face and all of the other stuff.  I finally had to . . . stand up and step back to . . . make sure that I wasn't actually attacked."[71]  During this altercation, the Mayor called the Receiver a racial slur.[72] This was not the first time that the Receiver had encountered racially fraught epithets during his service, as Councilwoman Elizabeth Williams repeatedly has referred to him

---

[69]      *Id.* at 36 (quoting N.T., 1/10/2023, at 71-72).

[70]      *Id.* at 36-37 (quoting N.T., 1/10/2023, at 117-18).

[71]      *Id.* at 24 (quoting N.T., 1/10/2023, at 17-18) (emphasis omitted); *see also id.* at 25 (quoting N.T., 1/11/2023, at 73-74) (noting Mr. Kapoor's testimony that, at the meeting in question, the Mayor "got extremely angry.  He started shouting.  He started threatening the Receiver.") (emphasis omitted).

[72]      *Id.* at 24; *see also id.* at 25 (quoting N.T., 1/11/2023, at 73-74) (noting Mr. Kapoor's testimony that, "[t]hen the Mayor called the Receiver the N-word").

as "slave master."[73]   On another occasion, the Mayor pointed at the Receiver and told him to "watch his back," warning that his "days are numbered."[74, 75]

### B.  Commonwealth Court's Decision

The Commonwealth Court found the Receiver's evidence to be credible[76] and rejected Mayor Kirkland's contrary testimony.[77]   In the Commonwealth Court's words, the "testimony presented at the hearing revealed . . . a culture of denial, blame-shifting, arrogance, and nepotism within the City's government," and demonstrated "significant operational issues within the City's departments, as well as City officials' lack of transparency, lack of cooperation, and blatant disrespect of Receiver and his team."[78] The City officials' "adverse behavior obstructs Receiver's ability to work amicably and productively" with them.[79]   The court noted that, although some matters like the gift card incident may seem small in comparison to the scale of the City's financial troubles, they nonetheless illustrated the City officials' failure to cooperate with the Receiver's efforts to investigate and remedy financial problems.   The court also was "extremely troubled" by

---

[73]      *Id.* at 24-25 (citing N.T., 1/10/2023, at 19; N.T., 1/11/2023, at 74).

[74]      *Id.* at 25 (quoting N.T., 1/10/2023, at 18-19) (cleaned up).

[75]      The Commonwealth Court observed that Mayor Kirkland "downplayed" these incidents in his testimony, admitting that he had a "heated" exchange with the Receiver and that he had used an "unfortunate word," but denying that he put his finger in the Receiver's face or told him to "watch [his] back."  *Id.* at 25-26 (quoting N.T., 1/10/2023, at 231, 234).

[76]      *See id.* at 28, 29, 39, 41, 44, 45.

[77]      *See id.* at 27.

[78]      *Id.* at 2.

[79]      *Id.* at 27.

Councilman Morgan's failure to report the phishing incident notwithstanding the court's prior mandamus order.[80]

With regard to the City's elected officials, the Commonwealth Court found:

The credible evidence presented at the hearing demonstrates that the City's elected officials are not empowering Receiver in the eyes of the City's employees.  Rather, the evidence shows that City officials frequently ignore Receiver's advice and directives, and even direct other employees in their departments to ignore his directives.  City officials also have historically overlooked issues such as the unauthorized payroll payments to an incarcerated employee, the former police chief allowing his friends to boost their pensions by working extra overtime before retirement, and the City's seven-year default on its [pension] payments.  These incidents, together with the evidence of widespread nepotism within the City's government, demonstrate a pattern of City officials taking care of their own and intentionally turning their backs on wrongdoing within their departments.  Further exacerbating these problems is the Mayor's assignment of Council members as department heads based on their loyalty to City Council and the Mayor's own inclination in a particular year, rather than on the person's actual qualifications to oversee a particular area.  These practices cannot continue.[81]

With regard to the application of Act 47 to these facts, the Commonwealth Court conducted an analysis of what it viewed as the overarching legal issues, which it used as a template to evaluate the individual initiatives proposed by the Receiver.  The Commonwealth Court correctly noted that it applies a "highly deferential" standard to the Receiver's modifications, and that it "shall confirm" the modifications "unless it finds clear and convincing evidence that the recovery plan as modified is arbitrary, capricious or wholly inadequate to alleviate the fiscal emergency in the distressed municipality."[82]

In the Commonwealth Court's view, the most significant limitation upon the Receiver's authority is found in Section 704(b)(1) of Act 47, which states that the

---

[80]    *Id.*

[81]    *Id.* at 39.

[82]    *Id.* at 13 (quoting *Davin*, slip op. at 3; 53 P.S. § 11701.703(e)) (emphasis omitted).

confirmation of a recovery plan "shall not be construed to . . . change the form of government of the distressed municipality."[83]  The Commonwealth Court interpreted this provision as a mandate against changing the City's form of government.  Noting that precedent addressing the meaning of a "form of government" is "extremely sparse," the Commonwealth Court found what it deemed to be the most salient guidance in this Court's decision in *Harrisburg School District v. Zogby*.[84]  The *Zogby* Court, in a context unrelated to Act 47, considered Article IX, Section 3 of the Pennsylvania Constitution, which allows the selection of an "optional form of government" by referendum.[85]  At issue in *Zogby* was a statute that gave the mayor of Harrisburg additional powers vis-à-vis the operation of the Harrisburg public school district, which, challengers contended, amounted to a change in the city's "form of government" without a referendum.  This Court defined "form" as the "organization, placement, or relationship of basic elements," and the "structure, organization, or essential character of something, as opposed to its matter."[86]  The *Zogby* Court held that Article IX, Section 3 "does not *per se* preclude a legislative grant of particularized powers and duties to the mayor of a city that has opted for a mayor-council form of government, but refers instead to a wholesale change of municipal government," and that, "[s]o long as the addition of such duties is not inconsistent with the basic existence, structure, and powers of the office of mayor or the other branches of city government, it does not alter its form."[87]

---

[83]    *Id.* (quoting 53 P.S. § 11701.704(b)(1)) (emphasis omitted).

[84]    *Id.* at 14 (citing *Harrisburg Sch. Dist. v. Zogby*, 828 A.2d 1079 (Pa. 2003)).

[85]    PA. CONST. art. IX, § 3.

[86]    *Weaver*, slip op. at 14 (quoting *Zogby*, 828 A.2d at 1092).

[87]    *Id.* at 14-15 (quoting *Zogby*, 828 A.2d at 1092) (emphasis omitted).

The Commonwealth Court distilled from *Zogby* a principle that "a mere change in duties does not alter the form of government," but that "any initiatives that give Receiver *exclusive* authority over internal administrative matters, while concomitantly stripping the Mayor and City Council of duties *expressly granted* to them by the City's governing documents," amount to an impermissible change in the City's "form of government."[88]  As additional support for its view, the Commonwealth Court cited Section 102(b)(1)(ii) and Section 605 of Act 47, both of which refer to the preservation of local officials' duties.[89] Thus, the Commonwealth Court determined that it would strike any initiative that purported to grant the Receiver "sole" or "exclusive" authority over the City's operations, as such would, in the Commonwealth Court's view, constitute a change to the City's "form of government," ostensibly in violation of Section 704(b)(1) of Act 47.

Notwithstanding this assumed limitation, the Commonwealth Court concluded that the Receiver was authorized to suspend the City Council members' duties as administrative department heads—an act that the Commonwealth Court referred to as their "removal" from their respective positions.[90]  The court noted that the City's Home Rule Charter states that the City Council or the Mayor "may" designate administrative department heads and, thus, "the Mayor's authority to assign department head responsibilities to City Council members is permissive, not mandatory."[91]  The Commonwealth Court found "nothing in the City's Charter or Administrative Code that

---

[88]    *Id.* at 16 (emphasis in original).

[89]    *Id.* (citing 53 P.S. § 11701.102(b)(1)(ii) (stating the General Assembly's intent to leave "principal responsibility for conducting the governmental affairs of a [distressed] municipality . . . to the charge of its elected officials")) (emphasis omitted); 53 P.S. § 11701.605 ("During a fiscal emergency, the . . . appointed and elected officials of the distressed municipality shall continue to carry out the duties of their respective offices.").

[90]    *Id.* at 16-17.

[91]    *Id.* at 17.

would preclude Receiver from removing Council members from their positions as department heads or from appointing non-Council members as department heads," provided that the court finds that such action is not arbitrary, capricious, or wholly inadequate to alleviate the City's fiscal emergency.[92]  The Commonwealth Court rejected the City's argument that the "removal" of department heads violated the Pennsylvania Constitution because it did not adhere to the requisite impeachment procedures,[93] noting that the Receiver "only seeks to remove certain Council members from their non-mandatory *administrative roles* as department heads; they would still remain in their elected positions as legislators on City Council for the remainder of their terms."[94] Because the Receiver's modification did not purport to remove the City Council members from their "public offices," the Commonwealth Court reasoned, it "does not trigger an impeachment process under the Pennsylvania Constitution."[95]

With these principles as its guide, the Commonwealth Court evaluated the Receiver's proposed initiatives.[96]  Although it did not discuss each of the many proposed initiatives in detail, the court's broader analysis served as its framework for weeding out the initiatives that it deemed impermissible.  The court, for instance, struck the "Chief of Staff Reporting" initiative because it would give the Receiver "*sole* authority" over the City's Chief of Staff, which in the Commonwealth Court's view constituted a change to the

---

[92]    *Id.* (emphasis added).

[93]    *See* PA. CONST. art. VI, §§ 6-7.

[94]    *Weaver*, slip op. at 17 (emphasis in original).

[95]    *Id.* (emphasis omitted).

[96]    In another section of its analysis, the Commonwealth Court concluded that Act 47 does not provide the Receiver with authority to "unilaterally" enter into contracts on the City's behalf.  *Id.* at 17-19.  This portion of the court's reasoning is not germane to the issues presently before this Court.

City's "form of government."[97]    For the same reason, the court struck the initiatives entitled:  Receiver Ability to Hire Contractors on Behalf of City or Authority; Budget and Budget Amendment Passage; Expenditure of ARPA Funds and Any Other Current or Future Federal and State Funds; and Receiver Power to Enter into Contracts and Agreements on Behalf of the City and to Direct that Expenditures Be Made or Eliminated.[98]  These initiatives, likewise, would give the Receiver "*sole* authority to act on the City's behalf," which the Commonwealth Court deemed to be an impermissible change to the City's "form of government."[99]    The Commonwealth Court authorized the Receiver to revise these proposals to "give Receiver the authority to act in these areas, without completely removing such authority from the City's elected officials."[100]    The Commonwealth Court confirmed the remaining initiatives without change.[101]

---

[97]    *Id.* at 29 (emphasis in original).

[98]    *Id.* at 40.

[99]    *Id.* (emphasis in original).

[100]    *Id.*  The Commonwealth Court struck three other initiatives, pending revision: Human Resources Policy Development, Implementation and Enforcement; Development, Implementation and Enforcement of Procurement Policies; and Development, Implementation and Enforcement of Ethics Policy.  *Id.*  The court directed the Receiver to revise these three initiatives "*only* to remove the language regarding the filing of a plan modification with the [c]ourt and asking the [c]ourt to render a decision within 21 days." *Id.* (emphasis in original).  "The remaining language in these three initiatives," the Commonwealth Court concluded, "is acceptable pursuant to Act 47."  *Id.*

[101]    The confirmed initiatives were those entitled:  Chief Operating Officer (COO); Administrative Duties of Elected Officials; Compliance with Chief of Staff Directives; Interference with Chief of Staff and Receiver Directives; Duty to Provide Information; Ability to Audit; Council and Board Agendas; Receivership Controls to Manage Staffing Levels and Personnel; Residency Requirement; Compliance with Human Resources Policies and Procedures; Employee Investigations; Internal Controls; Timely Expenditure Reports Prior to City Council Passage; Auditor Selection; Prompt Execution of Contracts; Selection Committee for Request for Proposals; Timely Written Legal Advice to City Departments; Disclosure of Non-Compliance with Court Orders or Amended Recovery Plan; Receiver Ability to Conduct Investigations; City and Authority Compliance with (continued…)

Although the Commonwealth Court struck several of the Receiver's proposed initiatives, it concluded its analysis by reiterating that "the credible evidence of record demonstrates that aside from the severe financial distress plaguing the City, the City also suffers from a municipal government that is internally dysfunctional."[102]    The City's "current administrative organization and allocation of duties is the single greatest operational obstacle to the City's ability to provide vital and necessary services" to its residents.[103]    Thus, the Commonwealth Court found, "not only is there no clear and convincing evidence that the Plan Modification is arbitrary, capricious, or wholly inadequate to alleviate the City's financial emergency, but the credible evidence establishes that Receiver's proposed initiatives are necessary . . . to save the City from the brink of financial doom."[104]

### III. City's Request for Review and Assumption of Jurisdiction

Following the Commonwealth Court's decision, the City sought this Court's review of several of the confirmed initiatives.    Although the City presents numerous legal arguments concerning their validity, our review is limited to the five initiatives in the Plan Modification that the City challenges.    The first is an initiative entitled "Residency requirement," which provides:

> The City has struggled to find qualified individuals to fill key roles within City government.    Section 11.9-903(c) of the City's [Home Rule] Charter provides that, "Where special skills are required, Council may at its discretion, employ qualified non-residents of the City in such cases where

---

Update to Municipal Comprehensive Plan Without Delay; and Approval of Economic Development Incentives.  *Id.* at 19-20, 29-30, 40-41, 44.

[102]    *Id.* at 44.

[103]    *Id.* (quoting Plan Modification at 25).

[104]    *Id.* at 45.

there are no qualified City residents available for the particular position involved." *This initiative substitutes "the Receiver" for "Council."*[105]

The second and third challenged initiatives concern the administrative duties of the City Council members in their roles as department heads. These initiatives, entitled "Administrative Duties of Elected Officials" and "Interference with Chief of Staff and Receiver Directives," provide, respectively: "The administrative duties of City elected officials with respect to day-to-day operations shall be suspended. . . . City elected officials may not direct a City employee relating to any matter in the line of the employee's employment"; and "City elected officials shall not interfere with the directives of the Chief of Staff or the Receiver."[106]

The fourth challenged initiative, entitled "Council and Board Agendas," grants the Receiver some authority over the City Council's legislative activities. With respect to this initiative, the Receiver detailed instances in which he was not informed about items on the City Council's agenda, which prevented the Receiver and his team from studying them to determine their impact upon the City's finances. Accordingly, this initiative provides that "the Receiver shall have the authority to direct the City or Authority to remove items from their Council or Board agenda."[107]

Finally, the fifth challenged initiative, entitled "Disclosure of Non-Compliance with Court Orders or Amended Recovery Plan," imposes an obligation upon the City Solicitor: "should the City Solicitor become aware of a situation where a City official or employee is not complying with an order of [the Commonwealth] Court or with a confirmed recovery

---

[105]    Plan Modification at 42 (emphasis added).

[106]    *Id.* at 30-31.

[107]    *Id.* at 33.

plan or plan modification, he shall immediately instruct the City official or employ[ee] to comply and he shall immediately inform the Receiver."[108]

On March 29, 2023, this Court exercised King's Bench jurisdiction over the City's appeal and directed briefing on the following nine questions, as stated by the City:

1. Whether the City's home rule charter may be amended without a voter referendum required by Article IX, Section 2 of the Pennsylvania Constitution?

2. Whether the modification to the Act 47 recovery plan may change the form of local government?

3. Whether the administrative duties of the appointed officials may be suspended by a modification to an Act 47 recovery plan?

