# EXHIBIT 2

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Neil R. Weaver, in his capacity as | : | |
| Acting Secretary of the Department | : | |
| of Community and Economic | : | |
| Development, | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 336 M.D. 2020 |
| | : | |
| City of Chester, | : | |
| Respondent | : | HEARD: January 9-11, 2023 |

BEFORE:      HONORABLE ELLEN CEISLER, Judge

## **MEMORANDUM AND ORDER**

Before the Court is the Modification of Amended Recovery Plan (Plan Modification) filed by Michael T. Doweary, in his capacity as Receiver for the City of Chester (Receiver), wherein Receiver seeks to amend the City of Chester's fiscal recovery plan pursuant to Section 703(e) of the Municipalities Financial Recovery Act (Act 47), Act of July 10, 1987, P.L. 246, No. 47, *as amended*, 53 P.S. § 11701.703(e).[1]  In his Plan Modification, Receiver proposes sweeping changes to the existing Amended Recovery Plan and seeks to exercise exclusive control over many aspects of the City of Chester's internal administrative operations.  The City of Chester, Mayor Thaddeus Kirkland, and City Council of the City of Chester (collectively, City)[2] have filed objections to the Plan Modification, asserting that the proposed modifications are beyond the scope of Receiver's authority under Act 47, effectuate an unconstitutional change in the form of government, and/or lack a fiscal recovery purpose.

---

[1] Section 703 of Act 47 was added by the Act of October 20, 2011, P.L. 318.

[2] The Court uses "City" in this Opinion to refer to the respondents collectively, as noted above, as well as to the City of Chester individually.

EXHIBIT 2

The Court held a three-day evidentiary hearing on the Plan Modification.  The testimony presented at the hearing revealed to the Court a culture of denial, blame-shifting, arrogance, and nepotism within the City's government.  The testimony also demonstrated the existence of significant operational issues within the City's departments, as well as City officials' lack of transparency, lack of cooperation, and blatant disrespect of Receiver and his team.   Receiver contends that these issues, collectively, have impeded his ability to carry out the goals of the Amended Recovery Plan that was approved by the Court in June 2021.

For the reasons that follow, the Court confirms in part Receiver's Plan Modification, strikes certain proposed initiatives from the Plan Modification, and grants Receiver leave to amend the Plan Modification, as discussed more fully below.

## I.  Introduction

### A.  <u>Act 47</u>

The General Assembly's purpose in enacting Act 47 was to "foster the fiscal integrity of municipalities" to enable them to "provide for the health, safety and welfare of their citizens; pay principal and interest on their debt obligations when due; meet financial obligations to their employees, vendors and suppliers; and provide for proper financial accounting procedures, budgeting and taxing practices." Section 102(a) of Act 47, 53 P.S. § 11701.102(a).  Act 47 provides a comprehensive program of fiscal management oversight and technical and financial assistance to municipalities experiencing severe financial distress in order to ensure the health, safety, and welfare of their citizens.  *See id.* § 11701.102(b).

To achieve these goals, once a fiscal emergency is declared and a receiver is appointed, Act 47 grants the receiver broad authority to oversee the distressed

2

EXHIBIT 2

municipality's financial recovery.   Specifically, Section 706(a) of Act 47 gives an appointed receiver the following enumerated powers and duties:

(1) To require the distressed municipality or authority to take actions necessary to implement the recovery plan under [S]ection 703 [of Act 47].

(2) To modify the recovery plan as necessary to achieve financial stability of the distressed municipality and authorities in accordance with [S]ection 703 [of Act 47].

(3) To require the distressed municipality or authority to negotiate intergovernmental cooperation agreements between the distressed municipality and other political subdivisions in order to eliminate and avoid deficits, maintain sound budgetary practices and avoid interruption of municipal services.

(4) To submit quarterly reports to the [municipality's] governing body and, if applicable, the chief executive officer of the distressed municipality and to the [D]epartment [of Community and Economic Development (DCED)]. . . .

(5) To require the distressed municipality or authority to cause the sale, lease, conveyance, assignment or other use or disposition of the distressed municipality's or authority's assets in accordance with [S]ection 707 [of Act 47].

(6) To approve, disapprove, modify, reject, terminate or renegotiate contracts and agreements with the distressed municipality or authority, except to the extent prohibited by the Constitutions of the United States and Pennsylvania.

(7) To direct the distressed municipality or authority to take any other action to implement the recovery plan.

(8) To attend executive sessions of the governing body of the distressed municipality or authority and make reports to the public on implementation of the recovery plan.

3

EXHIBIT 2

(9) To file a municipal debt adjustment action under the [United States] Bankruptcy Code (11 U.S.C. § 101 et seq.) and to act on the municipality's behalf in the proceeding. . . .

(10) To meet and consult with the advisory committee under [S]ection 711 [of Act 47].

(11) To employ financial or legal experts deemed necessary to develop and implement the recovery plan. . . .

(12) To make a recommendation to the [S]ecretary [of DCED] that the municipality be disincorporated in accordance with Chapter 4 [of Act 47].

*Id.* § 11701.706(a).[3]

In creating and implementing a fiscal recovery plan, the receiver must ensure the "continued provision of vital and necessary services" to the residents of the

---

[3] Section 706(b) of Act 47, in turn, specifies which actions by an appointed receiver are prohibited.  A receiver *may not*:

(1) Unilaterally levy taxes.

(2) Unilaterally abrogate, alter or otherwise interfere with a lien, charge, covenant or relative priority that is:

(i) held by a holder of a debt obligation of a distressed municipality; and

(ii) granted by the contract, law, rule or regulation governing the debt obligation.

(3) Unilaterally impair or modify existing bonds, notes, municipal securities or other lawful contractual or legal obligations of the distressed municipality or authority.

(4) Authorize the use of the proceeds of the sale, lease, conveyance, assignment or other use or disposition of the assets of the distressed municipality or authority in a manner contrary to [S]ection 707[of Act 47].

53 P.S. § 11701.706(b).  Section 706 of Act 47 was added by the Act of October 20, 2011, P.L. 318.

EXHIBIT 2

distressed municipality. *Id.* § 11701.703(b)(1)(i). Act 47 defines "vital and necessary services" as "[b]asic and fundamental municipal services," which includes not only police and fire services, trash collection, and snow removal, but also "[p]ayroll and pension obligations" and "[f]ulfillment of payment of debt obligations or any other financial obligations." Section 701 of Act 47, 53 P.S. § 11701.701.[4]

Importantly, throughout his or her appointment, the receiver has the express authority "[t]o *require* the distressed municipality . . . *to take actions necessary to implement the recovery plan*" and "[t]o modify [a] recovery plan *as necessary to achieve financial stability of the distressed municipality*." 53 P.S. § 11701.706(a)(1) and (2) (emphasis added). Any modification of a recovery plan must first be approved and confirmed by the Court before it may be implemented. *See id.* § 11701.703(e).

Once the Court confirms a plan modification, the municipality's elected and appointed officials are obligated to comply with the modified plan. Section 704(a) of Act 47 provides that the Court's confirmation of a plan modification "shall have the effect of: (1) imposing on the elected and appointed officials of the distressed municipality . . . *a mandatory duty to undertake the acts set forth in the recovery plan*"; and "(2) *suspending the authority of the elected and appointed officials* of the distressed municipality . . . to exercise power on behalf of the distressed municipality . . . *pursuant to law, charter, ordinance, rule or regulation to the extent that the power would interfere with the powers granted to the receiver or the goals of the recovery plan*." *Id.* § 11701.704(a)(1) and (2) (emphasis added). Section 704(b) also provides that the Court's confirmation of a plan modification "*shall not be construed to*: (1) *change the form of government* of the distressed municipality . . . ; or (2) except as set forth in [Section 704](a), *affect [the] powers and duties of [the]*

---

[4] Section 701 of Act 47 was added by the Act of October 20, 2011, P.L. 318.

5

EXHIBIT 2

*elected and appointed officials* of the distressed municipality . . . ."  *Id.* §
11701.704(b) (emphasis added).

## B. <u>Factual & Procedural Background</u>

Since 1995, the City has been designated a financially distressed municipality
under Act 47.  Between 1995 and 2020, the City operated under numerous Act 47
fiscal recovery plans.

On April 13, 2020, as a result of the City's continuing and deepening financial
crisis, Governor Tom Wolf issued a Declaration of Fiscal Emergency for the City
under Act 47.  On June 22, 2020, the Court placed the City under receivership and
approved the appointment of Mr. Doweary as Receiver under Act 47.[5]

The Court confirmed Receiver's initial Act 47 recovery plan in October 2020.
On April 7, 2021, Receiver submitted an Amended Recovery Plan, which the Court
confirmed on June 7, 2021.  At that time, the Court determined that the Amended
Recovery Plan "contain[ed] a number of initiatives that set forth short- and long-
term strategies to address structural issues" in the City and "propose[d] certain
initiatives, in cooperation with City officials and other stakeholders, to address the
fiscal emergency and continue to provide necessary and vital services in the City."
*Davin v. City of Chester* (Pa. Cmwlth., No. 336 M.D. 2020, filed June 7, 2021)
(*Davin I*), slip op. at 6-7.

