**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | Chapter 9 |
| | : | |
| CITY OF CHESTER, PENNSYLVANIA | : | Case No. 22-13032 |
| | : | |
| Debtor | : | |
| | : | |

**MEMORANDUM OF LAW IN SUPPORT OF ANSWER OF THE
STORMWATER AUTHORITY OF THE CITY OF CHESTER TO DEBTOR,
CITY OF CHESTER'S MOTION TO PRODUCE DOCUMENTS PURSUANT
TO BANKRUPTCY RULE 2004**

The Stormwater Authority of the City of Chester ("Respondent," "SAC," or the "Authority") hereby files this Memorandum of Law in support of its Answer to the Motion of Debtor, City of Chester, for Entry of an Order Requiring the Stormwater Authority of the City of Chester to Produce Documents pursuant to Bankruptcy Rule 2004, stating as follows:

**Introduction**

The scope of examination under Rule 2004 is characterized universally by courts as broad. *See*, *In re Philadelphia Orchestra Assn*., No. 11-13098-ELF (Bankr. E.D. Pa. July 25, 2011) citing *In re Drexel Burnham Lambert Group, Inc*., 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991) ("analogizing Rule 2004 examination to an authorized 'fishing expedition' that may 'net the dolphins as well as the tuna'."). A bankruptcy court must strike a balance between the parties' competing interests and is accorded broad discretion to consider the totality of the circumstances in determining the permissible scope of a Rule 2004 examination. *Id.* citing *In re Countrywide Home Loans, Inc*., 384 B.R. 373, 393 (Bankr. W.D. Pa. 2008), appeal dismissed, 2008 WL 2388285 (W.D. Pa. Jun 11, 2008) (court should employ a "sliding scale" comparing a creditor's need for the requested information with the level of potential intrusiveness involved).

The relevancy of the requested documents does not alone demonstrate good cause for production. *In re Drexel Burnham Lambert Group, Inc*., 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991). In this matter, the Debtor's Motion to Produce pursuant to Bankr. Rule 2004 should be denied because the Commonwealth Court is expecting to address the Stormwater Authority-related matters, at which time these documents can properly be requested. While Debtor's requests may be tangentially relevant to the pending bankruptcy proceeding, the totality of the circumstances require the Bankruptcy Court to allow the Commonwealth Court to continue in its statutory role.

## Overview and Legal Arguments

The instant Bankruptcy Court proceedings for the Debtor, City of Chester, do not exist in a vacuum. In 1995, the City of Chester ("Debtor," "Chester," or the "City") was designated as a distressed municipality under the Financially Distressed Municipalities Act ("Act 47" or the "Act"), which is administered by the Commonwealth of Pennsylvania's Department of Community and Economic Development (the "Department" or "DCED"). *See,* 53 P.S. §11701.121. Pursuant to the Act, among the Department's other responsibilities, it is tasked with appointing coordinators, which may be DCED employees or private consultants, to formulate plans to address the financial problems of distressed municipalities such as the City of Chester. *See id.* §11701.221(a), (b). All proposed recovery plans, including modified plans, must first be approved and confirmed by the Commonwealth Court of Pennsylvania (the "Commonwealth Court") before they may be implemented. *See,* id. § 11701.703(e).

The City was designated a distressed city under Act 47 in 1995. In the period between 1995 and 2020, it operated under numerous fiscal recovery plans. However, in June 2020 (pursuant to then-Governor Wolf's Declaration of Fiscal Emergency under Act 47), the City was

2

placed under receivership, and Mr. Michael Doweary approved as Receiver. In October of 2020, the Commonwealth Court approved the Act 47 Receiver's initial Recovery Plan for the City of Chester. In April of 2021, the Receiver proposed an Amended Recovery Plan, which was approved by the Commonwealth Court on June 7, 2021. However, any number of elected officials proved uncooperative with the Amended Recovery Plan and/or with the Receiver, and, on March 4, 2022, the Receiver filed a Petition of Mandamus with the Commonwealth Court pursuant to 53 P.S. § 11701.709(a) (which allows a receiver to petition the Commonwealth Court to issue a writ of mandamus upon persons elected by the citizens of the municipality, essentially to force compliance with an order issued by a receiver). Specifically, the Receiver petitioned the Commonwealth Court to issue a writ of mandamus compelling elected City officials to comply with initiatives outlined in the Amended Recovery Plan. On March 22, 2022, the Commonwealth Court granted the Receiver's requests, in part.

