## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| In re | : Chapter 9 |
| | : |
| CITY OF CHESTER, PENNSYLVANIA, | : Case No. 22-13032 |
| | : |
| Debtor. | : Judge Ashely Chan |
| | : |
| THE OFFICIAL COMMITTEE OF RETIRED EMPLOYEES OF THE CITY OF CHESTER, PENNSYLVANIA, | : |
| | : |
| | : |
| Plaintiff, | : Adv. Proc. No. _____ |
| | : |
| v. | : |
| | : |
| MICHAEL T. DOWEARY, as Receiver for the City of Chester, Pennsylvania and VIJAY KAPOOR, as incoming successor Receiver for the City of Chester, Pennsylvania. | : |
| | : |
| | : |
| Defendants. | : |
| | : |

## COMPLAINT

The Official Committee of Retired Employees of the City of Chester, Pennsylvania (the "**Retiree Committee**" or "**Plaintiff**"), by its counsel, Herrick, Feinstein LLP and Flaster Greenberg, PC, hereby commences this adversary proceeding against Defendants Michael T. Doweary, as receiver, and Vijay Kapoor as incoming successor receiver (collectively and individually, as applicable, the "**Receiver**") for the City of Chester, Pennsylvania (the "**City**" or "**Debtor**") and alleges upon personal knowledge as to its own acts, and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1.      In the City's above-captioned chapter 9 bankruptcy case (the "**Chapter 9 Case**"), there appears to be no dispute that the water management system assets (the "**Water Assets**") managed by Chester Water Authority ("**CWA**"), which (according to the currently prevailing case law) the City has the statutory right to repossess and monetize for its own benefit and the benefit of its creditors, are—by far—the most valuable assets the City has available to monetize in order to effectively emerge from the Chapter 9 Case.

2.      Despite the immense value of the Water Assets to the City, Plaintiff has been forced to file this Complaint to avert the catastrophic loss of value that would occur in monetizing the Water Assets as a result of the Receiver's self-imposed policy of insisting upon public ownership of the Water Assets to the exclusion of private-sector bidders (the "**Value Limiting Policy**"). If allowed to persist, the Value Limiting Policy's impact will be suffered by the City, its residents, and the Retirees (as defined below) for decades to come.

3.      Plaintiff aims to avert this financial catastrophe and save the City, its residents, and the Retirees from the heavy cost of what amounts to nothing more than a public policy initiative of the Receiver (and/or other non-Debtor third parties) and to avoid the outrageous and inequitable result of the Value Limiting Policy, which is antithetical to the policies and process under chapter 9 of title 11 of the United States Code (the "**Bankruptcy Code**").

4.      In February 2021, prior to the start of the Chapter 9 Case, the City sought bids to purchase the Water Assets and received three bids: $60 million from CWA; $410 million from Aqua Pennsylvania, Inc. ("**Aqua**"); and $425 million from Pennsylvania American Water ("**PAW**"). Even assuming the Aqua and PAW bids were gross purchase prices, the private-sector

bids vastly exceeded the CWA's bid by approximately $270-285 million, assuming the amount of CWA's bond debt is approximately $80 million.[1]

5.    In the Chapter 9 Case, the Receiver commenced his own request for proposal process to monetize the Water Assets (the "**RFP Process**"). However, despite the previous robust bids from Aqua and PAW, and the vast discrepancy between those bids and the anemic bid of CWA, the Receiver is insisting upon excluding Aqua, PAW, and any other deep-pocket non-governmental entities from making stand-alone bids for the Water Assets.[2] In doing so, the Receiver is preventing the City from realizing fair market value for the Water Assets—as the City is entitled to obtain under section 1329 of the Pennsylvania Public Utility Code, also known as Act 12 of 2016 ("**Act 12**").

6.    The Receiver, as the representative of the City in the Chapter 9 Case, has a fiduciary duty under the Bankruptcy Code to maximize the value of the City's assets for the benefit of the City, its residents, and its creditors, including the City's Retirees and to generally act in the best interests of these stakeholders. By preventing private-sector entities from making stand-alone bids for the Water Assets and inviting the loss of potentially hundreds of millions of dollars in sale proceeds, the Receiver is failing to pursue a value-maximizing transaction that would immensely benefit the City and the Retirees and is thus breaching this fundamental duty.

7.    The Receiver's primary stated justification for this sale strategy is that limiting ownership of the Water Assets to public entities will reduce the impact of future rate increases upon CWA's ratepayers—that is, including ratepayers who are not the City's residents. However,

---

[1] The amount of outstanding CWA bond debt may be somewhat unclear. *See* footnote 4 below.

[2] The Receiver is requiring that any monetization transaction for the Water Assets results in the Water Assets being owned by a municipal or other governmental entity. Thus, non-governmental entities are limited to participating in a non-ownership capacity pursuant to a management agreement, leasing agreement, concession agreement, or similar arrangement.

the Receiver has failed to, among other things: (i) explain why rate hikes for the City's residents

cannot be precluded in a sale to a private-sector entity through the creation of a rate stabilization

fund or a similar mechanism, and (ii) demonstrate how the potential reduction in rate hikes for the

City's ratepayers outweighs the anticipated dramatic loss of potentially hundreds of millions of

dollars in sale value, and the consequent harm to the Retirees and the City's revitalization plans,

resulting from seeking only public-entity bids.

