**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 9 |
| CITY OF CHESTER, PENNSYLVANIA, | : | |
| | : | Case No. 22-13032-amc |
| Debtor. | : | |
| | : | |
| CITY OF CHESTER, PENNSYLVANIA, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| DELAWARE COUNTY REGIONAL WATER QUALITY CONTROL AUTHORITY and AQUA PENNSYLVANIA WASTEWATER, INC., | : | Adv. Proc. No. _____ |
| Defendants. | : | |

**COMPLAINT**

The City of Chester (the "City"), the debtor in the above-captioned chapter 9 case (the "Chapter 9 Case"), by its undersigned attorneys, for its complaint against Delaware County Regional Water Quality Control Authority ("DELCORA") and Aqua Pennsylvania Wastewater, Inc. ("Aqua") asserts as follows:

**Jurisdiction and Venue**

1. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

3. Venue for this matter is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The City consents to entry of final orders or judgments by this Court in this adversary proceeding.

**Parties**

5.     The City is a municipality in the Commonwealth of Pennsylvania and the debtor in the Chapter 9 Case pending before this Court.

6.     DELCORA is a municipal authority organized under the laws of the Commonwealth of Pennsylvania with its principal place of business located at 100 East Fifth Street, Chester, PA 19013.

7.     The City and DELCORA are parties to an Agreement of Sale and Service dated February 12, 1973 (the "1973 Agreement") and a Facilities Easement dated November 26, 2014 (the "Easement").

8.     Aqua is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business located at 762 W. Lancaster Avenue, Bryn Mawr, PA 19010.

**Factual Background**

**A.  DELCORA.**

9.     DELCORA is a municipal authority established by Delaware County, Pennsylvania under the Pennsylvania Municipal Authorities Act, 53 Pa. C.S. §§ 5601 *et seq.* (the "MAA") and incorporated on October 20, 1971 to collect, convey, and treat wastewater generated by residents and businesses located in Delaware County.

10.     DELCORA owns and operates sewer collection systems serving 46 municipalities in Delaware and Chester Counties.

11.     DELCORA is governed by a nine-member board appointed entirely by Delaware County Council.

2

**B.  The Appointment of the Receiver and the Chapter 9 Case.**

12.     On June 1, 2020, Michael Doweary was nominated pursuant to the Pennsylvania Municipalities Financial Recovery Act, Act of 1987, P.L. 246, No. 47 ("Act 47") by the Secretary of the Pennsylvania Department of Community and Economic Development (the "Secretary"), to serve as receiver for the City.  On June 22, 2020, Mr. Doweary's appointment as receiver was confirmed by the Commonwealth Court of Pennsylvania (the "Commonwealth Court").

13.     On January 14, 2022, Mr. Doweary requested authorization from the Secretary to commence a proceeding under chapter 9 of the Bankruptcy Code on behalf of the City.  On February 8, 2022, the Secretary provided written authorization under Act 47 to file a municipal debt adjustment action on behalf of the City.

14.     On November 10, 2022, Mr. Doweary, as receiver, on behalf of the City, filed a voluntary petition under chapter 9 of the title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") before the United States Bankruptcy Court for the Eastern District of Pennsylvania.

15.     Vijay Kapoor (the "Receiver") was nominated by the Secretary to replace Mr. Doweary as the Receiver on March 13, 2025.  Mr. Kapoor's nomination was confirmed by the Commonwealth Court on March 25, 2025 and Mr. Kapoor assumed the role of the Receiver on July 1, 2025.

16.     The City and DELCORA entered into a series of tolling agreements (the "Tolling Agreement") extending the date by which the City was required to file any claims under 11 U.S.C. § 108(a).  The City and DELCORA have agreed to extensions of the Tolling Agreement, most recently to February 23, 2026.

17.      On August 26, 2024, the City filed the *Plan of Adjustment of Debts of the City of*

3

*Chester* [Bk. Dkt. No. 583] (the "Plan").  The Plan contemplates the monetization of the City's

rights under the 1973 Agreement and/or the sewer system within the City subject to the City's

reversionary interest under the 1973 Agreement.

**C.  The 1973 Agreement.**

18.    On February 12, 1973, the City, the Chester Sewer Authority, and DELCORA

entered into the 1973 Agreement.  A copy of the 1973 Agreement is attached as **Exhibit 1**.

