**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 9 |
| CITY OF CHESTER, PENNSYLVANIA, | : | |
| | : | Case No. 22-13032-amc |
| Debtor. | : | |
| | : | Chief Judge Ashely M. Chan |
| | : | |

**CHESTER WATER AUTHORITY'S MOTION TO (A) STRIKE THE PROPOSED
TREATMENT OF THE CHESTER WATER AUTHORITY AND ITS ASSETS FROM
THE DEBTOR'S PLAN OF ADJUSTMENT [DKT. NO. 583]; (B) VACATE THE
ORDERS (1) REQUIRING THE PRODUCTION OF DOCUMENTS AND
INFORMATION PURSUANT TO BANKRUPTCY RULE 2004 [DKT. NO. 688];
(2) AUTHORIZING THE USE OF SUCH DOCUMENTS AND INFORMATION IN
CONNECTION WITH THE RFP PROCESS [DKT. NO. 782]; (3) PERMITTING
PHYSICAL ACCESS TO THE CHESTER WATER AUTHORITY'S PROPERTY [DKT.
NO. 859]; AND (4) PROHIBITING THE ISSUANCE OF RIGHT-TO-KNOW LAW
REQUESTS THAT REFER OR RELATE TO THE RFP PROCESS [DKT. NOS. 692 &
713]; (C) MODIFY THE MEDIATION ORDER [DKT. NO. 139] TO RELEASE THE
CHESTER WATER AUTHORITY FROM ANY MANDATORY PARTICIPATION
OBLIGATION; AND (D) COMPEL THE DEBTOR TO RETURN ALL DOCUMENTS
AND INFORMATION PRODUCED BY THE CHESTER WATER AUTHORITY
PURSUANT TO BANKRUPTCY RULE 2004 OR IN MEDIATION**

The Chester Water Authority (the "CWA"), a non-debtor and non-creditor governmental

unit of the Commonwealth of Pennsylvania, files this motion (the "Motion") and respectfully

requests the entry of an order by the U.S. Bankruptcy Court for the Eastern District Pennsylvania

(the "Bankruptcy Court") substantially in the form attached hereto as **Exhibit A** (the "Proposed

Order") unwinding any orders asserting control over the CWA and/or its assets by: (a) striking the

proposed treatment of the CWA and its assets from the *Plan for the Adjustment of Debts of the*

*City of Chester* dated August 26, 2024 [Dkt. No. 583] (the "Plan"); (b) vacating (1) the *Order* [Dkt.

No. 688] (the "Production Order") requiring the CWA to produce documents and information to

the Debtor pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"); (2) the *Order* [Dkt. No. 782] (the "Usage Order") authorizing the Debtor to use such

ClarkHill\L5215\455064\286520095.v4-3/2/26

documents and information in connection with the request for proposals process (the "RFP Process") described in the Plan; (3) the *Order (I) Compelling Chester Water Authority's Compliance with the Order Dated February 13, 2025, (II) Permitting Certain Access to CWA Property, and (III) Setting Further Deadlines with Respect to Compliance with the 2004 Order and the City's Request for Sanctions* [Dkt. No. 859] (the "Access Order"); and (4) the *Order Enforcing the Automatic Stay Against the Chester Water Authority* [Dkt. No. 692] (the "Sanctions Order") and the *Amended Order Enforcing the Automatic Stay Against the Chester Water Authority* [Dkt. No. 713] (the "Amended Sanctions Order," and together with the Sanctions Order, the "Sanctions Orders"); (c) modifying the *Order (I) Appointing a Judicial Mediator, (II) Referring Certain Matters to Mandatory Mediation, and (III) Granting Related Relief* [Dkt. No. 139] (the "Mediation Order") to release the CWA from any obligation to participate in mediation; and (d) compelling the Debtor to (1) return all documents and information produced by the CWA pursuant to Bankruptcy Rule 2004 or in connection with mediation and (2) obtain and provide certifications of the return or destruction of any such documents or information from any third party given access by the Debtor.

In support of this Motion, the CWA represents as follows:

## I.      INTRODUCTION

The CWA and the Debtor have been embroiled in state court litigation centered on a critical question of intra-Commonwealth municipal governance for years: whether the Debtor has the right to dissolve the CWA and unilaterally seize and sell its assets under section 5622(a) of the Pennsylvania Municipality Authorities Act, 53 PA. CONS. STAT. §§ 5601–23 (the "MAA"), notwithstanding the reconstitution of its board to grant equal representational rights to the Debtor, Chester County, and Delaware County under Act 73 of 2012, 53 PA. CONS. STAT. §§ 5610(a.1),

2

5612(a.1) ("Act 73"). The Pennsylvania Supreme Court has now conclusively answered this question: *the Debtor does not. In re Chester Water Auth. Tr.*, Nos. 46–53 MAP 2022, __ A.3d __, 2026 WL 168066, *29 (Pa. Jan. 21, 2026).

The Debtor has no property interest in the CWA or its assets under the MAA, and the CWA filed no proof of claim in this bankruptcy case (the "Chapter 9 Case"). *Id.* at *18. But the Plan is premised on the Debtor's then-disputed right to seize and sell the CWA's assets, and the Debtor agreed to allow the Pennsylvania Supreme Court to decide these issues. However, the Debtor commenced a request for proposals process (the "RFP Process") to solicit third-party bids in furtherance of that goal and sought and obtained various relief against the CWA to facilitate its efforts while the matter was pending final appellate disposition.

The Pennsylvania Supreme Court has now resolved the dispute in favor of the CWA. This Court has made clear that it will honor that decision, and the CWA respectfully asks the Court to do so now. After bearing the cost of the Debtor's gamble throughout these proceedings, the time has come for the CWA to be disentangled from the Chapter 9 Case and the Debtor's repeated attempts to reorganize state government through the federal courts.

## II.     RELEVANT FACTS

### A.     The CWA's Independent Finances and Operations

1.      The CWA is a multijurisdictional joint water authority that provides clean and affordable water to approximately 200,000 people and businesses across over thirty municipalities throughout Chester and Delaware counties. Only 20% of the CWA's customers reside within the Debtor's borders. As a customer, the Debtor itself accounts for less than 1% of the CWA's operating revenue.

2.      The CWA was originally incorporated by the Debtor on July 6, 1939, pursuant to

3

the version of the MAA then in effect.[1]   Under the MAA, the CWA is its own independent municipal entity.  The MAA provides: "Every authority incorporated under this chapter shall be a body corporate and politic."  53 PA. CONS. STAT. § 5607(a).  Thus, municipal "authorities are 'independent agencies of the Commonwealth' and not the 'creatures, agents or representatives' of municipalities." *Chester Water*, 2026 WL 168066, at *18 (quoting *Erie Metro. Transit*, 281 A.2d at 884); *see also Upper Dublin Twp. Auth. v. Piszek*, 218 A.2d 328, 330 (Pa. 1966) (holding that a municipal authority "is a creature of the State, rather than of the creating municipality").

3.      The Pennsylvania General Assembly broadly empowered the CWA, as a standalone municipal entity, to "exercise all powers necessary or convenient for the carrying out of the purposes set forth in this section," which includes the right to, *inter alia*, "finance its operations by obtaining loans and issuing bonds" and "pledge its revenue as security for its indebtedness" and to collect charges from ratepayers but these funds can only be used "exclusively . . . for the purpose of providing for the payment of the expenses of the authority." 53 PA. CONS. STAT. § 2607.  The Debtor's proposal sought to "monetize" the CWA for the purpose of satisfying the Debtor's municipal debt, using revenues ultimately derived from CWA ratepayers.[2]

4.      The property procured by the CWA for its operations over the years was never funded by the Debtor; rather, it was funded through bond issuances and revenue collected from CWA ratepayers.  In fact, the CWA is both statutorily and contractually obligated to pay for its

---

[1] The original MAA was established by the Act of June 28, 1935, P.L. 463, No. 191.  It was repealed and replaced by the Act of May 2, 1945, P.L 382, No. 164, and later recodified under section 3 of the Act of June 19, 2001, P.L. 287, No. 22.  *Chester Water*, 2026 WL 168066, at *1 n.3.

[2] The CWA does not invite a ruling on this issue from this Court but respectfully notes that under 53 PA. CONS. STAT. § 2607, such revenues are lawfully restricted to the exclusive purpose of paying the expenses of the authority itself and may not be used, directly or indirectly, to discharge a municipality's financial obligations.

4

financing solely through the charging of rates *only*.  *See* 53 PA. CONS. STAT. § 2607; Dkt. No. 600, Ex. G, 2014 Bond Indenture Art. 7.02.

5.      The Debtor has never financially contributed to the CWA, even its early years.[3] From 1965 to 2013, the CWA invested in excess of $390 million in capital refurbishments to support its expansion.  None of these projects, infrastructure growth, or property acquisitions were funded by the Debtor.  As noted above, 99% of the CWA's revenue comes from sources other than the Debtor.