4. Whether an Act 47 receiver may be given the right to remove items from the legislative agenda of city council?

5. Whether a city solicitor may be required to disclose privileged information to an Act 47 receiver?

6. Whether the confirmed modifications to the Act 47 recovery plan are necessary to achieve financial stability of the distressed municipality?

7. Whether the separation of powers doctrine permits the Commonwealth Court to empower a receiver to exercise control over a local government?

8. Whether the facts of this case warrant the suspension of the administrative duties of the officials?

9. Whether the Commonwealth Court should have employed a more narrow remedy than suspension of the duties of the officials?[109]

---

[108]    *Id.* at 49.

[109]    *Rick Siger, in his Capacity as Acting Sec'y of the Dep't of Cmty. and Econ. Dev. v. City of Chester*, 12 & 15 MAP 2023 (Pa. March 29, 2023) (*per curiam*) (punctuation modified).

## IV. Discussion

Due to the number of issues presented, for clarity and ease of discussion, we consider the parties' arguments alongside our analysis of each question presented. Because we share much of the Receiver's view of the governing law, we focus primarily upon the City's position and the reasons that the City fails to establish that the Commonwealth Court erred in confirming the challenged initiatives.[110]

### A.

At the outset, however, we highlight a principle of Pennsylvania constitutional law that underlies the parties' arguments. The City frames much of its legal position as

---

[110]    The Receiver's position is supported by two *amici curiae*, the Pennsylvania Lodge of the Fraternal Order of Police ("PAFOP"), and the County of Delaware, Pennsylvania, within which the City is situated. The PAFOP is interested in this matter due to its members' participation in the City's underfunded pension plan and the City's "complete and utter failure" to maintain the solvency of defined benefit pensions for law enforcement officers employed by the City. PAFOP's *Amicus Curiae* Br. at 2. The PAFOP argues that there is "no doubt that the administrative duties of the officials of the City of Chester must be suspended," because they "have willfully and intentionally neglected their obligations" to ensure that the City's pension plan remains solvent and operational. *Id.* at 9. Highlighting the evidence of obstructiveness and intransigence that the Commonwealth Court credited, the PAFOP insists that there is no "narrower" remedy warranted because "[a]llowing these City officials any leeway will more than likely result in continued refusal to abide by [their] legal obligations" vis-à-vis the pension plan. *Id.* at 10.

*Amicus* Delaware County is concerned about the effect that further financial deterioration in the City may have upon other citizens in the county. Delaware Cnty's *Amicus Curiae* Br. at 1. The County argues that the Commonwealth Court's factual findings are amply supported by the record and that its legal conclusions are consistent with Act 47. *Id.* at 4. The confirmed initiatives, in the County's view, are "fundamental to reaching a solution for the City." *Id.*

A third *amicus curiae* brief was filed by the Chester Water Authority ("Authority"). The Authority does not support either party to this appeal, but is interested in the matter due to its involvement in other litigation concerning the proposed sale of the Authority's assets. The Authority asks that we avoid reaching any issue which might impact that separate litigation. Authority's *Amicus Curiae* Br. at 1-2. The Authority's concern is well-taken, and we assure the Authority that no portion of this Opinion is intended to offer comment upon any issue involving the Authority or its assets.

implicating a purported tension between the statutory powers of the Receiver and the City's Home Rule Charter, inasmuch as that document provides for the City's "form of government" and establishes the authority of the local officials.  The Receiver, by contrast, emphasizes the constitutional and statutory limitations upon home-rule authority.

Before the Pennsylvania Constitution of 1968, municipalities had "no inherent powers" and were authorized to "do only those things which the Legislature has expressly or by necessary implication placed within their power to do."[111]  The Constitution of 1968 inverted this principle, granting municipalities the right to adopt home rule charters, under which they may exercise powers beyond those explicitly granted to them by statute. Article IX, Section 2 of the Pennsylvania Constitution provides:

> Municipalities shall have the right and power to frame and adopt home rule charters.  Adoption, amendment or repeal of a home rule charter shall be by referendum.  The General Assembly shall provide the procedure by which a home rule charter may be framed and its adoption, amendment or repeal presented to the electors. . . .  *A municipality which has a home rule charter may exercise any power or perform any function not denied by this Constitution, by its home rule charter or by the General Assembly at any time.*[112]

As we previously have explained, under Article IX, Section 2, a municipality that adopts a home rule charter is authorized to exercise "any power that the General Assembly did not forbid,"[113] and it does not require an "express statutory warrant for each new ordinance"[114] that it passes.  However, a home-rule municipality's authority extends only to powers that are "not denied" by the General Assembly, *i.e.*, by statute.

---

[111]    *Pa. Rest. & Lodging Ass'n v. City of Pittsburgh*, 211 A.3d 810, 816 (Pa. 2019) (quoting *Denbow v. Borough of Leetsdale*, 729 A.2d 1113, 1118 (Pa. 1999)).

[112]    Pa. Const. art. IX, § 2 (emphasis added).

[113]    *Pa Rest. & Lodging Ass'n*, 211 A.3d at 816.

[114]    *City of Philadelphia v. Schweiker*, 858 A.2d 75, 84 (Pa. 2004).

In 1996, the General Assembly reinforced the limitations upon home-rule authority through the enactment of the Home Rule Charter and Optional Plans Law (the "HRC").[115] Echoing the constitutional language, Section 2961 of the HRC provides that a "municipality which has adopted a home rule charter may exercise any powers and perform any function not denied by . . . statute."[116]  Section 2962 further states that a "municipality shall not . . . [e]xercise powers contrary to or in limitation or enlargement of powers granted by statutes which are applicable in every part of this Commonwealth,"[117] and makes clear that statutes of general application "shall supersede any municipal ordinance or resolution on the same subject."[118]

Act 47 is a statute of general application, passed by the General Assembly and signed into law by the Governor.  Accordingly, Act 47 supersedes the City's Home Rule Charter.  In the language of our Constitution, Act 47 "denies" the City the power to act contrary to its mandates.  The City's home-rule authority does not allow it to "exercise powers contrary to or in limitation" of Act 47.[119]  Wherever there is tension between the City's Home Rule Charter and Act 47—and, by extension, between the Home Rule Charter and the recovery plan mandated by Act 47—it is axiomatic that the Home Rule Charter gives way.  Act 47 makes its precedence over any home rule charter abundantly clear in Section 704(a), which states that confirmation of a receiver's recovery plan has the effect of "imposing on the elected and appointed officials of the distressed municipality . . . a *mandatory duty* to undertake the acts set forth in the recovery plan,"

---

[115]    53 Pa.C.S. §§ 2901-3171.

[116]    *Id*. § 2961.

[117]    *Id*. § 2962(c)(2).

[118]    *Id*. § 2962(e).

[119]    *Id*. § 2962(c)(2).

and "*suspending the authority of the elected and appointed officials of the distressed municipality* . . . to exercise power on behalf of the distressed municipality . . . *pursuant to* law, *charter*, ordinance, rule or regulation to the extent that the power would interfere with the powers granted to the receiver or the goals of the recovery plan."[120]

The City additionally emphasizes that Section 2961 of the HRC states that grants of power to municipalities governed by a home rule charter "shall be liberally construed in favor of the municipality," and that we resolve ambiguities in the scope of municipal authority in the municipality's favor.[121]   Although the City is correct in this regard, this interpretive principle is counterbalanced by a competing one.  Act 47 is a remedial statute, and it must be construed liberally to effectuate its purpose of alleviating the challenges posed by financially distressed municipalities.[122]

> **B.**

With these principles in mind, we turn to the City's specific arguments regarding the challenged initiatives, reordered for ease of discussion.

> **(i)    Necessity of Modifications**

We begin with the City's challenge to the "necessity" of the Receiver's modifications, as the matter implicates the Commonwealth Court's standard of review and bears upon several of the City's arguments.   The City argues that the challenged initiatives are not "necessary to achieve financial stability," which is the only permitted

---

[120]    53 P.S. § 11701.704(a)(1)-(2) (emphasis added).

[121]    City's Br. at 26 (citing 53 Pa.C.S. § 2961; *Pa. Rest. & Lodging Ass'n*, 211 A.3d at 817).

[122]    *See* 53 P.S. § 11701.102 (stating the General Assembly's purpose and intent); *Peters v. Workers' Comp. Appeal Bd.*, 263 A.3d 275, 286 (Pa. 2021) (remedial legislation is liberally construed to effectuate its remedial purpose); *Quigley v. Unemployment Comp. Bd. of Rev.*, 263 A.3d 574, 589 (Pa. 2021) (same).

reason for a modification to a recovery plan under Section 706(a)(2) of Act 47.[123]  The
City offers various charged characterizations of the confirmed initiatives (*e.g.*, making the
chief of staff the "*de facto* chief executive" and giving the Receiver a "*de facto* veto" over
City Council), and it asserts that these measures exceeded what was "necessary to
achieve financial stability."[124]  In this regard, the City asserts that its financial problems
are unrelated to the City's governance, that the City officials "are not the problems," and,
therefore, that the initiatives that altered their duties or suspended their authority exceed
what was necessary, thus violating Act 47.[125]

  The City misconstrues the order of operations specified by Act 47.  Section
706(a)(2) grants the *Receiver* the power to "modify the recovery plan as necessary to
achieve financial stability of the distressed municipality . . . in accordance with section
703."[126]  Section 703, in turn, sets forth the Commonwealth Court's standard of review
when considering the Receiver's proposed modifications.  The court "may conduct a
hearing on the modification," following which the "court shall confirm the
modification . . . *unless it finds clear and convincing evidence that the recovery plan as
modified is arbitrary, capricious or wholly inadequate to alleviate the fiscal emergency in
the distressed municipality*."[127]

  Act 47 does not direct the court to conduct an independent analysis of whether, in
its view, the modifications are "necessary."  The determination of the necessity of the
modifications is committed to the Receiver's judgment.  The court may take evidence on

---

[123] City's Br. at 36 (quoting 53 P.S. § 11701.706(a)(2)).

[124] *Id.* at 37.

[125] *Id.* at 39.

[126] 53 P.S. § 11701.706(a)(2).

[127] *Id.* § 11701.703(e) (emphasis added).

the modifications at a hearing, but its role is limited to confirming the modifications, which it *must* do unless it finds, by clear and convincing evidence, that the modifications are "arbitrary, capricious or wholly inadequate to alleviate the fiscal emergency" under Section 703(e). Neither this Court nor the Commonwealth Court are experts in municipal finance, and Act 47 does not ask us to be. The question for a reviewing court is not whether the Receiver is, in fact, correct in determining that a particular modification is "necessary to achieve financial stability." Rather, Act 47 directs the court to apply a specific, and highly deferential, standard of review to the Receiver's determination.

Although the City asserts that the challenged initiatives are excessive and insists that the City officials are not the cause of the City's financial ailments, it makes no effort to establish that the Commonwealth Court erred in applying the statutorily mandated standard of review. Indeed, nowhere in its Brief does the City even reference Section 703(e) or its "arbitrary, capricious or wholly inadequate" standard. As such, we have no difficulty in rejecting the City's challenge to the "necessity" of the confirmed modifications.[128]

---

[128] Notwithstanding the City's failure to address the "arbitrary, capricious or wholly inadequate" standard under Section 703(e), the Dissent would conclude that every one of the challenged modifications was "arbitrary," and, thus, should have been rejected below. Dissenting Opinion and Opinion in Support of Vacation and Remand (Dougherty, J.) (the "Dissent") at 17. The Dissent opines that the Commonwealth Court's statutorily prescribed standard of review is "not a rubber stamp," and that a modification should be deemed to be arbitrary if it is "not cabined by law." Dissent at 6 (citations omitted). It is telling, however, that the Dissent makes no effort to engage with the *facts* found by the Commonwealth Court. *See Arbitrary*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("1. Depending on individual discretion; of, relating to, or involving a *determination made without consideration of or regard for facts*, circumstances, fixed rules, or procedures. 2. (Of a judicial decision) founded on prejudice or preference *rather than on reason or fact*.") (emphasis added); Dissent at 2.

This was no "rubber stamp." The Commonwealth Court provided an extensive account of the factual circumstances that led to the present proceedings, which we have summarized at some length above, precisely to illustrate the severity of the City's financial condition, the extent of the mismanagement on the part of the City's officials, and the (continued…)

### (ii)    "Form of Government"

The City argues that the confirmed modifications impermissibly alter the City's "form of government" in violation of Section 704(b) of Act 47.  Echoing the Commonwealth Court's reasoning and its invocation of *Zogby*, the City contends that an initiative changes the City's "form of government" if it is inconsistent with the "basic existence, structure, and powers of the office of mayor or the other branches of city government."[129]  The City asserts that the confirmed initiatives impermissibly change the City's form of government by:  "prohibiting the officials from directing the activities of the chief of staff"; "suspending the administrative duties of City [C]ouncil members"; "prohibiting the elected officials from

---

degree to which the challenged initiatives were, in the Commonwealth Court's words, "necessary" in order to "save the City from the brink of financial doom."  *Weaver*, slip op. at 45.  The Commonwealth Court took evidence over the course of a three-day hearing, found that the credible evidence offered by the Receiver justified many of the significant interventions proposed, and, indeed, rejected many of the initiatives that it concluded were impermissible.  The Commonwealth Court did not "rubber stamp" the Receiver's requests; it carefully considered the evidence and concluded that the approved modifications were not "arbitrary, capricious or wholly inadequate to alleviate the fiscal emergency" in the City.  53 P.S. § 11701.703(e).

Although the Dissent would have us second-guess both the Receiver and the Commonwealth Court based upon its assessment of the "necessity" of the modifications, Dissent at 5-6, the applicable provisions of Act 47 are quite clear.  Under Section 706(a)(2), the *Receiver* is expressly authorized to "modify the recovery plan as necessary to achieve financial stability" in the municipality "in accordance with section 703."  53 P.S. § 11701.706(a)(2).  Under Section 703(e), the Commonwealth Court "*shall* confirm the modification . . . *unless* it finds clear and convincing evidence that the recovery plan as modified is arbitrary, capricious or wholly inadequate to alleviate the fiscal emergency" in the municipality.  *Id.* § 11701.703(e) (emphasis added).  Nowhere in Act 47 is there an instruction for us to substitute our judgment for the Receiver's as to the "necessity" of a modification.  And nowhere in its analysis does the Dissent identify any "clear and convincing evidence" upon which the Commonwealth Court, or we, could conclude that the challenged modifications were "arbitrary" under the *facts* of this case.  To the extent that the Dissent concludes that the modifications were "arbitrary" because they failed to comply with the law, our analysis herein demonstrates that the challenged initiatives were consistent with the language of Act 47.

[129]    City's Br. at 24 (quoting *Zogby*, 828 A.2d at 1092).

interfering with directives of the chief of staff or the Receiver"; "giving the Receiver the right to remove items from the legislative agenda"; and "amending the Home Rule Charter."[130]  These modifications, in the City's view, "reverse the hierarchy" of the City's government by "making the Mayor subservient to the chief of staff and the Receiver by prohibiting the Mayor from interfering with the directives of the Receiver and chief of staff."[131]

Although the City acknowledges that Article IX, Section 2 of the Pennsylvania Constitution only permits home rule municipalities to exercise powers that are "not denied" by the General Assembly,[132] and that statutes therefore take precedence over the City's Home Rule Charter, the City contends that Act 47 "does not require or contemplate" the challenged initiatives.[133]  As support, the City points to the two provisions of Act 47 that refer to the maintenance of municipal officers' authority—Section 102(b)(1)(ii) and Section 605.[134]

To ask whether a recovery plan may alter the City's form of government is to ask the wrong question.  Although the Commonwealth Court concluded that Section 704(b)(1) of Act 47 precludes initiatives that would change the City's form of government, this assumed limitation is inconsistent with the plain language of the statute.  Section

---

[130]    *Id.* at 27-28.