On March 4, 2022, Receiver filed a Petition for Writ of Mandamus
(Mandamus Petition) with the Court pursuant to Section 709(a) of Act 47, 53 P.S.
§ 11701.709(a).[6]  In his Mandamus Petition, Receiver asked the Court to direct that

---

[5] On December 28, 2021, the Court extended the City's receivership for up to two years.

[6] Section 709(a) of Act 47 permits an appointed receiver to petition this Court "to issue a
writ of mandamus upon any elected or appointed official of the distressed municipality . . . to
secure compliance with an order" issued by the receiver.  53 P.S. § 11701.709(a).  Section 709 of
Act 47 was added by the Act of October 20, 2011, P.L. 318.

6

EXHIBIT 2

the City's elected officials comply with the initiatives outlined in the Amended Recovery Plan and with two prior orders issued by Receiver.

On March 22, 2022, after an evidentiary hearing, the Court granted in part and denied in part the Mandamus Petition.   Most notably, the Court found that Councilman William Morgan, who heads the City's Department of Finance and Human Resources (Finance Department), failed to cooperate with Receiver and his team and "engaged in conduct that has impeded Receiver's ability carry out the goals of the Amended Recovery Plan." *Davin v. City of Chester* (Pa. Cmwlth., No. 336 M.D. 2020, filed Mar. 22, 2022) (*Davin II*), slip op. at 9-10.   As such, the Court ordered that "Councilman Morgan and his team shall immediately share any future correspondence or information they receive relating to the City's finances with Receiver" and that "Mr. Morgan shall not direct any employee to act or take any action that in any way interferes with the operations of the City's Finance . . . Department[]." *Id.* at 11 n.11 & 13.

## C.  City's Governance Structure

The City is a City of the Third Class and has operated under a Home Rule Charter since 1980.  The Home Rule Charter incorporates the City's Administrative Code, which was adopted by ordinance and "provide[s] for the administrative organization of the City government, the assignment of duties and responsibilities to officers and employees, and procedural requirements set forth in the general laws or in the Charter."  Home Rule Charter § 602; *see also id.* §§ 211, 213, and 215 (incorporating provisions of the Administrative Code).

The City is governed by an elected Mayor, who is the City's "chief executive." *Id.* § 301.  The Mayor "shall have any and all additional powers and duties which may be conferred upon him by the Administrative Code."  *Id.* § 302.  The Mayor supervises the conduct of all City officers, examines all reasonable complaints

7

EXHIBIT 2

against them, and causes any violations or neglect of duty to be promptly punished or reported to City Council.  *Id.* § 303.

The City is also governed by an elected five-member Council, one of whom is the Mayor who has full voting rights.  *Id.* §§ 201, 301.  City Council members serve four-year staggered terms.  *Id.* § 205.  City Council is exclusively vested with "[a]ll legislative powers and duties of the City."  *Id.* § 215.  Such legislative powers include adopting a budget, making appropriations for expenditures, levying taxes, conducting audits and investigations, modifying the Administrative Code to create or abolish municipal departments, and adopting ordinances and resolutions.  *Id.*

### D.  Present Proceedings

### 1.  Plan Modification

On November 8, 2022,[7] Receiver filed the instant Plan Modification, seeking to amend the City's fiscal recovery plan a second time since it was initially confirmed by the Court.  In support of his Plan Modification, Receiver avers:

> The City . . . is at a critical point in its history.  Financially, it stands at the brink of bankruptcy with a severe structural deficit that cannot be addressed by one-time "fixes."  Operationally, the City cannot reliably provide basic vital and necessary services to its residents, and it does not have the basic internal financial and personnel capabilities and policies to reliably provide basic governmental functions to its employees.  Efforts to right [the City's] ship up to this point have not worked.  For [the City] to survive and thrive again, it must take bold and significant steps.
>
> . . . .

---

[7] Two days later, on November 10, 2022, Receiver filed a Chapter 9 bankruptcy petition in the United States Bankruptcy Court for the Eastern District of Pennsylvania.  On November 22, 2022, the federal bankruptcy court partially lifted the automatic bankruptcy stay to allow this Court to address Receiver's pending Plan Modification.

After over two and [one-]half years in [the City], the Receiver and his team of municipal professionals have tried to address the City's deep financial and operational problems. These problems are by far the worst that the Receiver's team has ever encountered in their many years of financially distressed local government experience. The status quo has not worked, is not working, and will not work. The residents of [the City] deserve better.

. . . .

As Act 47 requires the Receiver to ensure the provision of vital and necessary services to [City] residents, and as the City is on the verge of a Chapter 9 bankruptcy filing, the Receiver files this Plan Modification to secure Court approval to fulfill his responsibilities as they relate to the provision of vital and necessary services. Through this Plan Modification, the Receiver seeks approval, or in some cases clarification or reaffirmation, of initiatives that allow him to complete the very difficult task that this Court has confirmed him to accomplish.

Plan Modification at 1-4.[8]   Receiver contends that recent actions by the City's elected officials have impeded his ability to carry out the goals of the Amended Recovery Plan and the City's ability to provide vital and necessary services to its residents.

Receiver's Plan Modification contains 33 proposed initiatives, which Receiver has categorized as follows: (1) administrative duties and professional management; (2) core internal administrative functions and ethics; (3) parking services; (4) monetization of the Stormwater Authority of the City of Chester (Stormwater Authority);[9] and (5) economic development. *See* Plan Modification at 30-59.

---

[8] Receiver filed a revised Plan Modification with the Court on December 9, 2022, which incorporates compromised language proposed by Councilman Stefan Roots. The Court cites the December 9, 2022 version of the Plan Modification throughout this Opinion.

[9] On January 4, 2023, following a pre-hearing conference with the parties' counsel, the Court bifurcated the matter and directed that it would not receive evidence on Receiver's proposed initiatives relating to the Stormwater Authority at the Plan Modification hearing. Furthermore, during the hearing, the Court ruled from the bench that it would not consider evidence regarding Receiver's proposed parking initiatives at that time. N.T., 1/9/23, at 165-66, 169. The Court

9

EXHIBIT 2

The most contested initiatives seek to remove the City's elected officials from their appointed positions as department heads; suspend the administrative duties of the City's elected officials as they relate to day-to-day operations; and give Receiver the sole authority to take certain actions on the City's behalf, including entering into contracts and controlling and directing the expenditure of federal and state funds. Receiver also seeks to convert the City's current Chief Operating Officer (COO) into the City's Chief of Staff, who would report exclusively to Receiver and oversee each of the City's departments.

On December 2, 2022, the City filed objections to the Plan Modification and a supporting brief, asserting:

> The Receiver's proposed [m]odifications, inter alia: a) strip the mayor and city council (the "Elected Officials") of _**all**_ administrative duties with respect to the City; b) give all administrative duties to a chief operating officer who reports solely to the Receiver; c) give the Receiver a _de facto_ veto over all of the City's legislative activity by authorizing the Receiver to remove items from City Council's legislative agenda; and d) give the Receiver the sole authority to sell the City's assets and dissolve the City's municipal authorities.
>
> In short, the Receiver seeks to remove the Elected Officials from power and install himself as the unelected supreme authority of the City who is not answerable to the citizens.

City Br. in Opp. to Plan Modification at 1 (emphasis in original).

The crux of the City's opposition is that Receiver's proposed modifications effectuate a change in the form of government, which is prohibited by Act 47 and the Pennsylvania Constitution.   The City asserts that Receiver has specific enumerated powers under Act 47, which do not include the power to take

---

bifurcated the Stormwater Authority and parking matters from these proceedings due to the complex factual and legal issues involved, which the Court determined necessitated separate hearings.  Thus, the Court does not address the Stormwater Authority initiatives or the parking initiatives in this Opinion.

EXHIBIT 2

administrative control of the City or to oust elected officials from their positions. *See* 53 P.S. § 11701.706(a) (outlining a receiver's powers and duties). The City also asserts that the proposed modifications unconstitutionally disenfranchise the City's residents by amending the Home Rule Charter without a voter referendum. Finally, the City contends that, contrary to Receiver's assertions, "[t]he problem is not the [City's] [e]lected [o]fficials"; rather, the problem "is the debt which has accumulated over decades, the poverty of the City[,] and the reduced population. Disenfranchising the residents by removing their democratically elected officials will not solve the problem." City Br. in Opp. to Plan Modification at 27.

## 2. Evidentiary Hearing

The Court held a three-day hearing on the Plan Modification from January 9-11, 2023. Receiver testified on his own behalf and also presented the testimony of his Chief of Staff, Vijay Kapoor, and the City's newly hired COO, Leonard Lightner.[10] The City presented the testimony of its Solicitor, Kenneth Schuster, Esquire, Mayor Kirkland, and Councilman Morgan.

Much of the testimony at the hearing focused on the following incidents, which Receiver contends exemplify the City officials' lack of transparency, lack of cooperation, and disrespect of Receiver and his team:

---

[10] In the Plan Modification, Receiver avers:

Both the Receiver and a unanimous City Council approved the hiring [of] Mr. . . . Lightner on July 27, 2022, after a nationwide search conducted by a professional search firm. Mr. Lightner previously served as the [COO] for the City of Allentown and is also a 27-year U.S. Army veteran retiring at the rank of Command Sergeant Major.

Plan Modification at 29; *see* N.T., 1/10/23, at 106-07. Mr. Lightner testified at the hearing that he began serving as the City's COO on August 15, 2022. N.T., 1/10/23, at 107.