Thereafter, on November 8, 2022, the Receiver presented the Commonwealth Court with yet another proposed plan modification (the "Second Amended Recovery Plan").[1] The Receiver's proposed Second Amended Recovery Plan contained thirty-three (33) initiatives, which Receiver categorized as: 1.) administrative duties and professional management; 2.) core internal administrative functions and ethics;  3.) parking services;  4.) <u>monetization of the Stormwater Authority of the City of Chester</u>; and 5.) economic development. *See,* Plan Modification at 30-59. On or about December 2, 2022, the Authority filed its Response and

---

[1] Two days later, on November 10, 2022, the Receiver initiated the instant Bankruptcy Court matter, and this Court subsequently lifted the automatic stay so that the Commonwealth Court could address the Plan Modification. On November 22, 2022, this Court entered an Order clarifying that the automatic stay was not in effect with respect to proceedings in the Commonwealth Court relating to the Receiver's proposed Modified Recovery Plan.  *See,* Docket No. 80, Automatic Stay Order.

3

Objections to Petitioner's Modification of Recovery Plan (i.e., its Response and Objections to the "Second Amended Recovery Plan").  A copy of the Response and Objections is attached hereto as Exhibit 1.

In its Response and Objections, the Authority explained that it is a municipal authority, incorporated on October 12, 2016, and lawfully operating pursuant to Pennsylvania's Municipality Authorities Act, 53 Pa.C.S.A. § 5601, *et seq*. (hereinafter "Authorities Act"). Having been incorporated pursuant to the Authorities Act, the Authority is a corporate entity – separate and distinct from the City – created for the purpose of and with the power to acquire, hold, construct, finance, improve, maintain and operate projects related to stormwater planning and management within the City of Chester and for the benefit of the citizenry. *See,* 53 Pa.C.S.A. § 5607(a); *see also, Bristol Township Water Authority v. Lower Bucks County Joint Municipal Authority*, 567 A.2d 1110, 1113 (Pa. Commw. Ct. 1989) ("an authority which has been incorporated under the [Municipality Authorities] Act becomes an independent Commonwealth agency and not subject to the control of the incorporating township").

The Second Amended Recovery Plan suggested a plan to undermine the Stormwater Authority's Board.  Under Pennsylvania law, the administrative powers and duties of authorities such as the Stormwater Authority "shall be exercised by a board," which, albeit appointed by the municipality, nevertheless acts wholly independently from the municipality. *See,* 53 Pa.C.S.A. § 5610(a)(1).  Indeed, Section 5610(e) provides, in relevant part:

> The board shall have full authority to manage the properties and business of the authority and to prescribe, amend and repeal bylaws, rules and regulations governing the manner in which the business of the authority may be conducted and the powers granted to it may be exercised and embodied.

53 Pa.C.S. § 5610(e).  Nowhere in the Authorities Act is there any indication that the General Assembly intended for an incorporating municipality to stand in the shoes of a municipal

4

authority board regarding the operation of the authority. Thus, by operation of the Authorities Act, it is an authority's board, and not an authority's incorporating municipality, that has the power to "manage the properties and business of the authority" and to govern "the manner in which the business of the authority may be conducted and the powers granted to it may be exercised and embodied." *Id.*

With regard to the Receiver's suggested plans attempting to "monetize" the Authority and/or its assets, in its Response and Opposition, the Authority also argued that the Receiver would be bound to follow the Authorities Act and the limitations it places on proceeds of the Authority. Section 5622(d) of the Authorities Act provides in relevant part:

> Following transfer of a project pursuant to this section, the municipality…, which has acquired the project shall retain the reserves received from the authority which have been derived from operations in a separate fund, and the reserves shall only be used for the purposes of operating, maintaining, repairing, improving and extending the project. Money received from the authority which represents the proceeds of financing shall be retained by the municipality in a separate fund which shall only be used for improving or extending the project or other capital purposes related to it.

53 Pa.C.S.A. § 5622(d) (emphasis added). The Authority argued that this restriction would directly impair the Receiver's ability to use Stormwater Authority reserves or proceeds from financing towards the payment of outstanding debt obligations owed by the City. Instead, the proceeds from such monetization would have to be allocated specifically and exclusively for the purposes of operating, maintaining, repairing, improving and extending the City's stormwater management needs.