8.      At a minimum, there is no harm in allowing private-sector stand-alone bids in the

RFP Process and then determining, at the end of the RFP Process, which bid is best for the City,

its residents, and its creditors overall. Indeed, as discussed below, excluding private-sector stand-

alone bids will likely cause tremendous harm not only in forgoing such bids but also in preventing

a competitive process and removing the incentive for public-sector entities to bid competitively.

There is simply no justification for excluding private-sector stand-alone bids at this juncture. And

none of the Receiver's other stated justifications for his sale strategy are compelling. *See*

discussion at ¶¶ 58-69 below.

9.      Moreover, whether the Receiver is acting on his own behalf in insisting on

implementing the improper Value Limiting Policy, or at the behest of the Office of the Governor

of the Commonwealth of Pennsylvania (the "**Commonwealth,**" "**Pennsylvania,**" or the "**State**")

or other Commonwealth political entities, the Value Limiting Policy is effectively a restraint

imposed by such non-Debtor entity on the disposition of the City's Water Assets, and thus

constitutes an exercise of control over those assets in clear violation of the automatic stay under

section 362(a)(3) of the Bankruptcy Code.

10.     Plaintiff raised concerns about the prospect of an RFP Process limited to public-

sector entities on September 3, 2024, in its *Initial Response to the Receiver's Filing of His Plan of*

*Adjustment On Behalf of the City of Chester* [Dkt. No. 586] (the "**Initial Response**"). *See* Initial

Response at ¶¶ 12-16. Despite this, on May 2, 2025, the Receiver issued his Request for Bids

("**RFB**") to qualified bidders, continuing to insist on public-entity ownership of the Water Assets

and identifying a bid deadline of September 2, 2025.

11.    In light of the imminent bid deadline, the Court must order a course correction to

ensure that all potential bids—from both public *and* private entity bidders—are received and

considered in the RFP Process, rather than engaging in an illogical process of speculation, after

the bid deadline expires, as to what other bids *may* have been received from excluded private entity

bidders and how those bids *would have* compared to the limited actual bids received from public

entity bidders.

12.    Plaintiff therefore has promptly filed this Complaint to compel the Receiver to

conduct a more open and rational RFP Process and hereby seeks declaratory and injunctive relief

prohibiting the Receiver from continuing this value-destroying conduct and such other relief as

may be appropriate.

## JURISDICTION AND VENUE

13.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

14.    This is a core proceeding pursuant to one or more of 28 U.S.C. § 157(b)(2)(A), (L),

(N), and (O).

15.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## PARTIES

16.    The Retiree Committee is a statutory committee established by Appointment dated

February 6, 2023 [Dkt. No. 215] and Amended Appointment dated March 17, 2023 [Dkt. No. 271]

by the Office of the United States Trustee pursuant to section 1102 of the Bankruptcy Code. The

Retiree Committee represents the interests of the City's approximately 250 retired municipal employees (the "**Retirees**") who dedicated their working lives to the service of the City, its residents, and the surrounding community, as well as the interests of their spouses, dependents, and survivors, in the Chapter 9 Case. The Retiree Committee consists of eight individual members who served as police officers, firefighters, and providers of other critical services for the City.

17.     Michael T. Doweary is the current receiver for the City, as appointed by the Commonwealth Court of Pennsylvania on June 22, 2020, pursuant to the Pennsylvania Municipalities Financial Recovery Act, Act of 1987, P.L. 246, No. 47 ("**Act 47**"). It has been reported that Mr. Doweary will be resigning as receiver for the City as of June 30, 2025, and that Vijay Kapoor, currently Chief of Staff to Mr. Doweary as receiver, will succeed Mr. Doweary as receiver for the City. [Dkt. No. 741]. Upon information and belief, both Mr. Doweary and Mr. Kapoor are residents of the Commonwealth. As noted above, Mr. Doweary and Mr. Kapoor will each be referred to herein, as applicable, as the "**Receiver**."

## BACKGROUND

### A.  The City's History of Financial Troubles and The Appointment of the Receiver.

18.     According to the Receiver's pleadings in the Chapter 9 Case, since at least the mid-1950s, the City has experienced economic difficulties and challenges which have substantially hindered its ability to generate revenue, provide services to its residents, and otherwise meet its financial commitments.

19.     As a result, in 1995, the City was designated a distressed city under Act 47 and has been subject to supervision under Act 47 ever since.

20.     In April 2020, then-governor of the Commonwealth, Tom Wolf, declared a fiscal emergency in Chester, and on June 22, 2020, the City was placed in receivership pursuant to section 702(c)(2) of Act 47.

21.     That same day, on June 22, 2020, upon nomination of the Secretary of the Pennsylvania Department of Community and Economic Development, Mr. Doweary was appointed by the Commonwealth Court of Pennsylvania to serve as the Receiver to manage the finances of the City.