19.    At the time the 1973 Agreement was executed, the City owned facilities used for

collecting, transporting, and treating sewage within the City and in adjoining areas with a defined

"Service Area."   *See* 1973 Agreement, First Recital.   The City also received sewage from

municipal systems outside the Service Area pursuant to various agreements, defined as "Municipal

Agreements."  *Id.*

20.    The City agreed to sell to DELCORA:

[A]ll of the property, real, personal and mixed, constituting Seller's system for the
collection, transportation and treatment of sewage, including without limitation, all
of the following types of property which together are . . . called the 'Sewer
Properties':

(a)    The real property, together with all structures and improvements
thereon, including without limitation, the sewage treatment plant and all Seller's
land at the location of said plant, as described on Exhibit B attached [to the 1973
Agreement], pumping stations and such land around them as may be necessary for
future use and expansion, based upon surveys to be obtained by [the City] and
approved by [DELCORA], fixtures, private rights-of-way and other interests in
land (all being . . . referred to as the "Real Property");

(b)    All sewer mains, interceptors, force mains, collection systems,
valves, pumps, machinery, equipment, siphons, regulators and tied gates, inventory,
small tools, office equipment, furniture, supplies, customer lists and accounts,
franchises, licenses, sewage permits, accounts receivable and unbilled revenues
subject to Section 12 [of the 1973 Agreement], contract rights and related assets,
all rights in connection with Federal, State or other grant, loan or similar
applications for assistance with sewer projects (including without limitation [the
City's] pending application for  State subsidy under Act 13 (Harness Racing), to
the extent permitted by law, and all documents and papers used or held for use by

4

[the City] in the operation of the Sewer Properties, but not including cash, bank accounts or securities (all being . . . referred to together as the "Personal Property"). Books, records, maps, surveys, drawings, engineering and financial studies and reports, plans, of [the City] that [the City] is now using and may need in the future, shall be available for [DELCORA's] inspection, and [DELCORA] may make such copies as it requires, at its expense.  The tract of Real Property at the location of [the City's] existing sewage treatment plant (as shown on . . . Exhibit B), together with said plant and all of the Personal Property on said tract is . . . referred to as the "Treatment Plant", and all of the remainder of the Sewer Properties are herein referred to as the "Collection System";

(c)      All collectors and interceptors used as combined sewers, for sanitary wastes and storm drainage, subject to the provisions of Section 15.3 [of the 1973 Agreement], but excluding all mains which are used exclusively for storm drainage; and

(d)      All contracts and related rights (excluding accounts receivable and unbilled revenues) arising under the Municipal Agreements.

1973 Agreement § 1.

21.      Following the closing of the transaction contemplated by the 1973 Agreement, DELCORA was obligated to continue providing sewer services within the City and certain adjoining areas.  Specifically, Section 15.1 of the 1973 Agreement provides:

Following completion of the Closing [DELCORA] shall have the exclusive right **and duty** to provide collection, transportation, treatment and disposal of sanitary sewage and industrial wastes (but not storm or surface drainage, except in existing combined sewers subject to Section 15.3 hereof) in the Service Area, to the fullest extent permitted by law within [the] City limits and only limited elsewhere by the provisions of [the City's] existing agreements with private users and shall have the same right and duty outside the Service Area to the extent provided by the Municipal Agreements as they may be amended.

*Id.* § 15.1 (emphasis supplied).

22.      Section 16.5 of the 1973 Agreement also provides:

It is the intent of the parties that DELCORA will acquire, own, maintain, and operate the property of the Seller, and supply sewage treatment and collection service in accordance with the provisions of this Agreement, even though the proposed new treatment plant is not built at this time.

*Id.* § 16.5.

23.      Section 15.6 of the 1973 Agreement provides:

The provisions of this Section 15 shall continue in force for a term ending November 17, 2022 and thereafter for a term as long as the existence of the Authority unless terminated by either party on one year's notice prior to the end of the then-current term.

*Id.* § 15.6.

24.      The 1973 Agreement does not define the term "Authority."  The parties to the 1973 Agreement understood, and understand, that term to refer to DELCORA, which is itself a municipal authority under the MAA.

25.      However, if the term "Authority" means the Chester Sewer Authority, that entity has not been dissolved in accordance with section 5619(c) of the MAA.  *See* 53 Pa. C.S. § 5619(c).

26.      Section 15.7 of the 1973 Agreement provides:

If at any time in the future during the term of this Section 15 or at the end thereof, Buyer ceases to operate the system being purchased by it hereunder, then the fixed assets and the Real Property, other than the Treatment Plant and those facilities in the Collection System described in Section 2(d) shall revert to Seller's ownership rather than to the County of Delaware or any other agency."

1973 Agreement § 15.7 (the "Reversionary Provision").

27.      Section 2(d) of the 1973 Agreement provides:

For those facilities in the Collection System used to transport in combination sewage from within the City limits of Seller and sewage from outside, an amount which bears the same proportion to the total value of such facilities, 2,551,926, as the number of equivalent dwelling units located outside said City limits and served by said facilities bears to the total of all equivalent dwelling units served by said facilities, all as jointly determined by the Consulting Engineers of the parties hereto.