6.      The CWA is fiscally sound and until recently had an excellent Aa2 rating by Moody's.  In 2014, the CWA financed its operations via a bond issuance in the amount of $63,720,000.  *See* Dkt. No. 600, Ex. G, 2014 Water Revenue Bonds.  The MAA is clear that both the revenue and the debt obligations of the CWA are the CWA's alone.  53 PA. CONS. STAT. §§ 5607(e)(1–3).  The CWA's current bonds expressly recognize this:

> **THE 2014 BONDS ARE SPECIAL LIMITED OBLIGATIONS OF THE AUTHORITY.  NEITHER THE CREDIT NOR THE TAXING POWER OF THE COMMONWEALTH OF PENNSYLVANIA (THE "COMMONWEALTH"), THE CITY OF CHESTER, DELAWARE COUNTY, PENNSYLVANIA (THE "CITY") OR ANY OTHER POLITICAL SUBDIVISION OF THE COMMONWEALTH IS PLEDGED FOR THE PAYMENT OF THE 2014 BONDS OR THE INTEREST THEREON; NOR SHALL THE 2014 BONDS OR THE INTEREST THEREON BE, OR BE DEEMED TO BE, AN OBLIGATION OF THE COMMONWEALTH, THE CITY OR OF ANY OTHER POLITICAL SUBDIVISION THEREOF.  THE AUTHORITY HAS NO TAXING POWER.**

Dkt. No. 600, Ex. G, 2014 Water Revenue Bonds at 1.

7.      The CWA is forbidden by state law from taking any act that would impair its

---

[3] At its inception, the CWA started its operations by acquiring: (i) a "small pumping station and the pertinent water rights, in Pine Grove, on the Octoraro Creek, Chester County . . . forty miles distant from the City;" and (ii) a "dam, spill way, and a two billion gallon reservoir on the Octoraro Creek, a filtering plant and pumping station at Pine Grove and a large transmission main to carry the water to Chester." *Rankin v. Chester Mun. Auth.*, 68 A.2d 458, 462 (1949).  This acquisition was financed *by the CWA* through "the issuance of additional water revenue bonds in the amount of $3[,]670,000" along with water rates paid by the CWA's ratepayers.  *Id*.  A verified historical accounting of the CWA's growth—and who paid for it—is set forth in the CWA bond offering. Dkt. No. 600, Ex. G.  All these projects were financed by the CWA, using its own revenue from ratepayers and bond issuances.

ClarkHill\L5215\455064\286520095.v4-3/2/26

obligations to its bondholders or violate its bond indenture. 53 PA. CONS. STAT. § 2617 ("The authority shall not be authorized to do anything which will impair the security of the holders of the obligations of the authority or violate any agreements with them or for their benefit.").

8. Consistent with that statutory mandate, the CWA warranted in its Bond Indenture that "as long as the Bonds shall be Outstanding, [the CWA] will not sell or otherwise dispose of the Water System or any part thereof, or any of its Receipts and Revenues from the Water System." Dkt. No. 600, Ex. G, 2014 Bond Indenture Art. 12.05(a).

9. The CWA also covenanted "that it will at all times . . . continuously operate or provide for the operation of same" and "maintain its existence . . . and defend its right to own and operate the Water System for the benefit of the bondholders and the users of the Water System." *Id.* Art. 12.02(b–c).

**B. The CWA's Independent Governance**

10. The CWA was initially governed by a five-member board appointed by the Debtor (the "Old Board"). *See* Act of June 28, 1935, P.L. 463, No. 191, § 7. As the CWA expanded, this board composition became increasingly illogical because it failed to afford representation to the jurisdictions in which the majority of the CWA's users—who generate much of the revenue funding its growth and operations—now reside.

11. To correct this imbalance, the Pennsylvania General Assembly unanimously passed Act 73 on June 27, 2012, which amended the MAA to reconstitute the boards of certain multijurisdictional entities such as the CWA with equal representation for the additional jurisdictions that meet the specified criteria. Act 73 abolished the CWA's five-member board appointed by the Debtor and reconstituted it as a nine-member board of which the Debtor, Delaware County, and Chester County each appoint three (the "New Board"). *See* 53 PA.

6

CONS.STAT. § 5610(a.1)(1)(i).

## C.   Prepetition State Court Litigation[4]

12.     On March 1, 2019, with unanimous board approval, the CWA filed a petition in the Orphans' Court Division of the Delaware County Court of Common Pleas seeking authority to transfer its assets into a formal trust in furtherance of its constitutional obligations under the Environmental Rights Amendment of the Pennsylvania Constitution (the "ERA") and the Pennsylvania Supreme Court's mandate that such assets should be treated in accordance with private trust principals. *See* PA. CONST. Art. I, § 27; *Pa. Envtl. Def. Found. v. Commonwealth*, 161 A.3d 911, 916 (Pa. 2017).

13.     The Debtor and Aqua Pennsylvania Inc. ("Aqua")—which had previously made an unsolicited bid to purchase the CWA's assets that the CWA's board unanimously rejected— objected and filed motions for judgment on the pleadings asserting that the Debtor holds the sole the power to transfer the CWA's assets pursuant to section 5622(a) of the MAA.  The Debtor also commenced a separate action in the same court seeking, *inter alia*, a declaratory judgment validating its claimed right and filed a motion for judgment on the pleadings in that proceeding. The trial court denied the motions in both actions, holding that due to the reconstitution of the CWA's board under Act 73, the Debtor could no longer unilaterally convey the CWA's assets.

14.     The Commonwealth Court reversed both orders on consolidated appeal, holding that the Debtor "possesses the general authority under section 5622(a) to obtain the assets of the [CWA]." *In re Chester Water Auth. Tr.*, 263 A.3d 689, 706 (Pa. Commw. Ct. 2021), *rev'd*, 2026 WL 168066 (Pa. Jan. 21, 2026).  However, in an interlocutory decision remanding for further

---

[4] A detailed recitation of the prepetition state court litigation is set forth in paragraphs 70–93 of the *Motion by Chester Water Authority for Declaration that Automatic Stay Does Not Apply, or Alternatively, to Lift the Stay Relating to the Pending State Court Appeal* [Dkt. No. 600].

7

proceedings, the Commonwealth Court cautioned that "the litigation in this case is far from over, and, until all the pertinent legal issues surrounding the [Debtor]'s authority under section 5622(a)— and possibly other statutes—are resolved, the [Debtor's] plans and future expectations with respect to the [CWA's] assets are nothing more than a surmised contingency." *Id.* at 706.

15.     The Pennsylvania Supreme Court exercised its discretion to take up an appeal of the Commonwealth Court's decision on April 11, 2022 (the "State Court Appeal"), agreeing to consider both questions the CWA proposed for review:

> (1)     Does the City of Chester have the right to seize the assets of Chester Water Authority pursuant to Section 5622(a) of the Municipal Authorities Act, 53 Pa.C.S. § 5622(a), and sell those assets to address its own unrelated financial distress, while overriding the representational rights granted by Act 73 of 2012, 53 Pa.C.S. §§ 5610(a.1), 5612(a.1), to Delaware and Chester Counties?

> (2)     Did the Commonwealth Court commit reversible error by failing to follow *Burke v. N. Huntingdon Twp. Mun. Auth.*, 136 A.2d 310, 313-14 (Pa. 1957), which is controlling precedent that only an authority can authorize transfer under the predecessor to Section 5622(a)?

*In re Chester Water Auth. Tr.*, 276 A.3d 203, 204 (Pa. 2022).[5]  Oral argument was scheduled in the fully briefed State Court Appeal for November 30, 2022.

**D.     Chapter 9 Case**

16.     On November 10, 2022 (the "Petition Date")—the eve of oral argument in the State Court Appeal—the Debtor commenced the Chapter 9 Case by filing a petition for relief under chapter 9 of the Bankruptcy Code with this Court.  The next day, it filed a *Suggestion of Bankruptcy* in the Pennsylvania Supreme Court, which entered its own order staying the State Court Appeal.[3]

---

[5] The court also accepted a related question proposed on cross-appeal by Chester County. *Chester Water*, 276 A.3d at 204.

8

### 1.      Mandatory Mediation and NDA.

17.      On the Petition Date, the Debtor filed a *Motion for Entry of an Order (I) Appointing a Judicial Mediator, (II) Referring Certain Matters to Mandatory Mediation, and (III) Granting Related Relief* [Dkt. No. 16] (the "Mediation Motion").  The Debtor requested that the CWA be among the parties ordered to mediation, asserting that "to address the [Debtor's] significant and complex financial problems, the [Debtor] must address its $127.2 million underfunded pension liability and, in order to do so, must monetize the [CWA's assets] and resolve related litigation, both litigation currently pending and litigation that may be commenced depending on which actions the Receiver takes toward monetization."  Mediation Mot. ¶ 6.  It further asserted that "the outcome of the pending appeal to the Pennsylvania Supreme Court is uncertain and, if the [Debtor] prevails, the [Debtor] will still have to repossess the [CWA's assets] and before it can engage in a sale process to realize the [CWA's assets'] value," *id.* ¶ 21, and that "[t]here almost certainly would be further litigation in the Delaware County Court of Common Pleas (and, potentially, additional appeals) before the [CWA's assets] could finally be monetized," *id.* ¶ 22.  The Debtor also specified the "[m]onetization of the [CWA's assets] . . . and resolution of all related litigation" as an issue to be mediated.  *Id.* ¶ 18(a).