[131]    *Id.* at 28.

[132]    Pa. Const. art. IX, § 2.

[133]    City's Br. at 29.

[134]    *Id.* at 29-30 (citing 53 P.S. § 11701.102(b)(1)(ii) (stating the General Assembly's intent to leave "principal responsibility for conducting the governmental affairs of a [distressed] municipality . . . to the charge of its elected officials"); 53 P.S. § 11701.605 ("During a fiscal emergency, the . . . appointed and elected officials of the distressed municipality shall continue to carry out the duties of their respective offices."). We discuss the import of these provisions in the next section of this Opinion.

704(b)(1) states that confirmation of the recovery plan or any modification thereto "*shall not be construed to* . . . change the form of government of the distressed municipality."[135] This is an unambiguous instruction to those who might "construe" a recovery plan—reviewing courts, for instance—that they should *not* view a recovery plan as effecting a change to a distressed municipality's "form of government."  Where the Commonwealth Court and the City interpret Section 704(b)(1) as a limitation upon recovery plans, the statute states the exact opposite.  The measures taken during an Act 47 receivership are temporary in nature, and the legislature specified that changes to governmental operations that may be needed in the interest of financial recovery do not permanently alter the municipal government—and are not to be "construed" as a change to the municipality's form of government.

Accordingly, the specific ways in which the City suggests that the confirmed initiatives change its "form of government" are, in effect, irrelevant.  Our decision in *Zogby* is similarly inapposite.  To the extent that any initiative would, under the *Zogby* rubric, be deemed to change the City's form of government, this conclusion has no significance in the context of Act 47.  Indeed, the very inquiry is misplaced; Act 47 unambiguously commands us not to construe such modifications as changes to the City's form of government.

In any event, the majority of the measures that the City characterizes as impermissible alterations to its form of government are the subject of discrete challenges in this appeal, and are discussed separately in this Opinion.  The City's remaining grievance is that the Plan Modification improperly "prohibit[s] the elected officials from interfering with directives of the chief of staff or the Receiver," and that it makes the Mayor "subservient" to the Receiver by "prohibiting the Mayor from interfering with the directives

---

[135]    53 P.S. § 11701.704(b)(1) (emphasis added).

of the Receiver and chief of staff."[136]   But contrary to the City's suggestion, neither the Mayor nor any other City official is entitled to "interfere" with the Receiver's directives. Act 47 makes unmistakably clear that confirmation of a recovery plan "impos[es] on the elected and appointed officials of the distressed municipality . . . a *mandatory duty* to undertake the acts set forth in the recovery plan."[137]   The law also expressly empowers the Receiver to "issue an order to an elected or appointed official of the distressed municipality" to "implement any provision of the recovery plan," and to "*refrain from taking any action that would interfere* with the powers granted to receiver or the goals of the recovery plan."[138]   In light of these unambiguous provisions, the suggestion that City officials have a prerogative to "interfere" with the Receiver's directives is frivolous.

### (iii)    Suspension of Administrative Duties

The City challenges the Commonwealth Court's conclusion that the Receiver is empowered to suspend the administrative duties of the City Council members in their various roles as department heads.  The City acknowledges that Section 704(a)(2) of Act 47 provides that the confirmation of a recovery plan or modification has the effect of "suspending the authority of the elected and appointed officials" under any "law, charter, ordinance, rule or regulation" to the extent that it conflicts with the Receiver's powers or the goals of the recovery plan.[139]   Yet, the City contends that this provision must be construed narrowly in order to avoid conflict with Article VI, Section 7 of the Pennsylvania Constitution, which provides that, with the exception of officers who may be removed "on conviction of misbehavior in office or of any infamous crime," appointed civil officers "may

---

136     City's Br. at 27-28.

137     53 P.S. § 11701.704(a)(1) (emphasis added).

138     *Id.* § 11701.708(a)(1)-(2) (emphasis added).

139     City's Br. at 31-32 (citing 53 P.S. § 11701.704(a)(2)).

be removed at the pleasure of the power by which they shall have been appointed."[140] Because the City Council members who serve as department heads have not been convicted of any crime or misbehavior in office, and because the Mayor has not elected to remove them from their positions, the City suggests that it is unconstitutional for the Receiver to "remove" them from their positions.

As support within Act 47 itself, the City again points to Section 102(b)(1)(ii) and Section 605, both of which refer to the preservation of local officials' authority to perform their governmental duties.  Although the City acknowledges that Section 704(a)(2) of Act 47 allows the "suspension" of the City officials' authority "to the extent that the power would interfere with the powers granted to the receiver or the goals of the recovery plan,"[141] the City contends that this provision does not grant the Receiver a "broad right to suspend duties," and that such "suspension only occurs, if at all, if the duties conflict with a previously confirmed plan or the receiver's power."[142]

We reiterate that this issue concerns the duties of City Councilpersons, who have a legislative role as officials *elected* to serve on City Council, but who also, by virtue of the Mayor's appointment, have administrative duties as the heads of the City's various departments.  The challenged initiatives seek only to suspend these officials' duties in their administrative capacities, not in their legislative role as City Councilpersons.  For this reason, the Commonwealth Court was correct in concluding that the suspension of these

---

[140]    *Id.* at 30 (quoting PA. CONST. art. VI, § 7).

[141]    53 P.S. § 11701.704(a)(2).

[142]    City's Br. at 32.

officials' *administrative* duties did not unlawfully remove them from their elected offices without the impeachment process mandated by the Pennsylvania Constitution.[143]

However, the Commonwealth Court's conclusion is not entirely responsive to the City's constitutional argument, because the City also argues that the challenged initiative "removes" the City officials from their *appointed* offices, and Article VI, Section 7 states that such officers "may be removed at the pleasure of the power by which they shall have been appointed."[144]    Here, the City suggests, the City Councilpersons serve as administrative department heads at the pleasure of the Mayor, not the Receiver.  The City accurately characterizes the manner by which the City Council members obtained their roles as department heads, but it has not established that the challenged initiative violates Article VI, Section 7.

Although the City and the Commonwealth Court referred to this initiative as "removing" the City Councilpersons as department heads, on its face the Plan Modification does not remove these officials from their offices.  Rather, the challenged initiative states, in relevant part, that the "*administrative duties* of City elected officials with respect to day-to-day operations shall be *suspended*."[145]  And, as discussed below, such a "suspension" is authorized by Section 704(a)(2) of Act 47.  As with all measures taken during the receivership, this initiative is temporary in nature, and it makes no permanent alterations to the City's government or its assignment of personnel.  Upon expiration of the receivership—and hopefully with the City's fiscal emergency alleviated—there is

---

[143]    *See Weaver*, slip op. at 17 ("The removal of elected officials' administrative duties does not trigger an impeachment process under the Pennsylvania Constitution, which applies to the removal of government officials from their *public offices*.") (citing PA. CONST. art. VI, §§ 6-7) (emphasis in original).

[144]    PA. CONST. art. VI, § 7.

[145]    Plan Modification at 30 (emphasis added).

nothing in the Plan Modification that would prevent the City Council members from reassuming their administrative duties as department heads.  Moreover, nothing in the Plan Modification would require them to be reappointed to their positions.  Accordingly, the challenged initiative simply does not constitute a "removal" of the City Council members from their appointed offices, and thus does not violate Article VI, Section 7 of the Pennsylvania Constitution.

The City's statutory arguments are similarly unavailing.  In connection with both this initiative and others, the City primarily emphasizes the two sections of Act 47 that refer to local officials' continuing performance of their duties—Section 102(b)(1)(ii) and Section 605.  The City is correct that Section 102(b)(1)(ii) states that it is the General Assembly's intent to "[e]nact procedures and provide powers and guidelines to ensure fiscal integrity of municipalities while leaving principal responsibility for conducting the governmental affairs of a municipality . . . to the charge of its elected officials, consistent with the public policy set forth in this section."[146]  However, this is far from the only express statement of the General Assembly's intent.  Section 102 also states the General Assembly's intent to "[p]rovide for the exercise of the Commonwealth's sovereign and plenary police power in emergency fiscal conditions to protect the health, safety and welfare of a municipality's citizens *when local officials are unwilling* or unable to accept a solvency plan developed for the benefit of the municipality."[147]  This provision plainly indicates that the General Assembly contemplated situations in which the authority that it provided through Act 47 would need to be exercised against the will of uncooperative local officials.

---

[146]    53 P.S. § 11701.102(b)(1)(ii).

[147]    *Id*. § 11701.102(b)(1)(iv) (emphasis added).

Moreover, the General Assembly additionally found that a "sustained failure" of a municipality to adequately address its financial issues constitutes a fiscal emergency and signifies "a breakdown in the function of municipal government" and "a dereliction of its elected officials' paramount public duty to safeguard the health, safety and welfare of its citizens."[148]   The General Assembly specifically intended to authorize the Governor to respond to such a "dereliction of official duty."[149]

Through its continued invocation of Section 102(b)(1)(ii), the City treats Act 47 as though the General Assembly's paramount concern was the maintenance of local officials' authority, even in circumstances where they are "unwilling or unable to accept a solvency plan," requiring the exercise of the "Commonwealth's sovereign and plenary police power" to go over their heads, or where their performance is so deficient as to constitute a "dereliction of official duty."  It is absurd to suggest that the General Assembly intended for a receiver to be powerless in the face of such obstinance and neglect.

Section 102 contains numerous statements of the General Assembly's intent.[150] Through convenient cherry-picking, one might just as easily say that the legislative intent behind Act 47 was merely to provide "training and technical and financial assistance" to distressed municipalities.[151]   But this statement, like the City's emphasis upon Section 102(b)(1)(ii) to the exclusion of all else, would be significantly underinclusive of the legislature's express statements of its intent.  Indeed, among the matters listed in Section 102 is the General Assembly's intent to "[p]rovide for the exercise of the Commonwealth's

---

[148]   *Id.* § 11701.102(b)(4)(ii)(A)-(B).

[149]   *Id.* § 11701.102(b)(5).

[150]   *See supra* n.9 and accompanying text.

[151]   53 P.S. § 11701.102(b)(1)(i).

sovereign and plenary power to establish and abolish local government units."[152] Undoubtedly, the act of abolishing local government units is inconsistent with the City's insistence upon a supposedly ironclad devotion to maintaining the authority of such units' local officials.

As the Receiver observes, Act 47 contains multiple chapters that provide for different degrees of intervention depending upon the severity of the subject municipality's financial condition and the success or failure of previous measures.  The legislative intent provisions of Section 102 correlate to these different actions that may be taken under Act 47—from early intervention, to the appointment of a coordinator, to the development of an emergency action plan by the Governor and the Department, to the appointment of a receiver, and ultimately to the abolition of local government units.[153]  We agree with the Receiver that the provision of Section 102 that most closely aligns with receivership under Chapter 7 is the statement of the General Assembly's intent to "[p]rovide for the exercise of the Commonwealth's sovereign and plenary police power in emergency fiscal conditions to protect the health, safety and welfare of a municipality's citizens when local officials are unwilling or unable to accept a solvency plan developed for the benefit of the municipality."[154]  This provision demonstrates the legislature's intent to prioritize the financial recovery of such municipalities over the prerogatives of local officials.[155]

---

[152]    *Id.* § 11701.102(b)(1)(v).

[153]    *See* Receiver's Br. at 21.

[154]    53 P.S. § 11701.102(b)(1)(iv).

[155]    The Dissent contends that the various statements of the General Assembly's intent in Section 102 "are not mutually exclusive," that they all must be given effect, and, thus, that the powers of a receiver must be viewed through the lens of the local control referenced in Section 102(b)(1)(ii).  Dissent at 10.  The language in question, the Dissent opines, "calls for the preservation, not abrogation, of self-governance."  *Id.*  To the contrary, certain provisions of Section 102(b) are plainly incompatible with each other and, thus, mutually exclusive.  One might ask how, if the authority of local officials is (continued…)

The City's reliance upon Section 605 also offers it little aid.  Section 605—entitled "Elected and appointed officials"—appears in Chapter 6 of Act 47, which concerns declarations of fiscal emergencies in distressed municipalities.  Section 605 provides that, during such a fiscal emergency, "the authorities and appointed and elected officials of the distressed municipality shall continue to carry out the duties of their respective offices, except that no decision or action shall conflict with an emergency action plan, order or exercise of power by the Governor under section 604."[156]    However, receivership operates under *Chapter 7* of Act 47, which contains provisions that are more directly relevant to the challenged initiative.  Although a declaration of a fiscal emergency is a prerequisite to the appointment of a receiver,[157] receivership operates under the more specific provisions of Chapter 7.  It is noteworthy, for instance, that Section 605 prohibits local officials from taking action that conflicts with an "emergency action plan" under Chapter 6, but confirmation of a receiver's recovery plan under Chapter 7 has the effect of "superseding the emergency action plan developed by the secretary under section

---

unassailable, the Commonwealth might exercise its "sovereign and plenary police power" to protect the welfare of a municipality's citizens when such "local officials are unwilling or unable to accept a solvency plan" developed for the municipality's benefit?  53 P.S. § 11701.102(b)(iv).  How, one might ask, could the "principal responsibility for conducting the governmental affairs of a municipality" remain in the charge of its local officials when the Commonwealth exercises its power to "abolish" the local government unit in its entirety?  *Id.* § 11701.102(b)(ii), (v).  It is an untenable reading of Section 102 to suggest that the authority of local officials must be preserved at all costs, even in the face of their "dereliction of official duty," and notwithstanding conduct on their part that causes "a breakdown in the function of municipal government," that constitutes a failure to uphold their "paramount public duty to safeguard the health, safety and welfare" of their citizens, and that poses a "threat to the fiscal stability of neighboring communities."  *Id.* § 11701.102(b)(4)-(5).  Indeed, the purpose and the expressly stated intent of Act 47 is precisely to remedy such dereliction.

[156]    *Id.* § 11701.605.

[157]    *See id.* § 11701.702(a).

602."[158]  Further illustrating Chapter 7's greater specificity vis-à-vis receivership is its own provision that, like Section 605, is entitled "Elected and appointed officials."  That section empowers a receiver to "issue an order to an elected or appointed official of the distressed municipality" to "implement any provision of the recovery plan," and to "refrain from taking any action that would interfere with the powers granted to the receiver or the goals of the recovery plan."[159]  If Section 605 was wholly dispositive of a receiver's powers with regard to local officials' duties, there would have been no reason to include specific provisions within Chapter 7 that directly address the authority of the municipality's elected and appointed officials in the context of receivership.

Most significantly, as discussed throughout this Opinion, Section 704(a)(2) provides that a receiver's recovery plan has the effect of "suspending the authority of the elected and appointed officials of the distressed municipality . . . to exercise power on behalf of the distressed municipality" to the extent that the officials' authority "would interfere with the powers granted to the receiver or the goals of the recovery plan."[160]  The City's view of Section 605 is incompatible with Section 704(a)(2).[161]  Although the City

---

[158]    *Id.* § 11701.704(a)(3).

[159]    *Id.* § 11701.708(a)(1)-(2).

[160]    *Id.* § 11701.704(a)(2).

[161]    The same goes for the Dissent's view of these statutory provisions.  Although the Dissent acknowledges that Section 704(a)(2) facially authorizes the suspension of local officials' authority, it is unclear when this would ever occur, given the Dissent's emphasis upon the preservation of local officials' power under Section 605 and Section 102(b)(1)(ii). It is difficult to imagine what sort of suspensions of local officials' duties, on the Dissent's account, would be permissible under Section 704(a)(2), yet would not be vulnerable to attack as "directly violat[ing] Section 605's command that elected officials shall continue to carry out their duties during a fiscal emergency."  Dissent at 7.