EXHIBIT 2

- Councilman Morgan's involvement in a June 2022 phishing scam, which resulted in the City's loss of $400,000, and his failure to inform Receiver of the incident for three months;

- the City's unauthorized payroll payments to an employee for several months while he was incarcerated;

- Councilman Morgan's purchase of $1,500 in gift cards in December 2021 for which he was subsequently reimbursed by City Council without adequate documentation justifying the purchases; and

- Mayor Kirkland's verbal threats and racial slurs directed to Receiver on two occasions in February 2021 and December 2022.

The Court will address the specific testimony and evidence relevant to Receiver's proposed initiatives and the issues before the Court in the Analysis section of this Opinion. *See* Section II.C., *infra*.

### 3. Post-Hearing Submissions

At the conclusion of the hearing, the Court directed the parties to confer and submit to the Court compromised plan language, particularly with regard to the proposed Chief of Staff position. Notes of Testimony (N.T.), 1/11/23, at 100-02. After the hearing, the parties separately filed post-hearing briefs and exhibits containing proposed revised plan language. However, it appears from the parties' filings that Receiver and the City neither conferred nor agreed upon the proposed language in either party's exhibits. Therefore, the Court will not consider these post-hearing exhibits in rendering its decision on the Plan Modification and will instead focus on the version of the Plan Modification submitted to the Court on December 9, 2022. *See* note 8, *supra*.

12

EXHIBIT 2

## II.  Analysis

### A.  Standard of Review

In considering Receiver's Plan Modification and the City's objections thereto, the Court applies the standard of review set forth in Section 703(e) of Act 47, which provides:

> The [C]ourt *shall confirm* the modification within 60 days of receipt of notification of the modification *unless it finds clear and convincing evidence that the recovery plan as modified is arbitrary, capricious or wholly inadequate to alleviate the fiscal emergency* in the distressed municipality.

53 P.S. § 11701.703(e) (emphasis added).  As the Court previously recognized in its prior Memorandum Opinion, the Court's review of Receiver's proposed Plan Modification "is highly deferential."  *Davin I*, slip op. at 3.  Therefore, unless the Court finds "clear and convincing evidence" that the Plan Modification "is arbitrary, capricious or wholly inadequate to alleviate the fiscal emergency," the Court must confirm the Plan Modification.  53 P.S. § 11701.703(e).

### B.  Legal Issues

Before addressing Receiver's proposed initiatives and the evidence presented at the hearing, the Court will address the issues of law raised by the City in opposition to the Plan Modification.

### 1.  Change in Form of Government

The City first asserts that many of Receiver's proposed initiatives effectuate a change in the form of government, which is prohibited by Act 47.  Section 704(b) of Act 47 states that the Court's confirmation a plan modification "*shall not be construed to[] . . . change the form of government* of the distressed municipality." 53 P.S. § 11701.704(b) (emphasis added).  The City also argues that many of the proposed initiatives violate Article IX, Section 2 of the Pennsylvania Constitution,

13

EXHIBIT 2

which prohibits the amendment of a municipality's home rule charter without a voter referendum.  *See* Pa. Const. art IX, § 2 ("Adoption, amendment[,] or repeal of a home rule charter shall be by referendum.").  Article IX, Section 2 also provides that a home rule municipality, such as the City, "*may exercise any power or perform any function* not denied by this Constitution, by its home rule charter[,] or by the General Assembly at any time." *Id.* (emphasis added).

The law in Pennsylvania regarding what constitutes a change in the form government is extremely sparse.  However, the Court finds *Harrisburg School District v. Zogby*, 828 A.2d 1079 (Pa. 2003), instructive on this issue.  In *Zogby*, our Supreme Court interpreted Article 9, Section 3 of the Pennsylvania Constitution, which applies to the selection by municipalities of an optional form of government and requires that any change in the form of government be by voter referendum. *See* Pa. Const. art. IX, § 3 ("Adoption or repeal of an optional form of government shall be by referendum.").  At issue in *Zogby* was a statute enacted by the General Assembly, known as Act 91, which gave the Mayor of the City of Harrisburg the authority to appoint a board of control for the Harrisburg public school district.

The Supreme Court noted that "form" is defined as "the organization, placement, or relationship of basic elements" and "the structure, organization, or essential character of something, as opposed to its matter." *Zogby*, 828 A.2d at 1092. The *Zogby* Court determined that Article 9, Section 3 of the Pennsylvania Constitution "does not *per se* preclude a legislative *grant* of particularized powers and duties to the mayor of a city that has opted for a mayor-council form of government, but refers instead to *a wholesale change of municipal government.*" *Id.* (emphasis added).  Therefore, the Supreme Court concluded that "*[s]o long as the addition of such duties is not inconsistent with the basic existence, structure, and*

*powers of the office of mayor or the other branches of city government*, it does not alter its form." *Id.* (emphasis added).[11]

Here, Receiver seeks to have the Chief of Staff report *solely* to Receiver and not take any directives from the Mayor or City Council. However, the City's Administrative Code provides that the Chief of Staff "shall serve at the pleasure of . . . City Council" and that his powers and duties are "set by City Council from time to time." Admin. Code §§ 112.02, 112.06. Receiver also seeks the *sole* authority to act on the City's behalf with regard to entering into contracts and directing the expenditures of federal and state funds, contrary to the provisions of the Home Rule Charter and Administrative Code, which give such authority to the Mayor and/or other City officials. *See id.* § 115.005(a) and (b)(1) (the City Treasurer, who shall be appointed by and "serve[s] at the will of [the] Mayor and [City] Council," shall be responsible for "the safe keeping and payment over of all public moneys entrusted to his care); *id.* § 111.002(b) (all City contracts shall be signed by the director of the department having jurisdiction thereof); Home Rule Charter § 713 (City Council may enter contracts for all lawful purposes). Receiver also seeks to require that City Council pass any budget or budget amendment as he directs. However, the Home Rule Charter grants budget-making authority to the City's Chief Financial Officer (CFO)[12] and City Council. *See* Home Rule Charter § 703 (the CFO "shall prepare

---

[11] In so holding, the Supreme Court relied in part on Judge Leadbetter's Dissenting Opinion in *Harrisburg School District v. Hickok*, 781 A.2d 221, 239 (Pa. Cmwlth. 2001) (*en banc*) (Leadbetter, J., dissenting) (citation omitted; emphasis added), wherein she stated:

"Pa. Const. art. IX, § 3, by its own terms, only requires voter referendum when an optional form of government is adopted or repealed . . . . The provision thus speaks only to *a wholesale change of municipal government, not to amendments of municipal powers* which may be made from time to time by the General Assembly."

[12] The evidence presented at the Plan Modification hearing established that Receiver and the City officials are currently in the process of hiring a new CFO.

15

EXHIBIT 2

and submit to [City] Council a proposed operating budget for the ensuing fiscal year"); *id.* § 707 (City Council shall "adopt a final budget with such amendments as [City] Council considers advisable").

While *Zogby* suggests that a mere change in duties does not alter the form of government, the Court concludes that any initiatives that give Receiver *exclusive* authority over internal administrative matters, while concomitantly stripping the Mayor and City Council of duties *expressly granted* to them by the City's governing documents, effectuate "a wholesale change of municipal government." *Zogby*, 828 A.2d at 1092. Indeed, Act 47 recognizes that, the "*principal responsibility for conducting the governmental affairs of a [distressed] municipality*, including choosing the priorities for and manner of expenditures based on available revenues," *shall be left to "the charge of its elected officials*." 53 P.S. § 11701.102(b)(1)(ii) (emphasis added); *see also id.* § 11701.605 ("During a fiscal emergency, the . . . appointed and elected officials of the distressed municipality shall continue to carry out the duties of their respective offices.").

The Court will address the specific initiatives that it concludes effectuate a change in the form of government in Section II.C. of this Opinion, *infra*.

## 2.  Authority to Remove Department Heads

Next, the City asserts that Receiver lacks authority to remove the City's elected officials from their positions as department heads. The Court disagrees.

The City's Home Rule Charter provides that City "Council *may*, by ordinance, . . . . designate department heads from City Council." Home Rule Charter § 601 (emphasis added). The Home Rule Charter also provides that during City Council's annual organizational meeting, "the Mayor *may* assign to each Council member *a responsibility as department head* of one or more departments or agencies of the City government." *Id.* § 603 (emphasis added). While the Home Rule Charter

provides that either City Council *or* the Mayor may assign department heads, Mayor Kirkland testified at the Plan Modification hearing that, since he took office in 2016, he has appointed department heads each January. N.T., 1/10/23, at 243-44.

It is evident from the plain language of the City's Charter – which uses the term "may" instead of "shall" – that the Mayor's authority to assign department head responsibilities to City Council members is permissive, not mandatory. The Court finds nothing in the City's Charter or Administrative Code that would preclude Receiver from removing Council members from their positions as department heads or from appointing non-Council members as department heads, *if* the Court finds that such changes are not arbitrary, capricious, or wholly inadequate to alleviate the City's fiscal emergency. *See* 53 P.S. § 11701.703(e).