As it turns out, the Commonwealth Court did not consider or rule upon the City's proposed initiatives or the Authority's objections. Rather, following a pre-hearing conference with the parties' counsel, the Commonwealth Court bifurcated the matter, and directed that it

5

would not receive evidence on Receiver's proposed initiatives relating to the Stormwater Authority at the Plan Modification hearing. Specifically, the Commonwealth Court explained:

> On January 4, 2023, following a pre-hearing conference with the parties' counsel, the Court bifurcated the matter and directed that <u>it would not receive evidence</u> on Receiver's proposed initiatives <u>relating to the Stormwater Authority</u> at the Plan Modification hearing…. The Court bifurcated the Stormwater Authority… matter[] from these procedures <u>due to the complex factual and legal issues involved, which the Court determined necessitated separate hearing</u>. Thus, the Court does not address the Stormwater Authority initiatives [proposed by the Receiver]… in this Opinion.

*See,* Memorandum and Opinion of the Commonwealth Court of Pennsylvania in *Neil R. Weaver, in his capacity as Acting Secretary of the Department of Community and Economic Development v. City of Chester,* at FN.9 at pp- 9-10, a copy of which is attached hereto as Exhibit 2 (emphasis added).[2]

It bears repeating that the Commonwealth Court determined that the factual and legal issues involved with the Receiver's proposed Stormwater Authority initiatives in the proposed Second Amended Recovery Plan were so complex that they could not be considered, let alone resolved, without a separate hearing dedicated to those issues. The other three categories described by the Receiver (i.e.*,* administrative duties and professional management; core internal administrative functions and ethics; and economic development) could be considered in the 3-day hearing, however, the monetization of the Stormwater Authority, and parking required a separate hearing at some later time.

In the sixteen (16) months between the day the Commonwealth Court bifurcated the issues raised by the City regarding the Stormwater Authority, and date on which the City filed

---

[2] On February 9, 2023, the City filed a request that this Court take judicial notice of the Opinion and Order rendered by the Commonwealth Court of Pennsylvania on January 31, 2023, respecting the Modified Recovery Plan. *See,* Docket No. 226.

6

the instant Motion, the Receiver did nothing to re-present to the Commonwealth Court "the complex factual and legal issues involved which the Court determined necessitated separate hearing." The Receiver did not request another hearing on the initiatives as presented in the Second Amended Recovery Plan. On the contrary, after having reviewed and considered the Commonwealth Court's February 2023 Opinion and Memorandum, the City seems to have taken the legally unfounded position that it can essentially do an end-run around the required review and approval of the Commonwealth Court, and, instead, litigate "*the complex factual and legal issues involved*" with the Stormwater Authority in this Court.

On or about March 6, 2023, the Stormwater Authority entered into a Stipulation stating in part, "Any and all references to [Stormwater Authority of the City of Chester] in the initiatives set forth in the Receiver's Plan Modification as filed on February 10, 2023, shall be removed, and stricken by the Receiver." (*Id.,* at ¶ 2.) However, that portion of the Second Amended Recovery Plan is still pending review by the Commonwealth Court. Apparently hedging that it might not be able to circumvent the Commonwealth Court's oversight regarding the Stormwater Authority issues (or that this Court might reject attempts to use the bankruptcy process to litigate the Stormwater initiatives in this matter), the Stipulation correctly addresses the City's possible future need for a "third" Amended Recovery Plan by providing:

> SAC reserves the right to object to any inclusion of SAC by the Receiver in any future Plan Modification including, but not limited to, whether any proposed action or initiative by the Receiver towards SAC must be consistent with the Pennsylvania Municipality Authorities Act, 53 Pa. C.S.A. s. 5601, et seq.

(*Id.*, at ¶ 3.) In short, the Stipulation reaffirms the parties understanding that the Commonwealth Court bifurcated the Stormwater Authority matter necessitating separate hearing, i.e. a future Plan Modification to be proposed by the City to which the Authority can object and litigate in

7

Commonwealth Court with the usual exchange of information and documents. However, the City and the Receiver quickly decided to pursue a more aggressive tack.

Rather than abide by the terms of the Stipulation, counsel for the City in the bankruptcy proceedings sent the Stormwater Authority's Act 47 attorneys a list of 18 requests for information and documents. (*See,* Exhibit E to the City's instant Motion.) As a courtesy, on or about June 30, 2023, the Stormwater Authority produced certain documents and information directly to counsel for the City. (*See,* Exhibit F to the City's instant Motion.) Almost 4 months later, on or about October 27, 2023, counsel for the City expressed the City's desire for even more information and documents (and again couching it terms an alleged "connection with the bankruptcy and our goal to accomplish a viable plan of adjustment for the City and its residents"). (*See,* Exhibit G to the City's instant Motion.)