22.     Pursuant to section 705(e) of Act 47, the Receiver's compensation is paid by the Commonwealth in exchange for the services provided to the City by the Receiver. In fact, the Receiver, his counsel Ballard Spahr LLP, and certain other of his professionals have been paid for their services throughout the Chapter 9 Case by the Commonwealth—a non-Debtor third party—and not by the City itself.[3]

**B.  The Water Assets and Prepetition Litigation Concerning their Ownership.**

23.     The entity now known as CWA was incorporated by the City in 1935 in accordance with Pennsylvania's Municipality Authorities Act, (as amended, 53 Pa.C.S. §§ 5601, *et seq.*) (the "**MAA**").

24.     Over time, CWA expanded beyond the City's borders to serve municipalities across Delaware and Chester Counties, and the scope of the Water Assets expanded to include significant real property and physical infrastructure across CWA's service area.

---

[3] While it is true that sections 327(a) and 701(a) of the Bankruptcy Code and their disinterestedness requirements for a trustee and a trustee/debtor's employed professionals do not apply in a chapter 9 case, the danger of conflicts of interests should nonetheless remain a concern of the Court, to ensure that representatives of the City—particularly non-elected, State-appointed, and State-compensated representatives—are acting in the best interests of the City and its creditors rather than serving the interests of others.

25.     Prior to the Pennsylvania legislature enacting Act 73 of 2012, 53 Pa. C.S. §§ 5610(a.1), 5612(a.1) ("**Act 73**") in 2012, CWA was governed by a five-member board (the "**CWA Board**"), and all CWA Board members were appointed by the City.

26.     After the passage of Act 73, the CWA Board was expanded from five members to nine, with Chester and Delaware Counties given the right to appoint three CWA Board members each, with the remaining three seats to be appointed by the City.

27.     In early 2019, the CWA Board voted to create a trust and place the Water Assets into the trust, and on March 1, 2019, the CWA Board petitioned the Court of Common Pleas for Delaware County (the "**CCP**") for approval of the trust (the "**Trust Petition**").

28.     The City opposed the Trust Petition, arguing that the City possessed the statutory authority under MAA § 5622(a) to transfer the Water Assets to itself.

29.     On August 13, 2019, the City filed a separate action in the CCP seeking a declaratory judgment (the "**Declaratory Action**") that the City has the power under MAA section 5622(a) to re-acquire the Water Assets from CWA in accordance with section 5622(a), in an effort to ultimately sell them for fair market value and thus address its decades-long financial struggles.

30.     On April 24, 2020, the CCP denied the City's motion for judgment on the pleadings in the Declaratory Action, and the City subsequently appealed to the Commonwealth Court.

31.     On September 16, 2021, the Commonwealth Court in *In re Chester Water Authority Trust*, 263 A.3d 689 (Pa. Commw. Ct. 2021), issued its decision (the "**Commonwealth Court Decision**"), ruling that the City does indeed have the authority to unilaterally re-acquire the Water Assets from CWA pursuant to MAA section 5622(a).

32.     On September 17, 2021, CWA petitioned to appeal the Commonwealth Court Decision to the Pennsylvania Supreme Court, which petition was granted on April 11, 2022. Oral

argument on the appeal to the Pennsylvania Supreme Court was scheduled to occur on November 30, 2022.

33.    Upon the commencement of the Chapter 9 Case on November 10, 2022, oral argument and all proceedings in the appellate matter before the Pennsylvania Supreme Court were stayed. On November 20, 2024, this Court entered an order lifting the stay to permit the Pennsylvania Supreme Court appeal to proceed [Dkt. No. 629], and oral argument was conducted on May 14, 2025. To date, however, no decision has been issued by the Pennsylvania Supreme Court.

34.    Accordingly, as of the commencement of the Chapter 9 Case, the Commonwealth Court Decision remained the governing decision concerning the City's right to the Water Assets, establishing the City's property interest in the Water Assets. And, as of the filing of this Complaint, the City's property interest in the Water Assets remains the primary and most valuable asset of the City in the Chapter 9 Case.

C.  **The City's Prepetition Efforts to Sell the Water Assets.**

35.    In February 2021, the City commenced a request for proposal process seeking bids to purchase the Water Assets. The City received three bids: $60 million from CWA; $410 million from Aqua; and $425 million from PAW. Assuming the Aqua and PAW bids were gross purchase prices, to validly compare those bids to CWA's bid, approximately $80 million of bond debt would first be satisfied from the Aqua and PAW bids,[4] resulting in approximately $330-345 million in

---

[4]  Plaintiff's research of CWA financials indicates about $80 million in bond debt, as does the June 3, 2025 credit downgrade report by Moody's (*see* ¶ 66 below), but the Receiver's first-day pleading indicates approximately $200 million. *See* Declaration of Vijay Kapoor in Support of the City of Chester, Pennsylvania's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code and First Day Pleadings [Dkt. No. 6] ("**Kapoor Declaration**"), ¶ 39. If the bond debt were $200 million, then the net bids by Aqua and PAW would be approximately $210-225 million, exceeding CWA's bid by approximately $150-165 million—still reflecting a very large disparity between CWA's bid and the private-sector bids of Aqua and PAW.

net sale proceeds before closing costs. Thus, the private-sector bids exceeded the CWA's bid by approximately $270-285 million.

36.    Shortly after the Commonwealth Court Decision was issued, on October 13, 2021, the Chester City Council voted unanimously to accept the Aqua bid. The Council resolution stated:

> [T]he City has determined that Aqua Pennsylvania Inc. … has submitted a bid that is in the best interest of the City and offers the greatest value to the City, as determined by the Mayor and City Council in consultation with the City's financial advisor.