*Id.* § 2(d).

28.      Section 16.3 of the 1973 Agreement provides:

This Agreement sets forth the entire understanding of the parties, shall be governed by the laws of the Commonwealth of Pennsylvania, **shall not be assigned by either party hereto**, and all amendments to it shall be in writing and signed by both parties

hereto.

*Id.* § 16.3 (the "Anti-Assignment Provision") (emphasis supplied).

29.     The 1973 Agreement was amended as of January 21, 1986. *See* **Exhibit 2** (the "Amendment").  The Amendment did not alter sections 15.1, 15.6, 15.7, or 16.3 of the 1973 Agreement. *See id.*

### D.  The Easement.

30.     On November 26, 2014, DELCORA and the City entered into the Easement to permit DELCORA to operate and maintain a pipeline on, under, and as part of property of the City (the "Easement"), related to use of a 48-inch force main and related facilities located underneath real property within the City.  A copy of the Easement is attached as **Exhibit 3**.

31.     Section 4 of the Easement provides, in relevant part, as follows:

> DELCORA and the CITY agree that DELCORA shall pay the following for this easement: (a) Seventy Five Thousand Dollard ($75,000) in immediately available funds payable upon the date of the CITY's execution and delivery of this Agreement to DELCORA; and (ii) ten percent (10%) of any proceeds received by DELCORA from the sale or lease of the easement by DELCORA to any third party (the "Revenue Stream").  DELCORA shall include in any agreement of sale or lease relating to the easement with any third party a provision placing such third party on notice of the right of the CITY to receive the Revenue Stream hereunder . . . .

Easement § 4.

### E.  The Aqua Asset Purchase Agreement.

32.     DELCORA and Aqua entered into an Asset Purchase Agreement ("APA") dated September 17, 2019, as amended by a First Amendment to Asset Purchase Agreement dated February 24, 2020 (collectively, as defined above, the "APA").  A copy of the APA is attached as **Exhibit 4**.

33.     Through the APA, DELCORA agreed to sell and transfer to Aqua, among other

assets, the assets subject to the Reversionary Provision, the 1973 Agreement, and the Easement.

This sale is to be effectuated through several provisions of the APA, including:

i.   Acquired Assets – Section 2.01 of the APA defines the assets being acquired by Aqua as the "Acquired Assets," which include, among other assets:

(a) "all real property and appurtenant interests necessary for the operation of the System,[1] including without limitation . . . all Easements, including without limitation those identified on Schedule 4.09";

(b) "all sanitary wastewater treatment, disposal, sludge receiving assets and conveyance facilities, including but not limited to [DELCORA's] buildings, pipes, pipelines, treatment facilities, odor control stations, pumping stations, lift stations, holding tanks storage tanks, plants, structures, improvements, [and] fixtures";

(c) "all contracts, licenses and Leases identified on Schedule 4.15 to which [DELCORA] is a party (the 'Assigned Contracts')"; and

(e) "all personal property and fixed assets . . . ."

APA § 2.01.

ii.   Assigned Contracts.  The 1973 Agreement appears among the "Assigned Contracts" identified on Schedule 4.15 to the APA.  *See id.* § 2.01(c); Schedule 4.15, Item 119.

iii.   Easements.  The Easement is enumerated among the easements being acquired by Aqua on Schedule 4.09 to the APA.  *See id.* Schedule 4.09.

34.   Nothing in the APA contemplates paying the City for any assets subject to the Reversionary Provision or the 1973 Agreement or remitting or preserving the Revenue Stream under the Easement.  Nor does the APA identify the value of the Easement or address paying the City 10% of the Revenue Stream.

**F.  DELCORA'S Conversion Into a Trust and the Trust Agreement.**

35.   On December 18, 2019, DELCORA amended its Articles of Incorporation to

---

[1]   The term "System" is defined as "that certain sanitary wastewater collection and treatment system that provides sanitary wastewater service to various customers in Delaware County, Pennsylvania."  APA at 1, First Recital and Art. I.

8

change the purpose of DELCORA to dissolve DELCORA, sell its assets, and establish a trust for the benefit of its rate payers with the proceeds from the sale of its assets. Specifically, DELCORA added the following language to its Articles of Incorporation:

> In anticipation of the dissolution of the Authority and/or the transfer and sale of all or substantially all of the Authority's assets, property and projects in exchange for a cash payment, the Authority and its Board, in addition to any other authority granted by applicable law, shall have the full authority, without limitation, to: (1) establish a trust or non-profit entity to exist for the benefit of rate payers to distribute to rate payers some or all of the proceeds from any transfer and sale, in accordance with applicable law and any agreements concerning the transfer and sale of any assets and/or the Authority's dissolution; and (2) execute any necessary agreement to effectuate this purpose prior, during or after any transfer and sale and/or dissolution.