18.      On November 30, 2022, the CWA filed a response to the Mediation Motion [Dkt. No. 94] (the "Mediation Response"), stating that the CWA "is a party to this proceeding as a *creditor* of the Debtor and embraces referral of this matter to mediation in that capacity. The [CWA] is also willing to discuss in mediation the ways that it can assist the Debtor with its financial situation."  Mediation Response at 1 (emphasis in the original).  The CWA ultimately filed no proof of claim and is accordingly not a creditor of the Debtor.  Additionally, the CWA emphasized that neither it nor its assets are property of the Debtor and contested the Debtor's

9

characterizations that it could "monetize" or "repossess" the CWA's assets. *Id.* In agreeing to mediate in its capacity as a creditor subject to these reservations, the CWA "reserve[d] its right to challenge, at the appropriate time, the jurisdiction of this Court to determine whether (or not) the [Debtor] has the right to seize and sell the assets of the [CWA]" and made "abundantly clear that although [the CWA] embraces mediation, agreeing to mediate is in no way a waiver of the [CWA's] position that ultimately this Court lacks jurisdiction to determine the relationship between the Debtor and the [CWA], which are, as a matter of Pennsylvania law, two separate legal entities." *Id.* at 1–2. The CWA has repeatedly and emphatically taken this position throughout the Chapter 9 Case.

19. On December 16, 2022, the Court entered the Mediation Order, appointing the Honorable Mary F. Walrath as mediator and granting her "sole discretion to select the mediation parties . . . [and] define the mediation issues." Mediation Order ¶¶ 2–3. The Mediation Order provides that "[t]he Mediation will be subject to the confidentiality provisions set forth in Local Rule 9019-[3](k)(1)–(6) and subject to Fed. R. Evid. 408." *Id.* ¶ 4.

20. The CWA produced confidential documents and information during mediation in reliance on a carefully negotiated nondisclosure agreement [Dkt. No. 734-2] (the "NDA") with, *inter alia*, the Debtor's receiver (the "Receiver") acting on behalf of the Debtor. The NDA provides that "[a]ny Party to this Agreement may terminate this Agreement at any time upon three (3) business days' written notice to the other Parties," NDA ¶ 11, and that "[u]pon the expiration or termination of this Agreement, . . . a Party and its respective Representatives shall within three (3) business days return all copies, whether in written, electronic or other form or media, of the Confidential Information, or destroy all such copies and certify in writing to the requesting Party that such Confidential Information has been destroyed," *id.* ¶ 10(b). It defines "Confidential

10

Information" as "all non-public, confidential, or proprietary information disclosed before, on, or after the Effective Date, by any Party in connection with the Mediation."  NDA ¶ 1.

21.     On November 21, 2024, the CWA terminated the NDA, triggering the Debtor's obligation to return the CWA's confidential information in its possession.  As further described below, the Debtor breached its obligation to do so.

**2.      Proposed Plan Treatment.**

22.     On August 26, 2024, the Debtor filed the Plan.  It provides in relevant part:

> On the Effective Date, *pursuant to the Pennsylvania Municipality Authorities Act, 53 Pa.C.S. §§ 5601-5623 and the decision of the Pennsylvania Commonwealth Court in* **In re Chester Water Authority Trust,** *263 A.3d 689 (Pa. Commw. Ct. 2021), appeal granted, 276 A.3d 203 (Pa. 2022) (stayed)*, (a) the legal existence of CWA will be terminated, (b) all Water Assets shall revert to the City by force of Commonwealth law, (c) CWA's outstanding liabilities shall be paid, repaid, prepaid, redeemed, defeased or assumed, and (d) the Water Assets shall be subjected to the RFP Process.

Plan Art. IV.D.1 (emphasis added).  The Plan defines "Water Assets" as "the certain water source rights, raw water conveyance, treatment, treated water conveyance, storage and distribution systems currently maintained by the CWA."  *Id.* Art. A.IV.D.2.

23.     The Plan further provides that "[o]n or before the Effective Date, the [Debtor] shall ensure that each form of outstanding water indebtedness shall either be (i) assumed in full by the entity acquiring, leasing or otherwise taking ownership and/or operation of the Water Assets or (ii) otherwise paid, repaid, defeased, prepaid or redeemed in full."  *Id.* Art. IV.D.2.

24.     The Debtor has not submitted a disclosure statement—an indispensable prerequisite to consideration of the Plan for confirmation—despite nearly one-and-a-half years having elapsed since the Plan was filed.

11

ClarkHill\L5215\455064\286520095.v4-3/2/26

### 3.   Appeal Stipulation and RFP Process.

25.   On September 25, 2024, the CWA filed a motion [Dkt. No. 600] for an order declaring the automatic stay imposed by section 362(a) of the Bankruptcy Code inapplicable to the State Court Appeal, or in the alternative, lifting the stay for cause to the extent it applied.

26.   In its response [Dkt. No. 609], the Debtor admitted that that achieving the Receiver's goals "to exercise the same rights as every other Pennsylvania municipality that has incorporated an authority, to put the assets of the CWA to work for the benefit of the residents of the [Debtor], and to implement a long-term solution to the [Debtor's] financial distress . . . *requires* the Pennsylvania Supreme Court to resolve the [State Court Appeal]," ¶ 56 (emphasis added), and that "the legal questions pending before the Pennsylvania Supreme Court *must be decided* expeditiously," *id.* ¶ 41 (emphasis added).

27.   The parties stipulated to an order allowing the State Court Appeal to proceed to final appellate disposition, which the Court approved on November 20, 2024 [Dkt. No. 629].

28.   On the same day the order was entered, the Debtor initiated the RFP Process by issuing a Request for Qualifications (the "RFQ"[6]) to provide prospective bidders with "an opportunity to formally express their interest in bidding on a sale, lease or other form of monetization . . . of some or all of the [Debtor's a]ssets," which were purported to include "the [Debtor's] ownership rights to the water assets . . . currently held by the [CWA]." *See* RFQ at 1.

### 4.   Production Order.

29.   As described above, the CWA terminated the NDA on November 21, 2024,

---

[6] CITY OF CHESTER, DELAWARE COUNTY, PENNSYLVANIA, REQUEST FOR QUALIFICATIONS FOR PROPOSED SALE, LEASE, OR OTHER MONETIZATION OF CHESTER'S WATER ASSETS, STORMWATER ASSETS, AND REVERSIONARY INTEREST IN CERTAIN SEWER ASSETS (Nov. 20, 2024),
https://static1.squarespace.com/static/66b0dc5f2ca26d3b6f8c7b6a/t/673e6b66899b495d1bacb9fa/1732143974873/Chester+-+Request+for+Qualifications.pdf.

12

triggering the Debtor's contractual obligation to return the CWA's confidential information produced in mediation. Rather than complying, the Debtor's counsel demanded by letter dated November 26, 2024 [Dkt. No. 633-3], that the CWA produce dozens of categories of documents, including all confidential information submitted in mediation, pursuant to Bankruptcy Rule 2004.

30. On December 4, 2024, the Debtor filed the *Motion of City of Chester for Entry of an Order Requiring the Chester Water Authority to Produce Documents Pursuant to Bankruptcy Rule 2004* [Dkt. No. 633] (the "2004 Motion"), seeking to compel such production and further asserting that "the [Debtor] should be authorized to use the information obtained from the CWA to conduct the RFP Process[,] and the CWA should be required to permit the [Debtor] and potential bidders to inspect CWA properties in advance of submitting bids to acquire the [Debtor's] interest in CWA's assets through the RFP Process." 2004 Mot. ¶ 25.

31. The CWA filed an objection [Dkt. No. 643] on December 20, 2024; the Debtor filed a reply on January 29, 2025 [Dkt. No. 676], including with it a supplemental request for additional documents and information; and the CWA filed a sur-reply on February 7, 2025 [Dkt. No. 680].

32. On February 12, 2025, the Court conducted a hearing on the 2004 Motion and a separate motion by the Debtor to bar the CWA from issuing third-party information requests in connection with the RFP Process [Dkt. No. 679] (the "Sanctions Motion") under the Pennsylvania Right-to-Know Law, 65 PA. CONS. STAT. §§ 67.101–3104 (the "RTKL"). At the combined hearing, the Court characterized the RFP Process as follows:

> [R]ight now it does appear that the [Debtor] does have this contingent ability to take this action that they want to be taking, which I know that the CWA vehemently objects to.
>
> So if you guys win on the Supreme Court, then they may not have a contingent right, and that may not be property of the estate. But as

ClarkHill\L5215\455064\286520095.v4-3/2/26

it stands now, prior to resolution by the Pennsylvania Supreme Court, it seems pretty clear to me that this is an asset of the bankruptcy estate, right?

Dkt. No. 707 at 6 ll. 7–15.

33.    On February 13, 2025, the Court entered the Production Order, compelling the production sought by the Debtor but inviting further briefing on the other requested relief.  The Court stated that "[t]he [Debtor]'s document requests easily fall within the proper scope of [Bankruptcy] Rule 2004, as they are aimed at obtaining information regarding the [Debtor's] *contingent property interest in the CWA and its assets.*"  Production Order ¶ 26 (emphasis added).