As the Dissent notes, Section 605 sets forth a "general rule" concerning the duties of local officials in a municipality under a state of fiscal emergency.  *Id.* at 9 n.4.  But Section 704(a)(2) addresses the authority of local officials in the *specific* context of (continued…)

argues that Section 704(a)(2) only comes into effect where the local officials' actions contradict some specific and already extant provision of the recovery plan, we find no such limitation in the statutory text.  Rather, the officials' authority may be "suspended" where its exercise conflicts with, *inter alia*, the "goals of the recovery plan."

Here, as discussed above, the Receiver presented extensive evidence demonstrating that the City Council members' performance as department heads has impeded his efforts to effectuate the recovery plan and to remedy the City's financial condition.  The evidence, deemed credible by the Commonwealth Court, detailed numerous instances of obstructive and imprudent conduct on the part of these officials. This evidence amply justified a conclusion that the continued exercise of the City Council members' duties as administrative department heads "would interfere with the powers granted to the receiver or the goals of the recovery plan."[162]

We recognize that the complete suspension of these officials' duties is an extraordinary measure—one that will be warranted only very rarely.  If, for example, a receiver sought to take this step immediately upon appointment, with no evidence that the local officials' conduct posed an obstacle to financial recovery, it would be entirely appropriate for the Commonwealth Court to reject such an initiative as "arbitrary" or "capricious" under its prescribed standard of review.[163]  Here, however, the Receiver presented ample evidence establishing the necessity of the challenged initiative.  The Commonwealth Court, in turn, found no clear and convincing evidence that the "recovery plan as modified is arbitrary, capricious or wholly inadequate to alleviate the fiscal

---

receivership.  And, as the Dissent stresses, it is a fundamental principle of statutory construction that the specific controls over the general.  *Id.* at 14 (citing *LaFarge Corp. v. Commonwealth, Ins. Dep't*, 735 A.2d 74, 76 (Pa. 1999)).

[162]    53 P.S. § 11701.704(a)(2).

[163]    *See id.* § 11701.703(d)-(e).

emergency in the distressed municipality."[164]    Indeed, the court opined that the challenged initiatives not only survived its standard of review, but that they were "necessary" to "save the City from the brink of financial doom."[165]  In light of the evidence presented and detailed above, we find no error in the court's conclusion.

**(iv)    Direction to Remove Items from Legislative Agenda**

Next, the City challenges the initiative that allows the Receiver to direct the City Council to remove items from its legislative agenda.  The City argues that this power amounts to a "*de facto* legislative veto" that would give the Receiver "an unfettered right to block legislative action ranging from mundane items unrelated to the City's financial condition to items required for the health and safety of the residents."[166]  The City contends that empowering the Receiver in this manner "violates the City's Home Rule Charter," because that document gives City Council "the exclusive legislative power for the City."[167]  The City argues that nothing in Act 47 directly authorizes the Receiver to exercise such power, and it again cites Section 102(b)(1)(ii) and Section 605 for the proposition that Act 47 is intended to retain local officials' authority.

As with other of the challenged initiatives, the City's argument is premised upon the prerogatives of the City's officials under its Home Rule Charter, and the City asserts that the initiative improperly alters the City's "form of government."  As discussed above, Act 47 prevails over the City's Home Rule Charter, and the statute expressly directs a reviewing court not to construe the recovery plan as effectuating a change to the City's

---

164    *Id.* § 11701.703(e).

165    *Weaver*, slip op. at 45.

166    City's Br. at 33.

167    *Id.*

form of government.  Thus, the conceptual bases of the City's objections to this initiative are without merit.

The Receiver asserted before the Commonwealth Court that experience has shown that the members of City Council have a history of adding items to its agenda that can impact the financial health of the City, while providing little or no advance notice to the Receiver.  It is obvious that the City Council's legislative activities can involve the expenditure of the City's limited funds.  Cutting the Receiver out of the process of considering the prudence of such expenditures undoubtedly impacts his ability to provide for the City's financial recovery.  Because the City Council's power to take actions that would deplete whatever remains in the City's coffers can "interfere with the powers granted to the receiver or the goals of the recovery plan," this initiative once again implicates Section 704(a)(2), which allows for the suspension of the "authority of the elected and appointed officials of the distressed municipality . . . to exercise power on behalf of the distressed municipality" pursuant to the City's "charter."[168]

Indeed, it is questionable whether the Receiver even needed to modify the recovery plan in order to assert the power referred to in the Plan Modification.  The challenged initiative does not contemplate the Receiver's unilateral removal of items from the legislative agenda; rather, it authorizes him to "direct" the City to do so.[169]  Such authority is arguably already encompassed within other provisions of Act 47.  Section 706 expressly empowers the Receiver to "require the distressed municipality or authority to take actions necessary to implement the recovery plan," and to "direct the distressed municipality or authority to take any other action to implement the recovery plan."[170]

---

[168]    53 P.S. § 11701.704(a)(2).

[169]    Plan Modification at 33.

[170]    53 P.S. § 11701.706(a)(1), 11701.706(a)(7).

Section 708 similarly authorizes the Receiver to issue an order to elected officials—such as the members of City Council—to "implement any provision of the recovery plan" and to "refrain from taking any action that would interfere with the powers granted to the receiver or the goals of the recovery plan."[171]  Directing the City Council members to remove an item from their legislative agenda might fall under these specific grants of authority to the Receiver, and the challenged initiative may be viewed as merely a particular manifestation of the powers granted to the Receiver under Sections 706 and 708—stated more directly in order to make clear to the City Councilpersons their duty to comply with the Receiver's directives and to advance the goals of the recovery plan. Accordingly, we find no error in the Commonwealth Court's confirmation of this initiative.[172]

---

[171]    *Id.* § 11701.708(a)(1)-(2).

[172]    The Dissent takes issue with this initiative as well, contending that it exceeds what is "necessary" to achieve financial stability, and that the Receiver's authority in this regard is limited to the right to "*attend* executive sessions of the governing body" in the municipality.  Dissent at 13 (quoting 53 P.S. § 11701.706(a)(8)).  As with its general contentions regarding the asserted "arbitrariness" of the modifications, the Dissent makes no attempt to engage with the facts or the asserted reasons for the Receiver's modifications.  The notion that *some* activities of the City Council—such as "recognizing the accomplishments of a City resident" or "renaming a City holiday"—might not involve a substantial expenditure of funds is the exception that proves the rule.  *Id.*  In general, it is difficult to dispute the fact that municipal operations cost municipal funds.  Even seemingly minor activities involve the direction of municipal employees, who the municipality must pay.  When financial resources are as limited as they are in the City, expenditures become significant quickly.  In any event, as discussed above, the question for our purposes is not whether *we* believe that the challenged modification was "necessary," but rather whether the Commonwealth Court erred in approving the modification under the "arbitrary, capricious or wholly inadequate" standard of Section 703(e).  The court did not err.

As for the Dissent's contention that the Receiver's power is limited to merely "attending" city council meetings, it defies logic to suggest that the Receiver is powerless to do anything beyond sitting and watching City Council waste municipal funds.  The Receiver's very purpose—his *raison d'être*—is to provide for the financial recovery of the municipality.  To that end, the Receiver is expressly empowered, *inter alia*, to "require the (continued…)

### (v)     Separation of Powers

Next, the City argues that the challenged initiatives are precluded by the separation-of-powers doctrine.[173]  This doctrine, the City suggests, is "implicated in this case by the degree of control the Receiver seeks over the City."[174]  Seeking to portray the matter as involving a conflict between branches of government, the City asserts that the Receiver is "an arm of the court and a judicial officer."[175]  Because the Commonwealth Court is charged with confirming the recovery plan and any modification, the City insists, such confirmation "effectively give[s] the Commonwealth Court, acting through the Receiver, the right to prohibit legislation from being voted upon," and "indirectly places the police and fire department under the control of the judiciary."[176]  This alleged involvement of the judiciary in matters of local governance, the City contends, lacks the checks and balances that are the hallmarks of tripartite government.

The City's separation-of-powers theory is wholly dependent upon its unfounded assertion that an Act 47 receiver is a "judicial officer."  We find no support for this proposition within Act 47.  A receiver's power is granted by statute, not by an act of the

---

[173] distressed municipality or authority to take actions necessary to implement the recovery plan," and to issue orders to local officials (including members of City Council) to "implement any provision of the recovery plan" and to "refrain from taking any action that would interfere with the powers granted to the receiver or the goals of the recovery plan." 53 P.S. §§ 11701.706(a)(1), 11701.708(a)(1)-(2).  There is no reason to conclude that the City Council's listing of items on its legislative agenda is outside the reach of these broad statutory delegations of power to the Receiver.

[173] *See, e.g.*, *Renner v. Ct. of Common Pleas of Lehigh Cnty.*, 234 A.3d 411, 419 (Pa. 2020) ("The separation of powers doctrine is essential to our tripartite governmental framework and is the cornerstone of judicial independence. . . . The rationale underlying this separation of powers is that it prevents one branch of government from exercising, infringing upon, or usurping the powers of the other two branches.").

[174] City's Br. at 40.

[175] *Id.*

[176] *Id.* at 40-41.

---

judiciary.  The receiver is selected by the Secretary of the Department upon the order of the Governor, both of whom are executive branch officials.[177]  The Commonwealth Court has no control over the selection of a receiver; its role is limited to confirming the choice made by the executive branch officials upon demonstration of the statutory prerequisites for receivership.  "The court shall have no authority to appoint anyone other than the individual named in the petition as the receiver."[178]

The Commonwealth Court exercises no control over a receiver's day-to-day activities.  The court is not authorized to direct a receiver to take any particular action.  A receiver does not regularly report to the court on the status of the recovery plan or seek the court's guidance on the general performance of his or her duties.  The Commonwealth Court's role under Chapter 7 of Act 47 is limited to:  approving the steps needed to appoint the receiver and to initiate the receivership under Section 702; confirming the recovery plan or any modification to the plan under Section 703; revoking the appointment of the receiver upon the application of the Secretary under Section 705; considering petitions for a writ of mandamus or requests to enjoin actions of the receiver under Section 709; and extending the duration of the receivership, upon the Secretary's petition, under Section 710.[179]

None of these duties of the Commonwealth Court transform the receiver into, in the City's words, "an arm of the court and a judicial officer."  The Commonwealth Court's function in this area is fundamentally one of adjudication and review—granting or denying

---

[177]    53 P.S. § 11701.702(a) ("Following the issuance of a declaration of fiscal emergency under section 602(b), the Governor may direct the secretary to file a petition in Commonwealth Court to appoint the individual named in the petition as a receiver for the distressed municipality.").

[178]    *Id.*

[179]    *Id.* §§ 702, 703(d)-(e), 705(d), 709(a)-(b), 710(b).

the requests of various participants in the receivership process and ensuring compliance with statutory mandates.  Contrary to the City's suggestion, the Commonwealth Court does not act through a receiver to exercise judicial control over the operations of a municipality's police or fire departments.  An Act 47 receiver is an embodiment of "the Commonwealth's sovereign and plenary police power," exercised through statutory authority at the behest of executive branch officials, in order to remedy "emergency fiscal conditions" and "to protect the health, safety and welfare of a municipality's citizens."[180] The Receiver's powers are not vicariously attributable to members of the judiciary, and, accordingly, the City's suggestion that the challenged initiatives violate separation-of-powers principles lacks merit.

### (vi)    Residency Requirement

With regard to the initiative that empowers the Receiver to waive the residency requirement for City employees, the City argues that the Plan Modification attempts to "amend" the City's Home Rule Charter without a referendum, in violation of Article IX, Section 2 of the Pennsylvania Constitution.[181]  The initiative quotes language from the City's Home Rule Charter that provides that City Council "may at its discretion, employ qualified non-residents of the City in such cases where there are no qualified City residents available for the particular position involved."[182]  In the challenged portion, the Plan Modification states: "This initiative substitutes 'the Receiver' for 'Council.'"[183] Because the Plan Modification refers to a "substitution" of the Receiver for City Council,

---

[180]    *Id.* § 11701.102(b)(iv).

[181]    PA. CONST. art. IX, § 2 ("Adoption, amendment or repeal of a home rule charter shall be by referendum.").

[182]    Plan Modification at 42 (quoting Home Rule Charter § 11.9-903(c)).

[183]    *Id.*

the City contends that the initiative "expressly amends" the City's Home Rule Charter and thus "facially violates Article IX, Section 2 of the Pennsylvania Constitution."[184]

The City's argument is misplaced.  Although the initiative perhaps could be more clear in its phrasing, it seeks to amend the City's Act 47 *recovery plan*, not the City's Home Rule Charter.  The initiative proposes to vest a power in the Receiver that otherwise would be committed to City Council—the power to waive the residency requirement for City employees where necessary to hire qualified candidates.  The City does not suggest that it was unlawful to grant the Receiver this power.  Rather, the City contends that the wording of the initiative reflects an unconstitutional effort to "amend" the Home Rule Charter without the required referendum.  This is simply not what the initiative seeks to do, and it is telling that the City makes no effort to explain how such a purported "amendment" would work in practice.  The City does not, for instance, detail the manner by which an initiative in an Act 47 recovery plan—which is necessarily a temporary measure as a component of a receivership of limited duration—is capable of causing a change in the actual wording of the City's Home Rule Charter.[185]  We discern no effort on the part of the Receiver to amend the City's Home Rule Charter, with or without a referendum, and, thus, no violation of the Pennsylvania Constitution.

### (vii)    City Solicitor's Disclosure Obligations

The City takes issue with the initiative that directs the City Solicitor to inform the Receiver if he becomes aware of any official's or employee's noncompliance with the

---

[184]    City's Br. at 23.

[185]    The Dissent agrees that it "is indeed legally impossible" for the modification to amend the City's Home Rule Charter.  Dissent at 15.  Rather than joining our resolution of this issue, however, the Dissent instead concludes that the modification is thus "*ultra vires* and arbitrary."  *Id.*  The City's dubious framing of this issue aside, the fact remains that the City has failed to demonstrate why this modification to the *recovery plan* was impermissible.

recovery plan or other court order.  The City suggests that this initiative may require the City Solicitor to divulge communications that are protected by attorney/client privilege.[186] The City notes that the Solicitor is an attorney who is bound by Rule 1.6(a) of the Pennsylvania Rules of Professional Conduct, which prohibits a lawyer from revealing information relating to the representation of a client, absent informed consent.[187]  The Plan Modification, according to the City, puts the Solicitor in an "ethical quagmire," because it purportedly requires him to "choose between compliance with the recovery plan or the Rules of Professional Conduct."[188]

We are unpersuaded.  Rule 1.6(a) of the Rules of Professional Conduct states that a "lawyer shall not reveal information relating to representation of a client unless the client gives informed consent . . . except as stated in paragraphs (b) and (c)."[189]  As the Receiver points out, paragraph (c)(8) of the Rule provides that a "lawyer may reveal such information to the extent that the lawyer reasonably believes necessary . . . to comply with other law or court order."[190]  The challenged initiative merely requires the City Solicitor to inform the Receiver if he becomes aware that a City official or employee "is not complying with an order" of the Commonwealth Court or with a "recovery plan or plan modification," which are confirmed by court order.[191]  Under Rule 1.6(c)(8), a lawyer may divulge such information, and the City Solicitor's ethical obligations in no way require him

---

[186]   City's Br. at 35.

[187]   *Id.* at 35-36 (citing Pa.R.P.C. 1.6(a)).

[188]   *Id.* at 36.

[189]   Pa.R.P.C. 1.6(a).

[190]   Pa.R.P.C. 1.6(c)(8).