In its post-hearing brief, the City argues that Council members can only be removed from their positions via the legislative impeachment procedures outlined in the Pennsylvania Constitution. However, Receiver does not seek to remove Council members from their elected positions. Receiver only seeks to remove certain Council members from their non-mandatory *administrative roles* as department heads; they would still remain in their elected positions as legislators on City Council for the remainder of their terms. The removal of elected officials' administrative duties does not trigger an impeachment process under the Pennsylvania Constitution, which applies to the removal of government officials from their *public offices*. *See* Pa. Const., art. VI, §§ 6-7. Therefore, the Court rejects this claim.

### 3. Authority to Contract

Finally, the City argues that Receiver lacks the authority to unilaterally enter into contracts on the City's behalf. The City points out that Section 706(a) of Act 47 identifies each of Receiver's enumerated powers, and those powers do not include the authority to enter into contracts. The Court agrees.

17

EXHIBIT 2

Section 706(a)(6) of Act 47, addressing a receiver's powers with regard to contracts, gives Receiver the authority "[t]o *approve, disapprove, modify, reject, terminate or renegotiate* contracts and agreements with the distressed municipality . . . , except to the extent prohibited by the Constitutions of the United States and Pennsylvania." 53 P.S. § 1101.706(a)(6) (emphasis added). This provision does *not* expressly grant Receiver the power to "enter into" contracts, only to approve, disapprove, modify, reject, terminate, or renegotiate contracts with the City. The Court must give effect to the plain language of a statutory provision where, as here, the language is clear and free from ambiguity. *See* Section 1921(b) of the Statutory Construction Act of 1972, 1 Pa. C.S. 1921(b); *see also Thompson v. Thompson*, 223 A.3d 1272, 1277 (Pa. 2020) ("Under the doctrine of *expressio unius est exclusio alterius*, 'the inclusion of a specific matter in a statute implies the exclusion of other matters.'") (citation omitted). The Court concludes that Act 47 does not grant Receiver the power to *unilaterally enter into contracts* on the City's behalf. However, Receiver *is* authorized under Section 706(a)(6) to review any contracts proposed by the City and may disapprove, modify, reject, or renegotiate any proposed contracts.[13]

Moreover, the Administrative Code contains a provision relating to the execution of contracts. Section 117.01(a) and (b) provides:

> (a) *All contracts and agreements wherein the City is a party shall be prepared by the City Solicitor when requested by [City] Council* and *each contract and agreement, before its execution, shall be submitted by him to [City] Council or the director of the proper department.* After proper execution by the other contracting party, the City Solicitor shall mark his approval as to the form and the execution thereof.

---

[13] Act 47 also explicitly empowers Receiver to "[t]o employ financial or legal experts deemed necessary to develop and implement the recovery plan." 53 P.S. § 11701.706(a)(11).

18

EXHIBIT 2

(b) *Each contract or agreement wherein the City is a party shall be signed on behalf of the City by the director of the department having jurisdiction of the subject matter thereof and by the City Clerk*, and the City scale shall be attached thereto.

Admin. Code § 117.01(a) and (b) (emphasis added). Thus, to the extent Receiver seeks to completely usurp the power to execute contracts from City Council and the directors of City departments, the Court concludes that such an initiative also effectuates an impermissible change in the form of government. *See* Section II.B.1, *supra*.

## C. **Receiver's Proposed Initiatives**

The Court will now review Receiver's proposed initiatives, which the Court outlines below by the categories identified in the Plan Modification: (1) administrative duties and professional management; (2) core internal administrative functions and ethics; and (3) economic development. The Court also identifies the proposed initiatives using the same initiative titles that Receiver uses in the Plan Modification.

### 1. **Administrative Duties and Professional Management Initiatives**

Receiver seeks approval of the following eight initiatives in this category:

- Chief Operating Officer (COO)[14]

- Chief of Staff Reporting

- Administrative Duties of Elected Officials

- Compliance with Chief of Staff Directives

- Interference with Chief of Staff and Receiver Directives

- Duty to Provide Information

- Ability to Audit

---

[14] This proposed initiative would replace Initiative WF03 in the existing Amended Recovery Plan.

19

EXHIBIT 2

- Council and Board Agendas

According to Receiver, these initiatives "clarify the administrative duties of City officials to eliminate interference and to create a baseline level of professional management required for the basic functioning of the City and for the provision of vital and necessary services." Plan Modification at 11. Receiver maintains that the City needs skilled, qualified professionals to oversee its departments, particularly the Finance Department, because the present practice of appointing Council members as department heads is proving to be detrimental to the City's operations.

At the hearing, Receiver and his Chief of Staff, Mr. Kapoor, offered numerous examples of operational issues within the City's departments, as well as City officials' lack of transparency and lack of cooperation with Receiver and his team. Much of their testimony focused on problems within the City's Finance Department, which is overseen by Councilman Morgan.

Mr. Kapoor first testified regarding Councilman Morgan's involvement in a phishing scam in which the City lost approximately $400,000 in June 2022. Councilman Morgan discovered the scam in July 2022 but did not inform Receiver about it until three months later, in October 2022. N.T., 1/9/23, at 78, 80-81. Councilman Morgan called Receiver and told him that the City was about to send out a press release that day stating "that the City had lost . . . money in a phishing scam." *Id.* at 79. That phone call was the first time Receiver had heard about the incident. Plan Modification at 16.

Mayor Kirkland testified that Councilman Morgan first told him about the phishing incident in October 2022. N.T., 1/10/23, at 255. Mayor Kirkland recalled that he had surgery in September 2022, and that he was home recovering from that

20

EXHIBIT 2

surgery in October 2022 when Councilman Morgan visited him and told him about the incident. *Id.* at 235, 255.[15]

During his testimony, Councilman Morgan admitted that when first learned of the phishing scam in July 2022, he did not immediately notify Receiver, the Mayor, the City Solicitor, or a fellow member of City Council. N.T., 1/11/23, at 19-20. Councilman Morgan also apologized for his failure to notify Receiver in a timely manner, recognizing that his failure to do so was a violation of the Court's prior Order. *Id.* at 19. Councilman Morgan testified, however, that as a result of this incident, he "learned [his] lesson" and "took a cyber security . . . course." *Id.* at 30. He also testified that he has put additional safety measures in place to prevent a cyber crime from occurring again, including "making sure that all wires[] and transfers that go . . . in and out of the bank account go through our internal control process," working on "a million-dollar [information technology] infrastructure improvement plan," and applying for cyber insurance. *Id.* at 25-26.

Mr. Kapoor testified, on the other hand, that the City officials' handling of the phishing incident exemplifies their lack of accountability. Contrary to Councilman Morgan's testimony, Mr. Kapoor testified that, after the incident became public, "[n]o action was taken with respect to Councilman Morgan," "no new policies were created," and no "citywide e-mail [was] sent out." N.T., 1/9/23, at 118.

Receiver also contends that the City failed to properly investigate City Council's reimbursement of Councilman Morgan for his purchase of $1,500 in gift cards in December 2021, which were allegedly used to purchase toys for a Toys for Tots Christmas collection. Councilman Morgan testified that he used his own

---

[15] Mayor Kirkland initially testified that this conversation occurred in December 2022, but he later corrected his testimony and stated the conversation occurred after he was released from the hospital in October 2022. N.T., 1/10/23, at 235, 255.

EXHIBIT 2

money to purchase $1,500 in Visa gift cards at CVS, and those gift cards were used to buy toys at Five Below.  N.T., 1/11/23, at 23, 37-38.[16]  He explained:

> When it comes to any refunds or reimbursements that may have to go to someone, of course, there's checks and balances; and when it comes to my stuff, *the CEO of the City of Chester, that being the Mayor, will always have to sign off on any refunds that are done prior to them going back to me.  And then, of course, all expenditures . . . have to get ratified through . . . a vote of the Mayor and [City] Council.*

*Id.* at 23 (emphasis added).  Councilman Morgan did not recall the specific date, but he believed the Mayor approved the $1,500 reimbursement prior to him "receiving the refund check." *Id.* at 24.

During his testimony, Mayor Kirkland testified that, although he approved the reimbursement to Councilman Morgan, he never saw the receipts and does not know if the purchases actually totaled $1,500.  N.T., 1/10/23, at 227.  However, Mayor Kirkland testified:  "I trust that Councilman Morgan's focus was on those young people and doing the very right thing.  I don't believe that Councilman Morgan or anybody else . . . in City Council would jeopardize their career over a couple hundred dollars.  I just don't believe that." *Id.* at 228.

On rebuttal, Mr. Kapoor explained the discrepancies with regard to the gift card purchases as follows:

> [I]f you total the amounts expended on these receipts in [Receiver's] Exhibit 18, it does not total $1,500.  It totals a little . . . over $1,300.
>
> The second significant issue with these receipts . . . the receipt that is marked No. 2, in blue, if you go down to the total where it shows the method of purchase, it shows that the toys were purchased through Apple Pay, whereas in the first receipt that has an amount for [$]500 – and an amount for [$]417.50, it says they're paid by Visa [gift] cards.

---

[16] Duane Lee, who works in the Department of Parks and Recreation, purchased the toys at Five Below at Councilman Morgan's direction.  N.T., 1/11/23, at 36, 38.