On March 12, 2024, the *Mayor* of the City of Chester himself *directly* contacted the Authority, and requested some of the information and documents that had already been requested by the City's counsel in the bankruptcy matter. (*See*, Exhibit M to the City's Motion.) Thereafter, on April 1, 2024, the Receiver directly contacted the Authority's Chairwoman, Livia Smith, "to follow up on the email sent by City of Chester Mayor Stefan Roots . . . on March 12, 2024." (*See,* Exhibit N to the City's Motion.) In his letter, the Receiver requests information and documents, including information and documents that had already been requested by the City's bankruptcy attorneys. However, Mr. Doweary's letter makes no mention of the bankruptcy proceedings or the bankruptcy attorneys' requests. On the contrary, the request is specifically said to be based upon the Second Amended Recovery Plan as partially approved by the Commonwealth Court (the approval of which was upheld, by operation of law, by the Pennsylvania Supreme Court because it could not assemble a majority opinion). Indeed, Mr.

8

Doweary requests that information and documents be produced directly to him, and not to the City's bankruptcy attorneys. Further, as quoted more fully directly below, he specifically claims, "This request is made under the following Plan provisions…." It is not made in support of any bankruptcy matter or bankruptcy matter goals. Specifically, the Act 47 Receiver writes:

> According to the Recovery Plan confirmed by the Pennsylvania Supreme Court on January 29, 2024, the proper management of the debt and financial obligation of the City of Chester, along with its authorities, including the stormwater Authority, is integral to recovery. Therefore, I am renewing Mayor Roots' request and asking the Authority to provide the following information by April 10, 2024 to me at mdoweary@pa.gov: . . . .
>
> This request is made under the following Plan initiatives:
> The Receiver's Plan requires that "the distressed municipality and authorities" pay their lawful financial obligations, which include debt obligations, municipal securities, lease rental obligations, legal obligations, and consensual modifications of existing obligations. The City paid these obligations in 2020, and the 2021 budget provides for their payment this year.
>
> As stated in the City's [Act 47] Emergency Action Plan, the City and its authorities shall not incur any other debt without the Receiver's written approval. This includes issuing any new debt, including short-term cash borrowings, and refunding or refinancing existing debt. For any debt-related requests, the City shall provide the following to the Receiver for the Receiver's office for review: . . . .
>
> This extends without limitation to the Chester Economic Development Authority (CEDA), the Redevelopment Authority of the City of Chester (CRA), the Chester Parking Authority, and the Stormwater Authority of the City of Chester.

(Id) (emphasis added).

The Receiver's letter indicates that the City and the Receiver (whether directly or through their bankruptcy attorneys) had been demanding this information all along both pursuant to and in support of the Second Amended Recovery Plan. As counsel for the Authority explained in his letter of April 8, 2024 (attached as Exhibit O to the City's instant Motion), the Plan approved by the Commonwealth Court (and by operation of law upheld by the Pennsylvania Supreme Court) did not address the Stormwater Authority or its obligations, rights or prerogatives under Act 47.

9

Additionally, if the City has any interest in the Authority's assets, such interest can only be that which existed as of the Petition date. To now state that the information and documents being requested directly "relate to the City's property interests in SAC and its assets" is a bridge too far. The City and Receiver argue that they have a right to reacquire and/or dissolve the Authority pursuant to Act 47 and the MAA, but – even assuming, arguendo, that this is true – as of the Bankruptcy Petition date, the City had not yet done so. The Authority is and remains independent of the City, and its assets remain its own; they are not property of Debtor's bankruptcy estate. Proceedings to reacquire and dissolve the Authority pursuant to Act 47 and the MAA would have had to have been completed pre-Petition in order to make such a claim. Such proceedings are the exclusive jurisdiction of the Commonwealth Court, and this Court has already granted limited stay relief for Debtor to do so. The demands made by way of the letters referencing the bankruptcy proceedings and Rule 2004 were improper *ab initio*. Likewise, as outlined in the Authority's counsel's letter of April 8, 2024, the demands for information and documents are inappropriate pursuant to the Commonwealth Court's bifurcation of the Second Amended Recovery Plan and the Stipulation.