37.    However, just one year before he put the City into bankruptcy, the Receiver rejected the sale, a $410 million transaction that could have yielded significant net proceeds to address Chester's financial problems.

**D.    The City's Bankruptcy Filing.**

38.    On November 10, 2022 (the "**Petition Date**"), the Receiver commenced the Chapter 9 Case on behalf of the City pursuant to chapters 1 and 9 of the Bankruptcy Code.

39.    As stated, the Retiree Committee was appointed by the Office of the United States Trustee pursuant to section 1102 of the Bankruptcy Code to represent the interests of the approximately 250 Retirees, along with the interests of their spouses, dependents, and survivors, in the Chapter 9 Case.

40.    The City's Retirees dedicated their careers to serving the City, its residents, and the surrounding community and, in exchange, agreed to and relied upon the promise by the City that a portion of their compensation would be deferred and distributed to them over the course of their retirement years as pension and healthcare benefits. As of the Petition Date, according to Mr. Kapoor, the unfunded portion of those pension and healthcare benefits totaled approximately $127 million and $232 million, respectively, making the Retirees the City's largest creditor group by

claim amount by more than 10-fold compared to the next largest creditor claim. *See* Kapoor Declaration, ¶¶ 17, 18.

41.     Today, many of the Retirees are elderly and rely heavily on the pension income and healthcare benefits they earned during their employment. The Retirees would suffer serious and irreparable harm if the City were unable to continue to honor its commitment to pay the Retirees their hard-earned pension and healthcare benefits.

42.     If the City is unable to honor its promises to the Retirees, the City itself will likely also suffer significantly (in addition to the irreparable harm generally of being denied potentially tens or hundreds of millions of dollars as a result of the flawed RFP Process). Among other consequences, the City will likely struggle to retain and attract high-level talent for its workforce, as current and prospective employees will opt to work for other municipalities that have honored their commitments to their employees and retirees. This, in turn, may have a significant negative impact on the quality of essential services that the City must provide to its residents and local businesses and, consequently, the ability of the City to retain and attract residents and businesses, impairing the rehabilitation of the City and its economy.

**E.  The Receiver's Plan to Monetize the Water Assets for Less Than Fair Market Value, to the Detriment of the City, its Residents, and its Retirees.**

43.     Nearly two years into the Chapter 9 Case, on August 26, 2024, the Receiver, on behalf of the City, filed the City's Plan for the Adjustment of Debts [Dkt. No. 583] (the "**Plan**").

44.     To be sure, the Plan was not a comprehensive plan of adjustment but more of an outline.

45.     For example, the Plan did not describe the treatment of the claims of the Retirees or other creditors, it did not describe initiatives to improve the City's economy, and it did not

describe how the City would achieve a balanced budget and deliver an appropriate level of essential services to the City's residents.

46.    In relevant part, the Plan merely announced the RFP Process through which the Receiver would seek to monetize the Water Assets after reacquiring them from CWA.

47.    But the Plan made clear that, despite the City's statutory right to sell the Water Assets to a non-governmental entity for fair market value pursuant to Act 12 (which permits municipalities to sell water and wastewater treatment facilities to non-governmental entities at fair market value), the Receiver's Value Limiting Policy would not entertain any bids in the RFP Process that would result in the Water Assets being acquired by a non-governmental entity. The Plan provides:

> **All proposals regarding the proposed sale, lease, disposition or other form of monetization of Stormwater Assets, Water Assets and/or Sewer Assets (collectively, the "RFP Assets") shall provide that the RFP Assets will remain publicly owned.**

Plan at 30-31 (emphasis in original).

48.    On September 3, 2024, the Retiree Committee filed its Initial Response to the Plan.

49.    The Initial Response detailed the Retiree Committee's initial objections to the Plan based on, among other things, the Receiver's refusal to involve the Retiree Committee in negotiations concerning the development of the Plan and the Receiver's stated intent to exclude bids by potential private-sector bidders for the Water Assets in favor of keeping the Water Assets in public hands.

50.    As the Retiree Committee noted in the Initial Response, "[b]y limiting the potential acquirers of the Water Assets and excluding private-sector entities, the Receiver is almost assuredly—and drastically—reducing the value to the City of any monetization transaction." Initial Response, ¶ 13.

51.     Given the significant impact that proceeds from the monetization of the Water Assets could have on the City and its long-term viability, to maximize the benefit to the City, all potential acquirers of the Water Assets, including private-sector entities, should have the opportunity to freely bid and propose ownership and transaction structures that facilitate value-maximizing sale transactions. Private-sector entities, like public-sector bidders, should be full participants in the process and not be artificially restrained by policy decisions that depress the Water Assets' sale price.

52.     Not only would the Receiver's Value Limiting Policy exclude fair market value offers for the Water Assets by private-sector bidders pursuant to Act 12, but it would almost certainly ensure that public-sector bidders, free from the fear of being out-bid by a private-sector bidder, would submit even lower bids than they otherwise would if they were competing with private-sector bidders.