*See* **Exhibit 5**.

36.    Also on December 18, 2019, Delaware County Council adopted Ordinance 2019-4, authorizing the same amendment to DELCORA's Articles of Incorporation. *See id.*

37.    On December 27, 2019, DELCORA entered into the DELCORA Rate Stabilization Fund Trust Agreement (the "Trust Agreement") with Univest Bank and Trust Co. through which DELCORA would establish a trust (the "Trust") for the benefit of DELCORA's former customers (as of the closing of the sale to Aqua), into which the net sale proceeds from the sale of DELCORA to Aqua would be placed, and from which distributions would be made to former DELCORA customers to ameliorate the impact of rate increases imposed upon those former customers by Aqua following its acquisition of DELCORA's assets. *See* **Exhibit 6**.

**G. The PUC Proceeding Commenced By Aqua.**

38.    On March 3, 2020, Aqua filed a formal application (the "PUC Application") before the Pennsylvania Public Utility Commission (the "PUC") initiating a proceeding for approval of the transaction contemplated by the APA (the "PUC Proceeding"). Specifically, the PUC

Application seeks approval of, among other things: "the acquisition by Aqua of the wastewater systems of DELCORA situated within all or part of 49 municipalities within portions of Chester and Delaware Counties, Pennsylvania;" and "assignments of 163 municipal contracts, between Aqua and DELCORA." *See* **Exhibit 7** (without exhibits).

39.     On June 22, 2022, the Receiver filed a petition to intervene in the PUC Proceeding. Aqua opposed that petition.  An administrative law judge denied the Receiver's application to intervene in the PUC Proceeding on August 3, 2022. *See* Bk. Dkt. No. 536, Exhibit A.  Accordingly, the Receiver has been denied the opportunity to participate in the PUC Proceedings.

40.     On August 8, 2022, the Bureau of Investigation and Enforcement of the PUC (the "BIE") submitted a Prehearing Memorandum for Remand of Proceeding, which noted that the PUC, DELCORA, and Aqua were disregarding the City's reversionary interest and that DELCORA was attempting to transfer assets that it does not own as a result of the Reversionary Provision.   A copy of the BIE's memorandum is attached as **Exhibit 8**.

**H.  Automatic Stay Litigation in the Chapter 9 Case.**

41.     On February 3, 2023, the City filed a *Motion of Debtor Pursuant to Section 362 of the Bankruptcy Code for Entry of an Order Enforcing the Automatic Stay of Proceedings Pending Before the Pennsylvania Public Utilities Commission* [Bk. Dkt. No. 211] (the "Motion to Enforce") in the Chapter 9 Case.  Through the Motion to Enforce, the City sought to: (i) enforce the automatic stay under section 362(a)(3) of the Bankruptcy Code to halt the PUC Proceeding; (ii) bar DELCORA and Aqua from continuing the PUC Proceeding without relief from the automatic stay; and (iii) bar the PUC from continuing the PUC Proceeding.

42.     Aqua filed its opposition to the Motion to Enforce on February 16, 2023. *See* Bk. Dkt. No. 236 ("Opposition to Motion to Enforce").  Aqua included a procedurally improper request

10

for relief from the automatic stay in the Opposition to Motion to Enforce. *See id.* at ¶¶ 18-22; Fed. R. Bankr. P. 4001(a).

43. The City filed its reply in support of the Motion to Enforce on February 23, 2023. *See* Bk. Dkt. No. 243.

44. On March 7, 2023, the Bankruptcy Court entered an *Interim Order Granting the Motion of Debtor Pursuant to Section 362 of the Bankruptcy Code for Entry of an Order Enforcing the Automatic Stay of Proceedings Before the Pennsylvania Public Utility Commission* [Bk. Dkt. No. 259] (the "Interim Stay Order"). In the Interim Stay Order, the Bankruptcy Court granted the Motion to Enforce on an interim basis and denied, without prejudice, Aqua's procedurally improper motion for relief from the automatic stay.

45. Additionally, in the Interim Stay Order, the Bankruptcy Court directed that: "During the 60-day period following entry of this Order, Aqua, DELCORA, and the City shall promptly engage in a good faith effort to identify and agree upon the assets subject to the City's reversionary interests under the 1973 Agreement (the 'Reversionary Interest')." Interim Stay Order at ¶ 4.