It further explained:

> [O]btaining the information the [Debtor] has requested greatly impacts the administration of the [Debtor's] bankruptcy as the [Debtor's] Plan *relies on a proposed RFP [P]rocess for monetizing the Water Assets currently controlled by the CWA upon the [Debtor's] exercise of its disputed right to dissolve the CWA and regain control over the Water Assets.*  As such, not only are the requests proper in scope, but the [Debtor] has more than established good cause for the production of documents relating to the Water Assets in the CWA's control.  *A robust RFP [P]rocess for monetizing the Water Assets is critical to the success of the [Debtor's] proposed Plan*, and that process cannot happen without production of the requested documents *to inform the [Debtor] about the scope, condition, and value of the Water Assets.*

*Id.* (emphasis added)

34.    The Court also advised that even if Rule 26 of the Federal Rules of Civil Procedure (the "Civil Rules") governed instead, "the Court would find the [Debtor's] requests more than justified under [Civil] Rule 26 *to advance its proposal related to the Water Assets in the Plan*."

*Id.* ¶ 35 (emphasis added).

35.    On February 27, 2025, the CWA filed a motion for leave to appeal the interlocutory

14

Production Order [Dkt. No. 722], which motion remains pending before the U.S. District Court for the Eastern District of Pennsylvania (the "District Court"). *See Chester Water Auth. v. City of Chester, Pa.*, No. 25-cv-1115 (E.D. Pa.).

36. On March 10, 2025, the CWA filed a motion to stay the Production Order [Dkt. No. 734] pending the disposition of its appeal. The Debtor filed an objection on March 24, 2025 [Dkt. No. 746].

37. The Court conducted a hearing on April 2, 2025, where it stated that "[t]he [Production O]rder *simply recognizes* the existence of the Commonwealth order, the Commonwealth Court decision in the [Debtor's] favor, finding that the [Debtor] has [a] statutory right" under the MAA. Dkt. No. 779 at 10 ll. 12–14 (emphasis added). The Court explained:

> This Court has absolutely no interest in making any determination on the dispute about the water assets that is before the PA Supreme Court and has not attempted to or done so by merely permitting the [Debtor] to take discovery pursuant to [Bankruptcy Rule] 2004[,] and it has only recognized the Commonwealth Court decision. ***And should the PA Supreme Court reverse the Commonwealth Court, this Court will honor that decision.***

Dkt. No. 779 at 17 ll. 15–22 (emphasis added).

38. On April 4, 2025, the Court denied [Dkt. No. 772] the CWA's stay request.

**5.    Usage Order.**

39. As the Court requested, the Debtor and the CWA respectively submitted briefs on February 26 [Dkt. No. 716] and March 12, 2025 [Dkt. No. 739], addressing the Debtor's further request to share documents and information produced by the CWA with prospective bidders in furtherance of the RFP Process.

40. On April 11, 2025, the Court entered the Usage Order, authorizing the Debtor to "utilize the produced documents ***in connection with the RFP Process described in the Plan***,

15

subject to any reviewing third-party's entry into a non-disclosure or other confidentiality agreement with the [Debtor] to access non-public information." Usage Order ¶ 13 (emphasis added). The Court explained:

> [T]he [Debtor's] *overriding interest in proceeding with arguably the most important aspect of the proposed Plan—a robust RFP Process*, which appears stalled in the absence of the [Debtor] providing documents regarding the Water Assets and CWA to potential third- party bidders—outweighs the risk to CWA . . . . *These same factors further support a finding of good cause to share the documents with potential third-party bidders* who execute confidentiality agreements, to the extent necessary to make such a finding.

*Id.* ¶ 12 (emphasis added).

41.     On April 25, 2025, the CWA filed a motion for leave to appeal the interlocutory Usage Order [Dkt. No. 791], which motion remains pending before the District Court. *See Chester Water Auth. v. City of Chester, Pa.*, No. 25-2136 (E.D. Pa.).

**6.      Access Order.**

42.     On June 18, 2025, the Debtor filed a motion [Dkt. No. 839] (the "Access Motion") seeking, *inter alia*, an order "permitting a qualified third-party engineer access to CWA's premises to inventory the Water Assets" pursuant to Bankruptcy Rule 2004. Access Mot. ¶ 40.

43.     The CWA filed an objection [Dkt. No. 841] on July 2, 2025, followed by a motion for leave to supplement the objection [Dkt. No. 844] on July 8. The Debtor filed a motion for leave to file a reply [Dkt. No. 852] in support of the Access Motion on July 21.

44.     The Court conducted a hearing on July 23, 2025, at which the Debtor's counsel asserted that an engineer must be permitted to access the CWA's property "to inspect and prepare an inventory of the assets and condition, *which we can then share with the potential bidders*," asserting that such relief was "necessary" because "the potential bidders are asking for this

16

information." Dkt. No. 857 at 33 ll. 7–13 (emphasis added).

45.     The Court entered the Access Order on July 31, 2025, granting the Debtor "access to CWA's premises as reasonably necessary for a qualified third-party engineer to inspect the Water Assets . . . for the purpose of producing an inventory and condition report of the Water Assets." Access Order ¶ 4.[7]

### 7.     Sanctions Orders

46.     On February 7, 2025, the Debtor filed the Sanctions Motion, asserting that language contained in cover letters affixed to certain RTKL requests issued by the CWA to non-debtor state governmental entities (the "Cover Letter Requests") violated section 362(a)(3) of the Bankruptcy Code because "[t]he [Debtor's] statutory right to dissolve the CWA and take possession of the CWA's assets is a property interest and it is property of the [Debtor, and] . . . [t]he intimidation campaign by [the] CWA embodied in the [Cover Letter] Requests is an effort to destroy the value of the [Debtor's] right to dissolve the CWA under the MAA and take possession of its assets by scaring off potential bidders who may be interested in those assets." Sanctions Mot. ¶¶ 39–40.[8]

47.     The Sanctions Motion sought an order, *inter alia*, compelling the CWA to withdraw the Cover Letter Requests, prohibiting the CWA "from undertaking any further effort to threaten or intimidate potential participants in the RFP Process or to otherwise chill bidding or thwart the RFP Process," and imposing sanctions against the CWA, *id.* ¶ 28, as well as an emergency hearing on February 12, 2025, *id.* ¶ 60.

48.     On February 12, 2025, the CWA filed an initial brief objecting to the Sanctions

---

[7] The Court also granted the CWA and the Debtor's respective requests for leave to file a supplement and a reply. Access Order ¶¶ 9–10.

[8] An example of a Cover Letter Request with the recipient's name redacted is attached as Exhibit 1 to the Sanctions Motion [Dkt. No. 679-1].

ClarkHill\L5215\455064\286520095.v4-3/2/26

Motion [Dkt. No. 686] (the "Sanctions Objection") prior to the emergency hearing.

49.     At the February 12, 2025, combined hearing on the 2004 Motion and the Sanctions

Motion, the Court stated:

> They clearly have the right to do the RFP [Process], to just not
> actually have a sale, but they are allowed tee up the process. And
> I was just concerned about the actions taken by CWA, because it
> seemed to me that they were quite aggressive and taken with the
> direct purpose of trying to chill the bidding.

Dkt. No. 707 at 6 ll. 16–21.

50.     The Court further stated:

> I just think that you're asking for information from potential bidders,
> and you're including this ridiculous language in there.  It's going to
> chill the bidding.  You can't do that.  ***That's a property interest.***

*Id.* at 10 l. 22–11 l. 1 (emphasis added).

51.     On February 13, 2025, the Court entered the Sanctions Order, requiring the CWA

to withdraw any "RTKL requests referring to, relating to or ***in any way touching*** upon the . . . RFP

Process" within 24 hours, Sanctions Order ¶ 2 (emphasis added), and further enjoining the CWA

"from issuing any RTKL request to any entity that in any way refers to, or relates to, or ***touches***

***upon*** the RFP Process," *id.* ¶ 4 (emphasis added).

52.     On February 14, 2025, the CWA filed an emergency motion to clarify the scope of

the injunction [Dkt. No. 695] (the "Clarification Motion") because the relief went well beyond

merely enjoining RTKL requests similar to the Cover Letter Requests, Clarification Mot. ¶ 13, and

would have forced the CWA to withdraw certain existing RTKL requests then pending on appeal

before the Pennsylvania Office of Open Records (the "OOR"), which would have resulted in the

abandonment of those appeals, *id.* ¶ 22.

53.     At a February 20, 2025, telephonic hearing to address the Clarification Motion, the

Court stated that its reliance on the Commonwealth Court's decision was subject to the outcome of the State Court Appeal:

> *[U]ntil the appeal at the Supreme Court is resolved*, I have to observe the ruling made by the Commonwealth Court here, which is that the [Debtor] *does seem to have this contingent interest.* And I'm going to—you know, *unless that's disturbed by the Supreme Court*, that's really the law that I'm going to follow in terms of what [e]state interest might be at play here.

Dkt. No. 719 at 6 ll. 3–9 (emphasis added).