[191]   Plan Modification at 49.

to assist City officials in violating court orders.[192]  We find no error in the Commonwealth Court's confirmation of this initiative.

### (viii)  Weight of the Evidence

The City next argues that the facts of the instant case do not warrant the extreme remedy of suspending City officials' administrative duties.   The City reviews various examples of mismanagement that the Commonwealth Court highlighted, but in each

---

[192]     The Dissent disagrees.  Quoting selected portions of the explanatory comment attached to Rule 1.6, the Dissent suggests that a lawyer may not be compelled to divulge confidential information concerning the representation, even when the lawyer knows that such disclosure is necessary to comply with a court order.    The Dissent reaches this conclusion based upon language in the comment stating that Rule 1.6(c) confers "discretion" upon lawyers with regard to disclosures, and that paragraph (c) "permits but does not require" such disclosures.  Dissent at 16-17 (discussing Pa.R.P.C. 1.6, expl. cmt. [23]).

The Dissent overlooks the portions of the explanatory comment that directly address Rule 1.6(c)(8).  Those passages provide that "[o]ther law *may require* that a lawyer disclose information about a client."  Pa.R.P.C. 1.6, expl. cmt. [18] (emphasis added).  Although the comment does not identify which laws, specifically, supersede the general rule, it directly states that "*paragraph (c)(8) permits the lawyer to make such disclosures as are necessary to comply with the law.*"  *Id.* (emphasis added).   The comment goes on to make clear that "[a] lawyer *may be ordered to reveal information* relating to the representation of a client by a court or by another tribunal or governmental entity claiming authority pursuant to other law to compel the disclosure."  *Id.*, expl. cmt. [21] (emphasis added).   The lawyer is encouraged to advance nonfrivolous claims challenging such an order, but "[u]nless review is sought, *paragraph (c)(8) permits the lawyer to comply with the court's order.*"  *Id.* (emphasis added).  These portions of the comment make abundantly clear that, notwithstanding the fact that paragraph (c) is framed in discretionary terms as a general matter, a lawyer may indeed be compelled to disclose information otherwise covered by Rule 1.6 in order to comply with a court order.

The Dissent insists that disclosure under such circumstances remains purely optional, stressing that the comment merely "permits" the lawyer to disclose information, even when the "law may *require*" such disclosure, and even when "the lawyer may be *ordered*" to do so.  To the contrary, the plain and unmistakable language of the comment provides that what the lawyer is "permitted" to do is to "comply with the court's order" and to "make such disclosures as are necessary to comply with the law."  That is, when the law or a court order requires disclosure, Rule 1.6 is no obstacle.  That is what Rule 1.6(c)(8) means.  What the Dissent suggests would amount to disobedience of court orders and contempt of court, and these we emphatically discourage.

instance downplays its severity.  For instance, the City asserts that its residents "should not be deprived of the officials they chose to run the City simply because one of the officials reached into his own pocket to fund a Toys-for-Tots campaign for the City's children and was reimbursed by the City after the reimbursement was approved by City Council."[193]  And the City notes that, "[i]f the residents have problems with the Mayor's use of the racial slur, they can vote him out."[194]  None of the incidents described at the evidentiary hearing, the City asserts, "are cause to remove any of the other City Council members, who were not accused of any serious wrongdoing, from their positions as department heads."[195]  The City then claims that the Commonwealth Court disregarded its purported successes in governance, such as a reduction in violent crime by 60% during Mayor Kirkland's administration.[196]

We need not dwell upon the City's position.  Essentially a challenge to the manner in which the Commonwealth Court weighed the evidence presented at the hearing, the City's argument amounts to an assertion that various instances of mismanagement or obstruction on the part of City officials were, in essence, "not that bad."  We disagree. The Commonwealth Court thoroughly detailed the evidence that it deemed credible, and the court's characterizations of the City officials' conduct were amply supported.  Beyond its rhetorical defenses of the conduct detailed at the hearing, the City presents no *legal* argument as to why its preferred portrayal of the events entitles it to relief.  No such relief is warranted.

---

[193]    City's Br. at 44.

[194]    *Id.* at 45.  Mayor Kirkland was defeated in the 2023 municipal primary election.

[195]    *Id.*

[196]    *Id.* at 45-46.

### (ix)    Remedy

Finally, the City argues that, rather than confirming the initiatives that made such significant changes to the City's governance, the Commonwealth Court should have employed the "narrower" remedy of mandamus under Section 709 of Act 47.[197]  The City frames the Plan Modification as an effort to "bypass" the statutory mandamus procedure.[198]  In this regard, the City notes that the evidence at the hearing all related to *past* events, but there was no indication that City officials intend to obstruct the Receiver's efforts in the future.[199]  "If, in the future, the officials do something which interferes with the Receiver's power or the financial recovery of the City," the City argues, "the Receiver has the right to go to court to seek mandamus relief."[200]

Nothing in Act 47 requires the Receiver to seek "narrower" relief in the form of a writ of mandamus prior to modifying the recovery plan.  Rather, as discussed above, the Receiver is expressly empowered to "modify the recovery plan as necessary to achieve financial stability of the distressed municipality," and the Commonwealth Court "shall confirm the modification . . . unless it finds clear and convincing evidence that the recovery plan as modified is arbitrary, capricious or wholly inadequate to alleviate the fiscal emergency in the distressed municipality."[201]  The initiatives in the Plan Modification reflect the Receiver's determination that the measures contained therein are necessary to achieve financial stability in the City.  The Commonwealth Court properly confirmed the modifications at issue, having found no evidence that they were arbitrary, capricious, or

---

[197]    *Id.* at 46 (citing 53 P.S. § 11701.709).

[198]    *Id.* at 47.

[199]    *Id.* at 47-48.

[200]    *Id.* at 48.

[201]    53 P.S. §§ 11701.706(a)(2), 11701.703(e).

wholly inadequate to alleviate the fiscal emergency.  The procedures followed below were entirely proper and consistent with the plain language of Act 47.

## V. Conclusion

The General Assembly's predominating concern in drafting Act 47 was to provide for the financial recovery of distressed municipalities—particularly those whose condition is so severe as to warrant the appointment of a receiver.  Understandably, local officials may take umbrage at the suggestion that their performance has contributed to the problems that require such aggressive intervention.  And they likely would prefer not to change their established practices.   But the financial health of the municipality is paramount.

As noted above, we acknowledge that the Plan Modification contains some far-reaching provisions, and nothing in this Opinion should be construed as a categorical approval of such sweeping initiatives in all circumstances.   Where a municipality's condition is less critical, and the performance of local officials less problematic, certain modifications discussed above might not survive the prescribed standard of review.  But drastic times call for drastic measures.  The Commonwealth Court acted entirely within its authority in weighing the evidence before it and determining that conditions in the City justified the proposed initiatives.

The General Assembly predicted that circumstances may arise in which "local officials are unwilling or unable to accept a solvency plan developed for the benefit of the municipality."[202]   It decided that such situations may require "the exercise of the Commonwealth's sovereign and plenary police power in emergency fiscal conditions to

---

[202]    *Id.* § 11701.102(b)(iv).

protect the health, safety and welfare of a municipality's citizens."[203]  The City of Chester's

local officials must accept the exercise of that power, whether they like it or not.[204]

   The order of the Commonwealth Court is affirmed.

---

[203]   *Id.*

[204]   The Concurrence favors a slightly different approach.  On its reading of Act 47, a receiver is without authority to take most actions independently.  Referencing various provisions of Act 47, that opinion maintains that a receiver may only "*require*, *direct*, and *order* the municipal officials to take actions to implement the recovery plan."  Concurring Opinion and Opinion in Support of Affirmance With Modification (Brobson, J.) (the "Concurrence") at 5 (emphasis in original).  The Concurrence would review the entire Plan Modification and modify any initiative that would violate this ostensible limitation—even those that the City did not challenge before this Court.  The Concurrence offers an intriguing theory.  But, for two reasons, we do not agree with its approach.

   First, the asserted limitation upon the Receiver's power is premised upon language added to Act 47.  True, Section 708(a) provides that a receiver is authorized to "issue an order *to an elected or appointed official* of the distressed municipality."  53 P.S. § 11701.708(a) (emphasis added).  But the list of the receiver's express powers in Section 706(a), from which the Concurrence derives the purportedly limiting verbs "require" and "direct," does not reference the *officials* themselves.  Rather, the receiver is empowered to require or direct *the municipality* to take certain actions.  The receiver has the power, for instance, to "require the distressed municipality" to take actions necessary to implement the plan; to "require the distressed municipality" to negotiate intergovernmental cooperation agreements; and to "direct the distressed municipality" to take any other actions to implement the plan.  *Id.* § 11701.706(a)(1), (3), (7).  These provisions, unlike Section 708(a), do not specify the local *officials* as the object of the receiver's requirements and directives.  Rather, they treat the municipality as an entity distinct from its officials.  We must presume that the absence of "officials" from Section 706(a) is deliberate.  Were Section 706(a) to operate in the manner that the Concurrence suggests, one would expect the listed powers to say, for example, that the receiver may "require [the elected or appointed officials of] the distressed municipality" to take certain actions, *à la* Section 708(a).  There is no textual basis to conclude that every power listed in Section 706(a) requires an intermediary local official for its exercise.

   Second, even if our assumption of King's Bench jurisdiction would allow us to consider other initiatives in the Plan Modification beyond those specifically challenged, we do not think it prudent to do so.  Although the exercise of King's Bench authority removed any question over the appealability of the Commonwealth Court's order, our task here fundamentally remains one of review of a lower court's decision.  Absent discrete challenge supported with focused advocacy, matters outside the scope of the parties' arguments are better left for the Commonwealth Court—the court that Act 47 tasks with addressing such matters in the first instance.

Chief Justice Todd and Justice Donohue join the opinion.

Justice Brobson files a concurring opinion and opinion in support of affirmance with modification.

Justice Dougherty files a dissenting opinion and opinion in support of vacation and remand in which Justice Mundy joins.

**[J-34A-2023 and J-34B-2023] [MO: Wecht, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| RICK SIGER, IN HIS CAPACITY AS ACTING SECRETARY OF THE DEPARTMENT OF COMMUNITY AND ECONOMIC DEVELOPMENT | : : : : : : | No. 12 MAP 2023<br><br>Appeal from the Order of the Commonwealth Court Order dated January 31, 2023, at No. 336 MD 2020. |
| v. | : : | ARGUED:  May 24, 2023 |
| CITY OF CHESTER | : : : : : | |
| APPEAL OF: CITY OF CHESTER, MAYOR THADDEUS KIRKLAND AND CITY COUNCIL OF THE CITY OF CHESTER | : : : : | |
| RICK SIGER, IN HIS CAPACITY AS ACTING SECRETARY OF THE DEPARTMENT OF COMMUNITY AND ECONOMIC DEVELOPMENT | : : : : : : | No. 15 MAP 2023<br><br>Appeal from the Order of the Commonwealth Court Order dated February 14, 2023, at No. 336 MD 2020. |
| v. | : : | ARGUED:  May 24, 2023 |
| CITY OF CHESTER | : : : : : | |
| APPEAL OF: CITY OF CHESTER, MAYOR THADDEUS KIRKLAND AND CITY COUNCIL OF THE CITY OF CHESTER | : : : : | |

**CONCURRING OPINION AND OPINION IN SUPPORT OF AFFIRMANCE WITH MODIFICATION**

**JUSTICE BROBSON**                                    **DECIDED:  January 29, 2024**

As this case makes clear, the Municipalities Financial Recovery Act (Act 47)[1] is a unique and complicated legislative creation, and its infrequent invocation has given this Court little chance to consider its mandates.  The Opinion and Opinion in Support of Affirmance (Opinion and OISA) aptly recognizes its significant nature, particularly as it relates to the dire financial circumstances of the City of Chester (the City).  And, in parsing the provisions of Chapter 7 of Act 47 (Chapter 7),[2] the Opinion and OISA correctly rejects the bulk of the City's challenges to the modified recovery plan (the Plan) proposed by Michael T. Doweary (the Receiver).[3,4]  Nonetheless, I depart from the Opinion and OISA's ultimate conclusion to confirm the Plan in full because, in my view, the Plan defies a critical aspect of the Receiver's statutory authority:  Chapter 7 does not permit the Receiver to act independently to implement the Plan.  Rather, barring few exceptions, the Receiver is only empowered to *develop a recovery plan* and *require, direct, or order the City and its officials to implement it*.  Because I believe the Plan in many ways vests the Receiver with autonomous and unlawful authority to implement the Plan himself and the

---

[1] Act of July 10, 1987, P.L. 246, *as amended*, 53 P.S. § 11701.101.

[2] 53 P.S. §§ 11701.701-712.

[3] As the Opinion and OISA notes, the Receiver revised the Plan on December 9, 2022, as a compromise with a City official regarding the language of some of the initiatives. This Opinion refers to the December 9, 2022 version of the Plan.

[4] On this point, I join parts I through III of the Opinion and OISA.  As to the Opinion and OISA's discussion section, I agree with the Opinion and OISA that:  (1) Act 47 supersedes the City's Home Rule Charter; (2) the Plan should not be construed to alter the City's form of government; (3) the City's officials cannot interfere with the Receiver's enforcement of the Plan; (4) the Plan suspends the City's officials' administrative duties because those duties conflict with the goals of the Plan; (5) the Receiver can direct the City's officials to remove items from the legislative agenda; (6) the Receiver's authority under Act 47 does not violate separation of powers principles; (7) the City's solicitor's obligation is permissible; and (8) the weight of the evidence supports the remedies.  *See* Opinion and OISA at 32-55.  For that reason, I also join parts IV A and IV B(ii)-(v), (vii)-(viii).

City challenges that authority as violative of Chapter 7, I would modify the language of the Plan to limit the Receiver's independent authority and confirm the Plan as modified.

Under Chapter 7, when the Commonwealth Court confirms a recovery plan, that confirmation automatically imposes upon "*the elected and appointed officials* of the distressed municipality or an authority a *mandatory duty to undertake the acts set forth in the recovery plan*." 53 P.S. § 11701.704(a)(1) (emphasis added). Critically, confirmation also has the effect of "*suspending the authority of the elected and appointed officials* of the distressed municipality or an authority to exercise power on behalf of the distressed municipality or authority pursuant to law, *charter*, ordinance, rule or regulation to the extent *that the power would interfere with the powers granted to the receiver or the goals of the recovery plan*." 53 P.S. § 11701.704(a)(2) (emphasis added). The powers and duties of a receiver are set forth in Section 706 of Chapter 7, which provides, in relevant part:

(a) Powers and duties.--Notwithstanding any other provision of law, the receiver shall have the following powers and duties:

(1) To *require the distressed municipality* or authority to take actions necessary to implement the recovery plan under [S]ection 703.1.

(2) To modify the recovery plan as necessary to achieve financial stability of the distressed municipality and authorities in accordance with [S]ection 703.

(3) To *require the distressed municipality* or authority to negotiate intergovernmental cooperation agreements between the distressed municipality and other political subdivisions in order to eliminate and avoid deficits, maintain sound budgetary practices and avoid interruption of municipal services.

(4) To submit quarterly reports to the governing body and, if applicable, the chief executive officer of the distressed municipality and to the department. The reports shall be posted on a publicly accessible Internet website maintained by the distressed municipality.

(5) To *require the distressed municipality* or authority to cause the sale, lease, conveyance, assignment or other use or disposition of the distressed municipality's or authority's assets in accordance with [S]ection 707.2.

(6) *To approve, disapprove, modify, reject, terminate or renegotiate contracts and agreements with the distressed municipality or authority,*

except to the extent prohibited by the Constitutions of the United States and Pennsylvania.

(7) To *direct the distressed municipality* or authority *to take any other action to implement the recovery plan*.