> *So we had one problem with them not totaling $1,500, which was the amount that was supposed to be reimbursed, and the second problem was that one of the receipts was not paid via a Visa gift card. It was paid via Apple Pay. And there was no explanation ever provided about the discrepancy[] . . . .*

N.T., 1/11/23, at 51 (emphasis added); *see id.*, Receiver Ex. 17 (explaining that $582 of the $1,500 is unaccounted for and requesting additional documentation). Moreover, Mr. Kapoor testified that following this Court's Order on the Mandamus Petition, which directed the City to investigate the gift card matter and report its findings to Receiver, Receiver's team repeatedly asked Mr. Schuster, the City Solicitor, the status of the investigation, but they received "no substantive update," "no report," and "no conclusions." N.T., 1/11/23, at 53-54, 56. According to Mr. Kapoor, "[t]hat's why [Receiver has] provisions in the . . . [P]lan [M]odification that are very clear that the Receiver has the ability to conduct investigations and that employees, including [the] elected officials, must comply with any of those investigations." *Id.* at 57.

As noted in Section I.B. of this Opinion, *supra*, Councilman Morgan oversees both finance *and* human resources, as they presently comprise a single department. At the hearing, Mr. Schuster testified that he believes finance and human resources should be separate departments. He testified:

> I . . . believe that the department should be divided. Even though the Home Rule Charter says accounts and finances, finance department/[human resources], *I think they're two distinct roles. I think you need a CFO[] . . . and . . . a financial team, and I think you need a real [human resources] director like you would have in corporate America.*

N.T., 1/10/23, at 171-72 (emphasis added).

23

EXHIBIT 2

Receiver also testified to acts of hostility that City officials have directed toward him.  Receiver testified that Mayor Kirkland verbally threatened him on two separate occasions.   The "worst situation" occurred in  February 2021  during a meeting with the Mayor and City Council members to discuss the City's Executive On Loan program.  N.T., 1/10/23, at 17.   According to Receiver, "Mayor Kirkland was using this program basically to circumvent the budget and pay for positions that were no longer supported by the budget or . . . the [City's] salary ordinance." *Id.* When Receiver verbally expressed his disagreement with Mayor Kirkland about his handling of the program, "[t]he Mayor . . . became irate." *Id.*   Receiver described what transpired next as follows:

> *[The Mayor] got up, walked around the room and decided to stand over the top of me and challenge me to a fight, and finger in my face and all of the other stuff.*  I finally had to . . . stand up and step back to . . . make sure that I wasn't actually attacked.
>
> The [City's] former CFO[, Nafis] Nichols[,] stood in between us and broke it up and the Mayor eventually left the room.  But [*I'm definitely not anyone's nigger, and had the Mayor been any younger,*[17] *I really would have thought that . . . it was a chance for some physical harm.*

*Id.* at 17-18 (emphasis added).  Receiver further testified that Mayor Kirkland is not the only City official who has directed a racial slur toward him.  He testified that Councilwoman Elizabeth Williams has called him a slave master "on more than one occasion." *Id.* at 19.

Mr. Kapoor also attended the February 2021 meeting via telephone and testified to what he heard during the altercation between Receiver and Mayor Kirkland.  Mr. Kapoor testified:

---

[17] Mayor Kirkland testified at the hearing that he was about to turn 68 years old on January 12, 2023.  N.T., 1/10/23, at 202.

24

EXHIBIT 2

> *Mayor [Kirkland] got extremely angry. He started shouting. He started threatening the Receiver.* He then alleged that the Receiver was having . . . affairs with women in Chester hotels. He stated . . . something to the effect of, I heard where you were. I know you were talking to that girl. I know it's going on in those hotels.
>
> [Receiver] is married, and that was absolute defamation to [him]. I was shocked when I heard that, and then it continued.
>
> The Receiver's reaction was, he . . . laughed in sort of a way of like, I can't believe you're accusing me of this. . . .
>
> And then, again, I was on the phone, but it sounded like the Receiver and the Mayor were getting really close. *And you could hear the Receiver saying "Back off" to the Mayor. Then the Mayor called the Receiver the N-word.* And I heard a door slam, and then it was quiet.

N.T., 1/11/13, at 73-74 (emphasis added). Mr. Kapoor testified that Councilwoman Williams then entered the room and stated that the Mayor was very upset and that she "felt disrespected by the Receiver's team because all of these problems had been occurring previously and . . . we were asking questions 'of the wrong people.'" *Id.* at 74-75. Mr. Kapoor also testified that he has previously heard Councilwoman Williams call Receiver a slave master. *Id.* at 74.

Receiver testified that the second threat incident occurred very recently, in December 2022, during discussions with the Mayor about the hiring of a new CFO. N.T., 1/10/23, at 18. Receiver testified that "[t]hose conversations quickly broke down," and Mayor Kirkland pointed his finger at Receiver and stated, "Watch your back" and "[Your d]ays are numbered." *Id.* at 18-19.

Mayor Kirkland downplayed both of these incidents during his testimony. With regard to the February 2021 incident, Mayor Kirkland testified that he and Receiver had a "heated" exchange regarding the Executive On Loan program. *Id.* at

EXHIBIT 2

231.  He testified that Receiver referred to the program as "fraudulent" and said to Mayor Kirkland, "You're incapable of having an intelligent conversation," and "*[t]hat's when that unfortunate word came out of [Mayor Kirkland's] mouth*." *Id.* (emphasis added).  Mayor Kirkland admitted that he stood up during the exchange, but he denied physically threatening or pointing his finger at Receiver. *Id.* at 234. Mayor Kirkland further testified:  "I never said 'Watch your back.'  I stood up because I was upset. *I never put my finger in his face.  I spoke to the Receiver.  I never threatened him.*" *Id.* (emphasis added).  Mayor Kirkland acknowledged that four other people were present in the room, but he denied that Mr. Nichols had to stand between him and Receiver. *Id.*  Mayor Kirkland admitted that he called Receiver a racial slur, referring to it as an "inappropriate comment." *Id.* at 230.  He testified, however, that he apologized to Receiver at their next meeting. *Id.* at 231.

Furthermore, in the Plan Modification, Receiver seeks to convert the present COO position, which is held by Mr. Lightner, into a Chief of Staff position consistent with the City's Administrative Code.  Mr. Kapoor explained why Receiver wants to appoint a Chief of Staff to oversee the City's departments as follows:

> The City has in its [A]dministrative [C]ode, as it exists right now, a chief of staff position. . . . If you look at the chief of staff position, the chief of staff looks a lot like a city manager, in terms of what [the chief of staff is] responsible for doing. [The chief of staff is] essentially responsible for implementing and executing policy . . . within the City.
>
> At the time [Receiver] got involved, *it became very clear that the City needed centralized management, because each department had essentially been operating on its own.  And particularly for a city that's in financial trouble, you need that strong central management.*

N.T., 1/9/23 at 111-12 (emphasis added); *see* Admin. Code §§ 112.01-112.06 (setting forth the qualifications, duties, and responsibilities of the Chief of Staff). On cross-examination, Mr. Kapoor clarified: "We're not looking to remove

26

EXHIBIT 2

Councilman Morgan, the Mayor, or any other elected official[] from being a council member. *What we are looking to do is establish some sense of professional management and accountability as it relates to City operations.*" *Id.* at 262 (emphasis added).

* * * *

The Court concludes that all of this evidence, viewed together, demonstrates the City officials' continued lack of transparency and lack of cooperation with Receiver and his team. Even worse, Mayor Kirkland has verbally – and publicly – threatened and disrespected Receiver on more than one occasion. The Court discredits Mayor Kirkland's testimony to the contrary. This type of adverse behavior obstructs Receiver's ability to work amicably and productively with City officials to achieve the City's fiscal recovery goals. While the gift card issue, in particular, may seem minor in the grand scheme of the City's financial troubles, the Court believes it reflects the City officials' overall pattern of failing to work in partnership with Receiver. The Court agrees with Receiver that if the City officials responsible for carrying out the goals of the recovery plan "are incapable of doing so or refuse to do so and face no repercussions, then nothing will ever change and . . . Receiver will not be able to ensure the provision of vital and necessary services" to the City's residents. Plan Modification at 11.

The Court is also extremely troubled by the fact that Councilman Morgan failed to notify Receiver about the phishing incident for three months, in direct contravention of this Court's prior order to "immediately" share any information relating to the City's finances with Receiver. *Davin II*, slip op. at 13. Councilman Morgan's failure to promptly disclose this critical financial information is even more egregious considering that he meets with Receiver every week. *See* N.T., 1/10/23,

27

EXHIBIT 2

at 29-30.  Councilman Morgan also inexplicably failed to inform the Mayor of the phishing incident for two months prior to the Mayor's medical absence.

Compounding Councilman Morgan's recent actions is the fact that, in ruling on the Mandamus Petition, the Court previously found that "Councilman Morgan . . . ha[s] engaged in conduct that has impeded Receiver's ability carry out the goals of the Amended Recovery Plan," including, *inter alia*, failing to complete monthly bank reconciliations, making late and/or inaccurate federal tax payments, making improper "hazard" payments to certain employees, and allowing himself and other City officials to remain on an expensive health care plan that had been discontinued. *See Davin II*, slip op. at 9-10.[18]  In the Court's view, Councilman Morgan can no longer effectively serve as the head of the Department of Finance and Human Resources.

As explained in Section II.B.2. above, the Court concludes that Receiver has the authority to remove City Council members from their assigned positions as department heads and to appoint experienced professionals in their place.  Based on the credible evidence presented at the hearing, the Court believes that such administrative changes are not only permissible, but necessary.