       The Authority anticipates that the City/Receiver will argue that the requests for information and documents were presented in support of both the Second Amended Recovery Plan and the bankruptcy goals. However, and respectfully, there should not be a hybrid production argument. To the extent that there are or may be any conflicts between the City's use of the information and documents in the state court litigation and in the bankruptcy proceedings, it is the Commonwealth Court that must consider and address the Authority's position under Act 47. This Court should not take on what the Commonwealth Court bifurcated and postponed. If the City and Receiver now desire to impose terms and provisions of Act 47 onto the Authority, as

10

the Receiver's letter of April 1, 2024 states, the City must re-present the bifurcated elements of its Second Amended Recovery Plan or a proposed Third Amended Recovery Plan to the Commonwealth Court. In either event, the Authority has the right to present its Answers and Objections to the Commonwealth Court for consideration and resolution. The Supreme Court's several opinions (including a concurrence and a dissent) indicate that neither the consideration nor the resolution would be simple. However, the Pennsylvania Legislature has conferred on the Commonwealth Court the right to do so, and, respectfully, this Court might create a conflict with the Commonwealth Court that has far reaching unintended consequences were it to grant the instant Motion.

Likewise, were the Authority and its board members to be brought into the bankruptcy proceeding, this Court (as suggested by the City's Motion) might be required to rule on issues that the Commonwealth Court alone has authority over. Paragraphs 35 through 37 of the Motion present concerns regarding City of Chester Council Members who simultaneously hold paying positions as council members and as board members of the Authority. The City attaches emails from the City of Chester's Mayor raising concerns that it is a violation of the City's Charter. Respondent fails to see the relevance to the bankruptcy proceedings. Rather, as outlined in the Commonwealth Court's Opinion, and the several Supreme Court decisions attached to the Motion, the removal or movement of board members is an issue which can be presented in a proposed plan, and then considered and either approved or disapproved by the Commonwealth Court. Ultimately, and respectfully, this Court cannot remove a City of Chester Councilperson from their Council position or from any membership on the board of an authority. Therefore, neither this Court nor Bankruptcy Rule 2004 should be misused to collect information or

11

documents that the City might ultimately intend to use to remove any person from office or a board position.

Had the City properly brought its action seeking to monetize the Stormwater Authority of the City of Chester in Commonwealth Court, the parties could conduct their discovery in the normal course. Using this Court to avoid bringing such an action and extend the net is especially troubling when considering the fact that the parties are regularly subject to document productions similar in scope. In addition to being subject to 65 P.S. §67.101 et seq., the "Right-to-Know Law," the Authority is subject to an annual audit conducted by the same office from which the Receiver operates. Pursuant to 53 Pa.C.S.A. § 5612(b), in pertinent part:

> a required annual report shall be published in accordance with the following: (1) Every authority shall file, on or before 180 days following the end of its fiscal year, an annual report of its fiscal affairs covering the preceding fiscal year with the Department of Community and Economic Development and with the municipality or municipalities creating the authority on forms prepared and distributed by the Department of Community and Economic Development. The reports shall also be provided, and may be provided electronically, to any other municipality that has residents served by the authority. (2) Every authority shall have its books, accounts and records audited annually by a certified public accountant, and a copy of the audit report shall be filed in the same manner and within the same time period as the annual report… (3) A concise financial statement shall be published annually at least once in a newspaper of general circulation in the municipality where the principal office of the authority is located. If the publication is not made by the authority, the municipality shall publish such statement at the expense of the authority. (4) If the authority fails to make such an audit or if the municipality determines that there is a need for a review, then the controller, auditor or accountant designated by the municipality is hereby authorized and empowered from time to time to examine the accounts and books of it, including its receipts, billing systems, disbursements, transparency of contracts and how the contracts are awarded, leases, sinking funds, investments, compliance with relevant Federal and State statutes, conflicts of interest by the authority and its board members, staff and contractors and any other matters relating to its finances, operation and affairs. The review by the municipality shall be conducted within a year of an authority's annual audit…

The Authority's audit for fiscal year 2023 is due on or before June 30, 2024. The Authority's audit for fiscal year 2022 remains subject to further review by the Debtor. Information beyond that period is left to the exclusive jurisdiction of the Attorney General. *See,*

12

*id.* at 5612 (c), stating "The Attorney General of the Commonwealth shall have the right to examine the books, accounts and records of any authority." The Authority maintains that the bulk, if not all, of the Debtor's requests for information are either already public record and/or have already been provided.

## Conclusion

For the reasons above stated, the Stormwater Authority of the City of Chester respectfully requests that this Court deny Debtor's Motion.

WETZEL GAGLIARDI FETTER & LAVIN LLC

Date: May 23, 2024

By: /s/ John A. Gagliardi
John A. Gagliardi
122 South Church Street
West Chester, PA 19382
484-887-0779 x102
jgagliardi@wgflaw.com
Counsel for Stormwater Authority of
the City of Chester

13