53.     Whether or not the policy interest in maintaining public ownership of the Water Assets is viewed in certain political circles as a desirable policy, (a) it is not required under the law of Pennsylvania in light of Act 12, and (b) it is wholly inappropriate under the federal Bankruptcy Code for the Receiver—as the representative of the City in the Chapter 9 Case—to seek to implement that policy in the Chapter 9 Case at a massive cost to the City and its creditors, including particularly the Retirees.

54.     Even if the Receiver's efforts prepetition to maintain public ownership of the Water Assets were consistent with his role as an appointee of the Commonwealth under Act 47, as the representative of the City in the Chapter 9 Case, the Receiver's efforts postpetition to implement the Value Limiting Policy are ultra vires, being entirely inconsistent with and a violation of the Receiver's authority and duty under the Bankruptcy Code to maximize the value of the City's

assets in the Chapter 9 Case for the benefit of the City and its creditors and to generally act in the best interests of the City and its creditors.

55.    Indeed, if the Plan is premised on a sale of the Water Assets for less than the fair market value that could be obtained under Act 12, the Receiver will not be able to meet the "best interests of creditors" test for confirmation of the Plan under section 943(b)(7) of the Bankruptcy Code.

56.    Notwithstanding the Receiver's duties under the Bankruptcy Code and the requirements of, *inter alia,* section 943(b)(7) of the Bankruptcy Code, and despite the City's duly-elected Mayor and City Council's prepetition approval of the sale of the Water Assets to Aqua, the Receiver, as the City's putative, non-elected representative in the Chapter 9 Case, has continued to improperly adhere to his Value Limiting Policy in the RFP Process, excluding any stand-alone bid by Aqua or PAW and contravening the expressed will of the City.

57.    For example, during its October 22, 2024 and January 14, 2025 meetings, the Act 47 Municipal Financial Recovery Advisory Committee ("**MFRAC**"), led by the Receiver, repeatedly emphasized the Value Limiting Policy that the Water Assets remain publicly owned. *See* Water Asset Procurement presentation dated October 22, 2024 (the "**October 22 Presentation**")[5] at 2, 5, 12; Chester City Update presentation dated January 14, 2025[6] at 10, 11.

58.    According to the October 22 Presentation, in addition to "the requirement that the Water Assets remain publicly owned," the Receiver's "Paramount Objectives" in monetizing the Water Assets include:

---

[5] Available at https://static1.squarespace.com/static/66b0dc5f2ca26d3b6f8c7b6a/t/6717f002935c2a3833986aa6/1729622018495/MFRAC+-+Water+Asset+Procurement+10-22-24.pdf

[6] Available at https://static1.squarespace.com/static/66b0dc5f2ca26d3b6f8c7b6a/t/6786dbb4d6a24f6f491a9548/1736891316232/MFRAC+Presentation+-+Chester+City+Update+1-14-25.pdf

(i)      Maintaining affordable rates for all rate payers;

(ii)     Preserving pubic-sector employment opportunities;

(iii)    Preserving public access to, and use of, the Octoraro Reservoir, either through the creation of a land trust, or other protective measures;

(iv)     Promoting cost-effective capital reinvestment;

(v)      Enhancing service to customers by improving access to capital; and

(vi)     Boosting operation efficiency (reducing costs and improving service delivery.

October 22 Presentation at 5.

59.    Notably, the October 22 Presentation does not contain, and the Receiver has not offered, any explanation as to how objectives (ii) and (iii) above would benefit the City and its creditors, and thus, there is no identification of any nexus to the Receiver's duties under the Bankruptcy Code. Moreover, it appears that the Pennsylvania Department of Environmental Protection ("**DEP**") disputes the ability of the City or CWA to create a land trust governing public access to the Octoraro Reservoir. *See* Response of DEP to CWA motion for stay relief [Dkt. No. 611].

60.    Similarly, neither the October 22 Presentation nor the Receiver offers any explanation of how objective (i) above, which applies to "all" rate payers and not just the City's rate payers, pertains to the interests specifically of the City and its creditors in the Chapter 9 Case.

61.    The Receiver's apparent focus on all rate payers within the CWA service area is puzzling. It is the City that is in a chapter 9 bankruptcy, and it is the City, its residents, and its creditors that are the sole charge of the Receiver in the Chapter 9 Case.

62.    As of 2023, the median household income of the City's residents was $39,809 while the median household income of the townships and boroughs within the CWA service area,

excluding the City, was $110,729.[7] Again, as the putative representative of the City in the Chapter 9 Case, the Receiver's focus must be on the best interests of the City, its residents, and the Retirees, not on protecting against incremental increases in the water bills of vastly more prosperous non-Debtor communities.

63.     Moreover, there is no explanation of why maintaining affordable rates for the residents of the City cannot be achieved in connection with the sale of the Water Assets to a private-sector buyer through, for example, contractual mechanisms such as the creation of a rate stabilization fund for City residents or the funding or additional funding of customer assistance programs.[8] Indeed, a rate stabilization mechanism appears to have been part of the prepetition transaction negotiated between the City and Aqua.

64.     Objective (i) above also fails to define "affordable" rates. Presumably, rates, and a buyer's ability to maintain "affordable" rates, depend on, among other things, (a) the purchase price of the Water Assets, (b) the amount of projected capital expenditure that will be needed to maintain and improve the Water Assets, and (c) the future financial health of the entity that owns the Water Assets.