46. The City, DELCORA, and Aqua were not able to agree on the assets subject to the Reversionary Provision.

47. The Bankruptcy Court held a further hearing on the Motion to Enforce on May 15, 2023. *See* Bk. Dkt. 329 (the "5/13/23 Hrg. Tr."). During the May 15, 2023 hearing, Aqua argued that it had identified the assets subject to the Reversionary Provision and provided a list of those assets, with which the City disagreed. *See* 5/13/23 Hrg. Tr. at 11:18-14:4. DELCORA expressed its view that the assets subject to the Reversionary Provision include only assets in existence in 1973 and that DELCORA would need to obtain an engineering report to identify the assets subject

11

to the Reversionary Provision. *Id.* 17:24-21:12. The City asserted that the entire sewer system as it exists presently reverts back to the City under the Reversionary Provision. *Id.* 8:20-25; 11:1-2.

48. On May 23, 2023, the Bankruptcy Court entered an *Order Granting the Motion of Debtor Pursuant to Section 362 of the Bankruptcy Code for Entry of an Order Enforcing the Automatic Stay of Proceedings Before the Pennsylvania Public Utility Commission* [Bk. Dkt. No. 351] (the "Final Stay Order"), in which the Bankruptcy Court granted the Motion to Enforce on a final basis, holding that the automatic stay applies to the PUC Proceeding.

49. In the Final Stay Order, the Bankruptcy Court stated: "[I]t will be impossible to determine what assets are included in the Debtor's Reversionary Interest without further . . . time and expense given DELCORA's need to obtain an engineering report and the necessary litigation that must occur in order to do so." Final Stay Order at ¶ 25.

50. In the Final Stay Order, the Bankruptcy Court also found that "[i]n executing the APA, DELCORA has attempted to assign its rights and obligations under the 1973 Agreement to Aqua, which unequivocally violates the anti-assignment provision in § 16.3 of the 1973 Agreement such that the APA is unenforceable against the Debtor." *Id.* ¶ 26.

51. Additionally, the Bankruptcy Court recognized that the City's rights under the Reversionary Provision give rise to a property interest subject to protection of the automatic stay under the Bankruptcy Code. *Id.* ¶ 27.

52. Aqua filed an appeal from the Final Stay Order to the United States District Court for the Eastern District of Pennsylvania. *See, e.g.*, *In re City of Chester, Pa.*, Case No. 2:23-cv-02151-MRP (E.D. Pa.) (the "Aqua Appeal").

53. The issues raised by Aqua in the Aqua Appeal relate entirely to the Bankruptcy Court's decision in the Final Stay Order that the automatic stay applies to the PUC Proceedings.

12

*See* Bk. Dkt. No. 379 at 3-4 (Statement of the Issues to Be Presented on Appeal). Aqua did not appeal from the Bankruptcy Court's holding that the City's rights under the Reversionary Provision are a property interest of the City. The Aqua Appeal is fully briefed and remains pending.

54.     On February 8, 2024, Aqua filed the *Motion for Relief from the Automatic Stay of Aqua Pennsylvania, Inc.* [Bk. Dkt. No. 536] (the "Aqua Lift Stay Motion"). In the Aqua Lift Stay Motion, Aqua sought relief from the automatic stay to allow the PUC Proceeding to resume, making essentially the same arguments it had already made in its opposition to the Motion to Enforce and in the Aqua Appeal.

55.     The City filed its objection to the Aqua Lift Stay Motion on February 21, 2024. *See* Bk. Dkt. No. 542. Aqua filed a reply in support of the Aqua Lift Stay Motion on March 4, 2024. *See* Bk. Dkt. No. 544.

56.     The Bankruptcy Court entered an order denying the Aqua Lift Stay Motion on April 11, 2024. *See* Bk. Dkt. No. 549. Aqua did not appeal from that order.

## COUNT I
*Declaratory Judgment Under 28 U.S.C. § 2201*
*To Determine the Assets Included Within the Reversionary Provision*
*Against DELCORA and Aqua*

57.     The City incorporates each of the preceding paragraphs as if fully restated herein.

58.     Under 28 U.S.C. § 2201, this Court has the power to declare the rights and obligations of parties when an actual controversy exists between those parties. *See* 28 U.S.C. § 2201(a).

59.     The City asserts that the Reversionary Provision applies to all existing assets necessary for the City to maintain a sewer system within the City, excluding the Treatment Plant and the assets described in Section 2(d) of the 1973 Agreement.