54.     On February 21, 2025, the Court entered the Amended Sanctions Order, which slightly limits the scope of the injunction to require the withdrawal of only the existing Cover Letter Requests within 24 hours, Am. Sanctions Order ¶ 2, and further enjoins the CWA "from issuing any RTKL request to any entity that in any way refers to or relates to the RFP Process," *id.* ¶ 4.

55.     On February 27, 2025, the CWA appealed the Sanctions Orders to the District Court [Dkt. No. 721] (the "DC Sanctions Orders Appeal"). *See Chester Water Auth. v. City of Chester, Pa.*, No. 25-cv-1114 (E.D. Pa.).

56.     On March 10, 2025, the CWA filed a motion to stay the Sanctions Orders [Dkt. No. 736] pending the disposition of its appeal. The Debtor filed an objection on March 24, 2025 [Dkt. No. 747].

57.     The Court conducted a hearing on April 2, 2025, where it stated:

> [T]he Court finds that first, Section 902[(]1[)] of the Bankruptcy Code equates property of the estate with property of the debtor[,] justifying this Court's conclusion that the [Debtor's] statutory right under the MAA to reclaim the water assets constitutes a ***contingent of property interest for purposes of this bankruptcy proceeding*** because property of the estate is defined extremely broadly for purposes of the Bankruptcy Code.

Dkt. No. 779 at 21 ll. 18–25 (emphasis added).

19

58.     The Court further stated that "*[a]t this point*, the Court disagrees that CWA's competing legal interests outweigh the potential harm to the value of the [Debtor's] interests in the water assets, ***as the [Debtor] is relying on their monetization to support its plan of reorganization***." *Id.* at 25 ll. 2–6 (emphasis added).

59.     On April 4, 2025, the Court denied [Dkt. No. 771] the CWA's stay request.

60.     On April 17, 2025, the Debtor filed a motion to dismiss the DC Sanctions Orders Appeal in the District Court [DC Dkt. No. 7[9]] (the "DC Motion to Dismiss") on the basis that the Sanctions Orders were interlocutory.

61.     On September 4, 2025, the District Court entered an order [DC Dkt. No. 48] (the "DC Dismissal Order") granting the DC Motion to Dismiss.

62.     On September 12, 2025, the CWA appealed the DC Dismissal Order to the Third Circuit [DC Dkt. No. 50] (the "TC Sanctions Orders Appeal").  *See In re City of Chester, Pa.*, No. 25-2783 (3d Cir.).

63.     On October 14, 2025, the Debtor filed a motion to dismiss the TC Sanctions Orders Appeal for lack of jurisdiction [TC Dkt. No. 21[10]] (the "TC First Motion to Dismiss").  On October 24, 2025, the CWA filed a response in opposition [TC Dkt. No. 24].  On October 31, 2025, the Debtor filed a reply [TC Dkt. No. 25].

64.     On December 17, 2025, the Third Circuit referred the TC First Motion to Dismiss to the merits panel for consideration after full briefing [TC Dkt. No. 26].

65.      On January 23, 2026, the Debtor filed a second motion to dismiss the TC Sanctions

---

[9] References to the District Court docket in the DC Sanctions Orders Appeal are denoted herein as "DC Dkt. No. X."

[10] References to the Third Circuit docket in the TC Sanctions Orders Appeal are denoted herein as "TC Dkt. No. X."

ClarkHill\L5215\455064\286520095.v4-3/2/26

Order Appeal [TC Dkt. No. 38] (the "TC Second Motion to Dismiss"), asking the Third Circuit to

vacate the Sanctions Orders and dismiss the TC Sanctions Order Appeal in light of the

Pennsylvania Supreme Court's ruling in the State Court Appeal.  In its motion, the Debtor stated:

> The legal authority underlying the [Sanctions] Orders has materially changed due to the Pennsylvania Supreme Court's recent decision. In light of that change, the [Debtor] has decided to withdraw the [Sanctions] Motion giving rise to the [Sanctions] Orders and suspend the RFP Process that the [Sanctions] Orders were intended to protect.  These events have effectively rendered this appeal moot.

TC Second Motion to Dismiss at 3.

66.    On January 29, 2026, the CWA filed a response [TC Dkt. No. 42], and on February

5, 2026, the Debtor filed a reply [TC Dkt. No. 44].

67.    On February 17, 2026, the Third Circuit entered an order [TC Dkt. No. 45] granting

the TC Second Motion to Dismiss to the extent it sought to dismiss the TC Sanctions Orders

Appeal and denying the motion to the extent it sought to vacate the Sanctions Orders.[11]

68.    Also on January 23, 2026, the Debtor filed a motion to withdraw the Sanctions

Motion [Dkt. No. 1002] (the "Withdrawal Motion") in this Court.  On January 28, 2026, the CWA

filed a response [Dkt. No. 1005] (the "Withdrawal Objection").  In light of the Third Circuit's

dismissal of the TC Sanctions Orders Appeal and the relief requested in this Motion, the CWA is

withdrawing the Withdrawal Objection.

69.    At a status conference on February 11, 2026, the Court stated, "I think we all agree

that [the Sanctions Orders] should be vacated in light of the Supreme Court ruling."  ECF 1009 at

6 ll. 22–23.

---

[11] The Third Circuit also entered an order [TC Dkt. No. 46] denying the TC First Motion to Dismiss as moot.

21

**8.       Bond-Rating Downgrade and Status Quo Motion.**

70.       On September 19, 2025, the CWA filed a motion [Dkt. No. 905] for an order declaring the automatic stay imposed by section 362(a) of the Bankruptcy Code inapplicable to the CWA's right to seek modification of a state trial court order [Dkt. No. 905-1] (the "Status Quo Order") allowing the Debtor to conduct an RFP Process pending disposition of the State Court Appeal, or in the alternative, lifting the stay for cause to the extent it applies. The Debtor filed an objection [Dkt. No. 911] on October 3, 2025.

71.       As detailed in its motion, the CWA undertook efforts to refinance its current bonds in 2024 but faced overwhelming rejection by traditional capital markets due to the specter of its proposed treatment under the Plan and RFP Process. The CWA eventually finalized a transaction and sought authorization to close from its board on September 18, 2025.

72.       Before the Chapter 9 Case commenced, the CWA had an excellent Aa2 bond rating. Its existing bonds were financed at an interest rate of 3%. However, during the CWA's refinancing efforts, Moody's downgraded the CWA's bond rating from Aa2 to Aa3 in a report dated June 3, 2025 [Dkt. No. 905-4] (the "Moody's Report"), citing the "the risks and uncertainty surrounding the bankrupt City of Chester's attempt to seize and monetize the authority's assets." Moody's Report at 1. According to Moody's, the "most drastic scenario would be one in which the City of Chester assumes the authority's debt, even temporarily," and "[i]n that event, the rating on the authority's bonds could be downgraded many notches." *Id*.; *see also, e.g.*, Plan Art. IV.D.2 ("On or before the Effective Date, the [Debtor] shall ensure that each form of outstanding water indebtedness shall either be (i) assumed in full by the entity acquiring, leasing or otherwise taking ownership and/or operation of the Water Assets or (ii) otherwise paid, repaid, defeased, prepaid or redeemed in full.").

22

73.     As a result, the CWA was forced to seek financing from a non-traditional lender, resulting in the interest rate *more than doubling* to 7% for the first $45 million and 11% for the last $15 million.

74.     This increased rate will cost the CWA approximately $2 million per year for the next several years, and the way the new bonds are structured will conservatively result in an $8 million added cost to the CWA over the next four years.  The CWA has no choice but to address these costs of credit by increasing water rates for ratepayers by 14% in 2026 and commensurate increases in subsequent years.

75.     The Court conducted a hearing on the CWA's motion on October 8, 2025, where it stated: "I think the Moody's downgrade is a reflection of the *uncertainty of what the PA Supreme Court's going to rule.*  And I think that once we know how they're going to rule, *then we'll know exactly what's going to happen with the CWA*."  Dkt. No. 914 at 14 ll. 18–22 (emphasis added).

76.     The Court observed that the Moody's Report "very specifically cit[es] the ongoing uncertainty surrounding the bankrupt [Debtor's] attempt to seize and monetize the [CWA's] assets *as referenced in the [Debtor's] filed plan of adjustment* and explain[s] that the longer the state litigation drags on, the greater risk CWA faces from potential market access limitations and other challenges relating to this controversy," ultimately finding that "the uncertainty surrounding the disposition of the legal issues relating to the [Debtor's] ability to reclaim the water assets and dissolve the CWA . . . *has caused the downgrade*."  *Id.* at 25 ll. 4–14 (emphasis added).

77.     On October 9, 2025, the Court entered an order [Dkt. No. 920] (the "Status Quo Denial Order") denying the Status Quo Motion.

78.     On October 23, 2025, the CWA appealed the Status Quo Denial Order to the District Court [Dkt. No. 928].  *See Chester Water Auth. v. City of Chester, Pa.*, No. 25-cv-

6085 (E.D. Pa.).  Because such direct appeal divested this Court of jurisdiction over the Status Quo

Denial Order, this Motion does not seek relief regarding such order.