(8) To attend executive sessions of the governing body of the distressed municipality or authority and make reports to the public on implementation of the recovery plan.

(9) To file a municipal debt adjustment action under the Bankruptcy Code (11 U.S.C. § 101 et seq.) and to act on the municipality's behalf in the proceeding. The power under this paragraph shall only be exercised upon the written authorization of the secretary. The filing of a municipal debt adjustment action under this paragraph and any plan of the receiver accepted by the Federal court shall be considered a modification of the recovery plan, except that the modification shall not be subject to judicial review under section 709.3. A recovery plan submitted to and approved by the Federal court under a Federal municipal debt adjustment action may include Federal remedies not otherwise available under this chapter.

(10) To meet and consult with the advisory committee under [S]ection 711.4.

(11) To employ financial or legal experts deemed necessary to develop and implement the recovery plan. Notwithstanding any law to the contrary, the employment of such experts shall not be subject to contractual competitive bidding procedures.

(12) To make a recommendation to the secretary that the municipality be disincorporated in accordance with Chapter 4.

53 P.S. § 11701.706 (emphasis added). Section 708 of Chapter 7 pertains to elected

and appointed officials and provides:

(a) Orders.--The receiver may issue an order to an elected or appointed official of the distressed municipality or an authority to:

(1) implement any provision of the recovery plan; and

(2) refrain from taking any action that would interfere with the powers granted to the receiver or the goals of the recovery plan.

(b) Enforcement.--An order issued under subsection (a) shall be enforceable under [S]ection 709.

53 P.S. § 11701.708. In the event municipal officials refuse to implement a recovery plan,

Section 709(a) of Chapter 7 provides for enforcement through judicial action, as follows:

Action by receiver.--The receiver may petition Commonwealth Court to issue a writ of mandamus upon any elected or appointed official of the distressed municipality or authority to secure compliance with an order issued under [S]ection 708. The court shall grant or deny the relief within 14 days of the filing of the petition. The court shall grant the relief

requested if it determines that the order was issued in compliance with . . . [C]hapter [7].

53 P.S. § 11701.709(a).  Appointed and elected municipal officials similarly are authorized to "petition [the] Commonwealth Court to enjoin any action of the receiver that is contrary to . . . [C]hapter [7]."  53 P.S. § 11701.709(b).

Thus, the effect of confirmation of a recovery plan imposes a duty upon the *officials of the distressed municipality* to implement a recovery plan, and it suspends their authority to the extent it conflicts with that plan.  By contrast, a receiver is empowered to *require*, *direct*, and *order* the municipalities—which can only act through their elected and appointed officials—to take actions to implement the recovery plan.  "Just like a private corporation, any governmental agency or political subdivision, and indeed the Commonwealth itself, can only act or carry out its duties through real people—its agents, servants or employees."  *Moon Area Sch. Dist. v. Garzony*, 560 A.2d 1361, 1366 (Pa. 1989).  Apart from limited independent authority concerning reports, contracts and agreements, and municipal debt adjustment actions, Chapter 7 does not authorize a receiver to undertake the individual aspects of the recovery plan independently.  That task is left to the municipality through its officials.  To the extent the municipal officials refuse to enforce the recovery plan or comply with a receiver's requirements, directives, or orders, a receiver's *only* recourse is to secure a writ of mandamus from the Commonwealth Court.  If the officials still refuse to comply, the Commonwealth Court can hold the municipal officials in contempt of court order.

As the Opinion and OISA explains, the City's officials refused to comply with many of the Receiver's requirements, directives, and orders to implement the initiatives in the initial recovery plans that the Commonwealth Court approved.  This led the Receiver to include modifications in the Plan, as described below, that in several ways grant the Receiver independent authority.  Specifically, the ability to audit initiative provides, in part,

that "[t]he Receiver shall *have the ability to conduct* or to have conducted operational, financial or forensic audits or studies of any part of the City."  (Plan at 31 (emphasis added).)  The residency requirement initiative provides:

> The City has struggled to find qualified individuals to fill key roles within City government.   Section 11.9-903(c) of the City's Charter provides that, "[w]here special skills are required, Council may at its discretion, employ qualified non[]residents of the City in such cases where there are no qualified City residents available for the particular position involved."  *This initiative substitutes "the Receiver" for "Council."*

(*Id*. at 42 (emphasis added).)  And the employee investigations initiative provides, in part:

> As has been demonstrated repeatedly, City elected officials have failed to conduct internal investigations into personnel matters, including those that involve the expenditure of City funds.
>
> *The Receiver shall have the power to conduct investigations into City and Authority personnel matters and to review and approve any such investigation conducted by the City or Authority*.[5]

(*Id*. at 43 (emphasis added).)  The Plan further confers upon the Receiver the sole ability to:  (1) initiate or approve any hiring on behalf of the City as to both personnel and contractors; (2) determine the auditing firm that will perform City audits; (3) direct how the City spends the American Rescue Plan Act funds or any other federal or Commonwealth funds; and (4) "determine the members of a selection committee for a City or Authority request for proposals or any other procurement where a selection committee is convened."  (*Id*. at 41, 44-46, 48.)  Finally, while Chapter 7 authorizes the Receiver to "approve, disapprove, modify, reject, terminate or renegotiate contracts and agreements," the Plan goes a step farther and gives the Receiver the power to "*sign* contracts and agreements on behalf of the City."  (*Id*. at 47-48 (emphasis added).)

The Receiver seems to acknowledge that parts of the Plan transcend the authority vested in him by Chapter 7, but he justifies those infractions as being a consequence of

---

[5]  An ethics initiative similarly empowers the Receiver to initiate and conduct investigations.  (Plan at 51.)

necessity.  For example, as to administrative duties and professional management, the

Plan provides:

> The Receiver includes this section because he does not have any
> other choice.  He has tried to work with City elected officials to improve
> operations and implement basic city functions.  He went to [c]ourt earlier
> this year in a mandamus action, but . . . City officials ignored [the
> Commonwealth Court's order] from that proceeding . . . .

> At the end of the day, the Receiver (or the [Commonwealth] Court)
> can mandate any initiative, policy or procedure that it wants, but if the
> individuals responsible for implementing it are incapable of doing so or
> refuse to do so and face no repercussions, then nothing will ever change
> and the Receiver will not be able to ensure the provision of vital and
> necessary services.

(*Id.* at 11.)

The essence of the City's legal argument is that the Plan provides the Receiver

with authority that exceeds Chapter 7.  While I understand the Receiver's apparent

exasperation at the City's officials' attempts to forestall the recovery initiatives, that does

not empower the Receiver to implement the Plan independently.  There is no "nuclear

option" in Chapter 7.  The authority vested in a receiver under Chapter 7 is not a trivial

aspect of the law.  To the contrary, at the outset of Act 47, the General Assembly set forth

one of its critical purposes:

> [To e]nact procedures and provide powers and guidelines to ensure fiscal
> integrity of municipalities *while leaving principal responsibility for conducting
> the governmental affairs of a municipality, including choosing the priorities
> for and manner of expenditures based on available revenues, to the charge
> of its elected officials*, consistent with the public policy set forth in this
> [S]ection.

53 P.S. § 11701.102(b)(1)(ii) (emphasis added).

Contrast the more limited authority of a Chapter 7 receiver with that of a

rehabilitator under Article V of the Insurance Department Act of 1921.[6]  There, among the

---

[6] Act of May 17, 1921, P.L. 789, *as amended*, added by the Act of Dec. 14, 1977, P.L. 280,
40 P.S. §§ 221.1-.63.

powers the General Assembly provides the rehabilitator of an insurance company, a statutory receiver of sorts, are "the powers of the directors, officers and managers, whose authority shall be suspended." 40 P.S. § 221.16(b).  The rehabilitator also is authorized to "take such action as he deems necessary or expedient to correct the condition or conditions which constituted the grounds for the order of the court to rehabilitate the insurer."  *Id.*  This "step-into-the-shoes" authority is absent in Chapter 7.  The General Assembly, therefore, made a meaningful choice to limit a receiver's authority under Chapter 7 to developing a recovery plan and forcing the municipality through its officials to implement it.  It did not, however, give a receiver the authority to displace a municipality and its officials and implement the recovery plan himself.

Further, as recognized by Justice Dougherty in his Dissenting Opinion and Opinion in Support of Vacation and Remand (Dissenting Opinion and OISVR), "[a]n action or factor is arbitrary if it is not cabined by law or principle."  Dissenting Opinion and OISVR at 2 (quoting *Commonwealth v. Boczkowski*, 846 A.2d 75, 102 (Pa. 2004)).  As such, the Commonwealth Court's deferential standard of review does not require this Court to turn a blind eye to violations of Chapter 7 in the Plan.  *See* 53 P.S. § 11701.703(e) ("The [Commonwealth Court] shall confirm the modification within 60 days of receipt of notification of the modification unless it finds clear and convincing evidence that the recovery plan as modified is arbitrary, capricious or wholly inadequate to alleviate the fiscal emergency in the distressed municipality.").  Indeed, it was clearly within the Commonwealth Court's authority to determine whether the Plan violates any provision of Act 47.  Now that this Court has accepted King's Bench jurisdiction, we may do the same.

This is not to say that the Receiver lacks the authority to accomplish the initiatives set forth in the Plan; as explained above, I agree with the Opinion and OISA's rationale that the Plan's initiatives are generally permissible under Chapter 7.  I merely take issue

with the *manner* the Receiver employs to achieve the Plan's goals.  The unambiguous will of the General Assembly cannot bend to the supposed necessity, or convenience, in a particular instance.  I emphasize, however, that if the City's officials continue in their obstinance, the Receiver should again seek mandamus to compel compliance, and the Commonwealth Court should not hesitate to enforce the Plan and hold noncompliant City officials in contempt.  Mandamus is the only enforcement mechanism the General Assembly provided in Chapter 7, and, in my view, it should be used to the fullest in circumstances like the present to give effect to Act 47.

I acknowledge the Opinion and OISA disagrees with my position based, in part, on the varying language in Section 706 and Section 708 of Chapter 7 relative to a receiver's statutory authority—*i.e.*, a receiver requiring and directing a "municipality" in Section 706 but ordering "an elected or appointed official of the . . . municipality" in Section 708.  The Opinion and OISA's attempt to distinguish between the municipality and its officials for purposes of construing the statutory authority of a receiver under Section 706 is flawed in that it cannot withstand statutory construction scrutiny.  Specifically, Section 706(a) provides that the receiver shall have the powers and duties set forth within that subsection, including the power to "*require the distressed municipality* . . .  to take actions necessary to implement the recovery plan;" "*require the distressed municipality* . . . to negotiate intergovernmental cooperation agreements;" "*require the distressed municipality* . . . to cause the sale, lease, conveyance, assignment or other use or disposition of the distressed municipality's assets;" and "*direct the distressed municipality* . . . to take any other action to implement the plan."   53 P.S. § 11701.706(a)(1), (3), (5), (7).  In the absence of the above italicized words, I would agree that a receiver would have the statutory authority to "take actions necessary to implement the recovery plan;" "negotiate intergovernmental cooperation agreements;" "cause the sale, lease,

conveyance, assignment or other use or disposition of the distressed municipality's assets;" and "take any other action to implement the plan."  We cannot, however, simply ignore the italicized words and, as the Opinion and OISA appears to do, read them out of the statute.  *Dep't of Transp. v. Taylor*, 841 A.2d 108, 111-12 (Pa. 2004) ("As a general rule courts do not have the power to ignore clear and unambiguous statutory language in pursuit of a statute's alleged or perceived purpose.").  The Opinion and OISA's focus on the difference between a municipality and its officials does not address how the Opinion and OISA is able to reach its result and give effect to the words italicized above.  Whether *requiring* and *directing* a "municipality" under Section 706 or *ordering* "an elected or appointed official" under Section 708, a receiver is still limited in authority to requiring, directing, and ordering *another person or entity to implement a recovery plan*.  Nothing in these provisions empowers a receiver to act as a municipality or as a municipal official—*i.e.*, to implement a recovery plan himself.

A more reasonable reading of the language in Sections 706, 708, and 709 of Chapter 7 is that Section 706 sets forth the general powers of a receiver relative to a municipality and a recovery plan.  Section 706, therefore, speaks in broad terms concerning the financial stability of a municipality while setting forth the general rules for how a receiver and a municipality are meant to work together to accomplish the goals of Chapter 7.  Sections 708 and 709, by contrast, concern the *enforcement* of a recovery plan for circumstances where, like the present, municipal officials refuse to adhere to a receiver's requirements and directives.  Thus, Section 708(a) provides that a receiver may *order* an "elected or appointed official" to "implement any provision of the recovery plan" and "refrain from taking any action" that would obstruct a receiver or the plan. 53 P.S. § 11701.708(a).  In Section 708(b), titled "Enforcement," the General Assembly clarified that such an order "is enforceable under [S]ection 709."  53 P.S. § 11701.708(b).

As such, in situations where officials continue to drag their feet and strain a municipality's financial recovery, Section 709 provides that a "receiver may petition [the] Commonwealth Court to issue a writ of mandamus upon any elected or appointed official of the distressed municipality or authority to secure compliance with an order issued under [S]ection 708."  53 P.S. § 11701.709.

It is the well-settled law of this Commonwealth that, "[w]here a remedy is provided by an act of assembly, the directions of the legislation must be strictly pursued and such remedy is exclusive."  *Lurie v. Republican Alliance*, 192 A.2d 367, 369 (Pa. 1963).  I see no reason why this axiom does not apply here.  Where a municipality, which, again, can only act through its municipal officials, fails or refuses to implement a court-approved recovery plan, the exclusive remedy available to the receiver is to issue an order to comply (Section 708) and, if necessary, seek relief from the Commonwealth Court via mandamus (Section 709).  Adopting the Opinion and OISA's contrary view that the receiver can bypass the municipality and its officials and implement the plan independently essentially renders Section 708 and 709 superfluous, contrary to our rules of statutory construction.  *See Freundt v. Dep't of Transp.*, 883 A.2d 503, 506 (Pa. 2005) ("[I]ndividual statutory provisions must be construed with reference to the entire statute of which they are a part, and the entire statute is presumed to be certain and effective, not superfluous and without import.").

Finally, I disagree with the Opinion and OISA that we should not address the initiatives in the Plan that violate Chapter 7.  This entire case concerns the Receiver's statutory authority, and the City's primary grievance is that the modifications in the Plan vest the Receiver with excessive and unlawful authority.  The City's brief is rife with references to what it characterizes as the "sledgehammer" approach of the modifications, asserting that the modifications are unlawful and the Receiver must resort to mandamus

rather than seek more authority from the courts—*i.e.*, the exact concern of this minority opinion.  (*See, e.g.*, City's Br. at 42.)  Thus, to ignore violations of Chapter 7 in the Plan relative to the Receiver's authority would not only disregard the crux of the City's argument, but it would also overlook that we granted King's Bench for the express purpose of delineating a receiver's authority under Chapter 7.  I cannot agree with that outcome.  Additionally, as the Opinion and OISA also notes, this Court has not had an opportunity to address Chapter 7 before this case, thereby making it critical that we set a precedent that properly interprets the law for future receiverships, if any.

Accordingly, for the reasons set forth above, I concur in the Opinion and OISA's legal analysis but respectfully dissent from its ultimate conclusion to confirm the Plan in full.  Rather, I would modify the Plan to eliminate any independent authority vested in the Receiver to implement independently the Plan's substance and confirm the Plan as modified.