The Court also believes that having a Chief of Staff oversee the day-to-day operations of all City departments would help alleviate many of the obstacles Receiver and his team have experienced.  Mr. Lightner, the present COO who would become the Chief of Staff, credibly testified:  "[F]rom my standpoint, from an operational standpoint to meet the needs of the citizens, we need to have clear direction.  *The employees need to have clear direction of who they can take orders*

---

[18] In light of this evidence, it is inconceivable to the Court that Mayor Kirkland initially supported Councilman Morgan's candidacy for the position of the City's CFO.  *See* N.T., 1/10/23, at 223-24.

28

EXHIBIT 2

*from, who's in charge, how do we move things forward.*" N.T., 1/10/23, at 135 (emphasis added).

\* \* \* \*

The Court STRIKES the following initiative from the Plan Modification: Chief of Staff Reporting.  As explained in Section II.B.1 above, because this initiative, as written, gives Receiver *sole* authority and control over the Chief of Staff, in violation of the City's Home Rule Charter and Administrative Code, it effectuates a change in the form of government.  This initiative may be revised to allow the Chief of Staff to report to Receiver, but without changing the form of government pursuant to the Home Rule Charter and Administrative Code.

The Court CONFIRMS WITHOUT CHANGE the remaining seven initiatives in the administrative duties and professional management category.  The Court concludes, based on the credible evidence of record, that the proposed initiatives are not arbitrary, capricious, or wholly inadequate to alleviate the City's fiscal emergency.

### 2.  Core Internal Administrative Functions and Ethics Initiatives

Receiver seeks approval of the following 19 initiatives in this category:

- Receivership Controls to Manage Staffing Levels and Personnel[19]
- Receiver Ability to Hire Contractors on Behalf of City or Authority
- Residency Requirement
- Human Resources Policy Development, Implementation and Enforcement
- Compliance with Human Resources Policies and Procedures
- Employee Investigations

---

[19] This proposed initiative would replace Initiative WF02 in the existing Amended Recovery Plan.

29

EXHIBIT 2

- Internal Controls
- Timely Expenditure Reports Prior to City Council Passage
- Auditor Selection
- Budget and Budget Amendment Passage
- Expenditure of American Rescue Plan Act (ARPA) Funds and Any Other Current or Future Federal and State Funds
- Development, Implementation, and Enforcement of Procurement Policies
- Prompt Execution of Contracts
- Selection Committee for Request for Proposals
- Receiver Power to Enter into Contracts and Agreements on Behalf of the City and to Direct that Expenditures Be Made or Eliminated
- Timely Written Legal Advice to City Departments
- Disclosure of Non-Compliance with Court Orders or Amended Recovery Plan
- Development, Implementation and Enforcement of Ethics Policy
- Receiver Ability to Conduct Investigations

Receiver asserts that the impetuses for these initiatives are the City's poor auditing and recordkeeping practices, as well as the City's lack of clearly defined personnel and ethics policies to guide employees in their day-to-day responsibilities. According to Receiver, the City's past practices demonstrate that the City's "elected officials have failed to conduct internal investigations into personnel matters, including those that involve the expenditure of City funds." Plan Modification at 43.

As an example, Receiver points to an incident in which the City made unauthorized payments for several months to an employee who was incarcerated,

30

EXHIBIT 2

unbeknownst to Receiver.   Receiver's finance team first discovered the payments while conducting a routine backpay calculation process for a collective bargaining agreement. *Id.* at 36-37. Mr. Kapoor testified that upon discovering these payments, Receiver inquired about the employee during his weekly call with the City's former interim COO, Cyrise Dixon, "and she said, *Oh, he's in jail*." N.T., 1/9/23, at 102 (emphasis added).   When Receiver's team looked into the issue further, they learned that the employee worked in the Department of Parks and Recreation and had been incarcerated on child rape charges. *Id.* at 103.

Mr. Kapoor further testified:

> [W]e went back and started digging in to try and understand what happened, who authorized [the payments].   Because . . . putting aside the issue of the alleged incident that this person was incarcerated for allegedly committing, *our other problem was that when we looked at the payroll amounts, he was getting paid in excess of the number of hours in a week for a normal payroll amount.*   And then when we learned that he had been actually paid for – he had had sick leave and vacation leave paid out, this individual was a unionized employee, and the collective bargaining agreement does not provide for that. *That is not how vacation or sick time is done.   It's not paid out that way.   It's use it or lose it.*

> . . . .

> . . . [I]t was just given [to the former employee] as a lump sum.   And this would not be the type of situation where you would be able to use sick leave.   *You don't get to use sick leave for being incarcerated.*

*Id.* at 103-04 (emphasis added).

Mr. Kapoor testified that Receiver then attempted to investigate the matter and move forward with the employee's termination.   Receiver's attorney reached out three times to Councilwoman Portia West, who headed the Department of Parks and Recreation at that time, asking to meet with her, but he "received no response."

31

EXHIBIT 2

*Id.* at 105. Mr. Kapoor testified that when he later asked Councilwoman West why Receiver's attorney had not heard back from her, "she acted surprised and said, Well, I don't remember getting that e-mail. And then she looked through her phone and found the e-mail." *Id.* at 106.

According to Mr. Kapoor, "part of the problem with how the City operates is that each one of these departments is almost like a fiefdom." *Id.*; *see also* N.T., 1/10/23, at 71-72 (Receiver testified that "the [City's] elected officials are running five different . . . 'fiefdoms[]'"). Mr. Kapoor testified that in most municipalities, the human resources department and the city solicitor "would have taken this over immediately and it would have been out of the hands of the department head. But what happened here was that . . . Councilwoman West did not want to move to terminate the individual, . . . so he stayed on [the payroll]." N.T., 1/9/23, at 106-07. As Receiver points out in the Plan Modification, "[t]he fact that City funds were paid to an employee when he was not entitled to them demonstrates the lack of internal controls in and across the[] functional areas" of human resources, finance, and legal. Plan Modification at 39.

With regard to budgeting and finance, Mr. Kapoor testified that one significant problem is that Receiver and his team "don't have very strong financial reporting data from the City to be able to look on a day-to-day basis to understand how much money [the City has] in the account, and more importantly, how many checks have been sent out but haven't been cashed." N.T., 1/9/23, at 49. He testified that "*the City is perpetually on the verge of running out of money.*" *Id.* at 47 (emphasis added).

Mr. Kapoor also testified to several factors that have contributed to the City's present financial crisis. The first factor is that the City's pension fund is significantly underfunded. Mr. Kapoor testified that a minimum municipal obligation (MMO) is

32

EXHIBIT 2

"the annual payment a city needs to make into its pension funds." *Id.* at 27. Mr. Kapoor testified:

> *The City did not make its full MMO payments from 2013 until 2020.* Essentially how the City . . . got by was that it did not fully fund its pension plans. And instead of making the full payment there, they used it for operations. And the[ City] ran significant deficits over that time period and continued to do so.

*Id.* at 45-46 (emphasis added). According to Mr. Kapoor, the City now "has approximately $40 million in back-due MMO payments" and *"[t]he City . . . has absolutely no way of paying for that through its general operating revenues." Id.* at 46 (emphasis added).

Mr. Kapoor also recounted that at the end of 2022, Receiver and his team were concerned that "literally the City would run out of money and that [the City] would not . . . have enough money in [its] checking account to make payroll" in January 2023. *Id.* at 48-49. The City was able to do so only because it received an emergency order from the federal bankruptcy judge authorizing the Commonwealth to provide a $5 million tax revenue anticipation note (TRAN) to the City. *Id.* at 47-48. Mr. Kapoor explained that a TRAN is "kind of like a repayment plan" whereby the City "would get the money, and then . . . would pay it back [to the Commonwealth] when [the City's] property taxes would start coming in, which . . . happen[s] around May, June." *Id.* at 47.

Another significant problem, according to Mr. Kapoor, is that "the City is unable to balance its budget." *Id.* at 46. Mr. Kapoor testified:

> [The City] has a structural deficit. And if you look at the 2023 budget, . . . the budget that was passed in December of last year for 2023, it has . . . a little over a $2 million deficit in it already. It is not a balanced budget. We cannot pay for both operations as well as debt service as well as the MMO payments that are due. There is a deficit in there.

33

EXHIBIT 2

*Id.* at 46-47.  Mr. Kapoor characterized the City's financial situation as "dire." *Id.* at 49; *see also* N.T., 1/10/23, at 149 (Mr. Schuster characterized the City's financial condition at the start of the receivership as "abysmal").

Mayor Kirkland acknowledged that the City had not made any MMO payments since he took office in 2016 until after Receiver was appointed.  N.T., 1/10/23, at 216.  Mayor Kirkland testified, however, that he was unaware that the MMO payments were not made during that period.  *Id.* at 216-17.  Mayor Kirkland testified that "there is a lot that falls on [his] shoulders" and acknowledged that "[s]ome . . . things fall through the cracks." *Id.* at 217-18.  When asked if the Auditor General had cited the City for missing its MMO payments, Mayor Kirkland replied, "[t]he [A]uditor [General] never sent me any information citing the City." *Id.* at 218-19.  He testified that the notice probably went to the City's former CFO, Mr. Nichols.  *Id.* at 219.  However, he agreed that, as Mayor, he would expect that his Council members or employees would inform him of citations regarding debts or missed payments.  *Id.*

On rebuttal, Mr. Kapoor testified that "[a]n MMO payment is one of the biggest payments that a [c]ity has." N.T., 1/11/23, at 82.  He testified that, contrary to Mayor Kirkland's testimony, the Auditor General's compliance audits *were* sent to the Mayor and City Council.  *Id.* at 81; *see* Receiver Exs. 21-22.  Mr. Kapoor also pointed out that under the City's Administrative Code, the Mayor is the chairperson of the City's pension funds, and "as the chairperson of the pension funds, the Mayor has a fiduciary duty to know what the level of funding is in the plans" and "to ensure that the funding levels are appropriate in those plans." N.T., 1/11/23, at 81-82; *see* Admin. Code § 142.05(a) (stating that "the Mayor shall be the Chairperson of the City of Chester Aggregated Pension Fund Board").