65.     However, the Receiver has not disclosed a baseline analysis of necessary and desirable capital expenditures for the Water Assets, and Plaintiff has no reason to believe such an analysis has even been conducted. Without this analysis, the Receiver will not be able to independently assess, for example, whether a bid for the Water Assets fails to include an appropriate level of future capital expenditures and reflects an artificially low or deficient rate

---

[7] The townships and boroughs identified to be serviced by CWA are available at https://chesterwater.com/map-data/. 2023 household income for the townships and boroughs within the CWA are available at https://censusreporter.org/ and https://www.census.gov/.

[8] We understand private-sector parties already offer customer assistance programs for Pennsylvania residents.

projection. A deficient rate that does not responsibly and comprehensively address future capital

expenditure needs for the Water Assets (which, for example, could lead to system infrastructure

issues, reduction in services, incurrence of new debt or liabilities to fund repairs with these costs

passed along to ratepayers) is not in the best interest of any rate payer in the long-term and is not

truly "affordable."

66.    Notably, on June 3, 2025, credit rating agency Moody's downgraded the credit

rating of CWA to Aa3 from Aa2. A primary basis cited by Moody's for the downgrade is:

> the decline in debt service coverage and liquidity caused by a
> contraction in usage by a major wholesale customer; it will require
> several years of rate increases for the authority to build its cash
> position to a level more comparable with peers. . . . The CWA's debt
> service coverage (1.35x in 2023) and liquidity (days cash on hand
> 164) are weak compared to most highly rated peers . . . .

*See* Moody's Ratings downgrades Chester Water Authority, PA to Aa3 from Aa2, rating remains

on review for downgrade, dated June 3, 2025, available at https://www.moodys.com/research/

Moodys-Ratings-downgrades-Chester-Water-Authority-PA-to-Aa3-from--PR_909188354.

67.    Thus, according to Moody's, CWA's weak financials will likely lead to CWA

increasing water rates—ironically, precisely what the Receiver has asserted is less likely to occur

with a public-sector operator. And such a downgrade will likely result in CWA's cost of capital

rising, contrary to objective (iv) above.

68.    Further, the Receiver has not disclosed a long-term budget forecast for the City

showing how the proceeds from monetizing the Water Assets would be used to address structural

annual budget deficits (including the Retirees' underfunded pension and healthcare benefits),

provide essential services to the City's residents, and kick-start the City's economic rehabilitation.

Presumably, the Receiver must weigh its objective of maintaining affordable rates for rate payers

outside of the City with how to fund the City's future annual budgets, which currently rely on,

among other sources of revenue, federal funding and grants that are expiring and the distressed pension earned income tax.

69.    As to objectives (iv), (v), and (vi) above, ironically, all those objectives are routinely viewed by the Public Utility Commission ("**PUC**") as bases for approving sales of water and wastewater systems to *private-sector* entities under Act 12. Of the 22 sale transactions approved by the PUC under Act 12 since its passage in 2016, the majority of PUC approvals cite as reasons for approving the transactions (mostly with Aqua or PAW as the purchaser) some combination of the following factors: the greater access to capital of the private-sector purchaser (particularly relevant here in light of the Moody's downgrade of CWA referenced in paragraphs 66 and 67 above); the economies of scale and resulting operating efficiencies of a larger private-sector purchaser; and the greater access to technology, expertise, and other resources of the larger private-sector purchaser. None of these objectives are supported by the Value Limiting Policy.

70.    On May 2, 2025, after notifying qualified bidders that they were qualified to continue participating in the RFP Process, the Receiver released the request for bid ("**RFB**") portion of the RFP Process, inviting those qualified participants to bid on the Water Assets.

71.    Through the RFB, the Receiver once again emphasizes his Value Limiting Policy of excluding private entities from bidding on a stand-alone basis to own the Water Assets, *see* RFB at 2,[9] despite the private sector's ability to pay fair market value for the Water Assets and the public sector's general unwillingness and/or inability to do so, and thus inviting the loss of potentially hundreds of millions of dollars of value for the City, its residents, and its Retirees.

72.    Upon information and belief, even if private-sector bidders are permitted to participate in a non-ownership role via a concession agreement, leasing agreement, management

---

[9] Available at https://static1.squarespace.com/static/66b0dc5f2ca26d3b6f8c7b6a/t/6818c0b36728d860276e7bad/1746452659808/5.2.2025-Request+for+Proposals+for+Chester+Water+Wastewater+and+Stormwater+Assets.pdf

agreement, or other such arrangement with a public-sector entity, forcing private-sector entities to contort themselves to fit the Receiver's constraining policy objective of public ownership of the Water Assets via the Value Limiting Policy will greatly limit the number and value of bids in the RFP Process for the Water Assets, destroying the ability to receive fair market value under Act 12 and massively reducing the ultimate proceeds from such transaction to the tremendous detriment of the City, its residents, and its creditors, including the Retirees.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Declaratory Judgment against the Receiver)

73.     Plaintiff reasserts and realleges the allegations contained in paragraphs 1 through 72 above as if fully set forth herein.