60.     The City's interpretation of the Reversionary Provision of the 1973 Agreement is the only rational interpretation.  Under section 15.1 of the 1973 Agreement, DELCORA has the "exclusive right and duty to provide collection, transportation, treatment and disposal of sanitary sewage and industrial waters . . . in the Service Area, to the fullest extent permitted by law within [the] City limits . . . ."  1973 Agreement § 15.1.  Upon termination of the 1973 Agreement, DELCORA will cease to have the right to operate a sewer system within the City.  However, a sewer system within the City must continue to operate.  Accordingly, the only rational interpretation of the Reversionary Provision is that DELCORA must return to the City the existing assets necessary to operate a sewer system within the City, not simply the assets that were transferred to DELCORA in 1973.

61.     Aqua has asserted that the only assets subject to the Reversionary Provision are the assets that were transferred by the City to DELCORA in 1973.  *See* Bk. Dkt. No. 236 at 2 ("Significantly, the 1973 Agreement only provides for the return of certain now over fifty (50) year old assets to the City should DELCORA no longer operate the system."); Bk. Dkt. No. 536 at ¶ 10 ("The 1973 Agreement provides only for the return of certain assets, now over fifty (50) years old and significantly deteriorated, to the City should DELCORA no longer operate the system.").

62.     DELCORA has also asserted that the only assets subject to the Reversionary Provision are the assets that were transferred by the City to DELCORA in 1973.  *See* 5/13/23 Hrg. Tr. at 17:24-18:25 ("Delcora's position with regard to . . . which assets are subject to the reversionary interest as explained under the 1973 agreement are, one, the assets . . . that are not new since the agreement was signed and . . . have not been completely rebuilt since that agreement was signed.").

63. An actual controversy exists between the City, on the one hand, and Aqua and DELCORA on the other, regarding the assets subject to the Reversionary Provision.

64. Adversity exists between the City, on the one hand, and DELCORA and Aqua on the other, because the APA contemplates the transfer of assets subject to the Reversionary Provision to DELCORA in violation of the City's rights under the 1973 Agreement.

65. As the Bankruptcy Court has observed, the disagreement among the parties over the scope of the Reversionary Provision can only be resolved through litigation.

66. The City cannot monetize the rights it holds under the Reversionary Provision effectively until the scope of the assets included within the Reversionary Provision is resolved. Accordingly, the City will be harmed absent declaratory relief.

67. The declaratory relief requested by the City will definitively decide the rights of the parties under the Reversionary Provision of the 1973 Agreement.

68. The City lacks an adequate remedy at law to address its injury if DELCORA transfers assets subject to the Reversionary Provision in violation of that provision of the 1973 Agreement.

69. Accordingly, the City seeks declaratory judgment against DELCORA and Aqua that the assets included in the Reversionary Provision are all current assets of DELCORA necessary for the City to operate a sewer system within the City, excluding only the Treatment Plant and the "facilities in the Collection System described in Section 2(d)" of the 1973 Agreement.

## COUNT II
*Declaratory Judgment Under 28 U.S.C. § 2201*
*To Determine that the Aqua APA Violates the Anti-Assignment Provision*
*Against DELCORA and Aqua*

70. The City incorporates each of the preceding paragraphs as if fully restated herein.

71. Under 28 U.S.C. § 2201, this Court has the power to declare the rights and

15

obligations of parties when an actual controversy exists between those parties. *See* 28 U.S.C. § 2201(a).

72.     The City asserts that the inclusion of the 1973 Agreement among the contracts to be assigned by DELCORA to Aqua under section 2.01(c) and Schedule 4.15 of the APA violates the Anti-Assignment Provision and places DELCORA in breach of the 1973 Agreement.

73.     Aqua has asserted various arguments by which it claims that the assignment of the 1973 Agreement under the APA is not actually an assignment of the 1973 Agreement, despite the APA clearly providing for the assignment of the 1973 Agreement from DELCORA to Aqua. *See* Aqua Appeal at Dkt. 10, p. 10.

74.     An actual controversy exists between the City, on the one hand, and Aqua and DELCORA on the other, regarding whether DELCORA's attempt to assign the 1973 Agreement to Aqua through the APA violates the Anti-Assignment Provision of the 1973 Agreement.

75.     Adversity exists between the City, on the one hand, and DELCORA and Aqua on the other, because the APA contemplates the assignment of the 1973 Agreement from DELCORA to Aqua in violation of the Anti-Assignment Provision of the 1973 Agreement and the City's rights thereunder.

76.     DELCORA is attempting to assign, and Aqua is attempting to obtain through assignment, the 1973 Agreement in violation of the Anti-Assignment Provision of the 1973 Agreement and in violation of the City's right to not have the 1973 Agreement assigned. Accordingly, the City will be harmed absent declaratory relief.