**E.      Disposition of the State Court Appeal**

79.      The Pennsylvania Supreme Court issued its long-awaited decision in the State

Court Appeal on January 21, 2026, following oral argument that occurred on May 14, 2025.  *See*

*Chester Water*, 2026 WL 168066.  The court reversed the Commonwealth Court's decision and

held that the "[Debtor] no longer possesses the unilateral authority under Section 5622(a) to

acquire [CWA's] projects because those projects are no longer projects 'of a character' that [the

Debtor] 'has power to establish, maintain or operate.'"  *Id.* at *29 (quoting 53 PA. CONS. STAT. §

5622(a)) (internal footnote omitted).  It further held that "because the CWA's projects are now

governed by the New Board, [the Debtor], Chester County, and Delaware County are now the

'proper authorities' that 'may by appropriate resolution or ordinance' wield Section 5622(a)'s

conveyance power."  *Id.* at *29 (quoting 53 PA. CONS. STAT. § 5622(a)).

80.      Section 5622(a) of the MAA provides:

> If a project established under this chapter by a board appointed by a
> municipality is of a character which the municipality has power to
> establish, maintain or operate and the municipality desires to acquire
> the project, it may by appropriate resolution or ordinance adopted
> by the proper authorities signify its desire to do so, and the
> authorities shall convey by appropriate instrument the project to the
> municipality upon the assumption by the municipality of all the
> obligations incurred by the authorities with respect to that project.

53 PA. CONS. STAT. § 5622(a).

81.      The court observed that the plain text of the statute "does not utilize any language

signifying ownership of authorities by municipalities" and in fact could not do so because

"authorities are 'independent agencies of the Commonwealth' and not the 'creatures, agents or

representatives' of municipalities."  *Chester Water*, 2026 WL 168066, at *18 (quoting *Erie Metro.*

24

*Transit*, 281 A.2d at 884).  Accordingly, the court "***firmly reject[ed]*** arguments suggesting directly or by analogy that [the Debtor] has ***vested property rights associated with its relationship to CWA.***"  *Id.* (emphasis added).

82.    The court further determined that ***"[e]ven when a municipality is empowered to force the conveyance of an authority's projects***, significant limitations are placed upon the municipality's use of the assets associated with those projects.  ***Such limitations are incongruent with ownership.***"  *Id.* at \*18 n.21 (citing 53 PA. CONS. STAT. § 5622(d)) (emphasis added); *see also* § 5622(d) ("Following transfer of a project pursuant to this section, the municipality . . . which has acquired the project shall retain the reserves received from the authority which have been derived from operations in a separate fund, and the reserves shall only be used for the purposes of operating, maintaining, repairing, improving and extending the project.").

83.    The court next determined that section 5622(a) of the MAA must be read in conjunction with section 5602, which defines a "project" as that which "an authority **is** authorized to acquire, construct, finance, improve, maintain or operate, or provide financing for" and is "phrased in the present tense."  *Chester Water*, 2026 WL 168066, at \*18 (emphasis in the original).  Accordingly, the court determined that the opening clause of section 5622(a) "only permits a conveyance of a project to a municipality (or municipalities) that ***today controls the authority***," regardless of whether the project was "established under a previous board."  *Id.* at \*20 (emphasis added).

84.    The court emphasized that prior to the reconstitution of the CWA's board under Act 73, "[t]here is no dispute that [the Debtor] was once the only municipality that could have invoked Section 5622(a) . . . to acquire CWA's projects . . . [because] the Old Board by necessity established some of CWA's projects, and the Old Board was exclusively appointed by [the

25

Debtor]." *Id.* at \*25. But because "the CWA's projects are ***now governed*** by the New Board, [the

Debtor], Chester County, and Delaware County are now the 'proper authorities' that 'may by

appropriate resolution or ordinance' wield Section 5622(a)'s conveyance power." *Id.* at \*29

(quoting 53 PA. CONS. STAT. § 5622(a)) (emphasis added). As a result, the "[Debtor] no longer

possesses the unilateral power to acquire CWA's projects under Section 5622(a)." *Id.* at \*30. That

power is held by the Debtor, Chester County, ***and*** Delaware County as the "legislatively

designated municipalities that share governance over the CWA" through the New Board. *Id.*

**F.      The Debtor Declines to Comply with the CWA's Requests**

85.      In light of the material change in legal authority on which the Debtor and this Court

have relied throughout the Chapter 9 Case, the CWA's counsel requested substantially similar

relief to that now requested in this Motion by letter dated January 31, 2026 (the "1/31/26 Letter"[12]),

directed to the Debtor's counsel.[13]

86.      By letter dated February 10, 2026 (the "2/10/26 Letter"[14]), the Debtor's counsel

rejected the majority of such requests. Specifically, counsel advised that the Debtor (a) would not

withdraw or amend the Plan to remove references to the CWA or its assets because doing so would

be "unnecessary or premature"; (b) would not seek to vacate the Mediation Order because the

disposition of the State Court Appeal "leaves open many disputed matters and issues between the

[Debtor], CWA, and certain third parties that are an appropriate subject of mediation"; (c) would

not return any documents or information produced by the CWA under Bankruptcy Rule 2004

because it intends to "treat all documents produced by CWA to the [Debtor] as though produced

---

[12] A true and correct copy of the 1/31/26 Letter is attached hereto as **Exhibit B**.

[13] The 1/31/26 Letter did not seek relief relating to the Sanctions Orders because the TC Sanctions Orders Appeal was still pending at that time.

[14] A true and correct copy of the 2/10/26 Letter is attached hereto as **Exhibit C**.

26

in the context of mediation"; and (d) would not identify any third parties who had received access to the CWA's documents and information through the Debtor's electronic data room.  2/10/26 Letter at 1–3.  Counsel did not respond to the CWA's request to obtain certifications from such parties confirming the return or destruction of any documents or information they accessed.  *See id.* at 2.

87.     The Debtor's counsel partially complied with two requests, advising that (a) although the Debtor would not seek to vacate the Access Order, "it will not be seeking any access to CWA's premises for a qualified third-party engineer" thereunder and would seek any future access "by a new motion and order"; and (b) confirming "that access to the electronic data rooms established in connection with the RFP Process was terminated as of January 23, 2026, for all parties other than the [Debtor's] and Retirees' professionals," ignoring that the CWA requested termination of the data room itself.  *Id.*  The Debtor provided no explanation for the Retiree Committee's original or continued access to such data room.

88.     Counsel also represented that the Debtor had "suspended"—but not terminated— the RFP Process as of January 23, 2026.  *Id.*

### III.     ARGUMENT

89.     The disposition of the State Court Appeal confirms that the Debtor has no property interest in the CWA or its assets and no unilateral right to seize and sell them under the MAA. The CWA has not filed a proof of claim against the Debtor or voluntarily submitted to this Court's jurisdiction.  There is accordingly no legal basis to compel the CWA's participation in mediation, require the CWA to suffer the financial and operational consequences of its proposed treatment under the Plan, allow the Debtor to retain the CWA's confidential and proprietary documents and information produced under Bankruptcy Rule 2004 and/or in mediation, allow the Debtor to share

ClarkHill\L5215\455064\286520095.v4-3/2/26

such documents and information with anonymous third parties contrary to Pennsylvania statute, subject the CWA to a physical inspection of its premises by the Debtor's engineer, or enjoin the CWA under section 362(a)(3) of the Bankruptcy Code to protect a property interest of the Debtor that does not exist.  This Court has repeatedly stated that it will honor the Pennsylvania Supreme Court's decision.  *See, e.g.*, Dkt. No. 719 at 6 ll. 3–9; Dkt. No. 779 at 10 ll. 12–22.  The relief requested in this Motion seeks no more than that.

### A.     The Court Should Strike the Plan's Proposed Treatment of the CWA

90.     The Plan provides that the Debtor will unilaterally terminate the CWA's existence and seize and sell its assets through an RFP Process pursuant to the MAA and the Commonwealth Court's decision.  Plan Art.IV.D.1.  The Debtor later admitted that neither could occur until its "ability to exercise the same rights as every other Pennsylvania municipality which incorporates an authority can be confirmed once and for all" in the State Court Appeal.  Dkt. No. 609 ¶ 3.  The Pennsylvania Supreme Court instead held that the Debtor holds no such rights under the MAA. The proposed treatment of the CWA and its assets cannot occur as a matter of law, and the Plan is patently unconfirmable as a result.

91.     The Debtor asserts that withdrawing or amending the Plan to remove these provisions would be "unnecessary and premature" because it "never filed an accompanying disclosure statement related to the Plan or a motion to seek approval of the Plan."  2/6/26 Letter at 2.  This position ignores the financial and reputational harm suffered by the CWA and its ratepayers by virtue of the Plan's existence on the docket.  That harm is now materially impacting its ratepayers, who must pay higher rates to cover the cost of credit following the downgrade of the CWA's bond rating by Moody's.  Such negative impact will continue unless this Court acts to mitigate the harm.  The Court recognized that the Moody's Report "very specifically cit[es] the

ClarkHill\L5215\455064\286520095.v4-3/2/26

ongoing uncertainty surrounding the bankrupt [Debtor's] attempt to seize and monetize the [CWA's] assets *as referenced in the [Debtor's] filed plan of adjustment*" and found that such uncertainty "caused the downgrade." Dkt. No. 914 at 25 ll. 4–14 (emphasis added). The Debtor's glib assurance that it has not sought to confirm its unconfirmable Plan affords the CWA no comfort or relief.