**[J-34A-2023 and J-34B-2023] [MO: Wecht, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| RICK SIGER, IN HIS CAPACITY AS ACTING SECRETARY OF THE DEPARTMENT OF COMMUNITY AND ECONOMIC DEVELOPMENT | : : : : : : | No. 12 MAP 2023<br><br>Appeal from the Order of the Commonwealth Court Order dated January 31, 2023 at No. 336 MD 2020. |
| v. | : : : | ARGUED:  May 24, 2023 |
| CITY OF CHESTER | : : : : | |
| APPEAL OF: CITY OF CHESTER, MAYOR THADDEUS KIRKLAND AND CITY COUNCIL OF THE CITY OF CHESTER | : : : | |
| | | |
| RICK SIGER, IN HIS CAPACITY AS ACTING SECRETARY OF THE DEPARTMENT OF COMMUNITY AND ECONOMIC DEVELOPMENT | : : : : : : | No. 15 MAP 2023<br><br>Appeal from the Order of the Commonwealth Court Order dated February 14, 2023 at No. 336 MD 2020. |
| v. | : : : | ARGUED:  May 24, 2023 |
| CITY OF CHESTER | : : : : | |
| APPEAL OF: CITY OF CHESTER, MAYOR THADDEUS KIRKLAND AND CITY COUNCIL OF THE CITY OF CHESTER | : : : | |

**<u>DISSENTING OPINION AND OPINION IN SUPPORT OF VACATION AND REMAND</u>**

**JUSTICE DOUGHERTY**                    **DECIDED:  January 29, 2024**

"[D]rastic times" may "call for drastic measures[,]" Opinion and Opinion in Support of Affirmance (OOISA) at 59, but they can't justify illegal ones.  Each of the five modifications challenged by the City of Chester (City), the City's Mayor, and City Council, is contrary to the Municipalities Financial Recovery Act (Act 47), or otherwise unlawful. Accordingly, these modifications are arbitrary and should have been rejected as such by the Commonwealth Court.  I respectfully dissent.

Under Act 47, the Commonwealth Court "shall confirm" modifications to a recovery plan "unless it finds clear and convincing evidence that the recovery plan as modified is arbitrary, capricious or wholly inadequate to alleviate the fiscal emergency in the distressed municipality."  53 P.S. §11701.703(e).  A modification is arbitrary if it is contrary to law or rule.  *See Commonwealth v. Boczkowski*, 846 A.2d 75, 102 (Pa. 2004) ("An action or factor is arbitrary if it is not cabined by law or principle."); *accord Commonwealth v. Knight*, 156 A.3d 239, 247 (Pa. 2016); *Commonwealth v. Lesko*, 15 A.3d 345, 411 (Pa. 2011); *Commonwealth v. Chambers*, 980 A.2d 35, 56 (Pa. 2009); *see also Arbitrary*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "arbitrary" as "[d]epending on individual discretion; of, relating to, or involving a determination made without consideration of or regard for facts, circumstances, fixed rules, or procedures").  Legal questions are subject to *de novo* review by this Court.  *See, e.g.*, *Erie Ins. Exch. v. Moore*, 228 A.3d 258, 262 (Pa. 2020).[1]

---

[1] According to the OOISA, I've made "no effort to engage with the **facts** found by the Commonwealth Court."  OOISA at 35 n.128 (emphasis in original); *see also id.* at 36 n.128 ("[N]owhere in its analysis does the Dissent identify any 'clear and convincing evidence' upon which the Commonwealth Court, or we, could conclude that the challenged modifications were 'arbitrary' under the **facts** of this case.") (emphasis in original).  But this mischaracterization is beside the point; to be sure, disregarding facts is one way a (continued…)

Here, the five challenged modifications provide:

[(1)]  The administrative duties of City elected officials with respect to day-to-day operations shall be suspended. . . . City elected officials may not direct a City employee relating to any matter in the line of the employee's employment. . . .

[(2)]  City elected officials shall not interfere with the directives of the Chief of Staff or the Receiver. . . .

[(3)  T]he Receiver shall have the authority to direct the City to remove items from their Council agenda. . . .

[(4)]  Section 11.9-903(c) of the City's Charter provides that, "Where special skills are required, Council may at its discretion, employ qualified non-residents of the City in such cases where there are no qualified City residents available for the particular position involved."  This initiative substitutes "the Receiver" for "Council." . . .

[(5)  S]hould the City Solicitor become aware of a situation where a City official or employee is not complying with an order of this Court or with a confirmed recovery plan or plan modification, he shall immediately instruct the City official or employ to comply and he shall immediately inform the Receiver.

Modification of Amended Recovery Plan (Plan Modification), at 30-31, 33, 42, 49.

Regarding the first modification, by way of background, the legislative body for the City is a City Council consisting of five members elected from the City at large to staggered four-year terms.  *See* Home Rule Charter of the City of Chester §§201, 205.

---

determination may be arbitrary, but it is not the only one.  As this Court's precedents and the Black's Law Dictionary definition endorsed by the OOISA make clear, a determination is arbitrary if it disregards the facts **or the law**.  Moreover, the OOISA contends "[t]he Commonwealth Court took evidence over the course of a three-day hearing, found that the credible evidence offered by the Receiver justified many of the significant interventions proposed, and, indeed, rejected many of the initiatives that it concluded were impermissible."  *Id.* at 36 n.128.  However, the focus of the arbitrariness inquiry is not the Commonwealth Court's decision-making but whether "the **recovery plan** as modified is arbitrary[.]"  53 P.S. §11701.703(e) (emphasis added).  Whether the plan modifications challenged by the City are contrary to law and therefore arbitrary are legal questions to be reviewed *de novo*.

The Mayor is one of the five members of City Council, has full voting rights thereon, and serves as the body's presiding officer.  *See id.* §201.  City Council may, by ordinance, designate members of City Council to serve as the heads of the City's administrative departments.  *See id.* §601.  Alternately, the Mayor, at the annual organizational meeting of City Council, may assign members of City Council to head one or more of the City's administrative departments.  *See id.* §603.  Currently, and since at least 2016 when Mayor Thaddeus Kirkland took office, the latter procedure is followed.  That is, the Mayor annually appoints members of City Council as department heads.  *See* N.T. 1/10/23 at 243-44.  Thus, the duties of City Council members are not limited to their legislative responsibilities.  They also have administrative duties as department heads.  *See* OOISA at 13 ("Mayor Kirkland appoints exclusively City Council members as department heads, thus giving them administrative responsibilities in addition to their legislative roles."); *id.* at 40 ("City Councilpersons . . . have a legislative role as officials elected to serve on City Council, but . . . also, by virtue of the Mayor's appointment, have administrative duties as the heads of the City's various departments.") (emphasis omitted).

The challenged modification totally suspends these duties; it effectuates a wholesale suspension of the councilmembers' leadership of the various City departments, regardless of the particular department or specific governance issue.  *See id.* ("The challenged initiatives seek . . . to suspend these officials' duties in their administrative capacities[.]").  Indeed, the modification bars members of City Council from giving even *ad hoc* directions to City employees concerning their work.  *See* Plan Modification at 30 ("City elected officials may not direct a City employee relating to any matter in the line of the employee's employment.").  In the place of departments run by democratically-elected

members of City Council, the modification contemplates departments headed by unelected "employees and contractors." *Id.*

This drastic change in the way the City is governed contravenes several provisions of Act 47. Section 706 of Act 47 delineates the powers of the Receiver. Concerning modifications to the recovery plan, Section 706 grants to the Receiver the power "[t]o modify the recovery plan as necessary to achieve financial stability of the distressed municipality and authorities in accordance with section 703." 53 P.S. §11701.706(a)(2).[2] Accordingly, the Receiver's power to modify the recovery plan is not unlimited. Under the plain language of Section 706(a)(2), modifications are permitted only to the extent they are "necessary to achieve financial stability." 53 P.S. §11701.706(a)(2).

The City's departments include Public Affairs (which includes the Police Department), Accounts and Finance (which includes the Department of Human Resources), Public Safety (which includes the Fire Department), Streets and Public Improvements, and Parks and Public Property. *See* Codified Ordinances of Chester, arts. 111.04, 111.05, 111.06, 111.07, 111.09. Heading the day-to-day operations of these various departments necessarily involves numerous issues and decisions unrelated to the financial stability of the City. For instance, if the head of Public Affairs directs the police to focus on a specific block experiencing a sharp uptick in crime, if the head of Public Safety directs inspection of a fire plug to ensure it is in working order, if the head of Streets and Public Improvements directs a pothole to be filled, or if the head of Parks and Public Property directs a playground to be cleaned, the overall economic health of the City is not implicated. Completely barring the City's elected officials from involvement

---

[2] Section 703(e) establishes the procedure for modification. *See* 53 P.S. §11701.703(e).

in any administrative determination whatsoever, regardless of importance or subject, goes well beyond what is necessary to achieve financial stability for the City as a whole.

The OOISA argues:

> Neither this Court nor the Commonwealth Court are experts in municipal finance, and Act 47 does not ask us to be. The question for a reviewing court is not whether the Receiver is, in fact, correct in determining that a particular modification is "necessary to achieve financial stability." Rather, Act 47 directs the court to apply a specific, and highly deferential, standard of review to the Receiver's determination.

OOISA at 35. The standard of review under Section 703(e) is not a rubber stamp. A modification that is "arbitrary" must be disallowed, 53 P.S. §11701.703(e), and a modification is arbitrary "if it is not cabined by law," *Lesko*, 15 A.3d at 411; *Chambers*, 980 A.2d at 56; *Boczkowski*, 846 A.2d at 102. The pertinent law, Section 706(a)(2), does not grant the Receiver unfettered discretion to initiate any modification he pleases. Act 47 does not appoint the fox to guard the henhouse, and leave it to the Receiver alone to define the limits of his own authority to modify the recovery plan. Rather, any putative modification must be "necessary to achieve financial stability." 53 P.S. §11701.706(a)(2). Any modification which is not necessary to achieve financial stability is *ultra vires* and arbitrary. One need not be an "expert[ ] in municipal finance," OOISA at 35, to recognize that totally stripping the members of City Council of absolutely any say in the day-to-day minutiae of municipal operations clearly exceeds what is required to achieve financial stability.[3]

---

[3] As detailed below, one also does not need any special financial expertise to see that the authority to remove any item at all from City Council's agenda, including items unrelated to the City's finances, goes well beyond what is necessary to secure financial stability.

In addition to violating Section 706(a)(2), the first challenged modification also violates Section 605 of Act 47. Section 605 provides: "During a fiscal emergency, the authorities and appointed and elected officials of the distressed municipality shall continue to carry out the duties of their respective offices, except that no decision or action shall conflict with an emergency action plan, order or exercise of power by the Governor under section 604." 53 P.S. §11701.605. As the OOISA acknowledges, *see* OOISA at 13, 40, the duties of the councilmembers' offices include heading the City's various departments. Suspending these duties directly violates Section 605's command that elected officials shall continue to carry out their duties during a fiscal emergency.

The OOISA insists Section 605 offers "little aid" to the City because "receivership operates under **Chapter 7** of Act 47, which contains provisions that are more directly relevant to the challenged initiative." OOISA at 45 (emphasis in original). However, although a Receiver has been appointed for the City, the fiscal emergency continues. The "fiscal emergency shall end" only "upon certification by the [Secretary of Community and Economic Development] that the municipality: (1) is solvent and is not projected to be insolvent within 180 days or less; and (2) is able to ensure the continued provision of vital and necessary services after the termination of the fiscal emergency." 53 P.S. §11701.608(a).

Moreover, there is nothing in Chapter 7 authorizing the modification. The OOISA points to Section 708(a), *see* OOISA at 45-46 & n.159, but that provision authorizes the Receiver to issue a specific order to a specific elected official to either implement a particular provision of the recovery plan, or to refrain from taking a particular action that would interfere with the Receiver's powers or the goals of the recovery plan. *See* 53 P.S.

§11701.708(a) ("The receiver may issue an order to an elected or appointed official of the distressed municipality or an authority to: (1) implement any provision of the recovery plan; and (2) refrain from taking any action that would interfere with the powers granted to the receiver or the goals of the recovery plan.").  In other words, Section 708(a) permits *ad hoc* orders to elected officials on an as-needed basis, not the "extraordinary measure" of the "complete suspension" of the elected officials' administrative duties.  OOISA at 47.

The OOISA's reliance on Section 704(a)(2) is also misplaced.  *See id*. at 46-47. This section provides: "The confirmation of the recovery plan and any modification to the receiver's plan under section 703 . . . shall have the effect of: . . . suspending the authority of the elected and appointed officials of the distressed municipality or an authority to exercise power on behalf of the distressed municipality or authority pursuant to law, charter, ordinance, rule or regulation to the extent that the power would interfere with the powers granted to the receiver or the goals of the recovery plan[.]"  53 P.S. §11701.704(a)(2).  Section 704(a)(2) concerns the "effect" of a confirmed modification, not whether a modification is authorized in the first place.  It presupposes a valid modification confirmed under the procedure set forth in Section 703(e), and addresses the impact of confirmation.  Section 704(a)(2) does not address the Receiver's substantive power to modify the recovery plan; that is addressed by Section 706(a)(2). What's more, this section contemplates only the limited suspension of powers "to the extent" they would interfere with the powers of the Receiver or the goals of the recovery plan, not the blanket, unconditional suspension of duties proposed here.  *Id.*[4]

---

[4] The OOISA asserts that under my "view of these statutory provisions . . . [i]t is difficult to imagine what sort of suspensions of local officials' duties . . . would be permissible (continued…)

The total takeover of the elected officials' responsibilities to conduct the day-to-day affairs of the City also conflicts with Section 102, which sets forth the purpose and legislative intent of Act 47.  Specifically, Section 102(b)(1)(ii) provides: "It is the intent of the General Assembly to . . . [e]nact procedures and provide powers and guidelines to ensure fiscal integrity of municipalities **while leaving principal responsibility for conducting the governmental affairs of a municipality**, including choosing the priorities for and manner of expenditures based on available revenues, **to the charge of its elected officials**, consistent with the public policy set forth in this section."  53 P.S. §11701.102(b)(1)(ii) (emphasis added).  Presently, not only are the councilmembers stripped of their principal responsibility for conducting the day-to-day affairs of the City, but they are in fact deprived of **any** role at all in daily governance.  Wholly banishing the democratically elected officials from managing the City is clearly not what the legislature had in mind in promulgating Act 47.  Section 102(b)(1)(ii) calls for the preservation, not abrogation, of self-governance.

The OOISA contends:

Section 102 contains numerous statements of the General Assembly's intent. . . . [T]he provision of Section 102 that most closely aligns with receivership under Chapter 7 is the statement of the General Assembly's

---

under Section 704(a)(2) . . . yet would not be vulnerable to attack" under Section 605.  OOISA at 46 n.161.  However, Section 605 does not totally ban the suspension of local officials' duties.  Although it sets forth a general rule that "[d]uring a fiscal emergency, the authorities and appointed and elected officials of the distressed municipality shall continue to carry out the duties of their respective offices," expressly exempted from that rule is any "decision or action . . . conflict[ing] with an emergency action plan, order or exercise of power by the Governor under section 604."  53 P.S. §11701.605.  Section 605 thus appears to authorize the limited suspension of duties to the extent necessary for fiscal recovery.  But the wholesale suspension of the elected officials' administrative duties at issue in this case is incompatible with both Section 704(a)(2) and Section 605, even if a hypothetical, more circumscribed suspension could potentially pass statutory muster.

> intent to "[p]rovide for the exercise of the Commonwealth's sovereign and
> plenary police power in emergency fiscal conditions to protect the health,
> safety and welfare of a municipality's citizens when local officials are
> unwilling or unable to accept a solvency plan developed for the benefit of
> the municipality." . . . This provision demonstrates the legislature's intent to
> prioritize the financial recovery of such municipalities over the prerogatives
> of local officials.