34

EXHIBIT 2

When asked about the City's improper calculation of pension benefits, Mr. Schuster, the City Solicitor, testified:

> We all knew that there was an improper calculation going back to – I think we collectively were working on that . . . going back to before, I think, 2008.
>
> . . . .
>
>     I believe that . . . once the pension spiked and everyone started to wrap their arms around the deficit, that we began to uncover discrepancies in the calculation; whether it should be calculated on the past year of employment or the past five years, . . . which it probably should be[] . . . .
>
> . . . .
>
> *    . . . There was a particular administration and police chief who would let all of his friends work a ton of overtime for 12 months before they retired, and their pension would be calculated on that instead of their actual salary averaged over three or five years.  That's what was happening.  But there was, believe it or not, agreements in front of a prior pension board that th[ey were] legitimate calculations.  So[] . . . it's a real conundrum.*

N.T., 1/10/23, at 187-88 (emphasis added).

With regard to personnel issues, Receiver testified that there is very little consistency and a lot of turnover within the City's departments.  N.T., 1/10/23, at 45, 89-90.  Moreover, Receiver asserts that "[o]ther than being designated by the Mayor, there are no further qualifications necessary for a [City C]ouncil member to serve as a department head," nor is there "any requirement to demonstrate basic competence in the areas the [C]ouncil member is overseeing."  Plan Modification at 28.

Indeed, Mayor Kirkland testified that each January he appoints department heads, and he acknowledged that some department head positions have changed hands from year to year.  *Id.* at 243-44.  When asked what criteria he uses in

35

EXHIBIT 2

assigning department heads, Mayor Kirkland replied:   "I use the criteria of their experience, their background, their ability to perform the task[ and] to motivate the staff persons, and much, much more." *Id.* at 244.   With regard to Councilwoman Williams, who oversees the Department of Public Safety, "[h]er qualifications were her long standing on [City] Council, her ability to work within systems, her ability to seek . . . funding that would help our fire department move . . . in a continuously positive direction, and her attendance here in City Council." *Id.* at 244-45. Mayor Kirkland admitted that Councilwoman Williams previously oversaw parks and recreation and that, while she now oversees public safety, she has no prior experience in the areas of code enforcement or fire services.   *Id.* at 245.   Mayor Kirkland testified, however, that he does not "shuffle" City Council members between departments, but rather "appoint[s] those persons who[m] [he] believe[s] will better serve th[e] community and that department." *Id.* at 247.

Receiver further contends that he has encountered resistance from City employees because there is no clear chain of command within the City's departments.  Receiver asserts that often he or the COO, Mr. Lightner, will direct an employee to do something, but the employee does not comply because the Mayor or a City Council member told the employee not to comply or gave the employee conflicting information.  Plan Modification at 26-27.  Receiver testified that when the COO issues a directive to an employee, "it gets undermined by elected officials who say that they're responsible for that department" and "what they want supersedes what [the COO] is trying to advance."  N.T., 1/10/23, at 71.  Receiver explained: "The elected officials are running five different . . . 'fiefdoms,' . . . [s]o it's next to impossible to get past or through the elected official to get to the department and implement whatever needs to happen in that area." *Id.* at 71-72. Mr. Lightner corroborated this testimony.   Mr. Lightner explained that often "the

36

EXHIBIT 2

employees are trying to understand the structure, trying to understand the chain of command." *Id.* at 117.  He testified that when a task needs to be completed, "sometimes [employees are] a little hesitant or not sure, so they have to confirm if this is something that they should complete . . . or not" with a member of City Council. *Id.* at 117-18.

Receiver further testified that nepotism is a problem within the City's government.  According to Receiver, "there are significant relationships that aren't disclosed" and "aren't managed appropriately." *Id.* at 35.  For example, Receiver testified:

> We've dealt with the son-in-law of the Mayor being the chief of staff. The . . . former [human resources] director . . . is the niece of Councilwoman West.  [A] current [human resources] employee is the daughter of a public works deputy director; that wasn't disclosed.  We found that out [seven] months after the employee started.

*Id.* at 36; *see also* N.T., 1/9/23, at 116 (Mr. Kapoor testified that "[t]here[ are] a lot of employees in the City of Chester who are related").

On cross-examination, when asked if he knew that a human resources employee was related to a deputy director of another department, Mayor Kirkland replied, "yes."  N.T., 1/10/23, at 252.  However, Mayor Kirkland testified that he was unaware that Councilwoman West recently hired her sister to work in her department, stating, "I don't think that information is correct." *Id.* at 250-51.  When asked directly about nepotism, Mayor Kirkland stated, "I don't believe that . . . is a conflict of interest because someone's child or someone's family member has a skill set that fits the needs of the City and they're employed" by the City. *Id.* at 252-53. He testified that "[s]ome folks might call that nepotism," but he "simply call[s] it an opportunity for us to fill a void in City government that is so desperately needed." *Id.* at 253.  Mayor Kirkland explained:

37

EXHIBIT 2

[The City] . . . has approximately . . . 36,000 [residents]. Eventually you're going to come across some family members in our County government, in our City government, in our downtown area who are working alongside one another.

Because of the small population and because of the close-knit family that we have here and because of the talented persons, whether they are family members or whether they're persons that we've never met before, we try our best to make sure that those persons that are put in place that are hired by the City have the skill set to do the job.

*Id.* at 251-52.

Receiver also testified that he has attempted to work with the Mayor and City Council to revise the City's personnel policies, beginning with the employee handbook, but those efforts have "fall[en] on deaf ears." *Id.* at 36-37. Receiver explained that "[t]here will be working sessions where it sounds like we're all in favor of advancing [the policies], but transitioning from the staff level to [City C]ouncil approval, somewhere in there, the process dies." *Id.* at 37.

Mr. Lightner has also encountered difficulties in this area. Mr. Lightner explained: "[A]s we come across certain situations, I will ask for policies and procedures. And we don't have a centralized repository of policies or procedures." *Id.* at 111. He testified that they "have the employee handbook, but that's far from actual policies and procedures." *Id.* at 112. Mr. Lightner opined that the lack of centralized human resources policies is "problematic for all departments." *Id.*

On cross-examination, Mr. Lightner explained why the City needs a clear chain of command regarding internal operations as follows:

[F]rom my standpoint, from an operational standpoint to meet the needs of the citizens, *we need to have clear direction. The employees need to have clear direction of who they can take orders from, who's in charge, how do we move things forward.* And again, we need to put these policies and procedures and all this stuff in place.

38

EXHIBIT 2

*Id.* at 135 (emphasis added).  He further testified:  "It's having all the departments work together, [and] understanding that . . . one department can't work in the silo. *All departments have to work together.*"  *Id.* (emphasis added).

* * * *

The credible evidence presented at the hearing demonstrates that the City's elected officials are not empowering Receiver in the eyes of the City's employees. Rather, the evidence shows that City officials frequently ignore Receiver's advice and directives, and even direct other employees in their departments to ignore his directives.  City officials also have historically overlooked issues such as the unauthorized payroll payments to an incarcerated employee, the former police chief allowing his friends to boost their pensions by working extra overtime before retirement, and the City's seven-year default on its MMO payments.  These incidents, together with the evidence of widespread nepotism within the City's government, demonstrate a pattern of City officials taking care of their own and intentionally turning their backs on wrongdoing within their departments.  Further exacerbating these problems is the Mayor's assignment of Council members as department heads based on their loyalty to City Council and the Mayor's own inclination in a particular year, rather than on the person's actual qualifications to oversee a particular area.  These practices cannot continue.

Mr. Lightner testified that, as COO, he needs three things to help the City emerge from its fiscal emergency:  "[W]e need *consistency*, we need *stability*, and we need *direction*."  N.T., 1/10/23, at 134 (emphasis added).  The Court believes that Receiver's initiatives in this category, relating to human resources, finance, auditing, procurement, and legal, will help provide the City with that consistency, stability, and direction.

39

EXHIBIT 2

\* \* \* \*

The Court STRIKES the following initiatives from the Plan Modification: Receiver Ability to Hire Contractors on Behalf of City or Authority; Budget and Budget Amendment Passage; Expenditure of ARPA Funds and Any Other Current or Future Federal and State Funds; and Receiver Power to Enter into Contracts and Agreements on Behalf of the City and to Direct that Expenditures Be Made or Eliminated.  As explained in Section II.B.1. above, because these four initiatives, as written, give Receiver *sole* authority to act on the City's behalf in violation of the City's Home Rule Charter and Administrative Code, they effectuate a change in the form of government.  Furthermore, as discussed in Section II.B.3. above, Act 47 does not authorize Receiver to unilaterally enter into contracts on the City's behalf, only to approve, disapprove, modify, reject, terminate, or renegotiate proposed or existing contracts.  These initiatives should be revised to give Receiver the authority to act in these areas, without completely removing such authority from the City's elected officials pursuant to the Home Rule Charter and Administrative Code.