74.     The Bankruptcy Code reflects two governing policies: (1) that an honest debtor has a right to a "fresh start," and (2) that bankruptcy cases are to be conducted in the best interests of creditors to maximize such creditors' recoveries from the debtor's estate.

75.     The Bankruptcy Code contains no provision, nor does any legislative history or other scholarship indicate, that the Bankruptcy Code can properly be used to implement policies of a non-debtor or non-creditor third party in derogation of the interests of the debtor in obtaining a fresh start and of the creditors in obtaining a maximal recovery from the debtor.

76.     In order to ensure the faithful discharge of these duties to the debtor and its creditors, the Bankruptcy Code requires that those representing the debtor be "disinterested"—that is, that they do not hold or represent any interest that is adverse to the debtor or its estate.

77.     For example, the trustee in a chapter 7 case must be "disinterested" pursuant to Bankruptcy Code section 701(a)(1). 11 U.S.C. 701(a)(1).

78.     Similarly, bankruptcy professionals appointed by a debtor or trustee in the context of a chapter 7, 11, or 13 case must also be disinterested. *See* 11 U.S.C. 327(a).

79.     Here, in the Chapter 9 Case, the City is represented by the non-elected, Commonwealth-appointed, and Commonwealth-compensated Receiver.

80.     Although Bankruptcy Code section 701 is not incorporated into chapter 9 pursuant to section 901 of the Bankruptcy Code, section 902(5) of the Bankruptcy Code generally equates the chapter 9 debtor with the concept of a trustee.

81.     Moreover, the Receiver, as the representative of the City in the Chapter 9 Case, can sue and be sued in that capacity, in the same way a trustee can sue and be sued under section 323 of the Bankruptcy Code.

82.     Thus, while a state-appointed and state-compensated representative of a chapter 9 debtor, such as the Receiver, may not (by definition) be disinterested in the traditional sense required of a trustee under chapters 7, 11, and 13, it is indisputable that the Receiver, as the City's representative in the Chapter 9 Case, has duties and obligations to act in the best interests of the City, its residents, and its creditors—and not to blindly pursue policy goals (including those perhaps of the Commonwealth or other political entities) without regard for their impact on the City's rehabilitation or the right of the City's creditors to an optimal recovery through the bankruptcy process.

83.     The Receiver's duties to its creditors in this regard is reflected in, *inter alia,* the "best interests of creditors" test under section 943(b)(7) of the Bankruptcy Code, which must be satisfied in order to obtain confirmation of a plan of adjustment. And, clearly, selling the Water Assets pursuant to the current RFP Process at a fraction of the price obtainable for those assets is not in the best interests of the Retirees and other creditors.

84.    The catastrophic impact of the massive loss of value in the RFP Process that is likely to result from the Value Limiting Policy will be borne by the City, its residents, and the Retirees. To essentially have the City, its residents, and the Retirees pay for a public policy initiative of the Receiver and/or other non-debtor third parties is outrageous, inequitable, and antithetical to the policies and process under chapter 9 of the Bankruptcy Code.

85.    Accordingly, Plaintiff seeks a declaration that, by conducting the RFP Process in accordance with the Value Limiting Policy and thereby forgoing the State-law sanctioned opportunity to obtain fair market value for the Water Assets through a sale to a private-sector entity under Pennsylvania's Act 12 and thus inviting the loss of potentially hundreds of millions of dollars in value, the Receiver is breaching his fiduciary duty to the City and its creditors under the Bankruptcy Code.

## SECOND CAUSE OF ACTION
### (Injunction against the Receiver)

86.    Plaintiff reasserts and realleges the allegations contained in paragraphs 1 through 85 above as if fully set forth herein.

87.    By implementing the Value Limiting Policy restricting the universe of potential bidders in the RFP Process by requiring ultimate public ownership of the Water Assets, the Receiver is unnecessarily and drastically depressing the value that could be realized through a sale of the Water Assets in the RFP Process pursuant to Act 12.

88.    Should the Receiver continue pursuing the Value Limiting Policy, the resulting sale of the Water Assets to a public entity for less than fair market value and the loss of potentially hundreds of millions of dollars in sale proceeds will irreparably harm the City in its rehabilitation efforts under chapter 9 and irreparably harm its citizens and creditors, particularly the Retirees.

89.     If the Receiver does not obtain fair market value for the Water Assets, there is a substantial likelihood of the Receiver seeking under a plan of adjustment to impair Retirees' recoveries with respect to their pension and healthcare benefits to a degree that would be entirely unnecessary in the event of a fair market value transaction and cause unnecessary and tragic harm to the lives of the Retirees, their spouses, dependents, and survivors.

90.     If the Receiver does not obtain fair market value for the Water Assets, the resulting damage to the City's rehabilitation would also put at risk the future payments to Retirees under a plan of adjustment that depend on the City's future existence and financial health.

91.     This potential toll of the Value Limiting Policy on the City and the Retirees is arbitrary, capricious, unconscionable, and antithetical to the policies and process under chapter 9 of the Bankruptcy Code

92.     Accordingly, to prevent such irreparable harm, Plaintiff seeks an injunction preventing the Receiver from continuing to pursue the Value Limiting Policy and requiring that the universe of potential purchasers of the Water Assets be expanded to allow for private-sector ownership as permitted under Act 12 to ensure maximum value is achieved.