77.     The declaratory relief requested by the City will definitively decide the rights of the parties under the Anti-Assignment Provision of the 1973 Agreement.

78.     The City lacks an adequate remedy at law to address its injury if DELCORA assigns

16

the 1973 Agreement to Aqua in violation of the Anti-Assignment Provision of the 1973 Agreement.

79.     Accordingly, the City seeks declaratory judgment against DELCORA and Aqua that the APA contemplates the assignment of the 1973 Agreement from DELCORA to Aqua in violation of the Anti-Assignment Provision of the 1973 Agreement, and that any provision of the APA that purports to require, cause, or effectuate an assignment of the 1973 Agreement from DELCORA to Aqua is unenforceable.

### COUNT III
*Declaratory Judgment Under 28 U.S.C. § 2201*
*To Determine that the Aqua APA Violates the Easement*
*Against DELCORA and Aqua*

80.     The City incorporates each of the preceding paragraphs as if fully restated herein.

81.     Under 28 U.S.C. § 2201, this Court has the power to declare the rights and obligations of parties when an actual controversy exists between those parties.  *See* 28 U.S.C. § 2201(a).

82.     The Easement provides that DELCORA "shall pay . . . ten precent (10%) of any proceeds received by DELCORA from the sale or lease of the easement by DELCORA to any third party (the 'Revenue Stream')."  Easement § 4(a)(ii).

83.     The Easement provides that DELCORA "shall include in any agreement or sale or lease relating to the easement with any third party a provision placing such third party on notice of the right of the CITY to receive the Revenue Stream hereunder." *Id.*

84.     The APA does not provide for the payment of any amount to the City on account of the Easement, in violation of the Easement.

85.     The APA does not contain a provision placing Aqua on notice of the City's right to receive the Revenue Stream under the Easement, in violation of the Easement.

17

86.     The APA provides that the Easement shall be assigned by DELCORA to Aqua. *See* APA § 2.01(a)(ii) and Schedule 4.09.

87.     DELCORA has breached the terms of the Easement by failing to ensure that the City receives the payment it is entitled to and by failing to preserve the rights of the City under the Easement as required therein.

88.     An actual controversy exists between the City, on the one hand, and Aqua and DELCORA on the other, because DELCORA is attempting to assign the Easement to Aqua in violation of the City's right to the Revenue Stream thereunder.

89.     Adversity exists between the City, on the one hand, and DELCORA and Aqua on the other, because the City opposes the assignment of the Easement from DELCORA to Aqua in contravention of the terms of the Easement.

90.     DELCORA is attempting to assign, and Aqua is attempting to take an assignment of, the Easement in contravention of the City's rights under the Easement.  Accordingly, the City will be harmed absent declaratory relief.

91.     The declaratory relief requested by the City will definitively decide the rights of the parties under Easement.

92.     Accordingly, the City seeks declaratory judgment against DELCORA and Aqua that the APA contemplates the assignment of the Easement from DELCORA to Aqua without the payment to the City of the Revenue Stream or notice to Aqua of the preservation of the Revenue Stream in violation of the Easement and that any provision of the APA that purports to require, cause, or effectuate an assignment of the Easement from DELCORA to Aqua is unenforceable.

## COUNT IV
*Declaratory Judgment Under 28 U.S.C. § 2201*
*Anticipatory Breach of 1973 Agreement*
*Against DELCORA*

93.    The City incorporates each of the preceding paragraphs as if fully restated herein.

94.    Count IV is asserted exclusively against DELCORA and not against Aqua because Aqua is not a party to the 1973 Agreement.

95.    Under 28 U.S.C. § 2201, this Court has the power to declare the rights and obligations of parties when an actual controversy exists between those parties. *See* 28 U.S.C. § 2201(a).

96.    Sections 15.1 of the 1973 Agreement requires DELCORA to "provide collection, transportation, treatment and disposal of sanitary sewage and industrial wastes (but not storm or surface drainage, except in existing combined sewers . . .) in the Service Area, to the fullest extent permitted by law within the Seller's City limits . . . ." 1973 Agreement § 15.1.

97.    The parties' intent that DELCORA operate a sewer system within the City pursuant to the 1973 Agreement is confirmed by Section 16.5 of that agreement, which provides: "It is the intent of the parties that DELCORA will acquire, own, maintain, and operate the property of the Seller, and supply sewage treatment and collection service in accordance with the provisions of this Agreement, even though the proposed new treatment plant is not built at this time." *Id.* § 16.5.

98.    The Anti-Assignment Provision prohibits DELCORA from assigning the 1973 Agreement to any third party, including Aqua.