92. Although Civil Rule 12(f) does not apply in contested matters, the Court has equitable authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). "Section 105 specifically codifies what are traditionally called 'inherent powers' to give the bankruptcy courts the necessary ability to manage the cases on their docket." *In re Peregrine Systems, Inc.*, 311 B.R. 679, 690 (D. Del. 2004) (internal footnote omitted); *In re Stone*, 986 F.2d 898, 901–903 (5th Cir. 1993) ("Where it appears that a court cannot adequately and efficiently carry out its duties without employing some special device, the court has the inherent power to do so.").

93. "Inherent powers take into account the fact that legislatures cannot foresee the infinite circumstances of life and all the necessary orders that courts may have to issue to do justice." *In re Johnson*, 236 B.R. 510, 521 (D.D.C. 1999). Accordingly, "the Bankruptcy Court has the power to strike irrelevant and impertinent arguments" from filings on its docket. *Id.* at 523. It is particularly appropriate to do so where such relief will cause no detriment to the nonmoving party. *See id.*

94. The Plan's proposed treatment of the CWA signals legal uncertainty that has materially harmed both the CWA and its ratepayers. That uncertainty no longer exists, and the Pennsylvania Supreme Court has conclusively established that such treatment is unavailable under Pennsylvania law. The Court should accordingly exercise its inherent power to strike from the

ClarkHill\L5215\455064\286520095.v4-3/2/26

Plan all references to the CWA or its assets, including (i) Art. I.A.35 (defining "CWA"); (ii) Art.

I.A.132 (defining "Water Assets"); (iii) Art. IV.A (to the extent it references the CWA's assets,

calls for a request for proposals process regarding the CWA's assets, or includes the CWA's assets

in the definition of "RFP Assets"); (iv) Art. IV.D.1 (providing for the unilateral dissolution of the

CWA and seizure of its assets); (v) Art. IV.D.2 (providing for the disposition of the CWA's funded

debt); and (vi) Art. IV.D.3 (providing for third-party operation of the CWA's assets following the

RFP Process).  Such relief would not prejudice the Debtor because the subject provisions cannot

be effected and instead render the Plan unconfirmable.

**B.** **The Court Should Vacate the Production Order, Usage Order, Access Order, and Sanctions Orders.**

95.     The Court premised its orders granting relief under Bankruptcy Rule 2004 and

enforcing the automatic stay under section 362(a)(3) of the Bankruptcy Code on its interpretation

of legal authority that is now reversed, in support of an RFP Process that is now suspended, and in

furtherance of a Plan that cannot be confirmed.  However, it has stated that "***should the PA***

***Supreme Court reverse the Commonwealth Court, this Court will honor that decision.***"  Dkt.

No. 779 at 17 ll. 15–22 (emphasis added).

96.     First, the Court found good cause to grant the Production Order because "[t]he

[Debtor]'s document requests . . . [were] aimed at obtaining information regarding the [Debtor's]

***contingent property interest in the CWA and its assets.***"  Production Order ¶ 26 (emphasis added).

The Pennsylvania Supreme Court has made clear that no such interest exists.

97.     The Court further found that "***[a] robust RFP process for monetizing the Water***

***Assets is critical to the success of the [Debtor's] proposed Plan***, and that process cannot happen

without production of the requested documents ***to inform the [Debtor] about the scope, condition,***

***and value of the Water Assets.***"  *Id.* (emphasis added).  The Plan cannot succeed because the

30

Debtor has no right to seize and sell the CWA's assets, which belong to the CWA alone, and the RFP Process is suspended.  Accordingly, no basis for the relief granted in the Production Order survived the disposition of the State Court Appeal.

98.     Second, the Usage Order only authorizes the Debtor "to utilize the produced documents *in connection with the RFP Process described in the Plan*."  Usage Order ¶ 13 (emphasis added).  Because the RFP Process is suspended and cannot result in a forced sale, the Debtor retains no permitted utilization under the Usage Order.  Further, the Court determined that the Debtor's "overriding interest in . . . a robust RFP Process . . . outweighs the risk to CWA" outlined in the CWA's pleadings and found "good cause to share the documents with potential third-party bidders" on this basis.  *Id.* ¶ 12.  The Debtor retains no interest in a robust RFP Process, and potential third-party bidders no longer exist given that such process is suspended, so the only surviving interest is "the risk to the CWA."  *See id.*

99.     Third, the Access Order granted the Debtor "access to CWA's premises as reasonably necessary for a qualified third-party engineer to inspect the Water Assets . . . for the purpose of producing an inventory and condition report of the Water Assets," Access Order ¶ 4, which the Debtor asserted was "necessary" because "the potential bidders are asking for this information," Dkt. No. 857 at 33 ll. 7–13.  Not only is there no surviving basis for this relief, the Debtor has since confirmed that it will not seek access under the order.  2/6/26 Letter at 2.

100.    Fourth, the Sanctions Orders enjoined the CWA "from issuing any RTKL request to any entity that in any way refers to, or relates to, or touches upon the RFP Process," Am. Sanctions Order ¶ 4, on the basis that such requests would "chill the bidding" in the RFP Process and thus impact the Debtor's "property interest" under the MAA, Dkt. No. 707 at 10 l. 22–11 l. 1. The Court enforced such injunction under section 362(a)(3) of the Bankruptcy Code, which

31

provides: "a [bankruptcy] petition . . . operates as a stay, applicable to all entities, of— . . . any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."   11 U.S.C. § 362(a)(3); § 902(1) (directing Bankruptcy Code references to "property of the estate" to be read as "property of the debtor" in chapter 9 cases); *see also, e.g.*, Dkt. No. 779 at 28 ll. 5–7 (explaining that the Sanctions Orders "simply prescribed conduct appearing to violate 362(a)(3)").

101.    Indeed, the Court explicitly stated:

> "***So if you guys win on the Supreme Court, then they may not have a contingent right, and that may not be property of the estate.*** But as it stands now, prior to resolution by the Pennsylvania Supreme Court, it seems pretty clear to me that this is an asset of the bankruptcy estate, right?

Dkt. No. 707 at 6 ll. 7–15 (emphasis added); *see also, e.g.*, Dkt. No. 779 at 21 ll. 18–25 (stating that "the [Debtor's] statutory right under the MAA to reclaim the water assets constitutes a contingent . . . property interest for purposes of this bankruptcy proceeding"); Dkt. No. 719 at 6 ll. 3–9 ("[U]ntil the appeal at the Supreme Court is resolved, I have to observe the ruling made by the Commonwealth Court here, which is that the [Debtor] does seem to have this contingent interest."); Dkt. No. 707 at 11 l. 1 ("That's a property interest.").   The Court further stated that "***[a]t this point***, the Court disagrees that CWA's competing legal interests outweigh the potential harm to the value of the [Debtor's] interests in the water assets, ***as the [Debtor] is relying on their monetization to support its plan of reorganization***." Dkt. No. 779 at 25 ll. 2–6 (emphasis added).

102.    As the Pennsylvania Supreme Court made clear, the Debtor has no such property interest for the automatic stay to protect.  Moreover, the RFP Process has been suspended.  No basis for the relief granted in the Sanctions Orders survived the disposition of the State Court Appeal, leaving only the "CWA's competing legal interests." *See* Dkt. No. 779 at 25 l. 3.  Further,

32

at a status conference on February 11, 2026, the Court stated, "I think we all agree that [the Sanctions Orders] should be vacated in light of the Supreme Court ruling." ECF 1009 at 6 ll. 22–23.

103.   Even if these orders are interlocutory[15] and thus outside the scope of Civil Rule 60(b), applied in contested matters by Bankruptcy Rule 9024, "[b]ankruptcy courts. . . possess sufficient authority, pursuant to their equitable powers under § 105 of the Bankruptcy Code, to modify or vacate their own interlocutory orders." *In re Arms*, 238 B.R. 259, 261 (Bankr. D. Vt. 1999). "It is well settled that a bankruptcy court has the power to vacate or modify its orders, as long as it is equitable to do so." *In re Marcus Hook Dev. Park, Inc.,* 943 F.2d 261, 265 n.5 (3d Cir. 1991) (citation omitted); *In re Radco Merchandising Servs., Inc.*, 111 B.R. 684, 689 (N.D. Ill. 1990) ("Like a court of equity, the bankruptcy court has the power to amend, modify, or vacate its earlier orders."). Indeed, "interlocutory judgments are not brought within the restrictions of [Civil Rule 60(b)], but rather they are left subject to the complete power of the court rendering them to afford such relief from them as justice requires." *Scott v. Chipotle Mexican Grill, Inc.*, 103 F. Supp. 3d 542, 547 (S.D.N.Y. 2015) (quoting FED. R. CIV. P. 60, advisory committee's note to 1946 amendment)).