OOISA at 43-44 (footnotes omitted), *quoting* 53 P.S. §11701.102(b)(1)(iv).   But the

various statements of intent in Section 102 are not mutually exclusive.   They are not

separated by the word "or" or otherwise phrased in the disjunctive.   Section 102 does not

present a menu of intents from which a court can pick and choose.   Instead, the entirety

of Section 102 must be given effect to the extent possible.   *See* 1 Pa.C.S. §1921(a)

("Every statute shall be construed, if possible, to give effect to all its provisions.").   The

language of Section 102(b)(1)(ii) applies just as well to receivership under Chapter 7 as

the language of Section 102(b)(1)(iv).   Construed as a whole as it must be, Section 102

evinces the legislative intent of balancing the interests of preserving local, democratically

elected self-governance and promoting financial recovery.   Completely gutting City

Council's administrative duties does not balance these concerns but rather

disproportionately favors the latter side of the equation to the significant detriment of the

former.[5]

---

[5] The OOISA argues Sections 102(b)(1)(ii) and 102(b)(1)(iv) are "plainly incompatible[,]"
asking rhetorically "how, if the authority of local officials is unassailable, the
Commonwealth might exercise its 'sovereign and plenary police power' to protect the
welfare of a municipality's citizens when such 'local officials are unwilling or unable to
accept a solvency plan' developed for the municipality's benefit?"  OOISA at 44-45 n.155,
*quoting* 53 P.S. §11701.102(b)(1)(iv).   But Section 102(b)(1)(ii) does not endorse
"unassailable" local authority — it does not categorically provide that powers of local
elected officials should never be questioned, challenged, or abridged.   Instead, it calls for
"leaving **principal** responsibility for conducting the governmental affairs of a municipality
. . . to the charge of its elected officials[.]" 53 P.S. §11701.102(b)(1)(ii) (emphasis added).
(continued…)

The second modification appealed by the City, which dictates noninterference with the Receiver's directives, is also *ultra vires* of Act 47.  "Under the doctrine of *expressio unius est exclusio alterius*, the inclusion of a specific matter in a statute implies the exclusion of other matters."  *Thompson v. Thompson*, 223 A.3d 1272, 1277 (Pa. 2020) (quotation marks and citation omitted).  Act 47 addresses the power of the Receiver to address interference by elected officials in Sections 708(a)(2) and 709(a).  Again, Section 708(a)(2) provides: "The receiver may issue an order to an elected or appointed official of the distressed municipality or an authority to . . . refrain from taking any action that would interfere with the powers granted to the receiver or the goals of the recovery plan." 53 P.S. §11701.708(a)(2).  Section 709(a), in turn, states: "The receiver may petition Commonwealth Court to issue a writ of mandamus upon any elected or appointed official of the distressed municipality or authority to secure compliance with an order issued under section 708."  53 P.S. §11701.709(a).  Accordingly, Act 47 specifies two particular actions the Receiver may take to bar interference by elected officials: the Receiver can issue an order and, if the order is not obeyed, he can petition for mandamus.  Pursuant to the doctrine of *expressio unius est exclusio alterius*, the statute's explicit authorization of these two specific actions by the Receiver to protect against interference by elected officials implies the prohibition of other acts to accomplish this objective.  That is, under Sections 708(a)(2) and 709(a), interference with the Receiver's directives must be

---

This qualified and flexible legislative intent can be effectuated without barring the exercise of the Commonwealth's police power in emergency fiscal conditions pursuant to Section 102(b)(1)(iv).  It is entirely possible to give effect to both Sections 102(b)(1)(ii) and 102(b)(1)(iv), and therefore, pursuant to our rules of statutory construction, we are obliged to do so.  *See* 1 Pa.C.S. §1921(a).

addressed through orders and, if necessary, mandamus proceedings, not a provision in the recovery plan itself.

In addition, this modification violates Section 709(b), which provides: "Any elected or appointed official of a distressed municipality or authority may petition Commonwealth Court to enjoin any action of the receiver that is contrary to this chapter."  53 P.S. §11701.709(b).  Contrary to the OOISA's implication that the City's elected officials have a "mandatory duty" to comply with the Receiver's directives, OOISA at 39 (quotation marks, citation, and emphasis omitted), Section 709(b) recognizes the Receiver may issue directives in violation of Chapter 7, and authorizes the officials to take legal action to prevent illegal directives from being effectuated.  The disputed modification, however, imposes on the City's elected officials a blanket obligation to not interfere with any directive from the Receiver, regardless of its legality.  This unequivocal mandate is incompatible with the elected officials' statutory right to pursue mandamus to block illegal directives under Section 709(b).

The third modification, authorizing the Receiver to remove items from City Council's agenda, likewise violates Act 47, as it is unnecessary to achieve financial stability in contravention of Section 706(a)(2).  While it is no doubt true that "City Council's legislative activities can involve the expenditure of the City's limited funds[,]" OOISA at 49, the modification is not limited to agenda items related to the City's finances.  Rather, it authorizes the Receiver to direct the City to remove any item at all from City Council's agenda irrespective of the subject matter.  Under this modification, the Receiver would be able to block resolutions having no bearing whatsoever on the City's financial condition, such as resolutions recognizing the accomplishments of a City resident,

proclaiming support for an oppressed population overseas, naming a new City park, or renaming a City holiday.[6]    Granting the Receiver total control over City Council's legislative agenda, even when economic concerns are not implicated, is far in excess of what is required to secure financial stability for the City.

Furthermore, this modification conflicts with Section 706(a)(8).    That provision grants to the Receiver the power "[t]o **attend** executive sessions of the governing body of the distressed municipality or authority and make reports to the public on implementation of the recovery plan."    53 P.S. §11701.706(a)(8) (emphasis added). Under the *expressio unius est exclusio alterius* doctrine, the implication of Section 706(a)(8) is that the Receiver's powers regarding City Council's meetings are limited to attending them.    The Receiver is not empowered to actually participate in the meetings, much less direct that particular items be removed from Council's agenda.

The OOISA argues this modification "implicates Section 704(a)(2)[.]"    OOISA at 49.    As discussed, Section 704(a)(2), by its plain terms, addresses the "effect" of confirmation of a modification to the recovery plan; it does not grant any particular substantive power to the Receiver.    *See* 53 P.S. §11701.704(a)(2).    The OOISA also asserts "[s]uch authority [to control City Council's agenda] is arguably already encompassed within other provisions of Act 47[,]" specifically Sections 706(a)(1),

---

[6] The OOISA contends "[e]ven seemingly minor activities involve the direction of municipal employees, who the municipality must pay."    OOISA at 50 n.172.    None of the above-noted examples, which represent but the tip of the iceberg of potential non-financial matters that could be addressed by a city council, directs municipal employees to do anything.    In any case, existing municipal employees would get paid regardless of any such enactments.    Blocking the measures would not save the municipality from paying the salaries of employees already on the payroll.

706(a)(7), and 708(a).  OOISA at 49.[7]  However, these general provisions do not specifically address the Receiver's powers regarding City Council proceedings.  Section 706(a)(8), on the other hand, squarely addresses the Receiver's authority in this regard.  It is a well-settled rule of statutory construction that "the specific controls the general." *LaFarge Corp. v. Commonwealth, Ins. Dept.*, 735 A.2d 74, 76 (Pa. 1999).[8]

Fourth, the modification purporting to amend the City's Home Rule Charter to permit the Receiver to hire non-residents is unconstitutional.  The Pennsylvania Constitution mandates that "[a]doption, amendment or repeal of a home rule charter shall be by referendum."  PA. CONST. Art. 9, §2.  "'Referendum' means approval of a question placed on the ballot, by initiative or otherwise, by a majority vote of the electors voting thereon."  PA. CONST. Art. 9, §14.  The challenged modification purports to bypass the constitutional requirement of a voter referendum and amend the City's Home Rule Charter via the recovery plan.  This is clearly prohibited by Article 9, §2, rendering the modification arbitrary as contrary to law.

According to the OOISA, "[a]lthough the initiative perhaps could be more clear in its phrasing, it seeks to amend the City's Act 47 **recovery plan**, not the City's Home Rule

---

[7] Section 706(a)(1) authorizes the Receiver "[t]o require the distressed municipality or authority to take actions necessary to implement the recovery plan under section 703." 53 P.S. §11701.706(a)(1).  Section 706(a)(7) empowers the Receiver "[t]o direct the distressed municipality or authority to take any other action to implement the recovery plan."  53 P.S. §11701.706(a)(7).

[8] The OOISA maintains "[t]here is no reason to conclude that the City Council's listing of items on its legislative agenda is outside the reach of the[] broad statutory delegations of power to the Receiver" in Sections 706(a)(1) and 708(a).  OOISA at 51 n.172.  On the contrary, there is a very good reason to conclude these general provisions do not supersede the specific language of Section 706(a)(8) granting to the Receiver the limited power to attend City Council meetings: the bedrock principle of statutory construction that the specific controls over the general.  *See LaFarge*, 735 A.2d at 76.

Charter."  OOISA at 54 (emphasis in original); *see also id.* at 54 n.185 ("[T]he fact remains that the City has failed to demonstrate why this modification to the **recovery plan** was impermissible") (emphasis in original).  In fact, the modification seeks to do both things. It is an amendment to the recovery plan that would amend the City's Home Rule Charter. The modification purports to amend the language of Section 903(C) of the Charter by "substitut[ing] 'the Receiver' for 'Council.'"  Plan Modification at 42.  The OOISA implies a modification to the recovery plan is not "capable of causing a change in the actual wording of the City's Home Rule Charter."  OOISA at 54.  But that is exactly the point.  It is indeed legally impossible for a modification to a recovery plan to amend a Home Rule Charter subject to revision by voter referendum only, which is why this modification purporting to do precisely that is *ultra vires* and arbitrary.

The  fifth  and  final  contested  modification,  which  requires  the  City  Solicitor  to immediately notify the Receiver if an official or employee with the City has violated a court order or the recovery plan, contravenes Pennsylvania's Rules of Professional Conduct. In particular, Rule of Professional Conduct 1.6(a) provides: "[a] lawyer shall not reveal information relating to representation of a client unless the client gives informed consent[.]"  Pa.R.P.C. 1.6(a).  The explanatory comment to the rule expounds that "[a] fundamental principle in the client-lawyer relationship is that, in the absence of the client's informed consent, the lawyer must not reveal information relating to the representation[,]" "the public interest is usually best served by a strict rule requiring lawyers to preserve the confidentiality of information relating to the representation of their clients," and "[w]ith limited exceptions, information relating to the representation must be kept confidential by a lawyer."  Pa.R.P.C. 1.6, expl. cmt. [2], [7].  The City Solicitor is an attorney admitted to

practice in Pennsylvania, *see* Home Rule Charter of the City of Chester §607, and the modification requires him to reveal information relating to representation of his client irrespective of whether there has been consent to disclosure. This presents a clear conflict with Rule 1.6(a).

The OOISA argues the modification is permissible under Rule 1.6(c)(8). *See* OOISA at 55. However, that paragraph simply provides that "[a] lawyer **may** reveal such information [relating to representation of a client] to the extent that the lawyer reasonably believes necessary . . . to comply with other law or court order." Pa.R.P.C. 1.6(c)(8) (emphasis added). Paragraph (c)(8) "permits but does not require the disclosure of information relating to a client's representation to accomplish the purposes specified" in paragraph (c)(8). Pa.R.P.C. 1.6, expl. cmt. [23]. It confers "discretion" on the lawyer whether or not to disclose client information based on "such factors as the nature of the lawyer's relationship with the client and with those who might be injured by the client, the lawyer's own involvement in the transaction and factors that may extenuate the conduct in question." *Id.* "A lawyer's decision not to disclose as permitted by paragraph (c)[8] does not violate th[e] Rule." *Id.* The modification, on the other hand, mandates that the City Solicitor "**shall** immediately inform the Receiver" of any violation of an order or the recovery plan. Plan Modification at 49 (emphasis added). The permissive language of Rule 1.6(c)(8) does not authorize the mandatory disclosure of confidential client information pursuant to the challenged modification.[9] Because each of the five appealed

---

[9] The OOISA claims "portions" of paragraphs [18] and [21] of the explanatory comment to Rule 1.6 "make abundantly clear that, notwithstanding the fact that paragraph (c) is framed in discretionary terms as a general matter, a lawyer may indeed be compelled to (continued…)

modifications to the City's recovery plan is violative of law or rule and thus arbitrary, I

dissent.[10]

---

disclose" client information pursuant to a plan modification.    OOISA at 56 n.192.
Paragraph [18] provides:

Other law may require that a lawyer disclose information about a client. Whether such a
law supersedes Rule 1.6 is a question of law beyond the scope of these Rules. When
disclosure of information relating to the representation appears to be required by other
law, the lawyer must discuss the matter with the client to the extent required by Rule 1.4.
If, however, the other law supersedes this Rule and requires disclosure, paragraph (c)(8)
**permits** the lawyer to make such disclosures as are necessary to comply with the law.

Pa.R.P.C. 1.6, expl. cmt. [18] (emphasis added).    Similarly, paragraph [21] states:

A lawyer may be ordered to reveal information relating to the representation of a client by
a court or by another tribunal or governmental entity claiming authority pursuant to other
law to compel the disclosure.    Absent informed consent of the client to do otherwise, the
lawyer should assert on behalf of the client all nonfrivolous claims that the order is not
authorized by other law or that the information sought is protected against disclosure by
the attorney-client privilege or other applicable law.    In the event of an adverse ruling, the
lawyer must consult with the client about the possibility of appeal to the extent required
by Rule 1.4.    Unless review is sought, paragraph (c)(8) **permits** the lawyer to comply with
the court's order.

Pa.R.P.C. 1.6, expl. cmt. [21] (emphasis added).    Thus, like Rule 1.6(c)(8) itself, these
comments are "framed in discretionary terms."    OOISA at 56 n.192.    By their plain
language, they "permit[]" but do not oblige the lawyer to reveal client information.    These
permissively-worded comments do not mandate disclosure any more than the
permissively-worded Rule they address.

[10] It is unnecessary to my analysis to consider whether, in addition to the legal and ethical
violations described above, the challenged modifications also violate Section 704(b)(1),
which provides that "[c]onfirmation of the recovery plan and any modification to the plan
under section 703 shall not be construed to . . . change the form of government of the
distressed municipality or an authority[.]"  53 P.S. §11701.704(b)(1).  However, I note my
disagreement with the OOISA's interpretation "[t]his [provision] is an unambiguous
instruction to those who might 'construe' a recovery plan—reviewing courts, for
instance—that they should **not** view a recovery plan as effecting a change to a distressed
municipality's 'form of government.'"    OOISA at 38 (emphasis in original).    This
construction of Section 704(b)(1) as dictating the outcome of judicial review raises
constitutional separation of powers concerns.  *See Bailey v. Waters*, 162 A. 819, 821 (Pa.
1932) ("A legislative direction to perform a judicial function in a particular way, would be
(continued…)

Justice Mundy joins this dissenting opinion and opinion in support of vacation and remand.

---

a direct violation of the constitution, which assigns to each organ of the government its exclusive function and a limited sphere of action.") (quotation marks and citation omitted). As such, the doctrine of constitutional avoidance calls for rejecting this interpretation in favor of the Commonwealth Court's reasonable construction of this provision as a limitation upon the recovery plan, *i.e.*, as a mandate against the recovery plan changing a municipality's form of government.  *See Commonwealth v. Herman*, 161 A.3d 194, 212 (Pa. 2017) ("Under the canon of constitutional avoidance, if a statute is susceptible of two reasonable constructions, one of which would raise constitutional difficulties and the other of which would not, we adopt the latter construction.").