The Court also STRIKES the following initiatives from the Plan Modification: Human Resources Policy Development, Implementation and Enforcement; Development, Implementation and Enforcement of Procurement Policies; and Development, Implementation and Enforcement of Ethics Policy. These three initiatives should be revised **only** to remove the language regarding the filing of a plan modification with the Court and asking the Court to render a decision within 21 days.  The remaining language in these three initiatives is acceptable pursuant to Act 47.

The Court CONFIRMS WITHOUT CHANGE the remaining 12 initiatives in the core internal administrative functions and ethics category.  The Court concludes,

40

EXHIBIT 2

based on the credible evidence of record, that the proposed initiatives are not arbitrary, capricious, or wholly inadequate to alleviate the City's fiscal emergency.

### 3.  Economic Development Initiatives

Receiver seeks approval of the following two initiatives in this category:

- City and Authority Compliance with Update to Municipal Comprehensive Plan Without Delay
- Approval of Economic Development Incentives

At the hearing, Receiver recounted that, at one point, the Mayor's former son-in-law, Ronald Starr, was placed in charge of economic development. N.T., 1/10/23, at 46-47.  However, Receiver testified:

> In that year, I'm not sure what he accomplished.  *I know he personally acquired several downtown properties during that time period, but what was done to advance economic developments on behalf of the City, I don't know.*
>
> And as he previously served as the City's chief of staff, he definitely was not meeting a mark there.

*Id.* at 46 (emphasis added); *see also Davin II*, slip op. at 6-7 (discussing City Council's passage of a resolution supporting an application for an economic development liquor license to a property partially owned by Mr. Starr).

Mr. Kapoor also testified that Mr. Starr was previously the chief of staff, but Receiver laid him off because he "couldn't tell what [Mr. Starr] was actually doing," and *"then the Mayor requested that that [Mr. Starr] be placed as the business development officer*." N.T., 1/9/23, at 206-07 (emphasis added).  Mr. Kapoor testified that Mr. Starr took the business development position at the end of 2020, reducing his annual salary from $110,000 to $85,000.  *Id.* at 211; *see id.* at 91. According to Mr. Kapoor, Mr. Starr "was working on important economic development things," but he "[n]ever attended any operational meetings" and

41

EXHIBIT 2

"[n]ever attended any of the Receiver['s] weekly meetings with . . . City Council."
*Id.* at 207.  Mr. Kapoor testified that "it was sort of an ongoing joke that you never
[saw] him around City Hall."  *Id.*  Mr. Starr has since resigned from that position.
*Id.* at 212.

Receiver asserts that, with regard to economic development, the prior
Amended Recovery Plan included an initiative that required the City to "work
collaboratively with the Delaware County Planning Department, the Delaware
Valley Regional Planning Commission, and DCED to update its Municipal
Comprehensive Plan," which "serves as the primary resource document for long-
term land use planning decisions."  Plan Modification at 57.  Although the City
received a grant from DCED to pay for this study, it was never completed "due to
delays from the City Planner in providing information to the selected vendor."  *Id.*
Thus, Receiver seeks to reinitiate this study and to ensure that the City Planner and
other City officials fully cooperate in the process.

At the hearing, Receiver testified about the importance of economic
development in helping the City emerge from insolvency.  Receiver explained that
"growing the tax base . . . is critical to the long-term sustainability of the City."
N.T., 1/10/23, at 12.  According to Receiver, having a comprehensive strategic plan
for economic growth is "critical to setting a stage for a long-term vision for the City,"
including "tak[ing] on issues like blight, community engagement, how to invest in a
waterfront, and [how to] bring additional tourism[] . . . and dollars [in]to the City."
*Id.* at 11-12.  Receiver testified that the City's prior comprehensive plan expired in
2020 and his attempts to implement a new plan have been delayed because "access
to the vendor has been blocked" and "[r]equests for meetings have been denied."
*Id.* at 13-14.  Receiver testified that, in particular, he has faced resistance from the
City Planner, who has "obstruct[ed]" Receiver's efforts by "asking [Receiver and

42

EXHIBIT 2

his team] to explain . . . months later . . . why [they] need to talk to the vendor or why [they're] trying to take on this effort." *Id.* at 14.

Receiver agreed that the proposed economic development initiatives require the cooperation of the City Planner and other City officials in order to proceed. *Id.* at 14-15. Receiver testified that the City needs to "work[] with . . . consultants on [Receiver's] team," "the selected vendor," and Delaware County "collectively[ and] collaboratively to figure out a path forward." *Id.* at 14.

Mr. Schuster also recognized the importance of economic development in moving the City toward its fiscal recovery goals. *Id.* at 155-56. Mr. Schuster testified that crime rates are down in the City and "if you lower crime, there will be . . . economic development, residential development." *Id.* at 148, 155. Mr. Schuster testified that the City is uniquely situated near Philadelphia and Wilmington, the Blue Route, and public transportation. *Id.* at 156. He noted that the City's waterfront, in particular, "is a real keystone element of any economic development." *Id.* Mr. Schuster also seemed optimistic about future economic development in the City, as he has seen "art galleries, restaurants and small, locally-owned business" beginning to populate the downtown area and he "can see some vibrancy and . . . life coming back to the [C]ity." *Id.* at 156-57.

* * * *

It is evident that both Receiver and the City recognize that fostering economic development is critical to the City's financial recovery. Yet, in working toward that goal, the Mayor simply parachuted his former relative into the business development position, without providing any clear directives or oversight to ensure that the City's economic development objectives were being met. By all accounts, the only progress Mr. Starr made on that front during his tenure was to obtain a liquor license for one of his businesses.

43

EXHIBIT 2

The Court concludes, based on the credible evidence of record, that Receiver's economic development initiatives are not arbitrary, capricious, or wholly inadequate to alleviate the City's fiscal emergency.

The Court CONFIRMS WITHOUT CHANGE both initiatives in the economic development category.

### III. Conclusion

The appointment of a receiver under Act 47 is the Commonwealth's final attempt to save a distressed municipality from total financial collapse. That is why the General Assembly grants so much power to an appointed receiver under Act 47 and mandates that the elected officials comply with a fiscal recovery plan that has been confirmed by the Court. *See* 53 P.S. §11701.706(a)(1); *id.* § 11701.704(a)(1) and (2). Act 47, however, also cautions that the Court's confirmation of a recovery plan shall not be construed to change the form of government. *See id.* § 11701.704(b)(1). Thus, in ruling on a plan modification, the Court must balance the receiver's broad powers with the powers legislatively granted to the elected officials so as not to remove *all* such authority from the elected officials, while giving the receiver meaningful participation and authority to carry out his duties under Act 47.

In this case, the credible evidence of record demonstrates that aside from the severe financial distress plaguing the City, the City also suffers from a municipal government that is internally dysfunctional. While the recent hiring of Mr. Lightner as COO is a step in the right direction, the Court does not see a viable path forward for the City unless major changes are made to its internal administrative operations. According to Receiver, "the City's current administrative organization and allocation of duties is the single greatest operational obstacle to the City's ability to provide vital and necessary services" to its residents. Plan Modification at 25. The Court agrees.

44

EXHIBIT 2

The Court concludes that not only is there no clear and convincing evidence that the Plan Modification is arbitrary, capricious, or wholly inadequate to alleviate the City's fiscal emergency, but the credible evidence establishes that Receiver's proposed initiatives are necessary to help Receiver and his team work constructively with the COO (soon to become the Chief of Staff) and the elected officials to save the City from the brink of financial doom.   As explained in Section II.C. above, however, several of Receiver's proposed initiatives cannot be confirmed as written, but should be modified to conform with Act 47 and the City's Home Rule Charter and Administrative Code.  For this reason, the Court grants Receiver leave to amend the Plan Modification in accordance with the attached Order.

* * *

Accordingly, based on the foregoing analysis and conclusions, the Court enters the following Order:

45

EXHIBIT 2

# O R D E R

AND NOW, this 31st day of January, 2023, upon consideration of the Modification of Amended Recovery Plan (Plan Modification) filed by Michael T. Doweary, in his capacity as Receiver for the City of Chester (Receiver), the response thereto filed by the City of Chester, Mayor Thaddeus Kirkland, and City Council of the City of Chester (collectively, the City), and the arguments and evidence presented at the hearing held from January 9-11, 2023, including the credited testimony, the Court hereby CONFIRMS IN PART the Plan Modification, STRIKES certain of the proposed initiatives therein, and GRANTS Receiver leave to amend the Plan Modification.

It is further hereby ORDERED and DIRECTED that:

(1) Receiver's Amended Plan Modification shall conform to the Court's specific rulings on the proposed initiatives in the foregoing Opinion; **only the proposed initiatives that the Court has stricken shall be amended.**

(2) Receiver shall file the Amended Plan Modification with the Court for review **no later than Monday, February 13, 2023**.

_____
ELLEN CEISLER, Judge

Order Exit
01/31/2023

EXHIBIT 2