## THIRD CAUSE OF ACTION
### (Violation of the Automatic Stay against the Receiver)

93.     Plaintiff reasserts and realleges the allegations contained in paragraphs 1 through 92 above as if fully set forth herein.

94.     Under section 362 of the Bankruptcy Code, a petition commencing a bankruptcy case operates as a stay of, among other things, "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate. 11 U.S.C. § 362(a)(3).

95.     As a representative of creditors (*i.e.*, the Retirees) in the Chapter 9 Case, Plaintiff has standing to seek damages for violation of the automatic stay under section 362(k)(1) of the Bankruptcy Code. *See In re Scungio Borst & Assocs., LLC*, 652 B.R. 644, 655 (Bankr. E.D. Pa. 2023) (Chan, J.) ("Finally, the Court observes that courts have repeatedly found that creditors have standing to seek damages under § 362(k)(1) as they are clearly intended beneficiaries of § 362(a) of the Bankruptcy Code as without it, certain creditors would be able to pursue their own remedies against the debtor's property first to the detriment of other creditors, threatening the Bankruptcy Code's policy of ensuring all creditors are treated fairly and equitably.").

96.     The Debtor in the Chapter 9 Case is the City.

97.     The Water Assets are an asset of the City.

98.     The Receiver is not the Debtor in the Chapter 9 Case, but rather was appointed by the Commonwealth pursuant to Act 47 to manage the City prepetition, which role has continued postpetition in the Chapter 9 Case.

99.     The Receiver's willful imposition of the Value Limiting Policy upon the City's Water Assets pursuant to the RFP Process (regardless of whether it is on his own behalf or that of another non-debtor third party), in contravention of the City's rights under Act 12, constitutes an act by the Receiver as a third party (*i.e.*, ultra vires relative to his scope of authority in the Chapter 9 Case) or as an agent of another third party to exercise control over property of the City in violation of the automatic stay.

100.    The Receiver's violation of the automatic stay is likely to cause a disastrous, irreparable impairment of the value of the Water Assets to the City, with catastrophic consequences for the City, its residents, and the Retirees.

101.    Such conduct constitutes a blatant violation of section 362(a)(3) of the Bankruptcy Code.

102.    Accordingly, Plaintiff seeks injunctive relief, damages, and such other relief as the Court deems appropriate resulting from this violation of the automatic stay.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against the Receiver as follows:

i.      A declaratory judgment in Plaintiff's favor declaring that the Receiver has breached and is breaching his fiduciary duties under the Bankruptcy Code to the City and its creditors by inappropriately including the Value Limiting Policy in the RFP Process to monetize the Water Assets;

ii.     An injunction in Plaintiff's favor prohibiting the Receiver from continuing to include the Value Limiting Policy in the RFP Process to monetize the Water Assets and requiring the Receiver to properly accommodate bids in the RFP Process by private-sector entities pursuant to Pennsylvania's Act 12;

iii.    An award of damages (including attorneys' fees to the fullest extent available by law) against the Receiver and/or any non-debtor third party on whose behalf, upon discovery, it is determined that the Receiver is acting by imposing the Value Limiting Policy, for violation of the automatic stay;

iv.     Post-judgment interest at the maximum rate allowable by law; and

v.      Any such other and further relief as the Bankruptcy Court deems just and proper.

Dated: June 11, 2025
      Philadelphia, Pennsylvania

**FLASTER/GREENBERG P.C.**

By: */s/ William J. Burnett*
    William J. Burnett, Esquire
    1717 Arch Street, Suite 3300
    Philadelphia, Pennsylvania 19103
    Tel: (212) 279-9383
    william.Burnett@flastergreenberg.com

**HERRICK, FEINSTEIN LLP**

    Robert D. Gordon, Esquire
    Nicholas G.O. Veliky, Esquire
    Two Park Avenue
    New York, New York 10016
    Tel: (212) 592-1400
    Fax: (212) 592-1500
    rgordon@herrick.com
    nveliky@herrick.com

*Counsel for The Official Committee of
Retired Employees of the City of Chester
Pennsylvania*

11821830 v1

## VERIFICATION

I, Alan Davis, acting as the Co-Chair of the Official Committee of Retired Employees of the City of Chester, Pennsylvania (the "Retiree Committee"), state that I am authorized to make this Verification on behalf of the Retiree Committee and that: I have read the foregoing Complaint; and that the facts set forth therein are true and correct to the best of my knowledge, information and belief. I declare under the penalty of perjury and under the laws of the United States that the foregoing statements are true and correct to the best of my knowledge, information and belief.

Dated: June 11, 2025

_____
                                        Alan Davis

**VERIFICATION**

I, Charles Bolgunas, acting as the Co-Chair of the Official Committee of Retired Employees of the City of Chester, Pennsylvania (the "Retiree Committee"), state that I am authorized to make this Verification on behalf of the Retiree Committee and that: I have read the foregoing Complaint; and that the facts set forth therein are true and correct to the best of my knowledge, information and belief. I declare under the penalty of perjury and under the laws of the United States that the foregoing statements are true and correct to the best of my knowledge, information and belief.

Dated: June 11, 2025

_____
Charles Bolgunas