99.    The APA contemplates the sale of assets subject to the Reversionary Provision to Aqua.

100.    By agreeing to sell substantially all of its assets to Aqua under the APA, changing its purpose under its articles of incorporation to existing as a trust, and entering into the Trust

19

Agreement, DELCORA has made a distinct and affirmative acknowledgment of its inability to continue performing under the 1973 Agreement and its intent to violate the Anti-Assignment Provision and Reversionary Provision upon consummation of the transactions contemplated by the APA, giving rise to an anticipatory breach of the 1973 Agreement.

101. In the alternative, by agreeing to sell substantially all of its assets to Aqua under the APA, changing its purpose under its articles of incorporation to existing as a trust, and entering into the Trust Agreement, DELCORA has made an absolute and unequivocal refusal to continue performing under the 1973 Agreement and its intent to violate the Anti-Assignment Provision and Reversionary Provision upon consummation of the transactions contemplated by the APA, giving rise to an anticipatory breach of the 1973 Agreement.

102. The City lacks adequate financial resources, knowledgeable employees, or facilities to provide the services DELCORA is obligated to provide under the 1973 Agreement or to replace the assets subject to the Reversionary Provision that DELCORA has agreed to sell to Aqua.

103. The City lacks an adequate remedy at law to address its injury if DELCORA ceases performing under the 1973 Agreement because the City cannot replace the facilities or employees of DELCORA necessary to provide those services or replace the assets subject to the Reversionary Provision that DELCORA has agreed to sell to Aqua.

104. Accordingly, the City seeks declaratory judgment that by agreeing to sell substantially all of its assets to Aqua, changing its purpose under its articles of incorporation to existing as a trust, and entering into the Trust Agreement, DELCORA has anticipatorily breached the 1973 Agreement.

**Prayer for Relief**

WHEREFORE, the City requests judgment as follows:

(i)      As to Count I, declaratory judgment against DELCORA and Aqua that the assets included in the Reversionary Provision are all assets of DELCORA necessary for the City to operate a sewer system within the City, excluding only the Treatment Plant and the "facilities in the Collection System described in Section 2(d)" of the 1973 Agreement.

(ii)     A preliminary and permanent injunction prohibiting DELCORA from transferring the assets subject to the Reversionary Provision to Aqua or any other party other than the City.

(iii)    As to Count II, declaratory judgment against DELCORA and Aqua that the assignment of the 1973 Agreement under the APA would violate the Anti-Assignment Provision of the 1973 Agreement and that any provision of the APA that purports to require, cause, or effectuate the assignment of the 1973 from DELCORA to Aqua is unenforceable.

(iv)    A preliminary and permanent injunction prohibiting DELCORA from assigning the 1973 Agreement to Aqua or any other party without the City's consent.

(v)     As to Count III, declaratory judgment against DELCORA and Aqua that the failure of the APA to provide for the payment or preservation of the Revenue Stream as required under the Easement violates the Easement and that any provision of the APA that purports to require, cause, or effectuate the assignment of the Easement from DELCORA to Aqua without the payment and preservation of the Revenue Stream is unenforceable.

(vi)     A preliminary and permanent injunction prohibiting DELCORA from assigning the Easement to Aqua or any other party in contravention of the terms of the Easement.

(vii)    As to Count IV, declaratory judgment solely against DELCORA that DELCORA has anticipatorily breached the 1973 Agreement.

(viii)   A preliminary and permanent injunction prohibiting DELCORA from consummating the transactions contemplated by the APA in breach of the 1973 Agreement.

(ix)     Attorneys' fees, costs, and expenses allowable to the fullest extent of applicable law.

(x)      Such other relief as the Court deems just and appropriate.

Dated: February 6, 2026                          Respectfully submitted,

                                                 /s/ Tobey M. Daluz
                                                 Tobey M. Daluz (PA Bar No. 60685)
                                                 Margaret A. Vesper (PA Bar No. 329793)
                                                 Ballard Spahr LLP
                                                 1735 Market Street, 51st Floor
                                                 Philadelphia, PA 19103
                                                 Tel: (215) 864-8148
                                                 Email:  daluzt@ballardspahr.com
                                                         vesperm@ballardspahr.com

                                                         -and-

                                                 Matthew G. Summers*
                                                 Laurel D. Roglen*
                                                 Nicholas J. Brannick*
                                                 Ballard Spahr LLP
                                                 919 N. Market Street, 11th Floor
                                                 Wilmington, DE 19801
                                                 Tel: (302) 252-4465
                                                 Email: summersm@ballardspahr.com
                                                         roglenl@ballardspahr.com
                                                         brannickn@ballardspahr.com
                                                 (*Admitted pro hac vice)

                                                 Attorneys for Plaintiff the City of Chester

22