104.   Additionally, Civil Rule 54(b)(1), applied in adversary proceedings by Bankruptcy Rule 7054 and in contested matters by Bankruptcy Rule 9014(c)(1), provides that "any order or other decision that . . . does not end the action as to any of the claims or parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." FED. R. CIV. P. 54(b)(1). "Motions to reconsider interlocutory orders are properly

---

[15] The CWA reserves and preserves all rights all rights, claims, interests, defenses, and arguments as to whether the Sanctions Orders were interlocutory given that the Third Circuit never ruled on this issue on the merits.

considered under Bankruptcy Rule 7054 and [Civil] Rule 54(b)(1)." *In re Byrnes*, No. 20-1070, 2021 WL 3232565, at *2 (Bankr. D.N.M. July 29, 2021). Courts assess motions to reconsider under the standards provided in Civil Rule 59(e), which provides that reconsideration is appropriate in the event of "(1) an intervening change in controlling law; (2) new evidence previously unavailable; or (3) the need to correct clear error or prevent manifest injustice." FED. R. CIV. P. 59(e); *Byrnes*, 2021 WL 3232565, at *2; *see also In re Energy Future Holding. Corp.*, 904 F.3d 298, 311 (3d Cir. 2018); *In re Conex Holdings II, LLC*, 524 B.R. 55, 58 (Bankr. D. Del. 2015). An "intervening change" means a change that occurred after the challenged order was issued. *Marshack v. Comm'r of Social Sec.*, No. 19-12840, 2021 WL 5923264, at *2 (D.N.J. Dec. 15, 2021). "Controlling law" means that the change is binding precedent on the court that issued the order. *Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, No. 15-800, 2017 WL 3706495, at *5 (D. Del. Aug. 23, 2017).

105.    Here, the Pennsylvania Supreme Court's decision makes clear that there is no basis for the CWA to have been embroiled in this Chapter 9 Case—much less been made the focus of it—or for the Court's orders issued against the CWA. "When interpreting state law, [a federal court must] follow a state's highest court . . . ." *Ill. Nat'l Ins. Co. v. Wyndham Worldwide Operations, Inc.*, 653 F.3d 225, 231 (3d Cir. 2011); *In re Bashara*, 293 B.R. 216, 219 (Bankr. D. Neb. 2003) ("The interpretation of state law, whether in a civil or criminal case, by a state's highest court binds federal courts, including the bankruptcy court."). This Court has explicitly recognized this principle and stated that it will honor the outcome of the State Court Appeal. *See, e.g.*, Dkt. No. 719 at 6 ll. 3–9; Dkt. No. 779 at 10 ll. 12–22. That decision is intervening because it was issued after the subject orders were issued, and it is controlling as an interpretation of Pennsylvania law by the Commonwealth's highest court, which unequivocally establishes that the legal premises

34

of such orders are false.  It is now incumbent on this Court to vacate each order entered on those premises.

106.   Equity here also strongly favors the CWA.  Through the mediation process, the CWA produced confidential documents and information in reliance on the NDA.  When the CWA exercised its right to terminate that agreement, triggering the Debtor's obligation to return such productions, the Debtor instead wielded Bankruptcy Rule 2004 first as a shield to avoid the consequence of its breach and then as a cudgel to obtain further troves of highly sensitive information with public security, legal, and related implications.  It then shared this information with undisclosed third parties to inform their bids on the CWA's assets, which the Debtor intended to seize and sell unilaterally to pay down its unrelated debts.  The Debtor also obtained injunctive relief prohibiting the CWA from discovering information about the RFP Process, which was premised on the seizure and sale of its own assets.  The Pennsylvania Supreme Court has now conclusively confirmed that these outcomes are entirely unavailable, but the Debtor has returned nothing, and the CWA remains subject to the injunction.  Vacating the orders would help remediate these injustices while imposing no hardship on the Debtor, whose prior-asserted interests are invalid and therefore legally foreclosed.[16]

## C.      The Court Should Modify the Mediation Order to Release the CWA

107.   The CWA has been forced to defend rights and interests in the Chapter 9 Case but has submitted no claim against the Debtor to this Court's jurisdiction.  As the Pennsylvania

---

[16] Although the CWA sought leave to appeal the Production Order and the Usage Order, those motions remain pending in the District Court.  "[U]nder § 158(a)(3), there is no shift in jurisdiction unless and until the district court grants the motion for leave to appeal. . . . . Unless and until the district court grants the motion, the [bankruptcy] Court retains jurisdiction over the proceeding." *HRV Santa Fe, LLC v. Wolf*, No. 24-01002, 2024 WL 3770195, at *6–7 (Bankr. D.N.M. Aug. 12, 2024).

ClarkHill\L5215\455064\286520095.v4-3/2/26

Supreme Court has made clear, the Debtor holds no property interest in the CWA or its assets under the MAA.

108.    Although the Pennsylvania Supreme Court remanded the trust action for further proceedings, the remaining issues do not implicate property of the Debtor.  The Debtor asserts that the court's decision "leaves open many disputed matters and issues between the [Debtor], CWA, and certain third parties that are an appropriate subject of mediation pursuant to the Mediation Order" but identifies none.   2/6/26 Letter at 2.   Moreover, the Debtor's assessment of appropriateness does not establish the Court's jurisdiction to *compel* the CWA's participation.

109.    The 2/6/26 Letter instead reveals that the Debtor intends to weaponize mediation to entangle the CWA in its Chapter 9 Case indefinitely.  Rather than returning the CWA's documents and information produced under Bankruptcy Rule 2004, the Debtor now asserts that it "will treat all documents produced by CWA to the [Debtor] *as though produced in the context of mediation*" because "[m]any of the documents produced following entry of the [Production] Order were originally requested by the [Debtor] in the context of and pursuant to the Mediation Order." 2/6/26 Letter at 2 (emphasis added).  Even if the Court vacates the Bankruptcy Rule 2004 orders, the Debtor intends to return nothing in reliance on the Mediation Order.  Accordingly, the Court should modify the Mediation Order to make clear the CWA has no obligation to participate in any further mediation nor is there jurisdiction for this Court to force it to do so.

**D.    The Court Should Require the Debtor to Return the CWA's Documents**

110.    To the extent the Debtor asserts that all documents and information produced by the CWA are now deemed to have been produced in mediation, the Debtor must return all of it under the NDA.  When the CWA triggered the Debtor's obligation to do so, the Debtor used Bankruptcy Rule 2004 as a shield.  Now that the Pennsylvania Supreme Court has confirmed that

36

ClarkHill\L5215\455064\286520095.v4-3/2/26

Debtor has no claim or asset to examine under the rule, the Debtor seeks to use the Mediation Order as a shield instead.

111.    The Court should not countenance the Debtor's gamesmanship; this charade must come to an end.  If all documents and information produced by the CWA are unilaterally deemed subject to mediation rather than Bankruptcy Rule 2004, then the Debtor is contractually bound to return them.  If they are instead deemed subject to Bankruptcy Rule 2004 to avoid that obligation, then the Debtor must return them because no basis for an examination exists.

112.    Finally, the Court should require the Debtor to disclose all third parties that received access to the CWA's documents and information and obtain certifications that they have returned or destroyed it to protect the CWA's operational security interests and legal exposure.

## IV.    CONCLUSION

WHEREFORE, the CWA respectfully asks the Court to enter the Proposed Order (a) striking the proposed treatment of the CWA and its assets from the Plan; (b) vacating (1) the Production Order, (2) the Usage Order, (3) the Access Order, and (4) the Sanctions Orders; (c) modifying the Mediation Order to release the CWA from mandatory mediation; and (d) compelling the Debtor to (1) return all documents and information produced by the CWA pursuant to Bankruptcy Rule 2004 or in connection with mediation and (2) obtain and provide certifications of the return or destruction of any such documents or information from any third party given access to the same by the Debtor.

*[Rest of page intentionally blank; signatures follow]*

37

ClarkHill\L5215\455064\286520095.v4-3/2/26

Dated: March 2, 2026

**CLARK HILL PLC**

*/s/ Jennifer K. Green*
Jennifer K. Green (MI Bar No. P69019)
220 Park St., Ste. 200
Birmingham, MI 48009
Telephone: (248) 988-2315
Facsimile: (248) 642-2174
jgreen@clarkhill.com
(*Pro Hac Vice*)

Kevin Dooley Kent (Pa. I.D. No. 85962)
2001 Market St., Ste. 2620
Philadelphia, PA 19103
Telephone: (215) 640-8531
Facsimile: (215) 640-8501
kkent@clarkhill.com

William C. Price (Pa. I.D. No. 90871)
301 Grant St., Fl. 14
Pittsburgh, PA 15219
Telephone: (412) 394-7776
Facsimile:  (412) 394-2555
wprice@clarkhill.com

Megan A. Guernsey (Pa. I.D. No. 202065)
2001 Market St., Ste. 2620
Philadelphia, PA 19103
Telephone: (215) 640-8522
Facsimile: (215) 640-8501
mguernsey@clarkhill.com

Ronald A. King (MI Bar No. P45088)
215 South Washington Sq., Ste. 200
Lansing, MI 48933
Telephone: (517) 318-3015
Facsimile: (517) 318-3099
rking@clarkhill.com
(*Pro Hac Vice*)

*Counsel for Chester Water Authority*

ClarkHill\L5215\455064\286520095.v4-3/2/26